UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
JASON FREY, BRIANNA FREY,                          :
JACK CHENG, and WILLIAM SAPPE,
                                                   :
            Plaintiffs,
                                                   :
      -against-
                                                   :        Case No. 21 Civ. 5334 (NSR)
KEVIN P. BRUEN, Acting Superintendent
of the New York State Police, in his              :
official capacity, NEW YORK CITY,
New York, and DERMOT SHEA, in his                 :
official capacity as NYPD Commissioner,
                                                   :
            Defendants.
-----------------------------------------------------X


### STATE DEFENDANT SUPERINTENDENT KEVIN P. BRUEN'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION


                                        LETITIA A. JAMES
                                        Attorney General
                                        State of New York
                                        *Attorney for Superintendent Bruen*
                                        28 Liberty Street
                                        New York, New York 10005
                                        (212) 416-8659


IAN RAMAGE
NEIL SHEVLIN
Assistant Attorneys General
      *Of Counsel*

# TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND ............................................................................................ 3

    A.  The Longstanding History and Tradition of Regulating Firearm Carrying in Public ......... 3

    B.  New York's Longstanding History of Firearms Licensing and Registration .................... 4

    C.  New York Has a Long-Established Law Opting for the Licensed Concealed, Rather than Open Carry of Handguns ............................................................................. 6

    D.  Facts Concerning the Plaintiffs ....................................................................................... 9

        1.  Jason and Brianna Frey ............................................................................................ 9

        2.  Jack Cheng ............................................................................................................. 11

        3.  William Sappe ........................................................................................................ 12

STANDARD OF REVIEW ............................................................................................. 14

ARGUMENT .................................................................................................................... 15

POINT I        PLAINTIFFS DO NOT HAVE STANDING TO ASSERT THEIR CLAIMS AGAINST SUPERINTENDENT BRUEN ......................................................... 15

    A.  Plaintiffs Have Not Suffered An Injury In Fact ............................................................ 15

    B.  Plaintiffs Have Not Established That Superintendent Bruen Caused Their Alleged Injuries .......................................................................................................................... 18

    C.  Superintendent Bruen Could Not Provide the Requested Relief .................................... 19

    D.  Superintendent Bruen is Not a Proper Party To This Case ............................................ 20

POINT II      PLAINTIFFS HAVE NOT ESTABLISHED AN ENTITLEMENT TO THE EXTREME PRELIMINARY INJUNCTION THEY SEEK ............................... 21

    A.  *Heller* and *McDonald* ................................................................................................. 22

i

B. The Post-*Heller* Framework for Assessing Second Amendment Claims............................23

C. Regulations, Even Prohibition, of the Open Carry of Firearms in Public Are
Outside the Scope of the Second Amendment ................................................................24

    1. New York's Restrictions on the Open Carrying of Firearms in Public Does Not
Implicate the Second Amendment ............................................................24

    2. New York's License Restrictions on Open Carry Does Not "Substantially Burden"
a Second Amendment Right ....................................................................28

    3. Even if Heightened Scrutiny Applied, New York's Licensing Law Passes
Constitutional Muster ............................................................................29

        a. At Most, Intermediate Scrutiny Applies ............................................29

        b. Public Safety is a Compelling State Interest ......................................31

        c. The Laws at Issue Are Substantially Related to Important
Government Interests ............................................................................31

POINT III      PLAINTIFFS FAIL TO MAKE A SHOWING OF IRREPARABLE HARM.....34

POINT IV      THE BALANCE OF THE EQUITIES STONGLY FAVORS THE STATUS
QUO....................................................................................................36

CONCLUSION ..................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                        **Page(s)**

*Adam v. Barr*,
   792 Fed.Appx (2019) ............................................................17

*Anderson v. Mulroy*,
   186 A.D.2d 1045 (4th Dep't 1992) ...........................................10

*Aron v. Becker*,
   48 F. Supp. 3d 347 (N.D.N.Y. 2014) ...............................19, 30-31

*Babbitt v. United Farm Workers Nat'l Union*,
   442 U.S. 289 (1979)...............................................15, 17-18

*Bando v. Sullivan*,
   290 A.D.2d 691 (3rd Dep't 2002) ..............................................9

*Beal v. Stern*,
   184 F.3d 117 (2d Cir. 1999) ...................................................15

*Bobrick v. Leggett*,
   71 A.D.2d 869 (2nd Dep't 1979) ..............................................10

*Cave v. East Meadow Union Free Sch. Dist.*,
   480 F. Supp. 2d 610 (E.D.N.Y. 2007) .......................................39

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983)..........................................................15, 17

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)............................................................7

*Corbett v. City of New York*,
   160 A.D.3d 415 (2018) .........................................................31

*District of Columbia v. Heller*,
   554 U.S. 570 (2008).....................................................passim

*Doe v. N.Y.U.*,
   666 F.2d 761 (2d Cir. 1981) ...................................................15

*Ex parte Young*,
   209 U.S. 123 (1908)...........................................................20

*Gould v. Morgan*,
   907 F.3d 659 (1st Cir. 2018)..................................................27

*Gras v. Stevens*,
    415 F. Supp. 1148 (S.D.N.Y. 1976) (Friendly, J.)..............................................21

*Johnson v. N.Y. State Dep't of Corr. Servs.*,
    709 F. Supp. 2d 178 (N.D.N.Y. 2010) ..............................................................21

*Jones v. Becerra*,
    498 F. Supp. 3d 1317 (S.D. Cal. 2020) .............................................................35

*Kachalsky v. County of Westchester*,
    701 F.3d 81 (2d Cir. 2012) ..................................................................... passim

*Klenosky v. New York City Police Dep't*,
    75 A.D.2d 793 (1st Dep't 1980), aff'd, 53 N.Y.2d 685 (1981) .............................7

*Kwong v. Bloomberg*,
    876 F. Supp. 2d 246 (S.D.N.Y. 2012), aff'd, 723 F.3d 160 (2d Cir. 2013) ............... 19, 30-31

*Libertarian Party of Erie County v. Cuomo*,
    970 F.3d 106 (2d Cir. 2020) ...........................................................15, 19, 21

*Lore v. City of Syracuse*,
    No. 00 Civ. 1833, 2001 WL 263051 (N.D.N.Y. March 9, 2001) ........................35

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................................................ passim

*Matter of Delgado v. Kelly*,
    127 A.D.3d 644 (2015) ..................................................................................31

*McCluskey v. Comm'r of Nassau Cnty. Dep't of Soc. Servs.*,
    2013 U.S. Dist. LEXIS 127614 (E.D.N.Y. July 23, 2013).................................20

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010).............................................................22-23, 26-27

*Million Youth March, Inc. v. Safir*,
    155 F.3d 124 (2d Cir. 1998) ...........................................................................37

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    700 F.3d 185 (5th Cir. 2012) ..........................................................................23

*National Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012).......................................................................................30

*New Jersey v. New York*,
    872 F. Supp. 2d 204 (E.D.N.Y. 2011) .............................................................39

*Nunn v. State*,
   1 Ga. 243 (1846) .............................................................................26

*O'Connor v. Scarpino*,
   83 N.Y.2d 919 (1994) .......................................................................8

*Osterweil v. Bartlett*,
   819 F. Supp. 2d 72 (N.D.N.Y. 2011), vacated on other grounds by 738 F.3d
   520 (2d Cir. 2013) ...........................................................................19

*People ex rel. Darling v. Warden of City Prison*,
   154 A.D. 413 (1st Dep't 1913) ...........................................................5

*People ex. rel. Schneiderman v. Actavis PLLC*,
   787 F.3d 638 (2d Cir. 2015) ...........................................................14-15

*People v. Thompson*,
   92 N.Y.2d 957 (1998) ......................................................................16

*Peruta v. Cty. of San Diego*,
   824 F.3d 919 (9th Cir. 2016) (en banc) ..............................................4

*Sabin v. Nelson*,
   No. 12 Civ. 1373, 2014 WL 2945770 (N.D.N.Y. June 30, 2014) .......................21

*Savitch v. Lange*,
   114 A.D.2d 372 (2nd Dep't 1985) ......................................................10

*Seifullah v. City of N.Y.*,
   2017 WL 4339478 (E.D.N.Y. Sept. 27, 2017) ......................................34

*Sibley v. Watches*,
   194 A.D.3d 1385 (4th Dep't 2020) ....................................................8-9

*Sibley v. Watches*,
   501 F.Supp. 3d 210 (W.D.N.Y. 2020) ................................................17

*Silvester v. Harris*,
   843 F.3d 816 (9th Cir. 2016) ...........................................................25

*Singas Famous Pizza Brands Corp. v. New York Advert. LLC*,
   468 F. App'x 43 (2d Cir. 2012) .........................................................34

*Snell v. Suffolk Cnty.*,
   782 F.2d 1094 (2d Cir. 1986) ...........................................................32

*Standard & Poor's Corp. v. Commodity Exchange, Inc.*,
   683 F.2d 704 (2d Cir. 1982) ...........................................................37

*State v. Reid*,
  1 Ala. 612 (1840) ............................................................................................26

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ................................................................................ 15, 17

*Time Warner Cable of New York City v. Bloomberg L.P.*,
  118 F.3d 917 (2d Cir. 1997) ...........................................................................35

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
  60 F.3d 27 (2d Cir. 1995) ...............................................................................39

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) ........................................................................................30

*United States v. Decastro*,
  682 F.3d 160 (2d Cir. 2012) ...........................................................23, 28, 31

*Va. Office for Prot. & Advocacy v. Stewart*,
  131 S. Ct. 1632 (2011) ....................................................................................20

*Valenzuela Arias v. Decker*,
  No. 20 Civ. 2802, 2020 WL 1847986 (S.D.N.Y. Apr. 10, 2020) ........................35

*Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*,
  535 U.S. 635 (2002) ........................................................................................20

*Vringo, Inc. v. ZTE Corp.*,
  14-cv-4988, 2015 WL 3498634 (S.D.N.Y. June 3, 2015) ...............................39

*W.R. Huff Asset Management Co. v. Deloitte & Touche LLP*,
  549 F.3d 100 (2d Cir. 2008) ...........................................................................15

*Walters v. Kemp*,
  No. 20 Civ. 1624, 2020 WL 9073550 (N.D. Ga. May 5, 2020) .........................35

*Warden v. Pataki*,
  35 F. Supp. 2d 354 (S.D.N.Y. 1999), aff'd sub nom. *Chan v. Pataki*, 201 F.3d
  430 (2d Cir. 1999) ...........................................................................................21

*Warth v. Seldin*,
  422 U.S. 490 (1975) ........................................................................................15

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ........................................................................................31

*Weinberger v. Romero–Barcelo*,
  456 U.S. 305 (1982) ........................................................................................37

*Winter v. Natural Res. Defense Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................14, 34, 37, 39

*Wrenn v. D.C.*,
    864 F.3d 650 (D.C. Cir. 2017) ..........................................................27

*Yakus v. U.S.*,
    321 U.S. 414 (1944) ..........................................................................37

*Young v. Hawaii*,
    992 F.3d 765 (9th Cir. 2021) (en banc) ........................................ passim

*Young v. Hawaii*,
    No. 12-17808, slip op. (9th Cir. 2021) .............................................38

*Younger v. Harris*,
    401 U.S. 37 (1971).............................................................................15

## CONSTITUTIONS

First Amendment ....................................................................................35, 37

Second Amendment............................................................................... passim

Eleventh Amendment .............................................................................20-21

Fourteenth Amendment ..............................................................................22

## FEDERAL STATUTES

Act of Apr. 12, 1871, ch. 34
    § 1, 1871 ...........................................................................................26

Act of Apr. 13, 1784, ch. 28, 1784 .............................................................5

Act of Apr. 22, 1785, ch. 81, 1785 .............................................................5

*Association Between Connecticut's Permit-to-Purchase Handgun Law* ....................................32

*Changes in Permit-to-Purchase Handgun Laws*...................................................33

*Guns to Criminals through Effective Firearm Sales Laws* ......................................33

Heightened Scrutiny Applied, New York's Licensing Law..............................29

*Missouri's Handgun Purchaser Licensing Law*...................................................32

*New Pistol Law* ..............................................................................................5

New York's Civil Practice Law
    Article 78 ................................................................................9-10, 13

*Placing S. Antebellum Case Law*.......................................... 4, 27, 38

*Relationship Between Licensing, Registration, and Other Gun Sales Laws* ..............................33

*Right-to-Carry Laws*..........................................................38

Sullivan Law ..................................................................5-6

## STATE STATUTES

Act of Dec. 2, 1875, ch. 52
    § 1, 1876 ..............................................................26

1881 Ark. Acts Ch. 96
    §§ 1–2.................................................................26

1925 Mich. Pub. Acts 473, 474 No. 313
    § 6.....................................................................6

1925 N.J. Laws 185, 186 Ch. 64
    § 2.....................................................................6

New York Penal Law
    §§ 265.01(1), 265.01-b, 265.03(3), and 400.00(15) .............................1

1925 Or. Laws 468, 471 Ch. 260
    § 8.....................................................................6

1931 Pa. Laws 497, 498-99
    § 7.....................................................................6

Penal Law
  art. 265.......................................................................................................16-17, 36, 38
  § 265.................................................................................................................1, 16
  § 265.00(3).............................................................................................................7
  §§ 265.00(10), 400.00 (3)..................................................................................8, 10
  §§ 265.01-265.04, 265.20(a)(3).............................................................................6
  §§ 265.01(1), 265.01-b, 265.03(3) and §§ 400.00(6) and (15)...........................34
  § 265.20(3)...................................................................................................16, 36
  § 400.....................................................................................................................18
  § 400 a..................................................................................................................17
  § 400.00........................................................................................................passim
  § 400.00(1)(a)-(n)...................................................................................................7
  § 400.00(2)............................................................................................................19
  § 400.00(2)(a)–(b), (c)–(f)......................................................................................7
  § 400.00(2)(f).........................................................................................................7
  § 400.00(3)............................................................................................................18
  § 400.00(3)(a) and (7)............................................................................................9
  § 400.00(6).............................................................................................8, 12, 14, 18, 20
  § 400.00(15), Penal Law §§ 265.01(1) and 265.01-B.........................................17
  §§ 400.00(15) and (17)....................................................................................16, 17
  § 400.00(17)..........................................................................................................16
  § 400.00, *et seq*...................................................................................................18

1935 Wash. Sess. Laws 599, 600-01 Ch. 172
  § 1..........................................................................................................................6

Wyo. Terr. Comp. Laws ............................................................................................26

**FEDERAL REGULATIONS**

265.01-B, 265.03(2), and 265.03(3) ..................................................................16, 21

**MISCELLANEOUS AUTHORITIES**

38 RCNY § 5-10(n) ....................................................................................................14

1935 S.D. Sess. ..............................................................................................................6

Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 165
  (2011) ........................................................................................................................4

*Armed Assembly: Guns, Demonstrations, and Political Violence in America*,
  https://acleddata.com/2021/08/23/armed-assembly-guns-demonstrations-and-
  political-violence-in-america/;  https://www.courier-
  journal.com/story/news/politics/2020/05/24/second-amendment-supporters-
  protest-covid-19-restrictions-capitol/5250571002/ ...............................................34

*Calls Bill Livesaver*, N.Y. Tribune, Mar. 10, 1911 .....................................................5

*Context*, 125 YALE L.J. ................................................................................ 4, 27, 38

Daniel W. Webster & Garen J. Wintemute, *Effects of Policies Designed to Keep Firearms from High-Risk Individuals* ...........................................................32

Dodge City, Kansas and Tombstone, Arizona. Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82, 117 (2013)....................................................................4

Eric H. Monkkonen, *Murder in New York City* 21 (2001) ..........................................5

https://rulesofnyc.readthedocs.io/en/latest/c20/#chapter-5-handgun-licenses ...........................9

, https://www.dallasnews.com/news/crime/2016/07/09/open-carry-creates-confusion-during-dallas-police-ambush-but-supporters-say-law-works/ .............................34

*Increase in Homicides*, N.Y. Tribune ........................................................................5

Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82, 108 (2013) .............................27

Joseph Blocher & Reva B. *Siegel, When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller* ...............................................3

Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment*, 43 S. ILL. U. L.J. 61, 67 (2018) ....................................................................................3

N.Y. Times, Sept. 1, 1911 .........................................................................................5

New York Has a Long-Established Law ......................................................................6

Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 CLEV. ST. L. REV. 1, 8 (2012) .............................................................................................................4

RCNY §§ 5-01, 5-02 Title 38 ......................................................................................8

*Revolver Killings Fast Increasing*, N.Y. Times, Jan. 30, 1911 ....................................5

Ruben & Cornell, 125 Yale L.J. ...............................................................................27

Kevin P. Bruen, sued in his official capacity as Superintendent of the New York State Police ("Superintendent Bruen" or "Defendant Bruen"), by his attorney, Letitia James, Attorney General of the State of New York, respectfully submits this memorandum of law in opposition to Plaintiffs' motion for a preliminary injunction seeking to enjoin enforcement of New York Penal Law §§ 265.01(1), 265.01-b, 265.03(3), and 400.00(15) against: (i) Plaintiffs and those similarly situated individuals who possess a valid New York State handgun license who carry a registered handgun, open and exposed on their person within the State; and (ii) Plaintiff Sappe and those similarly situated individuals who possess a valid unrestricted concealed carry handgun license (issued by a licensing officer outside of New York City) who carry a registered handgun concealed on their person within New York City.[1]

## PRELIMINARY STATEMENT

By this application, Plaintiffs seek extreme and extraordinary relief that would immediately permit any person with a handgun license in New York to openly carry a handgun anywhere in the State, including in New York City. A close reading of their arguments reveal that this is essentially a backdoor attempt to have New York's licensing scheme invalidated as unconstitutional.

Plaintiffs' motion should be denied for a host of independently sufficient reasons. First, Plaintiffs lack standing to sue Superintendent Bruen. They have not suffered an injury-in-fact – indeed, because they have licenses, they cannot be prosecuted at all under the challenged sections of Penal Law § 265 or § 400. In any event, any injury they may have suffered is not fairly traceable to Defendant Bruen and cannot be redressed by him.

---

[1] This is the latest challenge to New York State's gun laws. The Supreme Court has granted *certiorari* in the matter of *New York State Rifle & Pistol Ass'n v. Bruen and McNally,* Supreme Court No. 20-843 (Argument date: Nov. 3, 2021). The question at issue in that case is whether the Second Amendment prohibits New York from requiring residents who wish to carry a concealed firearm in public to have an actual and articulable need to do so.

Second, because Plaintiffs' claims are, in fact, completely meritless – their demand for the unrestricted ability to openly carry a handgun in public seeks to reverse over one hundred years of consistently-upheld state law and is contrary to controlling authority from the Second Circuit – they cannot demonstrate the necessary clear likelihood of success on the merits. Carrying handguns openly in public is outside the ambit of Second Amendment protection and, as Plaintiffs have adequate alternatives to the open carry of firearms, the challenged restrictions do not substantially burden their Second Amendment rights. Even were it assumed otherwise, the challenged laws are substantially related to New York's valid public safety goals, and easily withstand constitutional scrutiny.

Third, Plaintiffs fail to demonstrate that they will suffer irreparable harm in the absence of the requested injunction. Their reliance on a presumption of such harm where constitutional violations are alleged is misplaced. Such presumptions are not absolute, and have no applicability here.

Finally, the balance of equities and the public interest counsel strongly in favor of maintenance of the status quo and against granting the requested injunction. Plaintiffs essentially contend that the relief they request is in the public interest because the streets have become more dangerous. But, even accepting their personal viewpoints as fact, Plaintiffs offer no arguments or evidence to show that open carry of firearms would reduce, rather than promote, gun violence. The Court should not entertain Plaintiffs' invitation to second-guess the Legislature's choice in this regard: "In the context of firearm regulation, the Second Circuit has made clear that the legislature is 'far better equipped than the judiciary' to make sensitive policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks."[2] For all

---

[2] *Kachalsky* v. *County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012).

2

these independently sufficient reasons, Plaintiffs' motion for a preliminary injunction should be denied.

## FACTUAL BACKGROUND

**A.      The Longstanding History and Tradition Regulating Firearm Carrying in Public**

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court first recognized an individual right to possess a handgun under the Second Amendment. It established that courts should look to the "historical understanding of the scope of the right" in assessing whether a law or policy implicates the Second Amendment or burdens the right. 554 U.S. at 625; *see also* 605, 634-35 (stating that interpretations of the Second Amendment "in the century after its enactment" are "critical" to assess how the scope of the right would have been understood at the time of adoption). Since *Heller*, historians and courts have looked more closely at the history related to specific firearms laws. It has become clear that the United States has a long history of regulating the possession and carrying of guns, which regulations were derived from earlier English laws.

The public carrying of offensive weapons was limited under English law as early as the 13th century. In 1328, this preexisting law was codified in the Statute of Northampton, which provided that "no Man great nor small" could "go nor ride armed by night nor by day, in Fairs, Markets," or "elsewhere," on pain of imprisonment and forfeiture of arms. 2 Edw. III, ch. 3 (1328). "There is little serious dispute that during this time period, the Statute was understood as a complete prohibition on carrying weapons in public, at least in populated areas." *See* Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment*, 43 S. ILL. U. L.J. 61, 67 (2018); *Young v. Hawaii*, 992 F.3d 765, 794 95 (9th Cir. 2021) (*en banc*) (discussing history of regulation of public carrying), *petition for cert.* filed May 25, 2021.

This tradition was carried forward into the laws of the colonies and into American law at

or around the time of this Country's founding.[3]  *See Heller*, 554 U.S. at 592, 595, and 599 (holding that the Second Amendment "codified a *pre-existing* right" and thus incorporated the "limitations upon the individual right" that were "inherited from our English ancestors.") (citation omitted).

Beginning in 1692 and forward to the mid-1800s, many colonies and American states adopted laws replicating the Statute of Northampton or otherwise restricting and regulating the public carrying of firearms. *Young*, 992 F.3d at 794-95. Indeed, many states enacted laws that prohibited the public carrying of firearms without reasonable cause, *i.e.*, a demonstrated need for self-defense. *See* Eric M. Ruben & Saul Cornell, *Firearm Regionalism & Public Carry: Placing S. Antebellum Case Law in Context*, 125 YALE L.J. Forum 121, 132-133 (2015). Other laws restricted the public carrying of all firearms, whether "concealed or openly," particularly in towns and cities, including in famous towns of the American West such as Dodge City, Kansas and Tombstone, Arizona. Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82, 117 (2013); Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 165 (2011). *See also Heller*, 554 U.S. at 626 (the "majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues"); *Peruta v. Cty. of San Diego*, 824 F.3d 919, 933–39 (9th Cir. 2016) (*en banc*)(noting long history of limitations on public carrying). While laws were not uniform, robust regulation of

_____

[3] *See, e.g., Young*, 992 F.3d at 786–93 ("some colonies adopted the Statute of Northampton almost verbatim. The colonists shared the English concern that the mere presence of firearms in the public square presented a danger to the community"); Joseph Blocher & Reva B. *Siegel, When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 NORTHWEST. L. REV. 1, 139 (August 29, 2021) ("For centuries the Anglo-American common law has regulated weapons not only to keep members of the polity free from physical harm, but also to enable government to protect their liberties against weapons threats and to preserve public peace and order."); Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 CLEV. ST. L. REV. 1, 8 (2012) ("A textual reading of the Statute [of Northampton] supports a broad prohibition on the public carrying of arms to prevent public injury, crime, and breaches of the peace.").

public carrying was firmly established for centuries in Anglo-American law.

**B.    New York's Longstanding History of Firearms Licensing and Regulation**

New York's regulation of the "possession and use of firearms predate the Constitution," *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 84 (2d Cir. 2012), and has continued since. For example, by 1785, New York had enacted laws regulating when and where firearms could be used, as well as restricting the storage of gun powder. *Id.* (citing Act of Apr. 22, 1785, ch. 81, 1785 Laws of N.Y. 152; Act of Apr. 13, 1784, ch. 28, 1784 Laws of N.Y. 627). As early as 1881, New York prohibited the concealed carrying of "any kind of fire-arms." *Id.* (quoting 1881 Laws of N.Y., ch. 676, at 412). By 1884, New York instituted a statewide licensing requirement for minors carrying weapons in public. *Id.* (citing 1884 Laws of N.Y., ch. 46, § 8, at 47). And, in 1905, it expanded its licensing requirements. *Id.* (citing 1905 Laws of N.Y., ch. 92, § 2, at 129-30).

In 1911, due to a rise in violent crime associated with concealable weapons, New York enacted the "Sullivan Law," expanded licensing requirements for anyone wishing to carry "any pistol, revolver or other firearm of a size which may be concealed upon the person,'" and the penalties for possessing or carrying such a concealable firearm. *Kachalsky*, 701 F.3d at 84-85 (quoting 911 Laws of N.Y., ch. 195, § 1, at 443); *People ex rel. Darling v. Warden of City Prison*, 154 A.D. 413, 422-23 (1st Dep't 1913); Eric H. Monkkonen, *Murder in New York City* 21 (2001); *Revolver Killings Fast Increasing*, N.Y. Times, Jan. 30, 1911, at 4; *Calls Bill Livesaver*, N.Y. Tribune, Mar. 10, 1911, at 4; *Increase in Homicides*, N.Y. Tribune, Feb. 17, 1911, at 5; *The New Pistol Law* (Letter), N.Y. Times, Sept. 1, 1911, at 6.

In 1913, New York amended the Sullivan Law's standards for issuing licenses to possess and carry concealable firearms. *See* 1913 Laws of N.Y., ch. 608, at 1627-30. A license was to be issued by "any magistrate in this state, upon application therefor, . . . provided such magistrate is

satisfied of the good moral character of the applicant,  and provided that no other good cause exists for the denial of such application." *Id*. The statute also authorized a magistrate to issue an unrestricted license for concealed carrying in public  "upon proof . . . that proper cause exists for the issuance [of the license]." *Id*.; *see Kachalsky*, 701 F.3d at 85. Many other states enacted similar regulations.[4]

These licensing measures have regulated the possession of handguns and other firearms in New York for more than a century. *Kachalsky*, 701 F.3d at 84-86; Statutory amendments and recodifications over the years have consistently  emphasized the importance of the State's licensing regime for crime prevention and public safety,  while at the same time preserving "legitimate interests such as . . . the right of self defense." *Kachalsky*, 701 F.3d at 97 n.22 (quoting Report of the N.Y. State Joint Legislative Comm. on Firearms & Ammunition,  Doc. No. 6, at 12 (1965)).

## C.   New York Has a Long-Established Law Opting for the Licensed Concealed, Rather than Open Carry of Handguns

In *Kachalsky*, the Court recognized that "extensive state regulation of handguns has never been considered incompatible  with the Second Amendment or, for that matter, the common-law right to self-defense," including "significant  restrictions on how handguns are carried, complete prohibitions  on carrying the weapon in public,  and even, in some instances, prohibitions  on purchasing handguns." *Kachalsky*, 701 F.3d at 100.

Under New York State's laws governing handguns, an individual  does not have the ability to apply for an open carry license. New York maintains  a general prohibition  on the possession of

---

[4] *See, e.g.*, Ch. 266, § 8, 1923 N.D. Acts 379, 380-81; Ch. 260, § 8, 1925 Or. Laws 468, 471; No. 313, § 6, 1925 Mich. Pub. Acts 473, 474; Ch. 64, § 2, 1925 N.J. Laws 185, 186; Ch. 207, § 7, 1925 Ind. Laws 495, 496-97; Act 158, § 7, 1931 Pa. Laws 497, 498-99; Ch. 208, § 7, 1935 S.D. Sess. Laws 355, 356; Ch. 172, § 1, 1935 Wash. Sess. Laws 599, 600-01; Act 82, § 7, 1936 Ala. Laws 51, 52; *see* Uniform Firearms Act § 7 (1926).

firearms, as defined by statute, without a license.[5] *See* Penal Law §§ 265.01-265.04, 265.20(a)(3); *see also Kachalsky,* 701 F.3d at 85. New York State's firearm licensing law is codified in Penal Law § 400.00. Aside from licenses connected to particular employment or professions, New York has two general types of licenses: a premises license for the home or place of business and a concealed carry license. Penal Law § 400.00(2)(a)–(b), (c)–(f).

All licensees must meet general eligibility requirements, including but not limited to requirements that the licensee is over twenty-one years of age, has not been convicted of a felony or a serious offense, does not suffer from a disqualifying mental illness, and "concerning whom no good cause exists for the denial of the license." Penal Law § 400.00(1)(a)-(n).

A license to carry a concealed handgun in public "shall be issued" to qualified applicants, "without regard to employment or place of possession," if they can show "proper cause." Penal Law § 400.00(2)(f).[6] Applicants seeking a license to carry a concealed handgun in public without

---

[5] A "firearm" is defined under New York law to include pistols and revolvers; shotguns with barrels less than eighteen inches in length; rifles with barrels less than sixteen inches in length; "any weapons made from a shotgun or rifle" with an overall length of less than twenty-six inches; and assault weapons. Penal Law § 265.00(3); *see Kachalsky,* 701 F.3d at 85. Rifles and shotguns are otherwise not subject to New York State's licensing provisions. Penal Law § 265.00(3); *see Kachalsky,* 701 F.3d at 85.

[6] The "proper cause" requirement serves to screen for individuals who demonstrate a threat and a need to carry a firearm for self-defense —while sifting out those persons who simply wish "to carry arms for *any sort* of confrontation," *Heller,* 554 U.S. at 595. When arguing that New York State's "proper cause" standard precludes the grant of carry licenses to "responsible, law abiding citizens" (Plaintiffs' MOL at 18 n. 17), Petitioners misunderstand what it means for a licensing applicant to "demonstrate a special need for self-protection distinguishable from that of the general community." *Klenosky v. New York City Police Dep't,* 75 A.D.2d 793, 793 (1st Dep't 1980), *aff'd,* 53 N.Y.2d 685 (1981); *see* Plaintiffs' MOL at 15 (citing this language and decisions repeating it). Distinguishing oneself from the general community entails proffering facts that are particular to the individual applicant. *Kachalsky,* 701 F.3d at 88. Applicants cannot rest on references to general background conditions or a mere "generalized desire to carry a concealed weapon" that assume a need for deadly force could arise for anyone at any time. *Id.* An applicant must instead identify "particularized" facts, specific to his or her personal circumstances, establishing a self-defense need that is not "speculative." *Id.* at 98-99.

restriction, meaning without any limitations on time and place of carrying, must show "an actual and articulable—rather than merely speculative or specious—need for self-defense." *Kachalsky*, 701 F.3d at 86. This entails proffering facts particular to the individual, *id.*, rather than a generalized desire to carry as the Second Amendment does not "protect the right of citizens to carry arms for any sort of confrontation." *Heller*, 554 U.S. at 595. New York courts have also defined "proper cause" to include "carrying a handgun for target practice, hunting, or self-defense." *Id*.

Where an applicant demonstrates proper cause to obtain a license for specific purposes, the licensing officer can limit the license to those purposes and grant a "restricted" carry license. *O'Connor v. Scarpino*, 83 N.Y.2d 919, 921 (1994). A licensing officer may also issue an "unrestricted" license that allows carrying a firearm anywhere in public, except in those places where firearm possession is specifically prohibited under local, state or federal law. Licensing is a largely local process in New York State. *Sibley v. Watches*, 194 A.D.3d 1385, 1386 (4th Dep't 2020) ("the relevant statutes governing review of pistol license applications contemplate that local officials—rather than state officials—are to review pistol license applications.") (citing Penal Law §§ 265.00(10), 400.00 (3)). Applications for a license are adjudicated by local licensing officers, which are local judges throughout most of the State. Penal Law § 265.00(10). In New York City, Nassau County, and Suffolk County, local police officials serve as licensing officers. *Id*.

New York City also allows the concealed carrying of handguns in public but is somewhat unique in the State in terms of handgun licensing. Concealed Carry licenses issued are valid throughout the State except in New York City unless "a special permit granting validity is issued by the police commissioner of that city." Penal Law § 400.00(6). New York City has its own regulations pertaining to the issuance of handgun licenses and provides for premises licenses and

different forms of concealed carry licenses. *See* Title 38 of RCNY §§ 5-01, 5-02; https://rulesofnyc.readthedocs.io/en/latest/c20/#chapter-5-handgun-licenses. Pursuant to Penal Law § 400.00(3)(a) and (7), New York City was permitted to devise its own licensing application. The State Police formulate the application form throughout the rest of the State.

The licensing process is generally iterative, allowing applicants to submit information to the licensing official, to know the reasons for any denial, and to request a hearing or further opportunity to be heard. *See, e.g., Sibley*, 194 A.D.3d at 1387 (rejecting a challenge to the denial of concealed carry license where the licensing officer complied with his obligation to give petitioner the specific reasons for the denial and the opportunity to respond to those reasons). *See also Bando v. Sullivan,* 290 A.D.2d 691, 692 (3rd Dep't 2002). Applicants may obtain judicial review of a licensing decision by filing an expedited special proceeding under Article 78 of New York's Civil Practice Law and Rules.

**D.      Facts Concerning the Plaintiffs**

**1.      Jason and Brianna Frey**

Jason and Brianna Frey are husband and wife. (Declaration of Jason Frey ("J. Frey Decl."), at ¶ 10, annexed as Exhibit ("Exh.") 1 to the Declaration of Amy L. Bellantoni in support of Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction ("Bellantoni Decl.")); (Declaration of Brianna Frey ("B. Frey Decl."), at ¶ 10, annexed to the Bellantoni Decl. as Exh. 1). They are both United States citizens and reside in Westchester County. *See* Complaint ("Compl.") ¶¶ 23-24; Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction ("Plaintiffs' MOL") at 3. On an unidentified date, both applied for, and were granted, restricted concealed carry licenses by a Westchester County judge. *Id*. ¶¶ 92 and 125. The licenses

were restricted "sportsman" licenses, limiting possession of their handguns to the inside of their home, to and from target shooting, and during sporting activities. *Id*. ¶¶ 93-94 and 126.

In 2019, both Freys allegedly applied for an amendment to allow for unrestricted concealed carry licenses. *Id*. ¶¶ 95 and 127. Their application was allegedly motivated by a physical and verbal attack on them by a former tenant in June 2018.[7] (J. Frey Decl. ¶ 9; B. Frey Decl. ¶ 13). The licensing officer denied the applications because neither Frey had met the "proper cause" standard as they had "not demonstrated the necessary proper cause for the issuance of a full carry firearm license . . . [in that they had] not demonstrated a need for self-protection distinguished from that of the general public." (Compl. ¶¶ 98 and 129).

Neither Frey appealed the denial of their applications by filing an Article 78 proceeding because "it would have been futile" as licensing officers have "broad discretion" in determining what constitutes "proper cause" and, in their opinion, New York State appellate courts, typically "rubber stamp" the determinations of licensing officers.[8] (Compl. ¶¶ 102 and 135-137).

---

[7] Plaintiffs have elected not to attach any of their licensing amendment applications, or any transcripts or licensing decisions to their Complaint or to this application. Nor were they able to produce them in response to a request by the State Defendant. It is thus not clear what information they shared with the licensing officer or the particulars and reasoning of the decisions in their applications. They ask the Court to proceed on this bare record.

[8] Plaintiffs cite no evidentiary basis for this assertion and for the most part do not appear to have sought to challenge their licensing decisions in Article 78 proceedings. They ignore the evidence that, for decades, even pre-*Heller*, New York courts have regularly reversed improper licensing decisions. *See, e.g.*, *Bobrick v. Leggett*, 71 A.D.2d 869, 870 (2nd Dep't 1979) (reversing licensing decision where petitioner was not given a reasonable opportunity to address reasons for his denial); *Anderson v. Mulroy*, 186 A.D.2d 1045, 1045 (4th Dep't 1992) (voiding a licensing decision where licensing officer did not identify specific reasons for denial and holding that the petitioner must be "given the opportunity to respond to the objections to his application and to present evidence in response."); *Anderson v. Mulroy*, 186 A.D.2d 1045, 1045 (4th Dep't 1992) (reversing and remanding licensing decision with instructions to "provide petitioner with the specific reasons for the denial of the pistol license and afford petitioner the opportunity to present evidence in response"); *Savitch v. Lange*, 114 A.D.2d 372, 373 (2nd Dep't 1985) (remanding matter with instructions to "provide petitioner with the specific reasons gleaned from the police report for the

Both Freys "seek to, and intend to, carry [their] handguns" in "public for all lawful purposes, whether concealed or open carry, without regard for any intrastate geographical restrictions" and without having to demonstrate "cause" or "need" to do so. (Compl. ¶¶ 105-106 and 140-141). Neither Frey has applied for an open carry license because New York State does not permit the open carry of a handgun. (Compl. ¶¶ 108 and 143). The Freys claim to travel to New York City but provide no details regarding the same. *Id*. ¶¶ 113 and 148. They claim to fear for their safety while in New York City because of, *inter alia*, the defunding of the New York Police Department, the reduction in the police force, the rise in violent crime, the rise in roving, armed gangs in New York City, [and] the rise in violent attacks (even in broad daylight) in New York City." *Id*. ¶¶ 115 and 150.[9]

### 2.    Jack Cheng

Jack Chang is a resident of Nassau County. Compl. ¶ 160). On an undisclosed date, he was issued a restricted concealed carry license by a Nassau County licensing officer. *Id*. ¶ 164-65; Plaintiffs' MOL at 3-4. The license permits possession of handguns to inside his home, to and from target shooting activities, and while engaged in hunting. *Id*. ¶ 165; (Declaration of Jack Cheng ("Cheng Decl.") at ¶ 6, annexed as Exh. 1 to the Bellantoni Decl.)

According to Mr. Cheng, his NYS license is not valid in NYC, (Compl. ¶ 166), and he cannot apply to have his NYS handgun license "endorsed" by a licensing officer in New York City

---

denial of her application for a pistol license, and afford her the opportunity to present evidence in response").

[9] Throughout their moving papers, plaintiffs make conclusory allegations for which they provide no evidentiary support. For example, they each allege that for safety reasons, they should be permitted to bring handguns into NYC because crime there has risen exponentially because of cuts in funding to the New York City Police Department. Plaintiffs have not provided any evidence to support these allegations such as statistics demonstrating the defunding of police, or the assertion that armed gangs are "roving" the streets of the City.

because his state license is not an unrestricted license. (Compl. ¶ 167). He claims that over fifteen years ago, he was issued a conceal carry license related to his businesses by the New York City Police Department ("NYPD") License Division. *Id.* ¶¶ 168-169. When that license was set to expire in October 2019, Mr. Cheng sought renewal. *Id.* ¶ 172. The NYPD License Division denied Mr. Cheng's renewal application. *Id.* ¶¶ 172-173; Cheng Decl. ¶ 14.

Mr. Cheng alleges that he travels to NYC on a daily basis to manage his various businesses, which includes collecting rents and making bank deposits. *Id.* ¶ 180. He allegedly fears for his safety while travelling to and from NYC, and while spending time there, for the same reasons as the Freys as well as concern "for [his] safety as an Asian American because of the incidents of random, violent attacks on Asian Americans in New York City arising from the COVID pandemic." Cheng Decl. ¶ 20, 21.

Mr. Cheng seeks to, and intends to, carry his handgun open and exposed on his person in public for all lawful purposes throughout NYS, including NYC, without geographical restriction and/or fear of criminal prosecution. *Id.* ¶¶ 176 and 178.

### 3. William Sappe

William Sappe is a resident of Orange County. (Compl. ¶ 188). He is self-employed and alleges that his business involves transporting "substantial amounts of cash, diamonds, and jewelry for high-end jewelers." *Id.* ¶¶ 190-192.

Since 2015, Mr. Sappe has held an open carry license from the State of California, where he is licensed as an armed security guard. *Id.* ¶¶ 193-194. Mr. Sappe is also licensed as an armed security guard in NYS and claims that for the past seven years he has held a valid NYS "unrestricted concealed carry (full carry) handgun license, which was issued by a County Court Judge/licensing officer in Orange County, New York." *Id.* ¶¶ 196-197; Plaintiffs' MOL at 4.

Pursuant to Penal Law § 400.00(6), Mr. Sappe's NYS unrestricted concealed carry handgun license is valid across the entire state except for NYC. *Id*. ¶¶ 199, 200.[10]

In October 2018, Mr. Sappe applied to the NYPD License Division for an endorsement of his NYS concealed carry license, which would allow him to continue to carry a concealed handgun in NYC. *Id*. ¶ 201. This application was denied. *Id*. ¶ 202. Mr. Sappe's appeal to the NYPD's License Division's Appeals Unit was also denied. *Id*. ¶ 204. Both the NYPD License Division and its Appeals Unit determined that plaintiff had failed to establish "proper cause" for the issuance of an unrestricted conceal carry license and that he did not possess the necessary "moral character" for the issuance of the license. *Id*. ¶ 204. The "lack of moral character" determination was based on Mr. Sappe's "driving history and dismissed criminal charges." *Id*. ¶ 205.

Mr. Sappe filed an Article 78 proceeding in New York County Supreme Court challenging the NYPD's denial of his application for a license to carry in New York City, which proceeding was subsequently dismissed by the court. *Id*. ¶ 212. In its decision, the court stated, "proper grounds for denial of a handgun license may include '[o]ther information [that] demonstrates an unwillingness to abide by the law, a lack of candor towards lawful authorities, a lack of concern for the safety of oneself and/or other persons and/or for public safety, and/or other good cause for the denial of the license.' 38 RCNY § 5-10(n)." (Declaration of William Sappe ("Sappe Decl.") ¶

---

[10] According to this statute, a "license to carry or possess a pistol or revolver, not otherwise limited as to place or time of possession, shall be effective throughout the state, except that the same shall not be valid within the city of New York unless a special permit granting validity is issued by the police commissioner of that city." Plaintiff did produce a license card for Mr. Sappe to the Attorney General. That license appears to be expired and it is not clear if Mr. Sappe's license was work related or a general concealed carry license and, as is the case with all of the Plaintiffs, they have not provided documentation of their applications, the information they gave to licensing officers, any hearing transcripts or other evidence relating to the licensure process, other than photographs of their actual licenses.

19, annexed as Exh. 1 to Bellantoni Decl.)

Mr. Sappe states that he travels to NYC on an almost daily basis for business. *Id*. ¶ 221. As with his co-Plaintiffs, he also fears for his safety while travelling to and from, and spending time in, New York City. *Id*. ¶ 224; Sappe Decl. ¶ 26.

Mr. Sappe states that he seeks to carry a firearm, concealed or open carry, for self-protection outside of his home and in public, (Compl. ¶¶ 214-218). Mr. Sappe states that he does not carry his handgun concealed on his person in NYC because of Penal Law § 400.00(6). *Id*. ¶ 225. Mr. Sappe further does not carry his handgun "open and exposed on his person anywhere in New York State, including New York City," for fear of criminal prosecution, the seizure of his registered handguns, and the revocation of his license. *Id*. ¶ 229.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs bear the burden of establishing that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Id*. at 20.

In addition, the Second Circuit has "held the movant to a heightened standard" where, as here: (i) an injunction is "mandatory" (i.e., altering the status quo rather than maintaining it), or (ii) the injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *People ex. rel. Schneiderman v. Actavis PLLC*, 787 F.3d 638, 650 (2d Cir. 2015). In such cases, the movant must show a "clear" or "substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm, in addition to showing that the preliminary injunction is in the public interest.

14

*Id*. (quoting *Beal v. Stern*, 184 F.3d 117, 123 (2d Cir. 1999); *Doe v. N.Y.U.*, 666 F.2d 761, 773 (2d Cir. 1981)).

## ARGUMENT

I.   **PLAINTIFFS DO NOT HAVE STANDING TO ASSERT THEIR CLAIMS AGAINST SUPERINTENDENT BRUEN**

Standing is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). In order to have standing in federal court, a plaintiff must show (1) injury in fact, which is a "concrete and particularized" harm to a "legally protected interest"; (2) causation in the form of a "fairly traceable" connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 116 (2d Cir. 2020) (quoting *W.R. Huff Asset Management Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008)). Plaintiffs bear the burden and must establish standing with respect to each claim he or she asserts. *Libertarian Party*, 970 F.3d at 116. As explained below, Plaintiffs fail to meet that burden.

A.   **Plaintiffs Have Not Suffered An Injury In Fact**

Justiciable injury for purposes of Article III must be "real and immediate" and not purely speculative and abstract. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). While a plaintiff challenging the constitutionality of a law generally need not wait until they are actually arrested or prosecuted, a credible threat of imminent prosecution against the plaintiff must exist. *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 159 (2014). A credible threat of prosecution cannot rest on fears that are "imaginary or speculative." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979), (quoting *Younger v. Harris,* 401 U.S. 37, 42 (1971)). Nor is such an injury evident where plaintiffs "do not claim that they have ever been threatened with prosecution, that a

prosecution is likely, or even that a prosecution is remotely possible." *Babbit,* 442 U.S. at 298–99 (internal quotation marks omitted).

To the extent Plaintiffs allege they are injured by virtue of an absence of an option to apply for an "open carry" license, those claims fail. Absent a denial of a "legally protected interest," injury does not exist. *Lujan,* 504 U.S. at 556. As set forth below, there is no Second Amendment right to carry firearms in any particular manner, including openly carrying handguns in public. Plaintiffs can currently carry under their concealed carry licenses and, if they want to carry unrestricted or in New York City, they can seek licensure for the same. But Plaintiffs have specifically stated that they are not challenging any licensing determination in this action or application. *See* (ECF No. 13, p. 2). Accordingly, Plaintiffs have no injury.

Plaintiffs lack standing to challenge Penal Laws §§ 265.01(1), 265.01-B, 265.03(2), and 265.03(3) for the additional reason that they have not and cannot be injured by those statutes. The Penal Law creates an exemption from the criminal penalties set out in the Penal Law art. 265 provisions for persons with a valid license. Under Penal Law § 265.20(3), each of the foregoing sections "shall not apply" to "[p]ossession of a pistol or revolver by a person to whom a license therefor has been issued as provided under" Penal Law § 400.00.[11] *See also* Penal Law § 400.00(17) (making pertinent provisions of Penal Law § 265 inapplicable to illegal possession of a firearm). Here, Plaintiffs have valid licenses. *See* (ECF No. 13, p. 2) ("Each plaintiff has a handgun license"). As such, they face no criminal penalties or threats of prosecution for violating

---

[11] Penal Law §§ 400.00(15) and (17) set out the penalty for those who have a license but nevertheless are caught carrying in violation of the license (carrying in New York City, for example, when you are not licensed to do so). For a violation of the terms of the license which is not itself a violation of a penal law provision, the result is an administrative penalty like revocation or suspension. *See People v. Thompson,* 92 N.Y.2d 957, 959 (1998).

the cited provisions of Penal Law art. 265 and accordingly lack standing to challenge those provisions.

Therefore, Plaintiffs are left with the hypothetical assumption that they will suffer imminent injury because, if they openly carry a handgun in New York State or if they carry in any manner in New York City without obtaining a separate New York City license, they *could* be arrested and prosecuted by the New York State Police under Penal Law § 400.00(15).[12] Plaintiffs' "imminent injury" argument fails for several reasons. First, they can carry concealed under their existing licenses with no threat of arrest. Second, although pre-enforcement challenges to a criminal statute are permissible, there must be a showing of "imminent injury." *See Driehaus,* 573 U.S. 149 at 159 (2014); *Babbitt,* 442 U.S. at 298. Absent allegations of particular circumstances that support credible threats of prosecution, such as prior prosecution or prior threats of prosecution, there is no "imminent injury" and standing fails. *Sibley v. Watches*, 501 F.Supp. 3d 210, 222 (W.D.N.Y. 2020) (quoting *Adam v. Barr*, 792 Fed.Appx at 22 (2019)). Such is the case here. Plaintiffs have alleged no past or present threats of prosecution, nor any other particularized threats that would justify "imminent injury."

Finally, if the Court were to adopt the broad scope of Plaintiffs' "imminent injury" argument, then essentially any person would have standing to challenge an existing criminal statute simply by alleging that they may, at some hypothetical point in the future, choose to violate the statute, and that they would then be arrested and prosecuted for this act by the defendant. Such speculative and hypothetical scenarios are insufficient to confer standing. *See generally Lyons*, 461 U.S. at 95 (injury must be real and immediate and not purely speculative and abstract); *Babbit,*

---

[12] Penal Law §§ 265.01(1) and 265.01-B criminalize the unlicensed "possession" of a firearm while §§ 265.03(2) and 265.03(3) criminalize the possession of a certain amount of firearms. Penal Law § 400.00(15) makes any violation of Penal Law § 400 a class A misdemeanor.

442 U.S. at 298 (1979) (same). Plaintiffs' threat of imminent injury is entirely speculative, and they have not suffered injury in fact.

**B. Plaintiffs Have Not Established That Superintendent Bruen Caused Their Alleged Injuries**

To succeed in showing causation, "there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly…trace[able] to the challenged action of the defendant." *Lujan*, 504 U.S. 555 at 560-61. Here, Plaintiffs completely fail to link their alleged injuries—specifically their inability to openly carry handguns throughout the State including New York City and/or to carry concealed handguns in New York City (Plaintiffs' MOL, p. 2)—to *any* conduct by Superintendent Bruen. Although Plaintiffs now claim they are not challenging the denial of any license under Penal Law § 400.00, *et seq* (ECF No. 13, p. 2),[13] in essence that is exactly what they are doing. Plaintiffs allege the current licensing scheme under Penal Law § 400 denies them a license that they seek—to openly carry a firearm. (Compl., p. 3). As such, Plaintiffs allege they are "injured" by being "denied" the option to obtain a particular firearm license under the Penal Law.

Plaintiffs point to the fact that the Superintendent of State Police is charged with drafting the license application form and the form does not contain an option for an individual to ask for permission to openly carry firearms. (Compl., p. 11); Penal Law § 400.00(3). But Superintendent Bruen does not decide what types of firearm carrying are permitted in New York State or make individual licensing determinations. Instead the types of carrying permitted and licenses available

---

[13] Plaintiffs' challenge to Penal Law 400.00(6), which is a New York City geographical limitation and a function of Plaintiffs' licensing determinations, is not directly addressed because Plaintiffs now state they are not challenging the denial of any license determinations. *See* ECF No. 13, p. 2.

are set forth in the Penal Law. Penal Law § 400.00(2). Further, Superintendent Bruen does not have the authority to grant or deny unrestricted licenses or licenses to carry in New York City.

It is not the form of the license application that the Plaintiffs seek to change by their preliminary injunction application, it is the requirement that they be licensed to carry loaded handguns in public, a decision that is not made or governed by Superintendent Bruen. Indeed, courts in this Circuit have expressly held that the Superintendent (as well as the Governor and the Attorney General) are not proper parties to actions, like this one, challenging New York's firearms licensing scheme as unconstitutional. *See Libertarian Party*, 970 F.3d at 116 (Superintendent); *Aron v. Becker*, 48 F. Supp. 3d 347, 368-69 (N.D.N.Y. 2014) (Governor); *Osterweil v. Bartlett*, 819 F. Supp. 2d 72, 75 (N.D.N.Y. 2011) (Governor and Attorney General), *vacated on other grounds by* 738 F.3d 520 (2d Cir. 2013); *see also Kwong v. Bloomberg*, 876 F. Supp. 2d 246, 248 n.1 (S.D.N.Y. 2012) (noting that the Attorney General was initially sued in this action challenging the constitutionality of aspects of the State's licensing law, but then subsequently dismissed as a defendant), *aff'd*, 723 F.3d 160 (2d Cir. 2013).

Plaintiffs also argue that any injury caused by arrest and prosecution under the Statutes is necessarily traceable to Superintendent Bruen through the New York State Police. *See*, ECF No. 13, p. 2. However, as with the hypothetical injury, any such connection between the injury and Defendant Bruen is also entirely speculative. Plaintiffs have simply not shown that the injury they complain of is fairly traceable to Superintendent Bruen and accordingly cannot establish one for the essential elements of standing. *Lujan*, 504 U.S. at 560.

### C. Superintendent Bruen Could Not Provide the Requested Relief

To successfully show redressability, there must exist a non-speculative likelihood that the injury can be remedied by the relief requested. *Lujan*, 504 U.S. 555 at 560-61. Plaintiffs lack

standing where the parties sued cannot grant the relief they seek. *Id.* at 568. Here, Plaintiffs claim that New York's lack of an "open carry" firearm license is unconstitutional and challenge the denial of licensure to be free to carry loaded handguns throughout the State, including New York City. Plaintiff Sappe asks to be permitted to carry a concealed handgun in public in New York City. But such relief is available under Penal Law § 400.00(6) and the City Administrative Code. Superintendent Bruen cannot grant Plaintiff Sappe the relief he wants or give Plaintiffs the right to openly carry firearms throughout the State. Further, even assuming the State Police were enjoined from enforcing the Penal Law, that injunction would not apply to other police departments or prosecutors, who would still be authorized to enforce those laws. Accordingly, there is no non-speculative likelihood that Plaintiffs' injury can be redressed by Superintendent Bruen.

### D. Superintendent Bruen is Not a Proper Party To This Case

The *Ex parte Young*, 209 U.S. 123 (1908) exception to Eleventh Amendment sovereign immunity allows for suits against state officers in their official capacities if the "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Va. Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1639 (2011) (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)) (internal quotation marks omitted). But this exception only applies where the official sued has "some connection with the enforcement of the [allegedly unconstitutional] act." *Ex parte Young*, 209 U.S. at 157; *see also, e.g., McCluskey v. Comm'r of Nassau Cnty. Dep't of Soc. Servs.*, 2013 U.S. Dist. LEXIS 127614, at *15 (E.D.N.Y. July 23, 2013) (explaining that the state official "must ha[ve] a direct connection to, or responsibility for, the alleged illegal action" (internal quotation marks and citations omitted)), *adopted by* 2013 U.S. Dist. LEXIS 126874 (E.D.N.Y. Sept. 5, 2013).

Here, Plaintiffs must plead facts showing that Defendant Bruen "had a connection with the alleged violation of federal law." *Johnson v. N.Y. State Dep't of Corr. Servs.*, 709 F. Supp. 2d 178, 183 (N.D.N.Y. 2010). They have failed to do so. As noted above, courts in this Circuit have expressly held that the Superintendent (as well as the Governor and the Attorney General) are not proper parties to actions challenging New York's firearms licensing scheme as unconstitutional.

Any reliance on the Superintendent's general law-enforcement duties under New York law is also unavailing. Unsupported fears of arrest and prosecution cannot turn Superintendent Bruen into a proper party to a suit that, at its core, challenges the constitutionality of a licensing scheme that is enforced and administered by local licensing officers. Under settled precedent, that is simply not enough to make Superintendent Bruen a proper party here. *See, e.g., Libertarian Party,* 970 F.3d at 116; *Warden v. Pataki,* 35 F. Supp. 2d 354, 359 (S.D.N.Y. 1999) (noting that "the vast majority of courts to consider the issue have held . . . that a state official's duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute"), *aff'd sub nom. Chan v. Pataki,* 201 F.3d 430 (2d Cir. 1999); *Sabin v. Nelson*, No. 12 Civ. 1373, 2014 WL 2945770 at *6 (N.D.N.Y. June 30, 2014) (same); *Gras v. Stevens*, 415 F. Supp. 1148, 1151-52 (S.D.N.Y. 1976) (three-judge court) (Friendly, J.).

Accordingly, Plaintiffs' claims against Superintendent Bruen are subject to dismissal on Eleventh Amendment grounds as he is not a proper party herein.

## II.   PLAINTIFFS HAVE NOT ESTABLISHED AN ENTITLEMENT TO THE EXTREME PRELIMINARY INJUNCTION THEY SEEK

Plaintiffs claim their Second Amendment rights are violated because "open carry is banned throughout New York State… there are no alternative means of carry." *See* Plaintiffs' MOL, p. 1. They have moved for a preliminary injunction against enforcement of New York Penal Laws §§ 265.01(1), 265.01-B, 265.03(2), 265.03(3), and §§ 400.00(6), 400.00(15). (Plaintiffs' MOL, pp.

4,5). However, Plaintiffs' claims fail, in their entirety, as a matter of law. Accordingly, for the reasons that follow, Plaintiffs' preliminary injunction motion should be denied.

### A.     *Heller* and *McDonald*

In *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects an individual right to keep and bear arms for lawful purposes, most notably for self-defense within the home. *Id.* at 595, 599-600, 635. The *Heller* Court thus ruled that the District of Columbia's then complete ban on the possession of handguns and any usable firearms in the home violated the Second Amendment, noting that handguns are the "quintessential self-defense weapon." 554 U.S. at 573, 628-29; *see Kachalsky*, 701 F.3d at 88. Indeed, the *Heller* Court found that the ban on home handgun possession squarely struck at the core of the Second Amendment right - a rare feat, because "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban." 554 U.S. at 629; *see also id.* at 628-30, 635. The Court thus held that the challenged D.C. statutes would fail constitutional muster under "any of the standards of scrutiny" applicable to "enumerated constitutional rights." *Id.* at 628-29.

The Court emphasized in *Heller* that "the right secured by the Second Amendment is not unlimited." *Id.* at 626. It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* The Court explicitly noted that, historically, the right has been subject to laws prohibiting how firearms are carried, including antebellum laws prohibiting the concealed carrying of weapons. *Id.* at 626-27.

Two years after *Heller*, in *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), the Supreme Court held that the right recognized in *Heller* applies to the states through the Fourteenth Amendment. In so doing, the Court reiterated its central holding in *Heller* "that the Second Amendment protects the right to possess a handgun in the home for self-defense." *Id.* at 790-91.

### B.     The Post-*Heller* Framework for Assessing Second Amendment Claims

Since *Heller* and *McDonald*, lower courts "have filled the analytical vacuum" left by the Supreme Court's failure to set forth a precise framework for assessing Second Amendment claims. *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012) (citing cases). The Second Circuit follows a two-step approach to analyze Second Amendment claims. *See Kachalsky*, 701 F.3d at 88-94; *United States* v. *Decastro*, 682 F.3d 160, 164-65 & n.3 (2d Cir. 2012).

*First*, the Second Circuit begins by inquiring into whether the conduct at issue falls within the scope of the Second Amendment right recognized in *Heller*. *Nat'l Rifle Ass'n*, 700 F.3d at 194; *Kachalsky*, 701 F.3d at 89. History and tradition help define the scope of that right.

*Second*, if the law at issue implicates conduct that falls within the scope of the Second Amendment right, the court next determines whether it places a "substantial burden" on that right. *Decastro*, 682 F.3d at 166. As the Second Circuit has held, "heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller*) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or other lawful purposes)." *Id.*; *accord Kachalsky*, 701 F.3d at 93. If no showing of substantial burden is made, such as where adequate alternatives remain available, then the law is subject to no heightened scrutiny at all. *Decastro*, 682 F.3d at 166-68 & n.5.

*Finally*, if the challenged law is found to substantially burden the right, "some form of heightened scrutiny" under the Second Amendment is appropriate. *Kachalsky*, 701 F.3d at 93; *Decastro*, 682 F.3d at 164-67. Courts have, almost without exception, applied intermediate scrutiny -- under which courts assess whether a law is substantially related to an important governmental objective -- at this stage of the analysis. *See, e.g.*, *Kachalsky*, 701 F.3d at 96-97.

23

As set forth below, Plaintiffs' challenge to New York's licensing regime, and the absence of an open carry license option, fails at each stage of analysis. First, the lack of open carry does not implicate Plaintiffs' constitutional rights because laws prohibiting carrying arms openly in public are outside the ambit of Second Amendment protection. Furthermore, Plaintiffs have "adequate alternatives" to openly carrying firearms because New York allows the concealed carrying of firearms. As such, New York law does not substantially burden their rights. And, in any event, even if it did impose a substantial burden, because the licensing regime so clearly advances New York's public safety goals, it easily withstands constitutional scrutiny.

C.    **Regulation, Even Prohibition, of the Open Carry of Firearms in Public Are Outside the Scope of the Second Amendment**

1.    **New York's Restrictions on the Open Carrying of Firearms in Public Does Not Implicate the Second Amendment**

New York's restrictions on who may openly carry a firearm in public follows a long, historical tradition of government's role in regulating where and how firearms may be carried in the public sphere. Accordingly, restrictions regulating the manner in which firearms may be carried in public are outside the scope of the Second Amendment.

Courts must ask "whether there is persuasive historical evidence showing that the regulation does not impinge on the Second Amendment right as it was historically understood." *Heller*, 554 U.S. at 625. But any assessment indicates a longstanding tradition of robust government regulation of firearms in the public sphere and supports the conclusion that States may prohibit open carrying of firearms. *Young*, 992 F.3d at 785. As discussed at pp. 2-6, *supra,* the government has long had the right to regulate and prohibit the public carrying of firearms without government leave, not just to prevent violence but also to keep the peace. This history includes regulations and prohibitions on the public display and carrying of weapons.

As the Ninth Circuit recently held, after a thorough and searching analysis of historical tradition: "Government regulations on open carry are '[l]aws restricting conduct that can be traced back to the founding era and are historically understood to fall outside of the Second Amendment's scope,' and thus 'may be upheld without further analysis.'" *Id.* at 813 (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)). "Laws restricting conduct that … are historically understood to fall outside of the Second Amendment's scope may be upheld without further analysis." *Id.* at 625. It is clear, therefore, that the "persuasive historical evidence" shows that governments had the right, and expectation, of regulating how firearms may be carried in the public sphere. Accordingly, there is no Second Amendment right to openly carry a firearm and any restrictions regulating that conduct are outside the scope of the Second Amendment.

This Court need not rely upon the Ninth Circuit's analysis, however. The Second Circuit already rejected the very argument that Plaintiffs' assert here. In *Kachalsky*, the Second Circuit disapproved the plaintiffs' contention that "history and tradition demonstrate that there is a 'fundamental right' to carry handguns in public, and though a state may regulate open or concealed carrying of handguns," if the State chooses to allow concealed carry it cannot "qualify" that carrying with a proper cause requirement. *Kachalsky*, 701 F.3d at 89–90. The Court rejected this and other challenges to New York's licensing statute. Plaintiffs' claims fail on this ground alone.

Nor, in their papers, have Plaintiffs justified reversal or disregard of this precedent. Plaintiffs' reliance upon historical caselaw almost entirely from the slaveholding South is unavailing. Not only did almost all of those cases allow regulation on the public carrying of a handgun, but they do not establish a federal constitutional right to open carry. Rather, they stand for the proposition that in those states, often under state constitutional provisions, the government could limit the manner of carry so long as the ability to carry a firearm was not abolished.

For example, Plaintiffs rely upon *State v. Reid*, 1 Ala. 612 (1840). *See* Plaintiffs' MOL, p. 16. However, in *Reid*, the court held that Alabama could prohibit a manner of carrying a weapon, so long as the ability to defend oneself remained in place:

> The question recurs, does the act, "To suppress the evil practice of carrying weapons secretly," trench upon the constitutional rights of the citizen. We think not. The constitution in declaring that, "Every citizen has the right to bear arms in defence of himself and the State," has neither expressly nor by implication, denied to the Legislature, the right to enact laws in regard to the manner in which arms shall be borne.

*Id.*, at 616. The court went on to note that there was no evidence "tending to show that the defendant could not have defended himself as successfully, by carrying the pistol openly, as by secreting it about his person" and reasoned that absent such a showing, a prohibition on concealed carry could not be unconstitutional. *Id.* at 621. *Nunn v. State*, 1 Ga. 243, 243 (1846), is similarly unhelpful to the Plaintiffs as there the court noted that a law which inhibits carrying a firearm in a certain manner is not unconstitutional unless it "cuts off the exercise of the right of the citizen altogether to bear arms." The court in *Nunn* let a ban on concealed carrying stand. *Id.* Although some slave-holding Southern states took more permissive approaches to public carrying by white men, this was not universal even in the South and this type of geographic variation is consistent with the tailoring of firearms laws to "suit local needs and values." *McDonald*, 561 U.S. at 785.

Plaintiffs' other cases fare no better. Indeed, the Second Circuit in *Kachalsky* has already rejected the argument that Plaintiffs assert based upon the very cases they cite. Specifically, in considering such cases, the Court held that the requirement that open carry be available was

> hardly a universal view. Other states read restrictions on the public carrying of weapons as entirely consistent with constitutional protections of the right to keep and bear arms. At least four states once banned the carrying of pistols and similar weapons in public, both in a concealed or an open manner. *See, e.g.*, Ch. 96, §§ 1–2, 1881 Ark. Acts at 191–92; Act of Dec. 2, 1875, ch. 52, § 1, 1876 Wyo. Terr. Comp. Laws, at 352; Ch. 13, § 1, 1870 Tenn. Acts at 28; Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws at 25. And the statutes in Texas, Tennessee, and

> Arkansas withstood constitutional *91 challenges. See, e.g., Fife v. State, 31 Ark.
> 455, 1876 WL 1562, at *4 (1876); English v. State, 35 Tex. 473, 1872 WL 7422,
> at *3 (1871); Andrews v. State, 50 Tenn. 165, 1871 WL 3579, at *11 (1871).

*Kachalsky*, 701 F.3d at 90. *See also* Eric M. Ruben & Saul Cornell, *Firearm Regionalism & Public*

*Carry: Placing S. Antebellum Case Law in Context*, 125 YALE L.J. FORUM 121, 128 (2015) (noting

that permissive view of public carry reflected in some antebellum cases was the product of

distinctive nature of slave-holding Southern society, but the view was not universally held even in

the South); *McDonald*, 561 U.S. at 844 (Thomas, J., concurring) (emphasizing how "fear of a slave

uprising gripped slaveholders"); Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82, 108 (2013)

(discussing regionalism and local variation in firearms laws); *Young,* 992 F.3d 802-08 (discussing

cases noted above); *Gould v. Morgan*, 907 F.3d 659, 672 (1st Cir. 2018).

Finally, Plaintiffs cite to the history of "sureties" as demonstrating a robust right to carry

firearms in public. But this is inaccurate. Plaintiffs interpret such laws as evidencing of carrying

rights, arguing that a surety could be demanded only upon proof of a violation of the law.

(Plaintiffs' MOL, p. 18, 19) (*citing Wrenn*, 864 F.3d at 661).[14] But Plaintiffs' analysis

misapprehends the way sureties were used in early law enforcement. Under the surety system, a

person caught carrying a firearm in public could have been arrested and held in jail until he found

---

[14] Plaintiffs cite to *Wrenn v. D.C.,* 864 F.3d 650, 659 (D.C. Cir. 2017), a case in which the D.C. Circuit Court struck down Washington D.C.'s handgun licensing statute, to support their demand for open carry. In *Wrenn*, the court invalidated a licensing law which required applicants to demonstrate previous "serious threats of death or serious bodily harm," actual physical attacks, or property theft from their person to obtain a carry license. *Id.*, 864 F.3d at 655, 56. New York State law makes no such demands. But while *Wrenn* recognized that the Second Amendment right reflects a "preexisting right" and that "legal regulations of possession or carrying that are 'longstanding'… reflect limits to the preexisting right" and are presumptively permissible, it elected to "sidestep" the historical debate and did not engage in any in-depth or independent historical analysis, relying on the analysis performed in *Heller* in regard to a *different* law. *Id.*, 864 F.3d at 659. Moreover, the *Wrenn* decision is not binding on this court and its analysis "was reached by a divided panel over a cogent dissent." *Gould*, 907 F.3d at 671 (discussing *Wrenn* in rejecting challenge to Massachusetts' firearms licensing statutes).

guarantors willing to pledge money to ensure the person's good behavior. Ruben & Cornell, 125 YALE L.J. FORUM at 130-31. Sureties therefore imposed a "severe constraint on anyone thinking of carrying a weapon in public." *Young*, 992 F.3d at 820; *see also* Ruben & Cornell, *supra*, 130.

In sum, Plaintiffs have cited no law or authority, nor any established history and tradition, evidencing that a right to open carry falls within the ambit of the Second Amendment.

### 2. New York's License Restrictions on Open Carry Do Not "Substantially Burden" a Second Amendment Right

Even if the Court were to find the challenged restrictions to the open carry of firearms implicate a Second Amendment right, Plaintiffs' claims still fail because the provisions do not substantially burden that right. In *Decastro*, 682 F.3d 160 (2d Cir. 2012), the Second Circuit held that "heightened scrutiny is triggered only by those restrictions that operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or other lawful purposes)." *Id.* at 166. Laws regulating the availability of firearms will not be deemed a substantial burden on the right to keep and bear arms, and will not be subject to heightened scrutiny, "if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense." *Id.* at 168-69. That is precisely the situation here.

New York's license laws, which permit concealed but not open carrying of handguns in public, do not substantially burden Plaintiffs' Second Amendment Rights because "adequate alternatives" remain for "law-abiding citizens to possess and use a firearm for self-defense." *Decastro*, 682 F.3d at 166. In New York, "adequate alternatives" to open carry already exist: concealed carry licenses under Penal Law § 400.00 permit the public carrying of firearms for those who can articulate a non-speculative need for self-defense in public. *Kachalsky*, 701 F.3d at 98.

Plaintiffs claim that "New York's ban on open carry leaves no alternative channels for the general population of non-prohibited people to bear arms in self-defense." Plaintiffs' MOL, p. 18.

This is false. New York's licensing scheme is not a ban and was already upheld as constitutional, despite the absence of an open carry license option, by the Second Circuit in *Kachalsky*. Plaintiffs already possess valid firearms licenses under New York's current licensing scheme.[15] *See* ECF No. 13, p. 2. Given these facts, it is nonsensical to claim no "alternative channels" are available for self-defense within current New York firearm licensing laws. Just saying it does not make it so. Therefore, since New York has a constitutional licensing scheme which permits citizens to possess firearms in public, adequate alternatives to openly carrying a firearm in public exist. Accordingly, there are no substantial burden to Plaintiffs' Second Amendment rights.

### 3.   Even if Heightened Scrutiny Applied, New York's Licensing Law Passes Constitutional Muster

Even if the Court were to assume, *arguendo*, that New York's restrictions on open carry substantially burden Plaintiffs' Second Amendment rights, their claims should still be dismissed because intermediate scrutiny, at best, is appropriate, and New York law withstands intermediate scrutiny. This conclusion is compelled by established Second Circuit precedent.

#### a.  At Most, Intermediate Scrutiny Applies

Where a law substantially burdens the Second Amendment right, courts assess how severely the challenged provision burdens that right in order to determine the level of scrutiny

---

[15] Given that every Plaintiff has a firearm license, there is no evidence that New York State's licensing Statutes operate as a "ban" in any way. Those Plaintiffs who have restricted carry licenses, which are limited to carrying where they have demonstrated a need for self-defense or in connection with certain activities or locations, may prefer unrestricted licenses. But they expressly represent that they are not challenging particular licensing decisions on this motion (*see*, ECF No. 13) and have not submitted documentary evidence of attempts to obtain different or other licenses, the outcomes thereof, or any appeals of such decisions. They thus should not be heard to complain that Penal Law § 400.00 operates as a ban as applied to them. In any event, further evidence on the operation of the law, both in regard to Plaintiffs and generally, will be developed in discovery in this case should it continue, and it will demonstrate the Penal Law § 400.00 does not operate as a ban in any way.

applicable. *See New York State Rifle and Pistol Ass'n ("NYSRPA") v. Cuomo*, 804 F.3d at 257-61 (2nd Cir. 2015); *Kwong*, 723 F.3d at 168 & n.15; *Kachalsky*, 701 F.3d at 93-94. As noted, both the Second Circuit and the district courts in this Circuit have, without exception, applied intermediate scrutiny at this stage of the analysis—including in assessing, and upholding, the constitutionality under the Second Amendment of New York's firearms licensing law with respect to both public carry and in-home possession. *See, e.g., Kachalsky*, 701 F.3d at 96; *Aron*, 48 F. Supp. 3d at 371. Thus, intermediate scrutiny is, at most, what would apply here.

Under intermediate scrutiny, a court must assess whether a law "is substantially related to the achievement of an important governmental interest." *Kachalsky*, 701 F.3d at 96-97. Courts give "substantial deference" to legislative efforts to design solutions to address public safety and well-being, especially in the area of firearms regulation. *Id.* at 98. Indeed, "[i]n the context of firearm regulation, the Second Circuit has made clear that the legislature is 'far better equipped than the judiciary' to make sensitive policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Id.* at 97 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994)); *accord NYSRPA*, 804 F.3d at 261. To survive intermediate scrutiny, the fit between the governmental objective and the challenged regulation need only be substantial, not perfect. *Kachalsky*, 701 F.3d at 97; *NYSRPA*, 804 F.3d at 263.

Given the "general reticence to invalidate the acts of our elected leaders," firearms regulations of the sort at issue here should be struck down under the Second Amendment "only if the lack of constitutional authority to pass the act in question is clearly demonstrated." *Kachalsky*, 701 F.3d at 100-01 (cleaned up) (quoting *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012)). And, where, as here, Plaintiffs bring not only an as-applied, but a facial challenge to the provisions of Statutes, that facial challenge can succeed only if Plaintiffs "show that no set of

circumstances exists under which the [Statutes] would be valid, *i.e.*, that the law is unconstitutional in all of its applications, or at least that it lacks a plainly legitimate sweep." *Decastro*, 682 F.3d at 168 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

### b. Public Safety is a Compelling State Interest

The Second Circuit has already held that New York's firearms licensing law, as it applies both to home possession and to the public carry of handguns, relate to a compelling state interest in public safety and crime prevention which are unquestionably not merely important, but compelling governmental interests. *See Kachalsky*, 701 F.3d at 97; *see also NYSRPA*, 804 F.3d at 261; *Aron*, 48 F. Supp. 3d at 372; *Matter of Delgado v. Kelly*, 127 A.D.3d at 644; *see also, e.g., Kwong*, 723 F.3d at 168-69 (noting that New York's firearms licensing scheme "is designed to promote public safety and prevent gun violence").

### c. The Laws at Issue Are Substantially Related to Important Government Interests

New York clearly has an important and compelling interest in protecting public safety. As such, the Court need only determine whether Plaintiffs have carried their burden on this motion of showing that the challenged provisions of New York's licensing law are not "substantially related to these interests." *Kachalsky*, 701 F.3d at 97.

Laws regulating the open carry of firearms in the public sphere have a long history and tradition given the public safety concerns they address. *See supra*, Point II(C)(1)(a). New York's firearm laws regulate, but do not ban, the public carry of firearms. *Kachalsky*, 701 F.3d at 91; *Corbett v. City of New York*, 160 A.D.3d 415, 415-16 (2018) (rejecting plaintiff's argument that the proper cause standard is unconstitutional in conjunction with the absence of an open carry option). Furthermore, "extensive state regulation of handguns has never been considered incompatible with the Second Amendment or, for that matter, the common-law right to self-

31

defense." *Id*. at 100.  Indeed, under the language of Heller, New York's licensing statute is a "longstanding" law which is presumptively constitutional. *Heller*, 554 U.S. at 627 n. 26; *Kachalsky*, 701 F.3d at 94-95 ("There is a longstanding tradition of states regulating firearm possession and use in public because of the dangers posed to public safety."), citing  Saul Cornell & Nathan DeDino, *A Well-Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L.Rev. 487, 502–16 (2004).  Such regulations are understood to advance the government's interest in public safety and maintaining the peace.

A brief overview of the some of the relevant empirical evidence further demonstrates that New York's firearms licensing scheme is substantially related to the State's compelling interests in protecting its populace from gun violence.[16] Research shows, in fact, that handgun permit and licensing laws are "[t]he type of firearm policy most consistently associated with curtailing the diversion of guns to criminals and for which some evidence indicates protective effects against gun violence." Daniel W. Webster & Garen J. Wintemute, *Effects of Policies Designed to Keep Firearms from High-Risk Individuals*, 36 Ann. Rev. Pub. Health 21, 34 (2015). One recent study, for example, found that Missouri's 2007 repeal of its handgun licensing law was associated with a 14% increase in the state's annual murder rate and an increase of 25% in its rate of firearm homicides. Daniel Webster et al., *Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides*, 91 J. Urban Health 293 (2014). Another recent study examined the impact of Connecticut's handgun licensing law, which, similar to New York's, is discretionary, and found that it was associated with a 40% reduction in that state's firearm homicide rate. Kara

---

[16] The Court may properly take judicial notice of "studies and data" in assessing Plaintiffs' Second Amendment claim under intermediate scrutiny. *Kachalsky*, 701 F.3d at 97-99; *see NYSRPA*, 804 F.3d at 261-64; *see also, e.g., Snell v. Suffolk Cnty.*, 782 F.2d 1094, 1105-06 (2d Cir. 1986) (holding that social science studies can be reviewed by courts as "legislative facts").

E. Rudolph et al., *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 Am. J. Pub. Health 49 (2015). And a third study indicated a marked effect on suicides: Missouri's repeal of its licensing law was associated with a 16% increase in firearm suicide rates, while Connecticut's enactment of its law was associated with a 15% decrease in such rates. Cassandra K. Crifasi et al., *Effect of Changes in Permit-to-Purchase Handgun Laws in Connecticut and Missouri on Suicide Rates*, 79 Preventive Medicine 43 (2015).

Licensing laws like New York's, which allow licensing officers discretion in issuing permits, have been found to be particularly effective in keeping guns out of the hands of criminals. *See* Daniel W. Webster et al., *Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws*, in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis* 109, 109-22 (2013) (handgun licensing laws that provided officers with discretion in issuing permits were associated with 76% lower per capita rates of exporting guns to criminals); Daniel W. Webster et al., *Relationship Between Licensing, Registration, and Other Gun Sales Laws and the Source State of Crime Guns*, 7 Injury Prevention 184, 188 (2001) (finding that "cities with the lowest proportion of their crime guns originating from in-state dealers," which included New York City, "were in states that also allowed law enforcement discretion in issuing permits to purchase handguns, had longer waiting periods, and required purchasers to be fingerprinted").

Here, for over 100 years, New York limited public handgun possession to concealed carry. *See* Factual Background, *supra*. As the Second Circuit noted, "[I]nstead of forbidding anyone from carrying a handgun in public, New York took a more moderate approach to fulfilling its important objective and reasonably concluded that only individuals having a bona fide reason to possess handguns should be allowed to introduce them into the public sphere." *Id* at 98, 99. The Court held that New York submitted studies and data demonstrating the efficacy of New York's license

regime to preserve "the safety and character of public spaces." *Id.* at 99. Accordingly, New York's concealed carry licensing scheme, substantially relates to public safety and crime prevention.[17]

In sum, applying the same legal analysis as in *Kachalsky*, New York's firearm licensing scheme, which restricts public carry of a firearm to concealed carry, substantially relates to the important government interest of public safety and crime prevention.

## III.   PLAINTIFFS FAIL TO MAKE A SHOWING OF IRREPARABLE HARM

A finding of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Singas Famous Pizza Brands Corp. v. New York Advert. LLC*, 468 F. App'x 43, 45 (2d Cir. 2012). To satisfy the irreparable harm requirement, a plaintiff "must demonstrate that absent a preliminary injunction [they] will suffer an injury that is neither remote nor speculative, but actual and imminent …" *Seifullah v. City of N.Y.*, 2017 WL 4339478, at *1 (E.D.N.Y. Sept. 27, 2017) (citations and quotations omitted); *see also Winter*, 555 U.S. at 22.

Here, Plaintiffs argue that they are being irreparably harmed by not being able to open carry in public throughout the state, (Plaintiffs' MOL, p. 22), and that unless this Court enjoins enforcement of certain of New York State's gun laws that criminalize possession of handguns (Penal Laws §§ 265.01(1), 265.01-b, 265.03(3) and §§ 400.00(6) and (15)) they, and those similarly situated, face severe consequences if they choose to open carry such as arrest, imprisonment, and confiscation of their handguns. This argument fails for a number of reasons.

---

[17] Plaintiffs fail to even address the public safety issues that would result to shifting to an open carry regime overnight and the particular problems presented when policing open carry. *See, e.g.*, https://www.dallasnews.com/news/crime/2016/07/09/open-carry-creates-confusion-during-dallas-police-ambush-but-supporters-say-law-works/. In addition, open carrying has been associated with intimidation and potential infringement or chilling of other constitutional rights. *See, e.g.*, *Armed Assembly: Guns, Demonstrations, and Political Violence in America*, https://acleddata.com/2021/08/23/armed-assembly-guns-demonstrations-and-political-violence-in-america/; https://www.courier-journal.com/story/news/politics/2020/05/24/second-amendment-supporters-protest-covid-19-restrictions-capitol/5250571002/.

First, Plaintiffs rely almost entirely upon the argument that there is a conclusive presumption of irreparable injury because they are alleging a constitutional violation. (Plaintiffs' MOL, p. 22). This argument is misplaced. Many courts "have held that the mere allegation of a constitutional infringement itself does not constitute irreparable harm." *Lore v. City of Syracuse,* No. 00 Civ. 1833, 2001 WL 263051, at *6 (N.D.N.Y. March 9, 2001) (collecting cases). And

> the Second Circuit has not clearly resolved the question of whether the infringement of a constitutional right is always considered irreparable harm. However, the Circuit has held that although 'impairment of First Amendment rights can undoubtedly constitute irreparable injury, it is often more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights.'

*Id.*, at *7 (quoting *Time Warner Cable of New York City v. Bloomberg L.P.,* 118 F.3d 917, 924 (2d Cir.1997)). Instead, "the Circuit has established that a court must often delve into the nature of the alleged constitutional violation before it makes a determination about irreparable harm." *Lore*, 2001 WL 263051, at *7. In the Second Amendment context, there has been a finding of no irreparable harm justifying a preliminary injunction where plaintiffs fail to show that they are likely to succeed on their Second Amendment claim, particularly where plaintiffs still had some avenues to exercise their right, even though they may prefer to exercise their rights in another manner. *Jones v. Becerra*, 498 F. Supp. 3d 1317, 1331 (S.D. Cal. 2020); *Walters v. Kemp*, No. 20 Civ. 1624, 2020 WL 9073550, at *11 (N.D. Ga. May 5, 2020). Indeed, even the case Plaintiffs' cite for the proposition that it is established in the Circuit that there is a presumption of irreparable injury in this context stated this only in dicta, and after conducting an extensive and detailed factual analysis of whether irreparable injury had been established by the plaintiff. *See Valenzuela Arias v. Decker,* No. 20 Civ. 2802, 2020 WL 1847986, at *3-5 (S.D.N.Y. Apr. 10, 2020).

Here, reliance upon any presumption there may be in this context is misplaced because, despite their arguments to the contrary and shown in Point II above, Plaintiffs' Second Amendment rights are not implicated here and, as shown in Point I above, they have not alleged *any* constitutional injury, let alone an irreparable injury. Contrary to their assertion that the State's laws prohibit open carrying of handguns in public and "thus, there are no alternative means of carry" (Plaintiffs' MOL, p. 1), New York permits the concealed carrying of handguns in public with a license and all of the Plaintiffs have a license of some sort. State laws which regulate the time, place or manner of the public carrying of handguns are consistent with the Second Amendment. In particular, laws like New York's, which prohibit the open carry of handguns in public are outside the scope of the Second Amendment. Any such laws are consistent with American history and tradition and pass any applicable level of constitutional scrutiny. And, because Plaintiffs agree that they have obtained licenses, they suffer no harm whatsoever from the challenged provisions of Penal Law art. 265, under which they could not be prosecuted. Penal Law § 265.20(3). Plaintiffs cannot obtain an injunction against these Statutes. *See generally* Point I, *supra*.

For all the foregoing reasons, Plaintiffs have failed to allege a constitutional violation, allege a constitutional injury, or show they will suffer irreparable harm absent the preliminary injunctive relief requested.

## IV.   THE BALANCE OF THE EQUITIES STRONGLY FAVORS THE STATUS QUO

Even if Plaintiffs are able to establish a clear or substantial likelihood of success on the merits and an actual and irreparable injury (and they cannot), they still would not be entitled to a preliminary injunction because they cannot demonstrate that the balance of equities tips in their favor and that an injunction is in the public interest.

"A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (collecting cases). It is Plaintiff's burden to establish that the preliminary relief they seek is in the public interest. *Id.*, at 20.

In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982); *see also Million Youth March, Inc. v. Safir*, 155 F.3d 124, 125–26 (2d Cir.1998) (modifying injunction because District Court failed to consider government's interest in public health, safety and convenience in balance against First Amendment rights). In considering an injunction, the Court must balance the interests and possible injuries to both parties. *See Yakus v. U.S.*, 321 U.S. 414, 440 (1944). Whether the relief sought is in the public interest is a factor to be considered. *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 711 (2d Cir.1982).

Here, Plaintiffs' requested relief — the ability for everyone with a handgun license to open carry anywhere in the State they desire —is extreme. In short, Plaintiffs are requesting this Court to upend New York's constitutionally sound firearm licensing scheme and vital sections of New York criminal law. (Plaintiffs' Motion for Preliminary Injunction "Pl Motion," p. 1). Such a result would have immediate and serious local, state, and national consequences and would vastly outweigh any claims of injury allegedly suffered by Plaintiffs.

First, New York's current licensing law is constitutionally sound. *See generally*, *Kachalsky*, 701 F.3d at 100 (2012). For this Court to upend this settled precedent would throw

chaos into the both the legal basis and public policy framework of New York's firearm licensing laws. These would include, but are not limited to, an uncertainty as to the legal scope of all current firearm license holders and applicants, uncertainty among state law enforcement agencies as to the enforcement of Penal Law § 265, uncertainty in criminal firearm cases being pursued in state court, and the uncertainty and fear amongst New York citizens when hundreds, if not thousands, of people started brandishing firearms openly in public without consequence. Additionally, Plaintiffs bring this injunction while *New York State Rifle & Pistol Ass'n v. Bruen and McNally,* Supreme Court No. 20-843 (Argument date: Nov. 3, 2021) — a case directly challenging New York's firearm licensing laws— is currently before the Supreme Court. Any substantive decision should be stayed pending a ruling in that case.

Second, there are strong public safety concerns underpinning the laws at issue. *Kachalsky* discussed and highlighted those concerns in detail, noting "[T]he connection between promoting public safety and regulating handgun possession in public." *Kachalsky* at 98 (discussing the public policy underpinnings of New York's firearm laws).[18] *See supra* Point II(3)(b).

The court must ensure that the "public interest would not be disserved" by the issuance of a preliminary injunction. *Salinger*, 607 F.3d at 80. As noted above, given the sudden and severe consequences of striking down State laws whose primary focus is public safety, the balance of the

---

[18] There are significant additional historical and social science publications on the public health and safety benefits of both firearm licensing schemes and restrictions on the open carry of firearms in public. Due to space limitations, they could not all be cited herein. As a sample, we invite the Court to review the following publications: John J. Donahue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Controls Analysis*, 16 J. Empirical Legal Stud. 198 (2019); Eric M. Ruben & Saul Cornell, *Firearm Regionalism & Public Carry: Placing S. Antebellum Case Law in Context*, 125 Yale L.J. Forum 121; Brief for Amici Curiae Social Scientists and Public health Researchers in Support of Appellate, *Young v. Hawaii*, No. 12-17808, slip op. (9th Cir. 2021) (and all referenced materials cited therein).

equities strongly favors the status quo. "Where, as here, a party seeks a preliminary injunction that is 'mandatory,' i.e., 'alter[s] the status quo by commanding some positive act,' a heightened showing is necessary." *Vringo, Inc. v. ZTE Corp.*, 14-cv-4988, 2015 WL 3498634 (S.D.N.Y. June 3, 2015) (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)). In this regard, such an injunction "'should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Id*. at *12-*13 (quoting *Doherty Assocs.*, 60 F.3d at 34). "'This higher standard is particularly appropriate when a plaintiff seeks a preliminary injunction against a government body'" such as a municipality and its police department. *New Jersey v. New York*, 872 F. Supp. 2d 204, 211-12 (E.D.N.Y. 2011) (quoting *Cave v. East Meadow Union Free Sch. Dist.*, 480 F. Supp. 2d 610, 631-32 (E.D.N.Y. 2007)). Plaintiffs' alleged injuries are far from being serious enough to tip the scale in their favor. As such, the public interest and public consideration alone require denial of Plaintiffs motion. *See Winter*, 555 U.S. at 23-24.

While Plaintiffs appear to perceive a threat to their personal safety at every turn – especially in the dystopian version of New York City they allege exists where "roving, armed gangs" (Compl., p. 19) prey on helpless individuals while a depleted and dispirited police force stands idly by either unwilling or unable to help – these claims are nothing more than conclusory assertions based on Plaintiffs' own views of the world, not on objective data. And imposing unrestricted open-carry of firearms into this quasi-dystopian landscape is extremely unlikely to promote public safety. Certainly, Plaintiffs offer no arguments or evidence to show that open carry of firearms would reduce, rather than promote, gun violence on the streets. They have thus done nothing to meet their burden on this motion.

## CONCLUSION

For the reasons set forth above, Superintendent Bruen respectfully requests that the Court deny Plaintiffs' application for emergency relief in its entirety, together with such other relief as the Court may grant.

Dated: New York, New York
        September 14, 2021

                                     Respectfully submitted,

                                     LETITIA JAMES
                                     Attorney General of the
                                     State of New York
                                     *Attorneys for Superintendent Bruen*
                                     By:
                                     _____/s/ Ian Ramage_____
                                     Ian Ramage
                                     Neil Shevlin
                                     Assistant Attorneys General
                                     28 Liberty Street
                                     New York, New York 10005
                                     (212) 416- 8659/8561
                                     Ian.Ramage@ag.ny.gov
                                     Neil.Shevlin@ag.ny.gov