UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

JASON FREY, BRIANNA FREY,                                   Case No. 21 Civ. 05334 (NSR)
JACK CHENG, and WILLIAM SAPPE,

                                     Plaintiffs,

        -against-                                            **FIRST AMENDED COMPLAINT**

NEW YORK CITY, New York, KEVIN BRUEN,
in his Official Capacity, KEECHANT SEWELL,
in her Official Capacity,

                                     Defendants.
----------------------------------------------------------------x

        Plaintiffs, by and through their attorneys, as and for their First Amended Complaint state

as follows:

### NATURE OF THE ACTION

        1.      This is an action for declaratory and injunctive relief, compensatory damages to

include presumed monetary damages in at least a nominal amount, costs, disbursements, and

reasonable statutory attorney's fees pursuant to 42 U.S.C. § 1983, for continuing harm to plaintiffs

and all similarly situated individuals proximately caused by Defendants' enforcement of New

York State Penal Law § 265.00, *et seq.*, and Penal Law § 400.00, *et seq.*

        2.      Plaintiffs are "the People" covered by the plain text of the Second Amendment;

they seek to engage in conduct covered and protected by the plain language of the Second

Amendment; the weapons in questions are in fact "arms" protected thereunder; and there is no

historical analogue for the challenged regulations.

        3.      In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court declared,

"In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an

individual's conduct, the Constitution presumptively protects that conduct." 142 S. Ct. 2111, 2126 (2022).

4.      Plaintiffs' conduct is protected by the plain text of the Second Amendment to the U.S. Constitution, to wit: (i) the right to carry a handgun open and exposed for self-defense and (ii) the right to carry a handgun concealed for self-defense.

5.      The *Bruen* Court continued, "To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Id.* citing, *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10 (1961).

6.      Firearms have been part of this Nation's history since the colonists arrived. The colonists would not have been able to defeat the English military in the Revolutionary War had they not possessed and had unrestricted access to firearms and ammunition – they had no 'military' and, as *Heller* confirmed, the right to keep and bear arms is an individual right, not a collective right of belonging to some group - militia or otherwise. *D.C. v. Heller*, 554 U.S. 570, 591 (2008) ("…even if 'keep and bear Arms' were a unitary phrase, we find no evidence that it bore a military meaning...Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation.").

7.      To be sure, "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny." *Heller*, at 598.

8.      Handguns are weapons in common use for lawful purposes and are therefore covered by the plain text of the Second Amendment. *Caetano v. Massachusetts,* 577 U.S. (2016) (holding that the Second Amendment protects all weapons in common use); *Heller*, at 629 ("It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon.").

9.      No permission from the government, license, registration, or any other action was required (or even imagined) for the People to exercise the God-bestowed, preexisting right that was later codified in the Second Amendment.

10.      The very purpose of codifying the right to keep and bear arms and declaring that it "shall not be infringed" was to prevent *any encroachment* of that right by the government. Yet, here we are.

## JURISDICTION AND VENUE

11.      Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(a)(3) in that this action seeks to redress the deprivation, under of color of the laws, statutes, ordinances, regulations, customs, and usages of the State of New York, of rights, privileges or immunities secured by the United States Constitution. This action seeks relief pursuant to 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1983. Venue in this district is proper pursuant to 28 U.S.C. § 1391.

## THE PARTIES

12.      Plaintiff JASON FREY ("Mr. Frey" or collectively, "the Freys") is a United States citizen and a resident of Westchester County, New York. Mr. Frey holds a valid New York State concealed carry pistol license issued outside of New York City. Mr. Frey is eligible to possess, purchase, receive and transfer firearms under state and federal law.

13.     Plaintiff BRIANNA FREY ("Mrs. Frey" or collectively, "the Freys") is a United States citizen and a resident of Westchester County, New York.  Mrs. Frey holds a valid New York State concealed carry pistol license issued outside of New York City. Mrs. Frey is eligible to possess, purchase, receive and transfer firearms under state and federal law.

14.     Plaintiff JACK CHENG ("Mr. Cheng" or "Cheng") is a United States citizen and a resident of Nassau County, New York. Mr. Cheng holds a valid New York State concealed carry pistol license issued outside of New York City. Mr. Cheng also holds a valid New York City concealed carry license. Mr. Cheng is eligible to possess, purchase, receive and transfer firearms under state and federal law.

15.     Plaintiff WILLIAM SAPPE ("Mr. Sappe" or "Sappe") is a United States citizen and a resident of Orange County, New York.  William Sappe holds a valid New York State concealed carry pistol license issued outside of New York City. Mr. Sappe is eligible to possess, purchase, receive and transfer firearms under state and federal law.

16.     Defendant KEVIN P. BRUEN ("Superintendent Bruen" or "Bruen") is the Superintendent of the New York State Police whose principal place of business is in Albany (Albany County), New York. Superintendent Bruen is sued in his official capacity only.

17.     Defendant Bruen and his troopers are enforcing the laws challenged herein and will continue to enforce such regulations, even against Plaintiffs.

18.     Defendant NEW YORK CITY, New York ("the City") is a governmental subdivision of New York State.

19.     Defendant KEESHANT SEWELL ("Commissioner Sewell" or "Sewell") is the Police Commissioner for the New York City Police Department ("NYPD") and a statutory

handgun licensing officer[1]  for five boroughs of New York City, to wit, New York County (Manhattan), Kings County (Brooklyn), Queens County, Richmond County (Staten Island), and Bronx County. Commissioner Sewell is sued herein in her official capacity only.

20.     As the NYPD Police Commissioner, Commissioner Sewell is the chief law enforcement officer in New York City. As such, she and the law enforcement officers she supervises and directs, have a duty to uphold the Constitution of the United States, as well as the laws of the State of New York and New York City. Sewell and her officers have the authority to enforce the Penal Laws and New York City regulations, make arrests, and file charges to prosecute violations of the criminal and non-criminal statutes and regulations taking place in the 5 boroughs.

21.     Defendant Sewell and her police officers are enforcing the laws challenged herein and will continue to enforce such regulations, even against Plaintiffs.

## STATEMENT OF FACTS

### *Plaintiff Jason Frey*

22.     Jason Frey is eligible to possess, purchase, receive, and transfer firearms under state and federal law. Mr. Frey lawfully possesses firearms (handguns and long guns) for self-defense.

23.     Mr. Frey holds a valid New York State pistol license issued by a judicial licensing officer in Westchester County, New York. Mr. Frey's license authorizes him to (i) only possess the handguns registered thereon; (ii) purchase additional handguns to be registered thereon; and (iii) carry his registered handguns concealed on his person.

24.     Mr. Frey's license does not authorize him to carry a handgun open and exposed (open carry) on his person for self-defense.

25.     Mr. Frey's license to carry concealed is restricted to possession to his home, target shooting, and sportsman activities.

---

[1] Penal Law 265.00(10).

26.     Mr. Frey has been deemed eligible to carry a handgun concealed and should not have to request 'permission' or 'amend' his duly issued and valid license to remove his concealed carry restrictions to carry concealed in public for self-defense.

27.     Mr. Frey's license is not valid in New York City. See, Penal Law § 400.00(6).

28.     Mr. Frey should not have to obtain a separate license to carry his handgun concealed in New York City. There is no historical analogue for such a regulation.

29.     Mr. Frey carries his handgun concealed on his person on a daily basis for self-defense everywhere he goes in New York State, including New York City, and outside of his license restriction - on public and private property, commercial and residential, where ordinary people travel, congregate, shop, fill up their cars with gas, and simply exist and he intends to continue such protected conduct on a regular basis until his natural death.

30.     Even when traveling to and from the target shooting and/or sportsman activities, Mr. Frey stops at gas stations, convenience stores, restaurants (licensed under the alcoholic beverage control law), and various other areas that are now defined as "restricted areas" that do not have any "conspicuous signage" nor has Mr. Frey sought or obtained "express consent" from the owner or lessee of the property, nor will he.

31.     Mr. Frey should not have to seek permission from anyone before exercising the right to possess and carry firearms for self-defense. Such regulations have no historical analogue and are unconstitutional.

32.     The Freys have young children; Mr. Frey presently carries his handgun everywhere he travels – outside of his restriction - to protect himself and his children in all public places and on private property, including without limitation, parks in Yorktown and Westchester County, camps, the Jefferson Valley Mall, various restaurants in and outside of Westchester County (licensed under the alcoholic beverage control law), campgrounds, libraries, and movie theatres.

33.     Having been deemed eligible to possess handguns and to carry a handgun concealed, Mr. Frey should not have to seek further permission from the government to carry a handgun concealed in public for self-defense.

34.     Under § 400.00(15), Mr. Frey risks and faces imminent arrest, incarceration, fines, loss of property, revocation of his license and his right to own firearms for self-defense for carrying concealed outside of his restriction.

35.     NYSP troopers will immediately arrest Mr. Frey if they observe him carrying his handgun concealed outside of his target shooting/sportsman restriction; in 'restricted' areas; and/or in 'sensitive' areas as defined by Penal Law §§ 265.01-d, 265.01-e.

36.     If Mr. Frey carries a registered handgun concealed on his person in New York City, NYPD officers will immediately arrest Mr. Frey because he does not have a separate license to possess/carry a handgun in New York City.

37.     Mr. Frey's license does not authorize him to carry his handguns open and exposed on his person ("holstered" or "open carry").  Open carry is banned in New York.

38.     There is no process for obtaining an open carry license in New York.

39.     If a process existed to obtain an open carry license and/or if one was required, such regulation would violate the Second and Fourteenth Amendments because there is no historical analogue.

40.     Beginning today, Mr. Frey intends to carry his handgun open and exposed on his person for self-defense everywhere he goes, including New York City, every day that he does not otherwise carry his handgun concealed.

41.     NYSP troopers will immediately arrest Mr. Frey if they observe him carrying his handgun open and exposed, whether in 'restricted' areas, 'sensitive' areas or otherwise.

42.     NYPD officers will immediately arrest Mr. Frey if they observe him carrying his handgun open and exposed, whether in 'restricted' areas, 'sensitive' areas or otherwise.

43.     Carrying his handgun open and exposed will cause Mr. Frey to be arrested, incarcerated, and fined; he will also lose his property (firearms), have his license revoked, and lose his right to own firearms for self-defense for carrying concealed outside of his restriction. See, Penal Law § 400.00(15); § 265.00, *et seq.*

44.     Mr. Frey should not have to risk arrest, incarceration, and other criminal and civil penalties to exercise a protected right.

***Plaintiff Brianna Frey***

45.     Brianna Frey is eligible to possess, purchase, receive, and transfer firearms under state and federal law. Mrs. Frey lawfully possesses firearms (handguns and long guns) for self-defense.

46.     Mrs. Frey holds a valid New York State pistol license issued by a judicial licensing officer in Westchester County, New York. Mrs. Frey's license authorizes her to (i) only possess the handguns registered thereon; (ii) purchase additional handguns to be registered thereon; and (iii) carry her registered handguns concealed on his person.

47.     Mrs. Frey's license to carry concealed is restricted to possession to her home, target shooting, and sportsman activities.

48.     Mrs. Frey's license does not authorize her to carry a handgun open and exposed (open carry) on her person for self-defense.

49.     Mrs. Frey's license is not valid in New York City. See, Penal Law § 400.00(6).

50.     Mrs. Frey should not have to obtain a separate license to carry a handgun concealed in New York City. There is no historical analogue for such a regulation.

51.     Beginning today, Mrs. Frey intends to carry her handgun concealed on her person on a daily basis for self-defense everywhere she goes, on public and private property, commercial and residential,  where ordinary people travel, congregate, shop, fill up their cars with gas, and simply exist and she intends to continue such protected conduct on a regular basis until her natural death.

52.     Even when traveling to and from the target shooting and/or sportsman activities, Mrs. Frey intends to stop at gas stations, convenience stores, restaurants (licensed under the alcoholic beverage control law), and various other areas that are now defined as "restricted areas" that do not have any "conspicuous signage" nor has Mrs. Frey sought or obtained "express consent" from the owner or lessee of the property, nor will she.

8

53.     Mrs. Frey should not have to seek permission from anyone before exercising the right to possess and carry firearms for self-defense. Such regulations have no historical analogue and are unconstitutional.

54.     In July 2022, Mrs. Frey applied to have the restrictions on her handgun license removed to allow for "full carry", which was denied in September 2022.

55.     Having been deemed eligible to possess handguns and to carry a handgun concealed, Mrs. Frey should not have to seek further permission from the government to carry a handgun concealed in public for self-defense.

56.     The Freys have small children; Mrs. Frey intends to carry her handgun concealed everywhere she goes – outside of her restriction - to protect herself and her children in all public County, camps, the Jefferson Valley Mall, various restaurants in and outside of Westchester County (licensed under the alcoholic beverage control law), libraries, and movie theatres and other places where ordinary people travel and frequent.

57.     Carrying her handgun outside of her restriction subjects Mrs. Frey to arrest, incarceration, fines, loss of property, revocation of his license and his right to own firearms for self-defense for carrying concealed outside of his restriction. See, Penal Law § 400.00(15).

58.     NYSP troopers will immediately arrest Mrs. Frey if they observe her carrying her handgun concealed outside of her restriction, in 'restricted' areas, and/or in 'sensitive' areas as defined under Penal Law §§ 265.01-d and 265.01-e.

59.     NYPD officers will immediately arrest Mrs. Frey if they observe her carrying her handgun concealed in New York City because she does not have a separate license to possess/carry a handgun in New York City.

60.     Mrs. Frey's license does not authorize her to carry a handgun open and exposed on her person ("holstered" or "open carry").  Open carry is banned in New York. There is no process for obtaining an open carry license, and if one was available and/or required, such regulation would violate the Second and Fourteenth Amendments because there is no historical analogue.

61.     Beginning today, Mrs. Frey intends to carry her handgun open and exposed on her person for self-defense everywhere she goes, including New York City, every day that she does not otherwise carry her handgun concealed.

62.     NYSP troopers will immediately arrest Mrs. Frey if they observe her carrying a handgun open and exposed, whether in 'restricted' areas, 'sensitive' areas or otherwise.

63.     NYPD officers will immediately arrest Mrs. Frey if they observe her carrying a handgun open and exposed, whether in 'restricted' areas, 'sensitive' areas or otherwise.

64.     Carrying her handgun open and exposed will cause Mrs. Frey to be arrested, incarcerated, and fined; she will also lose her property (firearms), have her license revoked, and lose her right to own firearms for self-defense for carrying concealed outside of her restriction. See, Penal Law § 400.00(15); § 265.00, *et seq.*

65.     Mrs. Frey should not have to risk arrest, incarceration, and other criminal and civil penalties to exercise a protected right.

***Plaintiff William Sappe***

66.     William Sappe is eligible to possess, purchase, receive, and transfer firearms under state and federal law. Mr. Sappe lawfully possesses firearms (handguns and long guns) for self-defense.

67.     Mr. Sappe holds a valid New York State pistol license issued by a judicial licensing officer in Orange County, New York. Mr. Sappe's license authorizes him to (i) only possess the handguns registered thereon; (ii) purchase additional handguns to be registered thereon; and (iii) carry his registered handguns concealed on his person.

68.     Mr. Sappe's license to carry concealed is unrestricted (full carry).

69.     Mr. Sappe's license is not valid in New York City. See, Penal Law § 400.00(6).

70.     Mr. Sappe should not have to obtain a separate license to carry his handgun concealed in New York City.

71.     There is no historical analogue for such a regulation.

72.     When traveling outside of New York City carrying his registered handgun, Mr. Sappe intends to stop at and visit residential and commercial property, including gas stations, convenience stores, eat at restaurants (licensed under the alcoholic beverage control law), and frequent various other areas that are now defined as "restricted areas" that do not have any "conspicuous signage" nor has Mr. Sappe sought or obtained "express consent" from the owner or lessee of the property, nor will he.

73.     Mr. Sappe should not have to seek permission from anyone before exercising the right to possess and carry firearms for self-defense. Such regulations have no historical analogue and are unconstitutional.

74.     Mr. Sappe travels to New York City for work every day during the week, unless he is traveling out of state for work. Mr. Sappe works in the Diamond District, and carries thousands of dollars in cash, precious gems, jewelry, and diamonds on a regular basis as part of his employment.

75.     Mr. Sappe is required to travel through and in the area designated and defined by New York City, NYPD, and the Office of the Deputy Commissioner as "Times Square" on a daily and/or regular basis in connection with his employment.

76.     Mr. Sappe intends to carry his handgun concealed on his person on a daily basis for self-defense everywhere he goes in New York State, including New York City, the area identified as "Times Square", and other areas now designated as 'restricted' or 'sensitive' areas on public and private, commercial and residential property to fill up his car with gas, shop, eat, and the like and he intends to continue such protected conduct on a regular basis until his natural death.

77.     Mr. Sappe has an objectively reasonable fear that he will be arrested, incarcerated, and subject to other criminal and civil penalties for carrying his handgun when traveling in and out of New York City, at restaurants, stores, gas stations, Times Square, and any other area now deemed "restricted" or "sensitive."

78.     Mr. Sappe risks arrest, incarceration, fines, loss of property, revocation of his license and his right to own firearms for self-defense for carrying concealed outside of his

restriction. See, Penal Law § 400.00(15).

79.     NYPD officers will immediately arrest Mr. Sappe if they observe him carrying his handgun concealed in New York City because he does not have a separate license to possess/carry a handgun in New York City.

80.     Mr. Sappe's license does not authorize him to carry his handguns open and exposed on his person ("holstered" or "open carry").  Open carry is banned throughout New York. There is no process for obtaining an open carry license; if a license was available and/or required to open carry, such regulation would violate the Second and Fourteenth Amendments because there is no historical analogue for such a regulation.

81.     Beginning today, Mr. Sappe intends to carry his handgun open and exposed on his person for self-defense everywhere he goes, including New York City, every day that he does not otherwise carry his handgun concealed.

82.     NYSP troopers will immediately arrest Mr. Sappe if they observe him carrying his handgun concealed in "restricted" and/or "sensitive" areas.

83.     NYSP troopers will immediately arrest Mr. Sappe if they observe him carrying his handgun open and exposed, whether in 'restricted' areas, 'sensitive' areas or otherwise whether because (i) he is carrying outside of his restriction [§ 400.00(15)] or (ii) open carry is banned and neither a NYS nor a NYPD license authorize open carry under their respective concealed carry licenses [§ 265.03].   Under either scenario, open carry is a crime punishable by arrest, incarceration, and other criminal and civil penalties.

84.     NYPD officers will immediately arrest Mr. Sappe if they observe him carrying his handgun open and exposed, whether in "restricted areas", "sensitive areas" or otherwise.

85.     Carrying his handgun open and exposed will result in Mr. Sappe's arrest and incarceration; he will also lose his property (firearms), suffer the revocation of his license, and lose his right to own firearms for self-defense for carrying concealed outside of his restriction. See, Penal Law § 400.00(15); § 265.00, *et seq.*

86.     Mr. Sappe should not have to risk arrest, incarceration, and other criminal and civil penalties to exercise a protected right.

***Plaintiff Jack Cheng***

87.     Jack Cheng is eligible to possess, purchase, receive, and transfer firearms under state and federal law. Mr. Cheng lawfully possesses firearms (handguns and long guns) for self-defense.

88.     Mr. Cheng holds a valid New York State pistol license issued by a judicial licensing officer in Nassau County, New York. Mr. Cheng's license authorizes him to (i) only possess the handguns registered thereon; (ii) purchase additional handguns to be registered thereon; and (iii) carry his registered handguns concealed on his person.

89.     Mr. Cheng's license to carry concealed is restricted to possession to his home, target shooting, and hunting activities.

90.     Mr. Cheng should not have to request 'permission' or 'amend' his duly issued and valid license to remove his concealed carry restrictions to carry concealed in public for self-defense.

91.     Mr. Cheng intends to continue carrying his handgun concealed on his person on a daily basis for self-defense everywhere he goes in New York State and outside of his license restriction - on public and private, commercial and residential, property where ordinary people travel, congregate, shop, fill up their cars with gas, and simply exist and he intends to continue such protected conduct on a regular basis until his natural death.

92.     When traveling outside of New York City carrying his registered handgun, Mr. Cheng intends to carry his handgun concealed on his person as he stops at gas stations, convenience stores, restaurants (licensed under the alcoholic beverage control law), and various other areas that

are now defined as "restricted areas" that do not have any "conspicuous signage", nor has Mr. Cheng sought or obtained "express consent" from the owner or lessee of the property, nor will he.

93.     Mr. Cheng should not have to seek permission from anyone before exercising the right to possess and carry firearms for self-defense. Such regulations have no historical analogue and are unconstitutional.

94.     Mr. Cheng has a reasonably objective fear of being arrested, incarcerated, fined, permanent deprivation of his property (firearms), revocation of his license and his right to own firearms for self-defense for carrying his handgun concealed outside of his restriction. See, Penal Law § 400.00(15).

95.     NYSP troopers will immediately arrest Mr. Cheng if they observe him carrying his handgun outside of his carry restriction and/or in restricted areas.

96.     Mr. Cheng currently holds a New York City handgun license that was issued last month after his application to renew the NYC Business Carry license he held for decades was denied by the NYPD License Division in November 2020 for lack of "proper cause."

97.     Mr. Cheng carries his handgun concealed on his person in New York City on a daily basis for self-protection in the course of his various businesses and business-related activities in New York City.

98.     Mr. Cheng is required to travel through and in the area designated and defined by New York City, NYPD, and the Office of the Deputy Commissioner as "Times Square" on a daily and/or regular basis in connection with his employment, as detailed more fully below, and now must risk arrest, incarceration, and be subject to other criminal and civil penalties for being in what is now deemed to be a "sensitive area" for carrying his registered firearm for self-defense.

99.     Mr. Cheng intends to continue carrying his handgun in New York City under his NYC concealed carry license while traveling within the Times Square area, to restaurants (that also happen to be licensed by the alcohol and beverage authority), on private and commercial property, in stores and shops, and on sidewalks near and next to areas that are now deemed "sensitive" and/or "restricted".

100.    NYPD officers will arrest Mr. Cheng if he is observed in a sensitive area and/or a restricted area of New York City carrying his registered firearm for self-defense. Mr. Cheng's exercise of his Second Amendment rights is being violated by NYPD's enforcement and implementation of Penal Law §§ 265.01-d and 265.01-e. Mr. Cheng fears arrest, incarceration, fines, loss of property, revocation of his license and his right to own firearms for self-defense. Mr. Cheng also fears enforcement of the NYPD policy and training that "Anyone carrying a firearm is presumed to be carrying unlawfully until proven otherwise", which places him at a heightened risk of danger and violence from the NYPD. Mr. Cheng also fears being frisked at will by any NYPD officer who thinks he is carrying a firearm.

### *Defendants Bruen and Sewell Are Proper Parties to this Action*

101.    As the Superintendent of the New York State Police ("NYSP"), Bruen and his law enforcement officers have a duty to enforce and uphold the laws of the State of New York, including those enumerated in the New York State Penal Law, and the authority to file charges to prosecute criminal and/or non-criminal offenses taking place throughout New York State.

102.    Bruen and his troopers are currently enforcing and will continued to enforce New York's firearm regulations against any violator, including Plaintiffs.

103.    Bruen acts at the direction of Governor Hochul with regard to the enforcement of New York's firearm regulations.

104.    Bruen's policies regarding the enforcement of firearm regulations implement Governor Hochul's goal of defying the Supreme Court precedent in *Bruen* as set forth in her enactment of the Concealed Carry Improvement Act ("CCIA") on September 1, 2022.

105.    Bruen publishes advisory memoranda advising New York's county and local law enforcement agencies of the State's position on various firearm-related issues, including statutory interpretation and enforcement.

106.    Local and county law enforcement agencies rely on, abide by and enforce Bruen's interpretations and policies, including the New York City Police Department.

107.    The NYSP website publishes New York's firearm laws, changes to the State's firearm laws, Bruen's interpretation of NY firearms laws, how NYSP will enforce those laws, including laws regarding the licensing of handguns and semiautomatic rifles.[2]

108.    Superintendent Bruen is statutorily required to publish the approved statewide application for the licensing of pistols, revolvers, and semi-automatic rifles.

109.    As a result of Governor Hochul's recent anti-Constitution legislation, Bruen revised the statewide firearm license application to comply with her new regulations, which all New Yorker's are required to use and all law enforcement agencies are required to implement.[3]

110.    As the head of the agency that advises this State's county and local law enforcement agencies of the interpretation of the firearm regulations and how they are to be enforced, Bruen's policies and procedures directly affect Plaintiffs and all residents statewide, including Plaintiffs.

111.    More specifically, the NYSP (through Superintendent Bruen), and NYPD (through Sewell) are working together, and in concert with, Governor Hochul, Everytown for Gun Safety, the Gifford Law Center – well-funded anti-gun special interest groups – , and other 'partners' as

---

[2] https://troopers.ny.gov/Firearms/
[3] The City of New York may use its own application form. See, Penal Law § 400.00(3).

Governor Hochul and NYSP consider them, with the goal and specific intention of violating the Supreme Court's precedent, analysis, and holdings in Second Amendment jurisprudence, including the recently decided *Bruen* opinion.[4]

112.    Gov. Hochul, Bruen (represented by First Deputy Superintendent Steven Nigrelli), NYC Mayor Eric Adams, and NYPD Police Commissioner Keechant Sewell are working together to knowingly enforce laws and regulations that violate the Second and Fourteenth Amendments[5], as borne out below.

113.    Gov. Hochul's August 31, 2022 press conference on the anti-Constitution Concealed Carry Improvement Act[6] ("CCIA") (which went into effect the following day) was attended and supported by New York City Mayor Adams and NYPD Police Commissioner, Defendant Sewell, whose silence evidenced their collaboration and compliance with Gov. Hochul's agenda to violate the Second and Fourteenth Amendments and the Supreme Court's mandate in *Heller, McDonald*, *Caetano,* and *Bruen*. The statements of Gov. Hochul and Bruen (through Nigrelli), and Sewell's silent acceptance, are incorporated fully herein by reference.

114.    Gov. Hochul acknowledged that the CCIA was created by her administration in partnership with NYC Mayor Adams' administration (2:27); she emphasized the importance of the "partnership" with New York City, the NYPD Police Commissioner, Keechant Sewell and "advocates" like the Gifford Law Center and Senior Counsel for "Everytown for Gun Safety" with whom she has "been joined at the hip" who were "helpful in the whole process of writing legislation (the CCIA) that we believe is responsive to the Supreme Court decision [in Bruen]".

---

[4] https://www.youtube.com/watch?v=gC1L2rrztQs
[5] https://www.youtube.com/watch?v=gC1L2rrztQs
[6] https://www.youtube.com/watch?v=gC1L2rrztQs

Had the Supreme Court not decided Bruen, Gov. Hochul confessed, "we would not be having this conversation." (2:41).

115.    In response to the Supreme Court's ruling, which Hochul proudly stated she had been working since last year and "was ready for it"; when *Bruen* was published, she called the already-recessed Legislature back for a special session to enact laws that are intended to be, and are, in direct contravention to the Supreme Court's holding, analysis, and historical account of this Nation's traditions as set forth in *Bruen*, *Heller*, *McDonald*, and *Caetano*. Gov. Hochul "fought back" against a ruling on the U.S. Constitution from our Nation's highest Court -  using the same 'public interest', 'means-end', 'collective rights' arguments (7:00) that have been resoundingly rejected by the Supreme Court since its decision in *Heller* in 2008 and thereafter. See, *McDonald*, and *Bruen*.

116.    NYSP First Deputy Superintendent Steven Nigrelli spoke in Bruen's place.

117.    Nigrelli vociferously thanked Governor Hochul as "someone [he] looks up to" for her "leadership on this topic…laser-like focus on **eradicating guns**, illegal guns, and gun crimes...**we appreciate that at the State Police**." (36:10).

118.    Like Governor Hochul, Nigrelli emphasized the importance of "partnerships", proclaiming that, to be successful in enforcing their anti-gun laws, they "found the greatest partner in the world – the NYPD. Commissioner Sewell thank you for what you and your organization does." (36:53).

119.    The NYSP will enforce the State's anti-gun laws against everyone who violates them:

> "Governor, it's an easy message. I don't have to spell it out more than this. We'll have zero tolerance. <u>If you violate this law, you will be arrested. Simple as that</u>. Because the <u>New York State Troopers are standing ready to do our job to ensure .. all laws are enforced</u>." *Id.*

120.    This truculent defiance of Supreme Court precedent cannot be rewarded.

121.    The NYSP Pistol Permit Bureau of the New York State Police in Albany, New York provides guidance and advisory information to the public upon inquiry regarding New York's firearms regulations.[7]

122.    On September 6, 2022, the NYSP Pistol Permit Bureau responded to an inquiry as to whether "open carry" by an individual holding a valid NY handgun license was an arrestable offense.

123.    The NYSP Pistol Permit Bureau informed that Penal Law 400.00(2)(f) is to "have and carry [a handgun] concealed" and that "the arrestable offense to open carry could be [either] the lesser class A misdemeanor in PL 400.00(15) for violating the terms of the pistol permit…[or alternatively,] [a]n argument could be made that the individual carried outside of the pistol permit and therefore was in criminal possession of a weapon" under Penal Law § 265."

124.    In either event, open carry is a criminal offense in New York subjecting the licensee to imminent arrest by law enforcement.

125.    In August 2022, after *Bruen* and the passage of the CCIA (but before it went into effect), the NYPD Office of the Deputy Commissioner published a memorandum of policies and procedures for NYPD officers (the "Memorandum"), which was published to the NYPD police force. NYPD officers are presumed to have knowledge of the policies outlined in the Memorandum.

126.    In part, the Memorandum provides, "Anyone carrying a firearm is presumed to be carrying unlawfully until proven otherwise."

---

[7] https://troopers.ny.gov/contact-us

127.    NYPD's policies and procedures are in direct conflict with the Second Amendment, which "presumptively protects" the possession and carriage of firearms for self-defense. See, *Bruen*, at 2126.

128.    The Memorandum reaffirmed that possessing a firearm without a license continues to be a crime.

129.    NYPD Officers may frisk anyone they reasonably believe is carrying a firearm.

130.    The Memorandum listed all of the "sensitive locations" under Penal Law § 265.01-e where no firearms may be possessed – "for example, since a bar that is licensed by the NYS Liquor Authority is a 'sensitive' location under …§ 265.01-e, the owner may not give customers permission to bring licensed firearms onto the premises" and "restricted areas" under § 265.01-d "Property owners and lessees who want to authorize lawful firearms holders to bring firearms onto the property may post clear and conspicuous signs granting permission..."

131.    The Memorandum further provides, "The following are restricted locations: All residential property; All commercial property including stores and businesses which are not on the sensitive location list noted above."  Ordinary people – even licensees – are presumptively criminals and banned from "all residential property" and "all commercial property."

132.    The Memorandum further instructs, "**People who are carrying firearms in New York are presumed to be doing so unlawfully, until proven otherwise.**" (emphasis supplied).

133.    This NYPD policy and theses regulations have no historical analogue and are presumptively unconstitutional and violate the Second and Fourteenth Amendments.

134.    On September 2, 2022, Mr. Frey was personally informed by an NYPD police officer that if Mr. Frey were to "open carry" a handgun in New York City, he would be arrested. The officer stated, "there's no open carry in New York City" because it is "illegal."

135.     With regard to concealed carry, the same NYPD police officer informed Mr. Frey that he "can't come into New York City because [his] permit is only for Westchester County", his NYS permit "is invalid to cross the county", that he "can't have [a handgun] at all in New York City" and carrying a concealed handgun in New York City with a Westchester handgun license is illegal.

136.     The NYPD officer's affirmation of NYPD's current and intended future enforcement of the Penal Law statutes concerning firearms confirms it application to Mr. Frey and the remaining Plaintiffs.

### *Plaintiffs Have Article III Standing*

137.     "A plaintiff  satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Picard v. Magliano*, 42 F.4th 89, 97 (2d Cir. 2022). "A plaintiff need not first expose himself to liability before bringing suit to challenge ... the constitutionality of a law threatened to be enforced." *Id.*

138.     "The standard…sets a low threshold and is quite forgiving to plaintiffs seeking such pre[-]enforcement review, as courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Picard*, 42 F.4th at 98.

139.     NYPD and NYSP have announced, verbally and in writing, that they will enforce the challenged laws, which are recent and not moribund – against *any* violators, including Plaintiffs.

140.     All Plaintiffs face a credible threat of arrest by NYSP, and other criminal and civil liabilities, for engaging in the open carriage of a handgun. Penal Law §§ 265.01, 265.01-b; 265.03(3).

141.    The Freys and Mr. Cheng face a credible threat of arrest by NYSP, and other criminal and civil liabilities, for engaging in the concealed carriage of a handgun outside of their license restrictions. Penal Law § 400.00(15).

142.    All Plaintiffs face a credible threat of arrest by NYSP, and other criminal and civil liabilities, for (i) carrying a firearm in a "restricted area"; (ii) and carrying a firearm in a "sensitive area." Penal Law §§ 265.01-d, 265.01-e.

143.    The Freys and Mr. Sappe face a credible threat of arrest by NYPD, and other criminal and civil liabilities, for carrying a firearm concealed in New York City without being issued a separate NYC license. Penal Law §§ 400.00(6), 400.00(15).

144.    All Plaintiffs face a credible threat of arrest by NYPD, and other criminal and civil liabilities, for (i) carrying a firearm in a "restricted area"; (ii) and carrying a firearm in a "sensitive area." Penal Law §§ 265.01-d, 265.01-e.

145.    All Plaintiffs face a credible threat of arrest by NYPD, and other criminal and civil liabilities, for engaging in the open carriage of a handgun in New York City. Penal Law §§ 265.01, 265.01-b; 265.03(3).

146.    The imminence of an arrest for engaging in the protected conduct detailed herein is not speculative, is more than 'remotely' possible, and this Court must assume that that the government will enforce the law. *Picard*, at 98.

147.    Plaintiffs, as individuals who are presently, or are going to in the immediate future, violate the law by carrying outside of their license restrictions, open carrying, carrying in restricted areas and sensitive areas – all in violation of the Penal Law, are part of the group of people who have been threatened by the NYSP and NYPD that, if they possess firearms in violation of the law, they will be arrested.

## STATEMENT OF LAW

### *The Second Amendment*

148.    The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

149.    The Second Amendment does not *bestow* any rights to the individual to possess and carry weapons to protect himself; it *prohibits the government* from infringing upon the basic, fundamental right of the individual to keep and bear weapons in common use for self-defense in the event of a violent confrontation. *Heller*, supra; *McDonald*, supra; *Caetano v. Massachusetts,* 577 U.S. (2016).

150.    "Individual self-defense is the central component of the Second Amendment right." *McDonald,* 561 U.S. at 767, citing, *Heller*, 554 U.S. at 599 (internal quotations omitted). The Second Amendment protects the core right of the individual to self-protection. *Heller*, 554 U.S. at 595-599, 628.

151.    The Second Amendment is "deeply rooted in this Nation's history and tradition" and fundamental to our scheme of ordered liberty". *McDonald*, 561 U.S at 768. The Second Amendment's protections are fully applicable to the states through the Fourteenth Amendment. *McDonald*, 130 S. Ct. at 3026.

152.    The "Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding …" *Caetano v. Massachusetts*, 577 U.S. at 411.

153.    Handguns are 'bearable arms' in common use for self-defense and therefore are presumptively protected by the Second Amendment. *Heller*, 554 U.S. at 629; *Caetano,* supra.

### *The "People" Protected By the Constitution*

154.    *Heller* explained, "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, at 580. "[T]he people' … refers to a class of persons who are part of

a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* (citation omitted).

155.    Plaintiffs are members of the national community with no prohibitors to the possession of firearms and are entitled to the full and unabridged protections of the Second and Fourteenth Amendments.

### The <u>Bruen</u> Test for Second Amendment Challenges

156.    The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, at 592.

> "Putting all of these textual elements together, we find that they *guarantee* the individual right to possess and carry weapons in case of confrontation. This meaning is strongly confirmed by the historical background of the Second Amendment. We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.' As we said in *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588 (1876), '[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed ....'"

*Id.* (emphasis added).

157.    In *Bruen*, the Supreme Court flatly rejected the 'means-end' public safety balancing and intermediate scrutiny test[8] improperly created and applied by the Second Circuit[9] and others. Rather, the test that must be applied to Second Amendment challenges is as follows:

---

[8] Second Amendment rights, like the right to possess firearms in the home for self-defense, are not subject to 'interest balancing'. *Heller*, 554 U.S. at 634 ("We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government--even the Third Branch of Government--the power to decide on a case-by-case basis whether the right is really worth insisting upon.").

[9] "Despite the popularity of this two-step approach, it is one step too many. Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, at 2127.

> "we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution **presumptively** protects that conduct.
>
> To justify its regulation, the government may not simply posit that the regulation promotes an important interest.
>
> Rather, **the government must demonstrate** that the regulation is consistent with this Nation's historical tradition of firearm regulation.
>
> Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, at 2126 (emphasis added) citing, *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10 (1961).

### ___Bruen___ *Defined and Limited the Relevant Historical Time Period*

158.    Because "not all history is created equal," the *Bruen* Court held that, when deciding whether the government's regulation is consistent with this Nation's historical tradition,

> the only appropriate inquiry is what the public understanding of the right to keep and bear arms was during the ratification of the Second Amendment in 1791, and perhaps during ratification of the Fourteenth Amendment in 1868.

*Bruen*, at 2138.

159.    "Post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, at 2137 (emphasis supplied) citing, *Heller*, 670 F.3d at 1274, n. 6 (Kavanaugh, J., dissenting); *Espinoza v. Montana Dept. of Revenue*, 591 U.S. ——, ——, 140 S.Ct. 2246, 2258–2259 (2020).

### *"Sensitive" and "Restricted" Areas*

160.    In *Bruen*, the Supreme Court rejected characterizing "places where people typically congregate" as "sensitive places" in which firearms may be prohibited. *Bruen*, at 2133. The

historical record of the relevant time-period – the 18th- and 19th-century – "yield[ed] relatively few 'sensitive places' where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses." *Bruen*, 142 S. Ct. at 2133 citing, D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); Brief for Independent Institute as *Amicus Curiae* 11–17.

### *The Challenged Regulations Violate the Second and Fourteenth Amendments*

161.    The plain text of the Second Amendment presumptively protects Plaintiffs' conduct: carrying handgun outside of one's home in public for self-defense.

162.    Defendants "must demonstrate that their regulations are consistent with this Nation's historical tradition of firearm regulation. *Bruen*, at 2126. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command'." *Bruen*, at 2126.

163.    Defendants cannot meet that burden.

### NEW YORK STATE REGULATIONS

164.    In New York State, the possession of a handgun – even in one's home – is a crime, subjecting ordinary people to arrest, incarceration, prosecution, fines, and other criminal and civil penalties, including permanent loss of Second Amendment rights and loss of property (firearms).

165.    Even after *Bruen*, New York State's licensing scheme – and it is a "Scheme" - to possess and/or carry handguns is "may issue" and affords licensing officers with broad discretionary authority. See, Penal Law § 400.00(1)(b).  New York City discretionary handgun licensing regulations virtually mirror the State's. See, 38 RCNY 5; NYC Admin. Code Title 10, Chapter 3.

Penal Law § 400.00(2)

166.    New York State's licensing scheme only authorizes two types of licenses: (i) possession on premises; or (ii) carry underlined concealed. § 400.00(2).

167.    No provision of New York State law authorizes open carry.

Penal Law § 400.00(15)

168.    Under Penal Code section 400.00(15), a violation of *any* provision the state's firearms licensing scheme (§ 400.00, *et seq.*) is a Class A Misdemeanor, punishable by 1 year incarceration, a fine of $1000, revocation of the right to possess and/or purchase handguns, revocation of the right to purchase, receive and/or transfer semi-automatic rifles, permanent loss of property (handguns).

169.    Possessing a handgun not registered to one's license and/or and carrying a registered handgun outside of one's concealed carry restriction are crimes punishable under section 400.00(15).

Penal Law § 400.00(6)

170.    Under Penal Law section 400.00(6), a license to carry or possess a pistol or revolver, or to purchase or take possession of a semiautomatic rifle, not otherwise limited as to place or time of possession, shall be effective throughout the state, except that the same shall not be valid within the city of New York unless a special permit granting validity is issued by the police commissioner of that city. An individual licensed to carry a handgun concealed on their person outside of New York City who possesses a handgun in NYC without having obtained a separate NYC carry license is a crime punishable under section 400.00(15).

171.    The NYPD License Division has no separate standards for determining and/or considering an application for an endorsement of a NYS handgun license to carry in New York

City; the NYPD has long had a policy and practice of subjecting NYS licensees to standardless consideration of applications for an endorsement of a NYS handgun license. At least one court in New York City has already found this NYPD policy and practice to be arbitrary and capricious and not based on any existing rules establishing criteria for validation of a NYS license under § 400.00(6).[10]

### Penal Law  § 265.01

172.     A person is guilty of criminal possession of a weapon in the fourth degree when s/he possesses any firearm. Criminal possession of a weapon in the fourth degree is a class A misdemeanor. A conviction of a felony or misdemeanor offense under Penal Law § 265.00, *et seq.* constitutes a statutory *per se* prohibitor to the future possession of handguns, rifles, and shotguns. Penal Law §§ 265.00(17); 400.00(1).

### Penal Law  § 265.01-b

173.     A person is guilty of criminal possession of a firearm when he possesses any firearm. Criminal possession of a firearm is a class E felony.

### Penal Law  § 265.01-d[11]

174.     A person is guilty of criminal possession of a weapon in a restricted location when such person possesses a firearm, rifle, or shotgun and enters into or remains on or in private property where such person knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or has otherwise given express consent. Criminal possession of a weapon in a restricted location is a class E felony.

---

[10] See, *Matter of Vicari v. Shea*, Index No. 161001/2020 (N.Y. Sup.Ct.), Rackower, J.

[11] Penal Law §§ 265.01-d and 265.01-e went into effect on September 1, 2022 through Governor Hochul's enactment of the Concealed Carry Improvement Act (CCIA) in direct response to the Supreme Court's decision in *Bruen*. A handgun license is not a defense or exemption to either criminal statute.

175.    A handgun license is not a defense or exemption to § 265.01-d. [See, § 265.20].

Penal Law  § 265.01-e

176.    A person is guilty of criminal possession of a firearm, rifle or shotgun in a sensitive location when such person possesses a firearm, rifle or shotgun in or upon a sensitive location, and such person knows or reasonably should know such location is a sensitive location.

177.    The statute identifies numerous areas and locations where members of the general public go and all sections of Penal Law § 265.01-e are incorporated herein by reference because the entire statute is facially unconstitutional.

178.    By way of example of some sections applicable to Plaintiffs include: (d) libraries, public playgrounds, public parks, and zoos; (f) nursery schools, preschools, and summer camps; (o) any establishment issued a license for on-premise consumption pursuant to article four, four-A, five, or six of the alcoholic beverage control law where alcohol is consumed (which includes most restaurants); (p) any place used for the performance, art entertainment, gaming, or sporting events such as theaters, stadiums, racetracks, museums, amusement parks, performance venues, concerts, exhibits, conference centers, banquet halls, and gaming facilities and video lottery terminal facilities as licensed by the gaming commission; and (t) the area commonly known as Times Square, as such area is determined and identified by the city of New York; provided such area shall be clearly and conspicuously identified with signage.

179.    New York City published its definition of the area commonly known as "Times Square", for purposes of Penal Law § 265.01-e to be: Times Square means and includes the following two tracts: (i) the tract in Manhattan including and bounded on the west by west side of Eighth Avenue, on the south by the south side of West Fortieth Street, on the east by the east side of Sixth Avenue, and on the north by the north side of West Fifty-third Street; and (ii) the tract in

Manhattan including and bounded on the west by the west side of Ninth Avenue. on the south by the south side of West Fortieth Street, on the east by the east side of Eighth Avenue, and on the north by the north side of West Forty-eighth Street."

180.   Criminal possession of a firearm, rifle or shotgun in a sensitive location is a class E felony.

181.   A handgun license is not a defense or exemption to § 265.01-e.

<u>Penal Law  § 265.03(3)</u>

182.   A person is guilty of criminal possession of a weapon in the second degree for possessing any loaded firearm outside of his home or place of business. Criminal possession of a weapon in the second degree is a class C felony.

***Open Carriage of a Handgun***

183.   Going backward to the point in time that people first inhabited the geographical region now known as New York State, the mere carriage of weapons for self-protection was an entirely lawful, normal occurrence.

184.   Possession of handguns was banned by New York State with the passage of the Sullivan Law in the early 1900s.

185.   Immediately prior to the passage of the Sullivan Law, open carry and concealed carry were lawful, as was possessing a handgun in your home or place of business for self-protection. There was no licensing requirement to possess or carry a handgun. Only a criminal ***act*** was punished.

186.   The Sullivan Law banned open carry outright; no provision of the licensing statute or any other law exempts open carry from criminal and civil penalties and sanctions.

187.    Since 1911, the only lawful means to possess a handgun in public for self-defense is to apply for and obtain a license to carry <u>concealed</u>.

188.    Concealed carry remains a discretionary and subjective process in New York State and has gotten substantially worse since the *Bruen* opinion with the passage of the CCIA. See, e.g., Penal Law § 400.00(1)(o).

189.    There is no specific exemption from arrest or prosecution for an individual carrying a handgun open and exposed in a holster on one's person (open carry). Penal Law § 265.20.

190.    Open carry continues to be banned throughout New York State and is punishable as a crime – whether a Class A misdemeanor in violation of § 400.00(15) or a felony under either § 265.01-b (unloaded, Class E) or § 265.03(3) (if loaded, Class C).[12]    And, concealed carry continues to be a 'privilege', subject to the broad discretion of the licensing officer and various other arbitrary and unconstitutional standards. See, § 400.00(1)(b), (o); *Boss v. Kelly*, 306 F. App'x 649, 650 (2d Cir. 2009) (quoting *Papaioannou v. Kelly*, 14 A.D.3d 459, 460, 788 N.Y.S.2d 378 (1st Dep't 2005)).

191.    Indeed, the Concealed Carry Improvement Act (CCIA) that went into effect on September 1, 2022 was implemented to purportedly "keep New Yorkers safe" from people carrying *concealed* handguns. Two of its regulations - 265.01-d, 265.01-e – were implemented to prohibit various areas now deemed "sensitive areas" and "restricted areas" 'safe' from those who would surreptitiously carry a handgun concealed.

192.    The argument being, police and other members of the public do not know who is carrying a handgun – because they are concealed – and that places a great burden on police and

---

[12] A "Class C violent felony offense" carries a mandatory period of incarceration that "must be at least three and one-half years and must not exceed fifteen years."  See, Penal Law § 70.02.

causes a public safety hazard because people will not know who is armed and dangerous – due to the *concealed* nature of the firearm. [13]

193.     The challenged regulations are inconsistent with this Nation's historical tradition of firearm regulation.

194.     Plaintiffs seek a judicial declaration that (i) New York State's ban on the open carriage of a firearm violates the Second and Fourteenth Amendments; and (ii) the enforcement of Penal Law §§ 265.01(1), 265.01-b, 265.01-d, 265.01-e, 265.03(3), and 400.00(15) against an individual with a valid handgun license who carries a firearm open and exposed for self-defense (open carry) violates the Second and Fourteenth Amendments.

195.     Plaintiffs seek a temporary and permanent injunction against the enforcement of §§ 265.01(1), 265.01-b, 265.01-d, 265.01-e, 265.03(3), and 400.00(15) against a handgun licensee who carries a firearm open and exposed on their person for self-defense.

### Concealed Carrying Outside of License Restriction

196.     The Freys and Mr. Cheng hold valid New York State handgun licenses.

197.     Having been deemed eligible to possess and carry a handgun concealed, they should not have to seek any additional permission from the government, take any additional steps, or be required to amend their licenses to remove their restrictions.

198.     Plaintiffs seek a judicial declaration that enforcement of Penal Law § 400.00(15) against individuals who hold a concealed carry license issued by a statutory licensing officer[14] subject to restrictions violates their Second and Fourteenth Amendment rights.

199.     The Freys and Mr. Cheng should not face arrest under § 400.00(15) for carrying a registered handgun concealed outside of their license restrictions.  There is no historical analogue

---

[13] https://www.youtube.com/watch?v=gC1L2rrztQs
[14] Penal Law § 265.00(10).

to such restrictions on the validity of a concealed carry license. Indeed, it was not until 1994 that New York held that licensing officers had the "power to restrict use of licensed firearm to purposes that justified issuance", like hunting and target shooting. See, *O'Connor v. Scarpino*, 83 N.Y.2d 919 (1994).

200.    Plaintiffs are not required to submit an application to have their restrictions removed in order to have standing to challenge the constitutionality of Penal Law § 400.00(15). See, e.g., *Shuttlesworth v. City of Birmingham Ala.*, 394 U.S. 147 (1969).

201.    Plaintiffs seek a judicial declaration that the enforcement of Penal Law § 400.00(15) against a licensee for carrying outside of license "type" violates the Second and Fourteenth Amendments.

202.    Plaintiffs also seek a temporary and permanent injunction of the enforcement of Penal Law § 400.00(15) against a licensed handgun owner who carries a handgun outside of his/her license restriction.

### *Geographical Ban of NYS Licenses*

203.    A handgun license issued by a licensing officer outside of New York City is not valid inside of New York City under § 400.00(6).

204.    There is no historical analogue for such a regulation.

205.    Plaintiffs seek (i) a judicial declaration that Penal Law § 400.00(6) violates the Second and Fourteenth Amendments, and (ii) a temporary and permanent injunction of its enforcement.

### *Carrying in "Sensitive" and "Restricted" Areas*

206.    New York's ban on the possession of firearms in 'sensitive places' and 'restricted locations' is inconsistent with this Nation's historical tradition of firearm regulation. Defendants

cannot justify the CCIA's ban the possession/carry of firearms on all private, commercial, and residential property and virtually every public location in the State.

207.   Penal Law §§ 265.01-d and 265.01-e are a blanket ban on conduct protected by the Second and Fourteenth Amendments – possession/carriage of firearms for self-defense. No license can be obtained by the ordinary person to shield the protected conduct barred by these statutes from felony arrest and prosecution.

208.   Penal Law §§ 265.01-d and 265.01-e are overbroad and facially invalid; they expand the category of "sensitive places" to all private and essentially all public property, eviscerating the general right of ordinary people to publicly possess/carry arms for self-defense.

209.   Penal Law § 265.01-d turns all private property into a "restricted area", presumptively barring the exercise of constitutional rights unless the property owner places "clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or has otherwise given express consent." A violation of § 265.01-d is a Class E Felony.

210.   Section 265.01-d converts most of New York State, including New York City, into a "sensitive area" presumptively barring the exercise of constitutional rights on private and public property where ordinary people travel, visit, and gather.

211.   Under Penal Law § 265.01-e, a person is guilty of a Class E Felony for the "mere possession" of a firearm for self-defense in the following "sensitive locations":

(a) any place owned or under the control of federal, state or local government, for the purpose of government administration, including courts;
(b) any location providing health, behavioral health, or chemical dependance care or services;
(c) any place of worship or religious observation;
(d) libraries, public playgrounds, public parks, and zoos;
(e) the location of any program licensed, regulated, certified, funded, or approved by the office of children and family services that provides services to children, youth, or young

adults, any legally exempt childcare provider; a childcare program for which a permit to operate such program has been issued by the department of health and mental hygiene pursuant to the health code of the city of New York;

(f) nursery schools, preschools, and summer camps;

(g) the location of any program licensed, regulated, certified, operated, or funded by the office for people with developmental disabilities;

(h) the location of any program licensed, regulated, certified, operated, or funded by office of addiction services and supports;

(i) the location of any program licensed, regulated, certified, operated, or funded by the office of mental health;

(j) the location of any program licensed, regulated, certified, operated, or funded by the office of temporary and disability assistance;

(k) homeless shelters, runaway homeless youth shelters, family shelters, shelters for adults, domestic violence shelters, and emergency shelters, and residential programs for victims of domestic violence;

(l) residential settings licensed, certified, regulated, funded, or operated by the department of health;

(m) in or upon any building or grounds, owned or leased, of any educational institutions, colleges and universities, licensed private career schools, school districts, public schools, private schools licensed under article one hundred one of the education law, charter schools, non-public schools, board of cooperative educational services, special act schools, preschool special education programs, private residential or non-residential schools for the education of students with disabilities, and any state-operated or state-supported schools;

(n) any place, conveyance, or vehicle used for public transportation or public transit, subway cars, train cars, buses, ferries, railroad, omnibus, marine or aviation transportation; or any facility used for or in connection with service in the transportation of passengers, airports, train stations, subway and rail stations, and bus terminals;

(o) any establishment issued a license for on-premise consumption pursuant to article four, four-A, five, or six of the alcoholic beverage control law where alcohol is consumed and any establishment licensed under article four of the cannabis law for on-premise consumption;

(p) any place used for the performance, art entertainment, gaming, or sporting events such as theaters, stadiums, racetracks, museums, amusement parks, performance venues, concerts, exhibits, conference centers, banquet halls, and gaming facilities and video lottery terminal facilities as licensed by the gaming commission;

(q) any location being used as a polling place;

(r) any public sidewalk or other public area restricted from general public access for a limited time or special event that has been issued a permit for such time or event by a governmental entity, or subject to specific, heightened law enforcement protection, or has otherwise had such access restricted by a governmental entity, provided such location is identified as such by clear and conspicuous signage;

(s) any gathering of individuals to collectively express their constitutional rights to protest or assemble;

(t) the area commonly known as Times Square, as such area is determined and identified by the city of New York; provided such area shall be clearly and conspicuously identified with signage.

212.    Ordinary people, NYS Licensees, and NYC Licensees are not exempted from arrest and/or prosecution for violating Penal Law §§ 265.01-d and 265.01-e.

213.    The sole ground for enacting these regulations is "public safety"[15], which the Supreme Court has stated several times does not take precedence over the individual right to possess weapons for self-defense and cannot be used to justify firearm regulations. See, *Heller*, *McDonald*, *Bruen*.

214.    Penal Law §§ 265.01-d and 265.01-e are overbroad, vague, and lack any historical analogue; as such they should be enjoined, declared unconstitutional, and stricken.

215.    Defendants - who alone bear the burden - cannot demonstrate that the challenged regulations are consistent with this our Nation's historical traditions of firearm regulation.

216.    Plaintiffs have suffered and will continued to suffer the violation of their constitutional rights, among other things, the inability to protect themselves and their families, lack of peace of mind, stress, fear of arrest and incarceration, risk of arrest, incarceration, property loss, and other criminal and civil penalties. Plaintiffs will continue to suffer such harm in the absence of the relief sought herein.

217.    New York City is liable to Plaintiffs for presumed monetary damages in at least a nominal amount for its enforcement of §§ 400.00(6) as described herein.

218.    New York City is liable to Plaintiffs for presumed monetary damages in at least a nominal amount for its enforcement of §§ 400.00(15) as described herein.

219.    New York City is liable to Plaintiffs for presumed monetary damages in at least a nominal amount for its enforcement of §§ 265.01-d and 265.01-e as described forth herein.

---

[15] https://www.youtube.com/watch?v=gC1L2rrztQs

220.    New York City is liable to Plaintiffs for presumed monetary damages in at least a nominal amount for its enforcement of §§ 265.01, 265.01-b, and 265.03(3) as described herein.

### COUNT I
### U.S. CONST., AMEND. II and XIV, 42 U.S.C. § 1983
### [Geographical Ban under Penal Law § 400.00(6)]

221.    Plaintiffs repeat and reallege paragraphs 1 to 220 as if set forth fully herein.

222.    The conduct regulated by § 400.00(6) is protected by the plain language of the Second Amendment.

223.    Penal Law § 400.00(6) is inconsistent with this Nations' historical traditions of firearm regulation and has no historical analogue.

224.    Plaintiffs are entitled to preliminary and permanent injunctive relief enjoining Penal Law § 400.00(6), which violates the Second and Fourteenth Amendments and should be stricken in its entirety.

### COUNT II
### U.S. CONST., AMEND. II and XIV, 42 U.S.C. § 1983
### [Penal Law § 400.00(15)]

225.    Plaintiffs repeat and reallege paragraphs 1 to 224 as if set forth fully herein.

226.    The conduct regulated by § 400.00(15) is protected by the plain language of the Second Amendment.

227.    Penal Law § 400.00(15) is inconsistent with this Nations' historical traditions of firearm regulation and has no historical analogue.

228.    Plaintiffs are entitled to preliminary and permanent injunctive relief enjoining the enforcement of Penal Law §§ 400.00(15) against handgun licensees for carrying a handgun concealed outside of their license restrictions, which violates the Second and Fourteenth Amendments.

## COUNT III
## U.S. CONST., AMEND. II and XIV, 42 U.S.C. § 1983
### [Open Carry]

229.   Plaintiffs repeat and reallege paragraphs 1 to 228 as if set forth fully herein.

230.   The conduct regulated by §§ 400.00(15), 265.01, 265.01-b, 265.01-d, 265.01-e, and 265.03(3) is protected by the plain language of the Second Amendment.

231.   Such restrictions on the right to open carry are inconsistent with this Nations' historical traditions of firearm regulation and have no historical analogue.

232.   Plaintiffs are entitled to preliminary and permanent injunctive relief enjoining Penal Law §§  400.00(15), 265.01, 265.01-b, 265.01-d, 265.01-e, and 265.03(3) from being enforced against licensed individuals who carry a handgun open and exposed on their person, as the regulations violate the Second and Fourteenth Amendments.

## COUNT IV
## U.S. CONST., AMEND. II and XIV, 42 U.S.C. § 1983
### [Restricted Locations § 265.01-d]

233.   Plaintiffs repeat and reallege paragraphs 1 to 232 as if set forth fully herein.

234.   The conduct regulated by § 265.01-d is protected by the plain language of the Second Amendment.

235.   Such restrictions on the right to possess/carry a firearm are inconsistent with this Nations' historical traditions of firearm regulation and have no historical analogue.

236.   Plaintiffs are entitled to preliminary and permanent injunctive relief from the enforcement of Penal Law § 265.01-d, as the regulations violate the Second and Fourteenth Amendments.

## COUNT V
### U.S. CONST., AMEND. II and XIV, 42 U.S.C. § 1983
### [Sensitive Locations § 265.01-e]

237.    Plaintiffs repeat and reallege paragraphs 1 to 236 as if set forth fully herein.

238.    The conduct regulated by § 265.01-e is protected by the plain language of the Second Amendment.

239.    Such restrictions on the right to possess/carry a firearm in public for self-defense are inconsistent with this Nations' historical traditions of firearm regulation and have no historical analogue.

240.    Plaintiffs are entitled to preliminary and permanent injunctive relief from the enforcement of Penal Law § 265.01-e, as the regulations violate the Second and Fourteenth Amendments.

## COUNT VI
### U.S. CONST., AMEND. II and XIV, 42 U.S.C. § 1983
### [*Monell* Liability Against New York City, New York]

241.    Plaintiffs repeat and reallege paragraphs 1 to 240 as if set forth fully herein.

242.    New York City is liable to Plaintiffs under *Monell* for violations of their Second and Fourteenth Amendment rights for implementation of its policies and procedures related to the enforcement of § 400.00(6);

243.    New York City is liable to Plaintiffs under *Monell* for the enforcement of the patently unconstitutional Penal Law statutes challenged herein;

244.    New York City is liable to Plaintiffs under *Monell* for the enforcement of its policies and practices related to firearm regulation as detailed herein.

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

- A judicial declaration that Penal Law § 400.00(6) violates the Second and Fourteenth Amendments; and the issuance of temporary order during the pendency of this matter, and a permanent order thereafter, against Defendants, their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Defendants who receive actual notice thereof from implementing and enforcing Penal Law § 400.00(6);

- A judicial declaration that enforcement of Penal Law § 400.00(15) against a handgun licensee for carrying concealed handgun outside of his/her license "type" or restriction violates the Second and Fourteenth Amendments; and the issuance of temporary order during the pendency of this matter, and a permanent order thereafter, against Defendants, their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Defendants who receive actual notice thereof from implementing and enforcing Penal Law § 400.00(15) against such licensees;

- A judicial declaration that enforcement of Penal Law §§ 400.00(15), 265.01, 265.01-b, 265.01-d, 265.01-e, and/or 265.03(3) against a licensed handgun owner who carries a handgun open and exposed on their person for self-defense violates the Second and Fourteenth Amendments; and the issuance of temporary order during the pendency of this matter, and a permanent order thereafter, against Defendants, their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Defendants who receive actual notice thereof from implementing and

enforcing Penal Law §§ 400.00(15), 265.01, 265.01-b, 265.01-d, 265.01-e, and 265.03(3) against licensed handgun owners who open carry;

- A judicial declaration that Penal Law §§ 265.01-d and 265.01-e are (i) facially unconstitutional and violate the Second and Fourteenth Amendments; and/or (ii) are overbroad and vague and violative of the Second and Fourteenth Amendments; and/or (iii) are unconstitutional as applied to individuals who hold a valid handgun license; and the issuance of temporary order during the pendency of this matter, and a permanent order thereafter, against Defendants, their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Defendants who receive actual notice thereof from implementing and enforcing Penal Law §§ 265.01-d and 265.01-e (i) generally; and/or against handgun licensees;

- Presumed monetary damages against Defendants for the constitutional violations alleged herein in at least a nominal amount;

- Reasonable statutory attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable statute; and

- Such other further and different relief as to this Court seems just, proper, and equitable.

Dated: October 3, 2022
Scarsdale, New York

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiffs*

By:     _____/s_____
Amy L. Bellantoni (AB3061)
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090 (t)
(888) 763-9761 (f)
abell@bellantoni-law.com

41