UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

JASON FREY, BRIANNA FREY,                              Case No. 21 Civ. 05334 (NSR)
JACK CHENG, and WILLIAM SAPPE,

                                        Plaintiffs,

                -against-

NEW YORK CITY, New York, STEVEN NIGRELLI,
in his Official Capacity, KEECHANT SEWELL,
in her Official Capacity,

                                        Defendants.
----------------------------------------------------------------x

# PLAINTIFFS' MEMORANDUM OF LAW
# IN SUPPORT OF ORDER TO SHOW CAUSE FOR
# PRELIMINARY INJUNCTION

**THE BELLANTONI LAW FIRM, PLLC**
*Attorneys for Plaintiffs*
**2 Overhill Road, Suite 400**
**Scarsdale, New York 10583**
**(914) 367-0090**
**abell@bellantoni-law.com**

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ....................................................................................... i

PRELIMINARY STATEMENT ................................................................................. 1

LEGAL ARGUMENT ............................................................................................... 2

I. NO DEFERENCE TO THE LEGISLATURE IS WARRANTED ........................................... 3

    A. No Deference to Regarding CCIA and Related NYC Regulations ............................. 3

    B. No Deference to the non-CCIA Regulations.................................................. 5

II. PLAINTIFFS HAVE STANDING TO SEEK INJUNCTIVE RELIEF ................................. 5

    A. Plaintiffs' Intent to Violate the Statutes ..................................................... 6

    B. Defendants Have Promised Enforcement Against All Licensees .............................. 9

III. THERE ARE SUFFICIENTLY SERIOUS QUESTIONS GOING TO THE MERITS TO MAKE THEM A FAIR GROUND FOR LITIGATION AND PLAINTIFFS HAVE A SUBSTANTIALLY HIGH LIKELIHOOD OF SUCCESS .................................................. 12

    A. The Statutes Cannot Pass the Bruen Test.................................................. 12

    B. Defendants Must Prove the Regulations Are Consistent with Historical Tradition .. 13

    C. Concealed Carry ............................................................................. 14

    D. Banning Open Carry Presumptively Violates the Constitution .............................. 14

    E. This Court Is Bound By the Supreme Court's Historical Analysis........................... 17

IV. PLAINTIFFS ARE SUFFERING AND WILL CONTINUE TO SUFFER IRREPARABLE HARM ................................................................................. 17

V. THE EQUITIES TIP IN PLAINTIFFS' FAVOR AND THE REQUESTED RELIEF SERVES THE PUBLIC INTEREST.............................................................. 20

CONCLUSION.......................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adam v. Barr,*
   792 F. App'x 20 (2d Cir. 2019) ......................................................................... 6

Arizona Dream Act Coalition,
   757 F.3d 1053 (9th Cir. 2014) ........................................................................ 20

*Avitabile v. Beach,*
   277 F. Supp. 3d 326 (N.D.N.Y. 2017) ......................................................... 9, 10

*Babbitt v. Farm Workers,*
   442 U.S. 289 (1979) ...................................................................................... 6, 18

*Boss v. Kelly,*
   306 F. App'x 649 (2d Cir. 2009) .................................................................... 16

*Cayuga Nation v. Tanner,*
   824 F.3d 321 (2d Cir. 2016) ................................................................... 6, 18, 20

*Connecticut Dep't of Envtl. Prot. v. O.S.H.A.,*
   356 F.3d 226 (2d Cir. 2004) ........................................................................... 19

*Connecticut State Police Union v. Rovella,*
   494 F. Supp. 3d 210 (D. Conn. 2020) .............................................................. 3

*Davis v. Federal Election Comm'n,*
   554 U.S. 724 (2008) ....................................................................................... 5, 6

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ............................................................................... 5, 15, 20

*Duncan v. Bonta,*
   265 F Supp 3d 1106, *aff'd* 742 F. App'x 218 (9th Cir. 2018) ................... 19, 21

*Espinoza v. Montana Dept. of Revenue,*
   591 U.S. ——, 140 S.Ct. 2246 (2020) ........................................................... 14

*Ezell v City of Chicago,*
   651 F3d 684 (7th Cir 2011) ............................................................................ 19

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
   559 F.3d 110 (2d Cir.2009) ............................................................................ 17

# TABLE OF AUTHORITIES (con't)

**Page(s)**

**Cases**

*Grace v. District of Columbia,*
    187 F. Supp. 3d 124 (DDC 2016) ................................................................. 19

*Hedges v. Obama,*
    724 F.3d 170 (2d Cir. 2013) .................................................................... 18

*Hobby Lobby Stores, Inc. v. Sebelius,*
    723 F.3d 1114 (10th Cir. 2013) ............................................................... 22

*Hutto v. Davis,*
    454 U.S. 370 (1984) .............................................................................. 17

*J.S.R. by & through J.S.G. v. Sessions,*
    330 F. Supp. 3d 731 (D. Conn. 2018) ....................................................... 20

*Jolly v. Coughlin,*
    76 F.3d 468 (2d Cir. 1996) .................................................................... 19

*Kelly v. Honeywell Int'l, Inc.,*
    933 F.3d 173 (2d Cir. 2019) .................................................................... 3

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................... 5, 6

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ............................................................................. 21

*Ms. L. v. U.S Immigr. & Customs Enf't ("ICE"),*
    310 F. Supp. 3d 1133 (S.D. Cal. 2018) ..................................................... 20

*Nat'l Org. for Marriage, Inc. v. Walsh,*
    714 F.3d 682 (2d Cir. 2013) .................................................................... 9

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) .................................................................... Passim

*Oquendo v. City of New York,*
    492 F. Supp. 3d 20 (E.D.N.Y. 2020) ....................................................... 16

*Payton v. New York,*
    445 U.S. 573 (1980) ............................................................................. 21

# TABLE OF AUTHORITIES (con't)

**Page(s)**

**Cases**

*Peterson v. Martinez*,
   707 F.3d 1197 (10th Cir. 2013) ............................................................... 17

*Picard v. Magliano*,
   42 F.4th 89 (2d Cir. 2022) ............................................................... 6, 12

*Shuttlesworth v. City of Birmingham, Ala.*,
   394 U.S. 147 (1969) ............................................................... 16

*Silva v. Farrish*, No. 21-0616,
   2022 U.S. App. LEXIS 23841, at *19-20 (2d Cir. Aug. 25, 2022) ........................................... 9

*Statharos v. New York City Taxi & Limousine Comm'n*,
   198 F.3d 317 (2d Cir. 1999) ............................................................... 19

*Staub v. City of Baxley*,
   355 U.S. 313 (1958) ............................................................... 16

*Steffel v. Thompson*,
   415 U.S. 452 (1974) ............................................................... 6

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ............................................................... 5, 6

*Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*,
   460 U.S. 533 (1983) ............................................................... 17

*Trump v. Deutsche Bank AG*,
   943 F.3d 627 (2d Cir. 2019) ............................................................... 3

*U.S. S.E.C. v. Citigroup Global Mkts. Inc.*,
   673 F. 3d 158 (2d Cir. 2012) ............................................................... 20

*Valenzuela Arias v. Decker*,
   2020 WL 1847986 (S.D.N.Y. Apr. 10, 2020) ............................................................... 19

*Wrenn v. District of Columbia*,
   864 F.3d 650 (D.C. Cir. 2017) ............................................................... 15

**Statutes**

NYC Admin. Code 10-315 ............................................................... 2, 3, 11, 22

## PRELIMINARY STATEMENT

> "In this case, petitioners and respondents agree that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense. We too agree, and now hold, consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022).

Plaintiffs seek an order preliminary and permanently enjoining statutes that impose criminal penalties and resulting civil penalties for the mere exercise of a guaranteed constitutional right – the right to carry a handgun for self-defense outside the home. *Bruen*, at 2122. The challenged regulations turn licensed handgun owners like Plaintiffs into criminals – misdemeanants and felons - for the mere exercise of the right to carry a firearm for self-defense. There is no historical tradition that justifies the government's regulations, and an immediate injunction is warranted to prevent further constitutional harm.

Open carry is banned in New York, but the historical traditions of this Nation reveal open carry to be the preferred method of public carry, largely unregulated. Even into the mid-19th century, "everyone started out with robust carrying rights" [*Bruen*, at 2149] only to be slightly curtailed – but not terminated - by surety laws, few statutory prohibitions on concealed carry, and common law offenses, none of which "impaired the right of the general population to peaceable public carry." *Bruen*, 2145-49.  Criminal laws punishing ordinary people, like Plaintiffs, for peaceably carrying a handgun on their person open and holstered (open carry) in the public square, market, or eatery for example, have no historical analogue and are presumptively unconstitutional.

Concealed carry is still (improperly) viewed as a 'privilege' in New York State, as evidenced by the State's archaic 'may issue' licensing scheme and post-*Bruen* insertion of even more subjective language and criminal penalties with the enactment of the Concealed Carry

Improvement Act (CCIA) in September 2022 and New York City's analogous regulations and NYPD protocols.

The Supreme Court held in *Bruen* that requiring an individual to prove they had a 'proper cause' to carry a handgun for self-defense violated the Second and Fourteenth Amendments. Likewise, statutes that punish a licensed handgun owner with criminal sanctions (and more) for crossing over from Westchester or Nassau County into New York City, carrying a handgun in public and on private land, and carrying a handgun open and holstered are inconsistent with this Nation's historical traditions of firearm regulation. And laws criminalizing concealed handgun licensees for carrying outside of their concealed carry sports-related 'restriction' fare no better.

Plaintiffs are entitled to a preliminary and permanent injunction against Defendants, their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with defendants, who receive actual notice thereof from implementing and enforcing Penal Law sections 400.00(6), 400.00(15), 265.01, 265.01-b, 265.01-d, 265.01-e, 265.03(3), and NYC Admin. Code 10-315 and the NYPD Rules promulgated thereunder against: (1) individuals who hold a valid handgun license issued by a New York State licensing officer and carry a handgun open and exposed (holstered) on their person; (2) individuals who hold a valid handgun license issued by a New York State licensing officer[1] and carry a handgun concealed; and for such further and different relief as this Court deems just and proper.

## LEGAL ARGUMENT

To obtain a preliminary injunction, a movant must show irreparable harm and meet either of two standards: (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping

---

[1] As defined in Penal Law § 265.00(10).

2

decidedly in the movant's favor." *Connecticut State Police Union v. Rovella*, 494 F. Supp. 3d 210, 218 (D. Conn. 2020) quoting, *Trump v. Deutsche Bank AG*, 943 F.3d 627, 635 (2d Cir. 2019), rev'd on other grounds, —— U.S. ——, 140 S.Ct. 2019, 207 L.Ed.2d 951 (2020); *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 184 (2d Cir. 2019).

## I. NO DEFERENCE TO THE LEGISLATURE IS WARRANTED

Usually, where a party seeks to enjoin "government action" taken pursuant to a statutory or regulatory scheme, an injunction should be granted only if the movant demonstrates a likelihood of success on the merits. *Deutsche Bank AG*, 943 F.3d at 635. This "exception" to the use of the serious-questions standard reflects the idea that governmental policies implemented through legislation are entitled to a higher degree of deference and should not be enjoined lightly. *Rovella,* at 219. The likelihood-of-success standard is generally appropriate in a case where the full play of the democratic process involving both the legislative and executive branches has produced a policy in the name of the public interest embodied in a statute and implementing regulations. *Id.*

### A. No Deference to Regarding CCIA and Related NYC Regulations

No deference to the legislature is warranted when considering the constitutionality of the CCIA and related New York City regulations.[2] The CCIA, NYC Admin. Code 10-315 and accompanying NYPD Rules are the product of Governor Hochul and her administration working in partnership with NYC Mayor Adams and Commissioner Sewell (2:27) with the specific intention of defying the Supreme Court's ruling in *Bruen.* In her August 31, 2022 public address, Gov. Hochul lauded herself and her "partners" in the yearlong project with New York City, Commissioner Sewell and "advocates" like the Gifford Law Center and Senior Counsel for

---

[2] No challenge is made at this time to those sections of the CCIA that ban possession of firearms in polling places, courts and other locations that have been enumerated by the Supreme Court as 'sensitive places.' As set forth in Plaintiffs' sworn Declarations, they do not intend to carry a firearm in such locations.

"Everytown for Gun Safety" with whom she has "been joined at the hip" who were "helpful in the whole process of writing legislation (the CCIA) that we believe is responsive to the Supreme Court decision [in *Bruen*]". Had the Supreme Court not decided *Bruen*, Gov. Hochul confessed, "we would not be having this conversation." (2:41). Hochul proudly stated she and her "partners" had been working since last year to counter the *Bruen* decision and she "was ready for it." *Id.*

When the *Bruen* opinion was published, Governor Hochul called the already-recessed Legislature back for a special session to enact the CCIA[3] - laws that are intended to be, and are, in direct contravention to the Supreme Court's holding, analysis, and historical account of this Nation's traditions as set forth in *Bruen*, *Heller*, *McDonald*, and *Caetano*.

Gov. Hochul proudly announced she "fought back" against the United States Supreme Court (7:00). Let that sink in. Our governor "fought back" against our Nation's highest Court - the final adjudicator of questions of constitutional law. She announced her intention and those of her 'partners' to disregard and defy the Constitution and the rule of law. Specifically, the rights protected by the Second and Fourteenth Amendments. No deference is due to the legislature's passage of the CCIA because it was not produced for the benefit of the People, but rather in defiance of the People's Rights. To their detriment, Gov. Hochul and the legislature used the same 'public interest', 'means-end', 'collective rights' arguments (7:00) that have been resoundingly rejected by the Supreme Court since its decision in *Heller*, *McDonald*, and *Bruen*.

"Unqualified deference" is due to the Second Amendment, not state legislatures that knowingly violate it.

> "If the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of "intermediate scrutiny" often defer to the determinations of legislatures. But while that judicial

---

[3] *Id.*

4

deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here. The Second Amendment "is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Heller*, 554 U.S. at 635, 128 S.Ct. 2783.

It is this balance—struck by the traditions of the American people—that demands our unqualified deference."

*Bruen*, at 2131.

### B. No Deference to the non-CCIA Regulations

Similarly, no legislative deference is warranted regarding the non-CCIA regulations, which were enacted under the misguided belief that possession of a handgun is a privilege, the Second Amendment does not apply to the states, and only applies to the collective rights of a militia. New York State's ban on open carry, intrastate geographical restrictions, and criminal penalties for carrying outside of one's restriction were enacted using the same 'public safety' interest balancing reasons that have been rejected by the Supreme Court and are not entitled to deference.

## II. PLAINTIFFS HAVE STANDING TO SEEK INJUNCTIVE RELIEF

Only one plaintiff need have standing to seek each form of relief requested in the complaint. *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008). The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.

To establish injury in fact, a plaintiff must show that he suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). An allegation of future injury may suffice if the threatened injury is "certainly impending," or there is a "substantial risk" that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). This injury must be fairly traceable to the

challenged action of the defendant and likely to be redressed by a favorable decision. *Lujan,* at 560–61. For pre-enforcement challenges, "[a] party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. FEC*, 554 U.S. 724, 734 (2008). An actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging a law. *Id.* citing, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).

A plaintiff satisfies the injury-in-fact requirement where he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony*, 573 U.S. at 158–59 quoting, *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979). The Second Circuit's "low threshold" showing of a credible threat of enforcement is a "forgiving" standard, and "courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022).  Although a credible threat is not established by 'imaginary or speculative' fears of prosecution[4]  the Second Circuit has found a credible threat when the government has announced its intention to enforce the challenged regulation. See, *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016).

### A.  Plaintiffs' Intent to Violate the Statutes

Plaintiffs face a credible threat of enforcement. As set forth in their Declarations, Plaintiffs have announced their intention to carry a firearm in violation of the challenged laws sufficient to confer Article III standing. [See, Declarations of Jason Frey, Brianna Frey, and William Sappe].

Jason Frey "regularly carr[ies] a handgun concealed on [his] person in public" [Dec. J. Frey at ¶14] and he intends to continue carrying his licensed handgun outside of his 'sportsman' carry restriction, during his everyday life for self-protection [¶14], including locations that are 'sensitive'

---

[4] *Adam v. Barr*, 792 F. App'x 20, 22 (2d Cir. 2019).

and 'restricted' in violation of the CCIA. Mr. Frey carries while "shopping at the Jefferson Valley Mall and Acme in Yorktown and to Shop Rite and Walmart in the Cortlandt Town Center", at restaurants "that are also subject to the alcohol beverage control laws, including Primavera Restaurant in Croton Falls, BLT Steakhouse in White Plains, Antonella's on Route 9 in Fishkill, La Famiglia in Carmel and other restaurants", businesses that do not "have 'conspicuous signage' granting [him] permission to exercise [his] right to be armed for self-defense" [¶14], when he goes to the "Regal Cinemas in the Cortlandt Town Center" and plans to carry there "within the next week or two." [¶15]. Mr. Frey will not "seek permission" or refrain from carrying because there is no 'conspicuous signage' granting permission to carry. [¶16]. The NYSP have a barracks in the Cortlandt Town Center and it is "very likely" that a trooper could observe a bulge from Mr. Frey's firearm while he is shopping at the Cortlandt Town Center or walking to his car and arrest him because there is no 'conspicuous signage' granting 'permission' for people to carry firearms. [¶17]. Mr. Frey also carries when "getting gas" at "BP on Route 6 and 7-11 in Jefferson Valley" which also "lack 'conspicuous signage' but he intends to continue getting gas "at these and other locations." [¶19]. Mr. Frey carries at "various parks" in Westchester County like "Sunnyside Park" and "Legacy Field", noting that "[b]ear and coyote sightings are not uncommon." [¶18]. These locations are outside of Mr. Frey's CCW 'sportsman' restriction and are 'sensitive' and 'restricted' locations. Mr. Frey also carries concealed in the City, on "the Metro North Train into Grand Central" on "the number 4 train" and to "Times Square to get goodies at Junior's" and "Murray's Bagels on 8th Avenue" [¶27], when visiting "friends in Williamsburg", on the "L train", and he "intend[s] to continue" carrying in New York City. [¶27].   Mr. Frey also has a specific intent to carry open and holstered ("open carry") at the above locations when he is not carrying a handgun

concealed [¶¶21, 28, 31], but does not intend to carry a handgun at those places the Supreme Court has indicated are 'sensitive locations' such as polling places and courthouses. [¶33].

Brianna Frey is a wife and mother; she holds a valid NYS handgun license restricted to 'sportsman.' [Dec. B. Frey at ¶3]. Mrs. Frey intends to carry a handgun outside of her 'sportsman' concealed carry restriction for her protection and her family's at places that she regularly visits because she "does not want to be in a situation where either [her] life or the lives of [her] husband and children are at stake and [she] was unarmed and unable to protect [herself] or them." [¶11]. Mrs. Frey intends to carry at the "Jefferson Valley Mall, Acme in Yorktown and the Shop Rite and Walmart in the Cortlandt Town Center", which she does "on a regular basis" [¶12]; she also intends to carry at various restaurants she visits with her family, like "Primavera Restaurant in Croton Falls, BLT Steakhouse in White Plains, Antonella's on Route 9 in Fishkill, La Famiglia in Carmel and other restaurants" that are subject to the alcohol and beverage laws [¶13], and at "Regal Cinema" at the "Cortlandt Town Center", where she intends to see "Halloween Ends" within "the next week or two." [¶14].

Mr. Sappe holds a valid full carry concealed handgun license issued by a judicial licensing officer outside of New York City [Dec. of W. Sappe at ¶¶ 2, 3], which is not valid in New York City. Mr. Sappe intends to carry concealed in New York City for self-defense "on a daily basis." [¶10]. Based on his work "in the Diamond District where [he] com[es] in and out of high-end jewelry stores", "transport[ing] substantial amounts of cash, diamonds, and jewelry for high-end jewelers…between the Diamond District and various locations in the 5 boroughs of New York City, throughout New York State, and to other states, including California and Nevada" Mr. Sappe is a "high-level target for a violent attack" and "will be carrying a concealed handgun for self-protection on a regular basis from now on." [¶¶7, 10].

8

Mr. Sappe "travel[s] through the area designated as the "Times Square" gun-free zone and is "going to carry [his] handgun in the Times Square area for self-protection even though such constitutionally-protected activity had been made unlawful by New York State and New York City", notwithstanding that his "daily commute will now subject [him] to being arrested and charged with a felony" among other civil and criminal penalties. [¶13]. Mr. Sappe also intends to carry "open and exposed" when he is not carrying a handgun concealed, both "inside New York City and throughout the state." [¶19]. Mr. Sappe does not intend to carry a handgun at places the Supreme Court indicated are 'sensitive locations' such as polling places and courthouses. [¶24].

Having a handgun license is not an exception or defense to arrest and incarceration under the CCIA for carrying a handgun in a 'sensitive place' or 'restricted location.' See, Penal Law § 265.20.

Plaintiffs have established their respective standing by declaring their intentions to engage in a course of conduct protected by the constitution but proscribed by statute; there exists a credible threat of prosecution thereunder, and Plaintiffs should not be required to await and undergo a criminal prosecution as the sole means of seeking relief. See, *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689-90 (2d Cir. 2013) (a plaintiff need not demonstrate to a certainty that he will be prosecuted under the statute to show injury, only an actual and well-founded fear that the law will be enforced against him). Plaintiffs have a well-founded fear of enforcement against them.

**B. Defendants Have Promised Enforcement Against All Licensees**

In the Second Circuit, a credible threat exists where the state does not dispute that it would apply those regulations to the plaintiffs and the defendants have failed to disavow the claim that they would criminally charge the plaintiffs for violating the challenged statutes. See, *Silva v. Farrish*, No. 21-0616, 2022 U.S. App. LEXIS 23841, at *19-20 (2d Cir. Aug. 25, 2022); *Avitabile*

*v. Beach*, 277 F. Supp. 3d 326, 331-32 (N.D.N.Y. 2017) (plaintiff asserted credible threat of enforcement by announcing a "desire" to engage in conduct that "would be likely to result in his prosecution," even absent any specific  intention by the district attorney to enforce the statute).

Gov. Hochul's August 31, 2022 press conference with Nigrelli, NYC Mayor Adams, and NYPD Commissioner Sewell collectively informed the public of their united front in the war on the Second Amendment and all individuals seeking to exercise their rights thereunder.[5] Rather than adhere to the plain text and national history and traditions, as required by *Bruen*, Defendants entered into a "partnership" with anti-Second Amendment "advocates" Gifford Law Center and "Everytown for Gun Safety", with whom Defendants have "been joined at the hip", and were "ready for [the Supreme Court's opinion in *Bruen*]"; when *Bruen* was published, the already-recessed Legislature was called back for a special session to enact laws – to "fight back" against the Supreme Court. (7:00).

Nigrelli vociferously thanked Hochul from the podium as "someone [he] looks up to" for her "leadership on this topic…laser-like focus on ***eradicating guns***, illegal guns, and ***gun crimes***...***we appreciate that at the State Police***." (36:10).  Like Hochul, Nigrelli emphasized the importance of "partnerships", proclaiming that, to be successful in enforcing their anti-gun laws, they "found the greatest partner in the world – the NYPD. Commissioner Sewell thank you for what you and your organization does." (36:53). Nigrelli and the NYSP will enforce the State's anti-gun laws against everyone who violates them:

> "Governor, it's an easy message. I don't have to spell it out more than this. We'll have ***zero tolerance***. ***If you violate this law, you will be arrested***. Simple as that. Because the New York State Troopers are ***standing ready to do our job to ensure ... all laws are enforced***." *Id.* (emphasis added).

---

[5] https://www.youtube.com/watch?v=gC1L2rrztQs

Nigrelli hit the nail – "Eradicating guns" – all guns. Nigrelli spoke as the head of the NYSP to the entire state – but, more specifically, to ***all licensed handgun owners***. The *Bruen* case stripped New York State of its control over who can defend themselves in public by striking the state's "proper cause" requirement for concealed carry. In response, Defendants made virtually every private and public area of the state a sensitive or a restricted place where even licensed handgun owners face felony charges. "Zero tolerance" - for lawful gun owners. The NYSP and NYPD do not recognize a right to carry your firearm outside of the home. Violent criminals are still free to commit crime at will because now the entire state is a "gun free zone."[6]

In September 2022, Jason Frey was told by a NYPD officer that if he carries a handgun in New York City he'll be arrested because his Westchester permit is no good in the City, and that he will also be arrested for open carrying because "there's no open carry in New York City…it's illegal." [Dec. J. Frey at ¶¶28-29].

An August 2022 legal bulletin instructs NYPD officers that "Anyone carrying a firearm is presumed to be carrying unlawfully until proven otherwise", a view in marked conflict with the fact that the Second Amendment "presumptively protects" possessing and carrying a handgun for self-protection. [Bellantoni Dec. at Ex. 1]. The bulletin instructs, "[o]fficers may stop an individual when the officer has reasonable suspicion that an individual is carrying a firearm [ ] and may frisk that individual since the officer has reasonable suspicion that the individual is armed and dangerous, meaning that an individual simply engaging in Second Amendment-protected conduct now gives the NYPD reasonable suspicion to believe an individual is '*dangerous*.' [Dec. Sappe ¶¶ 14-15]. NYPD officers who think that an individual might be armed have a basis to stop and frisk,

---

[6] Like Gov. Hochul, Mayor Adams recently passed legislation making Times Square a 'gun free zone' and authorizing the NYPD to promulgate their own Rules of enforcement under NYC Admin. Code 10-315.

which will ensure Plaintiffs' arrest and incarceration if they carry in New York City because they do not have a NYC handgun license and their NYS license is invalid in the City. § 400.00(6); (15).

Regarding open carry, the NYSP Pistol Permit Bureau confirmed on September 6, 2022 that open carry by a handgun licensee is illegal in New York State, whether as a misdemeanor under § 400.00(15) or a felony under § 265. [Dec. J. Frey at ¶23; Bellantoni Dec. at Ex. 2]. Because Nigrelli's troopers will enforce "all laws", any trooper observing Plaintiffs carrying open and exposed will arrest, jail, and charge Plaintiffs with a crime.

Jason Frey faces a credible and imminent risk of arrest and incarceration, handgun license revocation, loss of property, and other criminal and civil penalties, for carrying a handgun in New York State and New York City, which is heightened because he has announced through this lawsuit that he is presently exercising his Second Amendment rights in violation of the law.

Brianna Frey and William Sappe face a credible threat of enforcement of the challenged regulations by the NYSP and NYPD, as set forth herein, as this lawsuit has brought to the attention of the NYSP and NYPD that they intend to engage in constitutionally protected conduct that also violates the law. Courts are generally "willing to presume that the government will enforce the law" [*Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022)] and Defendants' statements and conduct show that enforcing the statutes to effectually ban public carry is at the forefront of their agendas and no Defendant has disavowed enforcement of the challenged regulations. See, *Silva,* at 19-20.

## III. THERE ARE SUFFICIENTLY SERIOUS QUESTIONS GOING TO THE MERITS TO MAKE THEM A FAIR GROUND FOR LITIGATION AND PLAINTIFFS HAVE A SUBSTANTIALLY HIGH LIKELIHOOD OF SUCCESS

### A.  The Statutes Cannot Pass the *Bruen* Test

Flatly rejecting the 'interest balancing' test formerly applied by the Second Circuit to Second Amendment claims, the Supreme Court laid out a clear path to determine the

constitutionality of government regulations affecting the Second Amendment: "We reiterate that the standard for applying the Second Amendment is as follows:

> "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.
>
> The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"

*Bruen*, at 2126. ("In sum, the Courts of Appeals' second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny.") (citation omitted).

The Constitution presumptively protects Plaintiffs' conduct - carrying a handgun for self-defense.

Defendants now have an affirmative obligation to prove that the challenged statutes are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, at 2126. "Only then may this Court conclude that Plaintiffs' conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, at 2126-2127.

Defendants cannot meet their burden.

**B. Defendants Must Prove the Regulations Are Consistent with Historical Tradition**

Because "not all history is created equal," the *Bruen* Court held that, when deciding whether the government's regulation is consistent with this Nation's historical tradition,

> "the only appropriate inquiry is what the public understanding of the right to keep and bear arms was during the ratification of the Second Amendment in 1791, and perhaps during ratification of the Fourteenth Amendment in 1868."

*Bruen*, at 2138.

"Post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, at 2137

13

(emphasis supplied) citing, *Heller*, 670 F.3d at 1274, n. 6 (Kavanaugh, J., dissenting); *Espinoza v. Montana Dept. of Revenue*, 591 U.S. ——, ——, 140 S.Ct. 2246, 2258–2259 (2020).

The historical evidence from antebellum America demonstrates that the manner of public carry was subject to reasonable regulation, but none of these limitations on the right to bear arms operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose. *Bruen*, 142 S. Ct. at 2120.

### C.  Concealed Carry

Concealed carry falls within the conduct protected by the Second Amendment – carrying a handgun in public for self-defense.

Criminal penalties for carrying outside of one's concealed carry license restriction and having to seek permission to carry a handgun into another county within the same state are inconsistent with the 'traditions' rooted in America's 'history' of firearm regulation.

Punishing licensed individuals as criminals for carrying a handgun for self-protection in the 'public square', at restaurants, gas stations, parks, malls, and all other places that general members of the public go, eviscerates the Second Amendment.

In any event, Defendants alone have the burden of establishing that their regulations are consistent with this Nation's historical traditions of firearm regulations, which they are not.

### D.  Banning Open Carry Presumptively Violates the Constitution

Open carry is conduct that is "presumptively guarantee[d]" by the Constitution. *Bruen*, 142 S.Ct. at 2129-30 ("The Second Amendment's plain text thus presumptively guarantees a right to 'bear' arms in public for self-defense."). *Bruen*, 142 S.Ct. at 2135.

Defendants cannot demonstrate any historical tradition banning open carry because none exists, nor is there any American historical tradition of imposing criminal sanctions for the open

carriage of handgun for self-defense. Even New York did not criminalize open carry or even require individuals to seek and obtain a license to carry concealed within the relevant historical time period. The Sullivan Law, which banned open carry and criminalized concealed carry for all but the privileged few who could obtain a license, was not enacted until 1911.

Criminal penalties for open carry, whether under § 400.00(15) if interpreted as carrying outside of license restriction or under Penal Law section 265, have no historical analogue. Likewise, the numerous locations now defined as 'sensitive' and 'restricted' locations under sections 265.01-d and 265.01-e are inconsistent with this Nation's robust right to open carriage of handguns[7], as are intrastate restrictions on open carry based on county and/or population size.

None of the challenged statutes existed in Antebellum America, nor was the tradition at the time consistent therewith. The Supreme Court's extensive historical analysis in *Heller*, *McDonald*, and *Bruen* reveals that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2120 quoting, *Heller*, 554 U.S. at 614.[8]

"[Where] later history contradicts what the text says, the text controls." *Bruen*, 142 S. Ct. at 2137. Public carry restrictions, which did not arise until after the ratification of the Second Amendment, can be categorized into (i) Common-Law Offenses, which forbade "affray" or going armed "to the terror of the people" but did not impair the right of the general population to peaceable public carry; (ii) Statutory Prohibitions proscribed the *concealed* carry of pistols and

---

[7] Plaintiffs are not challenging those areas identified as sensitive locations by the Supreme Court, such as courthouses and polling places.

[8] "Indeed, the few nineteenth-century cases that upheld onerous limits on carrying against challenges under the Second Amendment or close analogues are sapped of authority by *Heller I* because each of them assumed that the Amendment was only about militias and not personal self-defense. So *Heller I* rejects their crucial premise. "And with these cases off the table, the remaining cases speak with one voice" on the Amendment's coverage of carrying as well as keeping arms. *Peruta*, 742 F.3d at 1174. Under *Heller I's* treatment of these and earlier cases and commentaries, history matters, and here it favors the plaintiffs." *Wrenn*, 864 F.3d at 658, citing, *Peruta v. Cty. of San Diego*, 742 F.3d 1144, 1174 (9th Cir. 2014), vacated, 781 F.3d 1155, 1156-63 (9th Cir. 2015).

other small weapons; and (iii) Surety Statutes, which required individuals to post a bond before

carrying weapons in public, but only if another person specifically show "reasonable cause to fear

an injury, or breach of the peace"; even then, if the accused proved a special need the fee could be

avoided. *Bruen*, 142 S. Ct. at 2120.

"[N]one of these limitations on the right to bear arms operated to prevent law-abiding

citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id.*

The challenged regulations violate the free exercise of rights protected by the plain

language of the Second Amendment. See, *Oquendo v. City of New York*, 492 F. Supp. 3d 20

(E.D.N.Y. 2020) ("Under New York law, it is well settled that the possession of a handgun license

is a privilege, not a right, which is subject to the broad discretion of the New York City Police

Commissioner.") quoting, *Boss v. Kelly*, 306 F. App'x 649, 650 (2d Cir. 2009) (citation omitted).

> "It is settled by a long line of recent decisions of this Court that an ordinance
> which, like this one, makes the peaceful enjoyment of freedoms which the
> Constitution guarantees contingent upon the uncontrolled will of an official—as
> by requiring a permit or license which may be granted or withheld in the
> discretion of such official—is an unconstitutional censorship or prior restraint
> upon the enjoyment of those freedoms. *Staub v. City of Baxley*, 355 U.S. 313,
> 322, 78 S.Ct. 277, 282, 2 L.Ed.2d 302.
>
> …our decisions have made clear that a person faced with such an
> unconstitutional licensing law may ignore it and engage with impunity in the
> exercise of the right of free expression for which the law purports to require a
> license. The Constitution can hardly be thought to deny to one subjected to the
> restraints of such an ordinance the right to attack its constitutionality, because
> he has not yielded to its demands."

*Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 151 (1969) (quotation marks and footnote

omitted); see also, *People of the State of California v. Diaz*, Sacramento Superior Court (July 27,

2022) (attached), sustaining the demurrer of a felony indictment for firearm possession because

the state's criminal statutes, like New York's, are a blanket ban on firearm possession and the path

to firearm licensure was – because of its discretionary licensing scheme (like New York's) –

unconstitutional. ("According to *Shuttlesworth*, faced with an unconstitutional restriction, on his constitutional right, defendant was free to engage 'with impunity in the exercise of the right...'").

That said, Plaintiffs have subjected themselves to the State's licensing scheme, passed a criminal and mental health background check, were issued and continue to hold valid pistol licenses, and have held such licenses without incident since their issuance.

### E. This Court Is Bound By the Supreme Court's Historical Analysis

Federal district courts and circuit courts are bound to adhere to the controlling decisions of the Supreme Court. Justice Rehnquist emphasized the importance of precedent when he observed that "unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." *Hutto v. Davis*, 454 U.S. 370, 375 (1984); *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533 (1983) (the Supreme Court, in a per curiam decision, stated: "Needless to say, only this Court may overrule one of its precedents.").

The extensive historical analysis conducted by the Supreme Court's in *Bruen*, *Heller*, *McDonald*, and *Caetano* cannot be swept aside; the inferior federal courts "are bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *Peterson v. Martinez*, 707 F.3d 1197, 1210 (10th Cir. 2013).

## IV.  PLAINTIFFS ARE SUFFERING AND WILL CONTINUE TO SUFFER IRREPARABLE HARM

Irreparable harm is the single most important prerequisite to the Court's issuance of preliminary injunctive relief. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir.2009).

The Second Circuit has held that when a plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016). The standard established in *Babbitt*[9] "sets a low threshold and is quite forgiving to plaintiffs seeking such preenforcement review," as courts are generally "willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Cayuga Nation*, 824 F.3d at 331.

Under *Babbitt*, actually being threatened with prosecution is not a requirement. It is sufficient for a plaintiff to allege that enforcement is likely.

Jason Frey is engaging in conduct, and Mrs. Frey and William Sappe announced their concrete plans to engage in conduct protected by the Second Amendment, which violates Penal Law sections 265.01, 265.01-b, 265.01-d, 265.01-e, 400.00(6), and 400.00(15), and subjects them to **guaranteed enforcement** – arrest and incarceration - by the NYSP and NYPD, and other criminal and civil penalties for exercising their rights. See *Babbitt*, 442 U.S. at 302 (responding to Appellant's argument that the criminal penalty provision has not yet been applied and may never be applied, "when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute.").[10]

---

[9] *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298, 99 S. Ct. 2301, 2309, 60 L. Ed. 2d 895 (1979).

[10] In numerous preenforcement cases where the Supreme Court has found standing on a showing that a statute indisputably proscribed the conduct at issue, it did not place the burden on the plaintiff to show an intent by the government to enforce the law against it. Rather, it presumed such intent in the absence of a disavowal by the government or another reason to conclude that no such intent existed. *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013). In *Vermont Right to Life and Pacific Capital Bank*, the Second Circuit suggested "that a plaintiff has standing when it may legitimately fear that it will face enforcement under its reasonable interpretation of the statute and (2) the Supreme Court's recognition that a preenforcement challenge is justiciable when enforcement is a realistic danger

In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm. *Valenzuela Arias v. Decker*, No. 20 CIV. 2802 (AT), 2020 WL 1847986, at *5 (S.D.N.Y. Apr. 10, 2020) citing, *Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) (no separate showing of irreparable harm is necessary); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[I]t is the alleged violation of a constitutional right that triggers a finding of irreparable harm.") (emphasis supplied).

"The right to keep and bear arms protects tangible and intangible interests which cannot be compensated by damages…The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence — and psychic comfort — that comes with knowing one could protect oneself if necessary…Loss of that peace of mind, the physical magazines, and the enjoyment of Second Amendment rights constitutes irreparable injury." *Duncan v. Bonta*, 265 F Supp 3d 1106, 1135 citing, *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (DDC 2016); see also *Ezell v City of Chicago*, 651 F3d 684, 699 (7th Cir 2011) ("Infringements of this right cannot be compensated by damages.")

Plaintiffs Second and Fourteenth Amendment rights are being violated by the threatened enforcement of the challenged statutes and regulations. Plaintiffs detailed their intention to engage in and/or are actually engaging in, a course of conduct implicating a constitutional right but proscribed by a criminal statute and there exists a credible threat of enforcement thereunder.

Plaintiffs should not be required to await arrest and enforcement against them as the sole means of seeking relief. See, *Cayuga Nation*, supra.

---

when there is a "credible threat of prosecution," or when a plaintiff has an "actual and well-founded fear" of such enforcement….neither this Court nor the Supreme Court has required much to establish this final step in challenges to ordinary criminal or civil punitive statutes. Rather, we have presumed that the government will enforce the law. *Id.* at 199–200.

## V. THE EQUITIES TIP IN PLAINTIFFS' FAVOR AND THE REQUESTED RELIEF SERVES THE PUBLIC INTEREST

*Bruen*, *Heller* and *McDonald*, flatly rejected 'balancing' the government's interests against the individual rights guaranteed by the Second and Fourteenth Amendments. The Right to defensively carry a handgun is the "very product of an interest balancing by the people" and "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense." *Heller*, 554 U.S. at 635.

Nevertheless, the equities decidedly tip in Plaintiffs' favor.

A preliminary injunction is "in the public interest" if the preliminary injunction would not "cause harm to the public interest." *U.S. S.E.C. v. Citigroup Global Mkts. Inc.*, 673 F. 3d 158, 163 n.1 (2d Cir. 2012). "As with irreparable injury, when a plaintiff establishes 'a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction.'" *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 743 (D. Conn. 2018) citing, *Ms. L. v. U.S Immigr. & Customs Enf't ("ICE")*, 310 F. Supp. 3d 1133, 1146 (S.D. Cal. 2018), modified, 330 F.R.D. 284 (S.D. Cal. 2019), and enforcement granted in part, denied in part sub nom. *Ms. L. v. U.S. Immigr. & Customs Enf't*, 415 F. Supp. 3d 980 (S.D. Cal. 2020) quoting, *Arizona Dream Act Coalition*, 757 F.3d 1053, 1069 (9th Cir. 2014) (balance of equities favors preventing the violation of a party's constitutional rights).

The public are "the People" for whom the Second Amendment was codified. Punishing the public for exercising their constitutional rights does not, under any view, serve the public's interest. The government interest – purportedly keeping everyone 'safe' by restricting the exercise of constitutional rights – has been flatly rejected by the Supreme Court. "As Members  of  the Supreme Court  have already explained, [t]he right to keep and bear arms ... is not the only

20

constitutional right that has controversial public safety implications." *Bruen*, at 2126, n. 3

quoting, *McDonald v. Chicago*, 561 U.S. 742, 783, 130 S.Ct. plurality opinion).

Defendant's enforcement of criminal penalties against average citizens for the mere

exercise of a protected right sharply tips the balance of equities in favor of Plaintiffs because

statutes disarming law-abiding responsible citizen gun owners "reflect an opinion on gun policy"

and "as *Heller* explains, the Second Amendment takes certain policy choices and removes them

beyond the realm of debate." *Duncan v Bonta*, 265 F Supp 3d 1106, 1128, 1135-1136 (SD Cal

2017) ), aff'd *Duncan v Bonta*, 742 F App'x 218, 222 (9th Cir 2018).

Disarming licensed New Yorkers is "not a constitutionally-permissible policy choice." *Id.*

Even New York's highest court has recognized that a "longstanding, widespread practice is not

immune from constitutional scrutiny." *Payton v. New York*, 445 U.S. 573, 600 (1980).

This is particularly true for New York's open carry ban, which eviscerates the plain

meaning of the Second Amendment. There is strong public interest in enjoining the enforcement

of criminal penalties against licensees who open carry because New York's licensing scheme for

concealed carry remains discretionary[11] and fails to recognize or allow any Right to bear arms in

public for self-defense.

"The public interest favors the exercise of Second Amendment rights by law-abiding

responsible citizens. And it is always in the public interest to prevent the violation of a person's

constitutional rights. *Duncan*, at 1136 (S.D. Cal. 2017), aff'd, 742 F. App'x 218 (9th Cir. 2018)

(granting preliminary injunction of California's magazine ban statute) citing, *Hobby Lobby Stores,*

---

[11] See, § 400.00(11), which allows for the revocation of a pistol license for any reason that would prevent the issuance of a license in the first instance under § 400.00(1) - § 400.00(1)(b) ["moral character"] and (n) ["any good reason"] are purely subjective and discretionary factors.

*Inc. v. Sebelius,* 723 F.3d 1114, 1145 (10th Cir. 2013), aff'd sub nom., *Burwell v. Hobby Lobby Stores, Inc.*, ⸺ U.S. ⸺, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014).

## CONCLUSION

Based on the foregoing, along with the Declarations and Exhibits submitted herewith, Defendants, their officers, agents, servants, and employees, all other persons who are in active concert or participation with Defendants receiving actual notice of such order by personal service or otherwise, should be preliminarily and permanently enjoined from enforcing Penal Law sections 400.00(6), 400.00(15), 265.01, 265.01-b, 265.01-d, 265.01-e[12], 265.03(3), and NYC Admin. Code 10-315 and the NYPD Rules promulgated thereunder against: (1) individuals who hold a valid handgun license issued by a New York State licensing officer and carry a handgun open and exposed (holstered) on their person; (2)  individuals who hold a valid handgun license issued by a New York State licensing officer and carry a handgun concealed; and for such further and different relief as this Court deems just and proper.

Dated: October 19, 2022
　　　　Scarsdale, New York

　　　　　　　　　　　　　　　THE BELLANTONI LAW FIRM, PLLC
　　　　　　　　　　　　　　　*Attorneys for Plaintiffs*

　　　　　　　　　By:　*Amy L. Bellantoni*
　　　　　　　　　　　　Amy L. Bellantoni (AB3061)
　　　　　　　　　　　　2 Overhill Road, Suite 400
　　　　　　　　　　　　Scarsdale, New York 10583
　　　　　　　　　　　　(914) 367-0090 (t)
　　　　　　　　　　　　(888) 763-9761 (f)
　　　　　　　　　　　　abell@bellantoni-law.com

---

[12] Except polling places and courthouses.



FILED ENDORSED

JUL 2 7 2022

By J. Bredberg, Deputy Clerk

1
2
3
4
5
6
7

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SACRAMENTO**

The People of the State of California,

    Plaintiff,

v.

**TONY DIAZ,**

    Defendant.

Case No. 21FE019850   Dept. 40

**ORDER SUSTAINING DEMURRER**

    The defense demurs to four felony firearm charges, including three alleged violations of Penal Code section 25400, subdivision (a)(3)[1] and one alleged violation of section 25850, subdivision (a). After careful review, the Court concludes the demurrer must be sustained.

*I. Introduction*

    The facts of the case are largely irrelevant to the legal analysis, so the Court will provide only a brief synopsis.

    Defendant was one of three individuals in a vehicle smoking marijuana when they were contacted by law enforcement. Defendant was patted down and a loaded unregistered handgun was found in his waistband. Officers also located a key on defendant's person. The key opened a safe that contained two more firearms. Both were unregistered and one was reported stolen.

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

1

1

*II. The Demurrer and the People's Response*

2      On July 11, 2022, the defense filed a demurrer challenging the charges. The defense

3 maintains that in light of *New York State Rifle & Pistol Assoc., Inc. v. Bruen* (2022) 142 S.Ct.

4 2111 (*Bruen*), violations of sections 25400 and 25850 are no longer public offenses. (§ 1004,

5 subd. (4).) The defense maintains *Bruen* invalidated California's concealed carry licensing

6 statutes (§§ 26150, 26155), meaning individuals can no longer be punished for concealed carry of

7 a firearm. Critically, the defense argues an individual need not have attempted to obtain a

8 concealed carry license before invoking *Bruen*. The People disagree.

9      The People make several arguments that attempt to distinguish *Bruen* and demonstrate the

10 defense's interpretation of *Bruen* is overbroad. The People argue that, under *Bruen*, a state may

11 impose statutory prohibitions so long as those prohibitions do not "altogether prohibit the *public*

12 carry of arms protected by the Second Amendment or state analogues." (Peop. Resp. at p. 5 citing

13 *Bruen*.) The People then point out that sections 25400 and 25850 do not "contain any language

14 regarding a licensing scheme" and that section 25400 prohibits various forms of concealed carry

15 but that *Bruen* was concerned with "licensing scheme that involved public or open carry laws."

16 The People contend section 25850 is still valid because "it does not ban, altogether, public carry."

17 The People go on to cite pre-*Bruen* cases holding sections 25400 and 25850 are constitutional.

18 Finally, the People maintain defendant is not the "law-abiding" citizen that *Bruen* approved for

19 public carry.

20

*III. California's Public Carry Laws*

21      Section 25400, read by itself, completely prohibits carrying a concealed firearm in a

22 vehicle or on one's person. The offense is either a misdemeanor or a felony depending on the

23 circumstances. Section 25850, read by itself, completely prohibits carrying a loaded firearm on

24 one's person or in a vehicle "while in any public place." Like section 25400, the offense is a

25 misdemeanor or a felony depending on the circumstances. Per sections 25655 and 26010, an

26 individual may, however, avoid prosecution for these offenses by obtaining a license under

27 section 26150 or section 26155.

28      Sections 26150 and 26155 outline the requirements for obtaining a concealed carry

2

1  license.[2] The two statutes are essentially identical with one (§ 26150) applying when the sheriff is

2  the licensing authority and the other (§ 26155) applying when the city chief of police is the

3  licensing authority. For the remainder of this order the Court will refer to section 26150 as the

4  relevant statute. To obtain a license an applicant must meet four criteria:

5        (1)    The applicant is of good moral character;

6        (2)    Good cause exists for issuance of the license;

7        (3)    The applicant is a resident of the county, or the applicant's principal place of

8               employment is in the county and the applicant spends a substantial period of time

9               in that place of employment;

10        (4)    The applicant has completed a course of training as described in Section 26165.

11       Compliance with section 26150 is the only legal means by which the majority of

12  individuals can legally carry a concealed firearm[3].

13  *IV. Bruen and its Effect on California Law*

14  *a. Bruen*

15       *Bruen* holds that the "Second and Fourteenth Amendments protect an individual's right to

16  carry a handgun for self-defense outside the home." (*Bruen, supra,* 142 S. Ct. at p. 2122.) The

17  "Second Amendment's plain text [] presumptively guarantees" the right to " 'bear' arms in public

18  for self-defense." (*Id.* at p. 2635.) The decision allows for objective regulations only if they are

19  "consistent with the Nation's historical tradition of firearm regulation." (*Id.*)

20       *Bruen* addressed New York's concealed carry licensing law, which required an applicant

21  to convince a licensing officer that he is "of good moral character" and that "proper cause" exists

22

23  [2] Sections 26150 and 26155 provide a narrow exception that allows open carry in counties with populations under 200,000 people. Other than this exception, open carry is completely banned in California.

24  [3] Obtaining a license under section 26150 is not the *only* exemption from prosecution for carrying a concealed

25  firearm. Other exemptions, however, depend on a person's place of employment, or the activity they are engaged in. For the vast majority of individuals, compliance with section 26150 is their only legal path to exercising their right to public carry. (§ 25620 [members of the Armed Forces permitted to public carry when on duty] § 25645

26  [transportation of unloaded firearms permitted for a person operating a licensed common carrier]; § 25640 [licensed hunters and fisherman permitted to carry concealed weapon while engaged in hunting or fishing]; § 25630

27  [exemption for any guard or messenger of any common carrier, bank, or other financial institution].)

28

1    to issue it. An individual caught with a concealed firearm and without a license, was punishable
2    by four years in prison for a felony or one year in jail for a misdemeanor. Possession of a loaded
3    firearm without a license was punishable by up to 15 years in prison. The two petitioners in *Bruen*
4    each sought a license to carry a concealed weapon and each was denied. The petitioners sued for
5    declaratory and injunctive relief, alleging New York's statute violated the Second Amendment by
6    denying their license applications on the basis that they had failed to show "proper cause."
7    (*Bruen, supra,* at pp. 2122-2126.) The Supreme Court agreed.

8         The Court began its analysis by rejecting the two-step approach appellate courts had taken
9    to analyze firearm regulations in the wake of *District of Columbia v. Heller* (2008) 554 U.S. 570
10   (*Heller*) and *McDonald v. City of Chicago* (2010) 561 U.S. 742. The specifics of the two-step
11   approach are not relevant here. Suffice it to say, the Court rejected the two-step analysis and
12   concluded that to justify a regulation of the Second Amendment, the state must demonstrate that
13   the regulation "is consistent with this Nation's historical tradition." Only then, will the
14   individual's conduct fall "outside the Second Amendment's 'unqualified command.' [Citation.]"
15   (*Bruen, supra,* at p. 2126.) The Court then conducted a painstaking review of historical firearm
16   regulations. At the end of their journey, the Court concluded New York did not meet "their
17   burden to identify an American tradition justifying the State's proper-cause requirement." (*Id.* at
18   p. 2156.) The Court stated, "we know of no other constitutional right that an individual may
19   exercise only after demonstrating to government officers some special need." (*Id.*) Though it
20   struck down New York's licensing statute, the Court made it clear that regulations consistent with
21   historical precedent are permitted.

22                                        *b. Effect on California Law*

23        California's concealed carry licensing scheme is the same as New York's. *Bruen*
24   specifically identified California as one of seven states (including New York) that utilize a
25   "proper cause" standard. (*Bruen, supra,* 142 S. Ct. at p. 2124.) In a "Legal Alert," the California
26   Attorney General expressed his view that "that the Court's decision renders California's 'good
27   cause' standard to secure a permit to carry a concealed weapon in most public places

28
                                                    4

1    unconstitutional." [4] The Attorney General also states he believes the other requirements of section

2    26150 remain valid and recommends licensing authorities should "continue to apply and enforce

3    all other aspects of California law with respect to public-carry licenses and carrying of firearms in

4    public." The Legislature is currently considering a bill that would amend California's licensing

5    scheme to comply with *Bruen*. (Sen. Bill 918, 2021-2022 Reg. Sess.)

6                                              *V. Discussion*

7                                         *a. The People's Arguments*

8            The Court recognizes that *Bruen* addressed a licensing statute, but the demurrer challenges

9    a punishment/criminal statute. But the People's attempt to separate the licensing scheme from the

10   criminal statutes is untenable. The licensing scheme (§ 26150) and criminal statutes (§§ 25400,

11   25850) are two sides of the same coin. Charging a violation of either section 25400 or 25850 is

12   implicitly and functionally an allegation that the defendant failed to comply with section 26150.

13   When the licensing statute and criminal statutes are considered together, and in light of the

14   caselaw cited by defense, the defendant cannot be punished for exercising his right to public

15   carry.

16           *Bruen* unequivocally holds that public carry is *presumptively legal*. States may regulate

17   public carry, but the regulation must be rooted in our Nation's history of gun regulation as

18   interpreted by *Bruen*. If the regulation is not constitutional, then the state returns to the default

19   position – that public carry is legal, at least until the unconstitutional portions of the licensing

20   scheme are excised or amended. The People's arguments do not counter this conclusion.

21           The Court identified five arguments in the People's response. First, the People contend

22   section 25400 "specifically prohibits various forms of *concealed* carry," but that *Bruen* "was

23   concerned with a licensing scheme that involved public or open carry laws." (Peop. Resp. at p. 5

24   (Italics in original).) The People are incorrect.   The opening paragraphs of *Bruen* cite the New

25   York law prohibiting concealed carry. The Court observed: "If he wants to carry a

26   firearm outside his home or place of business for self-defense, the applicant must obtain an

27

28   [4] The Legal Alert can be found at https://oag.ca.gov/system/files/media/legal-alert-oag-2022-02.pdf

                                                    5

1  unrestricted license to 'have and carry' a *concealed* 'pistol or revolver.' § 400.00(2)(f). To secure

2  that license, the applicant must prove that 'proper cause exists' to issue it." (*Bruen, supra,* 142 S.

3  Ct. at p. 2123 (Italics added).) Clearly, *Bruen* is as applicable to laws related to concealed carry as

4  it is laws concerning open carry.

5        Related to their first argument, the People's second argument posits that section 25850 "is

6  also appropriate under the *Bruen* analysis as it does not ban, altogether, public carry. Therefore,

7  contrary to Defendant's best efforts to incorrectly expand *Bruen*, Penal Code sections 25400 and

8  25850 are constitutional statutory prohibitions." (Peop. Resp. at p. 5.) This argument is

9  impossible to square with the statute's plain language. Section 25850 subjects anyone in a public

10  place "carrying a loaded firearm" on the person or in a vehicle to criminal prosecution. This

11  amounts to a total ban on public carry. The validity of the statute depends on individuals having a

12  legal means to exercise their right to public carry. This argument is emblematic of the People's

13  failure to connect the licensing scheme to criminal statutes.

14        The People's third argument is that *Bruen* only applies to the licensing statutes. To

15  support this argument, the People cite a footnote in a United States District Court case that states

16  "the Supreme Court decision in [*Bruen*], calls into question the constitutionality of California

17  Penal Code § 26150." The Court fails to see the relevance of this case. As noted above and

18  explained more fully below, the invalidation of the only legal means by which an individual can

19  exercise the right to public carry has significant ramifications on the ability to punish an

20  individual for the exercise of this constitutional right. The People's fourth argument is that two

21  pre-*Bruen* California decisions have already found sections 25400 and 25850 are constitutional.

22  *Bruen*, however, renders both of these decisions obsolete.

23        In *People v. Yarbrough* (2008) 169 Cal.App.4th 303, the defendant was convicted of

24  carrying a concealed and loaded firearm (fmr. §§ 12025 (now § 25400), § 12031 (now § 25850)).

25  The defendant argued these convictions violated the Second Amendment. Relying on *Heller*, the

26  court held the two statutes do "not broadly prohibit or even regulate the possession of a gun in the

27  home for lawful purposes of confrontation or self-defense, as did the law declared constitutionally

28  infirmed in *Heller*." (*Id.* at p. 313.) The court also found that "carrying a firearm concealed on the

6

1   person or in a vehicle in violation of section 12025, subdivision (a), is not in the nature of a

2   common use of a gun for lawful purposes which the court declared to be protected by the Second

3   Amendment in *Heller*." (*Id.* at p. 313-314.) The court's conclusions do not survive *Bruen*'s

4   holding that public carry is presumptively legal. Further, the court's reliance on *Heller* (a case

5   that decided whether possession of firearms in the home was protected by the Second

6   Amendment), is superseded by *Bruen*. As it was with *Yarbrough*, the People's faith in *People v.*

7   *Flores* (2008) 169 Cal.App.4th 568 (*Flores*) is misplaced.

8        In *Flores*, the defendant was convicted of being a felon in possession of a firearm,

9   carrying a concealed firearm and carrying a loaded firearm in a public place. The defendant

10  argued the convictions violated his Second Amendment rights under *Heller*. The court found that

11  "[g]iven [*Heller's*] implicit approval of concealed firearm prohibitions, we cannot read *Heller* to

12  have altered the courts' longstanding understanding that such prohibitions are constitutional."

13  (*Flores, supra,* at p. 575.)

14       *Flores'* conclusion that *Heller* approved concealed firearm prohibitions turned out to be

15  erroneous. *Heller* stated, "the majority of the 19th-century courts to consider the question held

16  that prohibitions on carrying concealed weapons were lawful under the Second Amendment or

17  state analogues." (*Heller, supra,* 554 U.S. at p. 626.) However, *Heller* also made clear they "do

18  not undertake an exhaustive historical analysis today of the full scope of the Second

19  Amendment." (*Ibid.*)  The Supreme Court completed its exhaustive analysis in *Bruen*. The *Bruen*

20  court acknowledged *Heller's* dicta on concealed carry laws and stated, "we cautioned that we

21  were not 'undertak[ing] an exhaustive historical analysis today of the full scope of the Second

22  Amendment' and moved on to considering the constitutionality of the District of Columbia's

23  handgun ban." (*Bruen, supra,* 142 S. Ct. at p. 2128.) *Flores* is no longer good law.

24       The People's fifth, and final argument, is that the facts of the present case distinguish it

25  from *Bruen*. The People argue (1) the charges involve unregistered firearms; (2) "these statutory

26  prohibitions fall short of the blanket bans discussed in *Bruen*; and (3) defendant is not the "law-

27  abiding" citizen using the firearm for self-defense that the Supreme Court approved for concealed

28  carry. The Court fails to see the import of the firearms not being registered, or even stolen. The

1   defendant is not charged with possession of an unregistered firearm and is not charged with

2   possession of stolen property. The question is whether the charges defendant is facing are still

3   public offenses, and those charges do not depend on whether the gun was registered or stolen.

4   The Court acknowledges sections 25400 and 25850 have provisions that affect the *punishment* for

5   public carry of an unregistered or stolen firearm, but those provisions do not change the

6   fundamental question before the Court. The People's contention that *Bruen* does not apply

7   because defendant is not the type of person entitled to public carry under *Bruen* is similarly

8   unpersuasive.

9       None of the People's arguments find traction. The People are correct that the Supreme

10  Court repeatedly states the Second Amendment protects the right of "law-abiding" citizens to

11  public carry for "self-defense." However, *Bruen* does not define law-abiding or give any guidance

12  on how lower courts should determine whether a weapon is carried for self-defense or for some

13  other purpose. The People also decline to offer a definition of these ambiguous terms, and the

14  Legislature has not yet addressed these questions. Do the criminal allegations themselves mean

15  someone is not law-abiding? Does carrying a concealed firearm while possibly engaged in

16  uncharged criminal conduct mean someone is no longer law-abiding? Does a prior conviction of

17  any kind mean someone is no longer law-abiding? What if the prior conviction is stale? How does

18  a court determine whether a firearm in a waistband is possessed for self-defense or not? Is a

19  firearm locked in a safe possessed for self-defense or some other purpose? Denying someone's

20  constitutional right by teasing through nebulous questions like these is not the Court's role.

21      The best argument for sustaining the demurrer is found in caselaw cited by the defense.

22  The People never address these cases in their brief.

23                           *b. Defendant May Exercise his Right with Impunity*

24      A critical question in deciding whether to overrule or sustain the demurrer is whether

25  defendant needed to attempt to comply with section 26150 before possessing the firearm in

26  public. The petitioners in *Bruen* chose to challenge the licensing law *after* they applied and were

27  denied, but did they *have to* apply for the license first? The cases cited by the defense are

28  unequivocal – the answer is no.

8

1   In *Shuttlesworth v. City of Birmingham, Ala.* (1969) 394 U.S. 147 (*Shuttlesworth*), the

2 petitioner was convicted of violating a city ordinance that prohibited participation in a "parade or

3 procession or any other public demonstration" without first obtaining a permit. The defendant

4 was sentenced to 90 days imprisonment at hard labor and fined. The Alabama Court of Appeals

5 initially reversed the conviction, but it was reinstated by the Alabama Supreme Court. The

6 Supreme Court then reviewed the ordinance and easily determined it was unconstitutional.

7   *Shuttlesworth* stated the ordinance was an unlawful prior restraint on the First Amendment

8 because it "conferred upon the City Commission virtually unbridled and absolute power to

9 prohibit any 'parade,' 'procession,' or 'demonstration' on the city's streets or public ways."

10 (*Shuttlesworth, supra,* at p. 150.) Critically, the Court then stated:

11

12    *And our decisions have made clear that a person faced with such an unconstitutional*
    *licensing law may ignore it and engage with impunity in the exercise of the right of free*

13    *expression for which the law purports to require a license.*

14 (*Id.* at p. 151.) The Court cited six prior opinions in support of this conclusion, including *Staub v.*

15 *City of Baxley* (1958) 355 U.S. 313 and *Freedman v. Maryland* (1965) 380 U.S. 51. The defense

16 cites both cases in the demurrer. At least one California appellate court has also held that

17 individuals faced with an unconstitutional license scheme may exercise their right without fear of

18 prosecution.

19   In *Aaron v. Municipal Court* (1977) 73 Cal.App.3d 596, the petitioners sought a writ of

20 prohibition to prevent their prosecution for violation of a municipal ordinance which outlawed

21 soliciting without a license. The petitioners argued the ordinance violated their First Amendment

22 rights. Application for the writ was necessary because the trial court had overruled the petitioners'

23 demurrers. The appellate court agreed, and reversed the judgment of the trial court and

24 "remanded with directions to issue a peremptory writ of prohibition commanding the respondent

25 municipal court to refrain from further proceedings in the actions specified in the petition,

26 pending against petitioners, *other than to dismiss the same.*" (*Id.* at p. 610 (Italics added).)

27         *c. Conclusions*

28

         9

1         *Aaron* and *Shuttlesworth* provide a powerful argument for sustaining the demurrer. In

2   *Shuttlesworth*, the defendant's conviction was overturned because the licensing scheme was

3   unconstitutional. In *Aaron*, the court did not even allow the prosecution to proceed because it was

4   based on an invalid restraint on a constitutional right. Read together, the cases hold that an

5   individual cannot be prosecuted for exercising a constitutionally protected right. There is no

6   reason to believe these holdings do not apply when the Second Amendment is at issue. As *Bruen*

7   stated: "The constitutional right to bear arms in public for self-defense is not a 'second-class

8   right, subject to an entirely different body of rules than the other Bill of Rights Guarantees.'

9   [Citation.]" (*Bruen, supra,* 142 S. Ct. at p. 2156.)

10         At the time of defendant's arrest California provided one legal means by which an

11   individual could exercise their right to public carry – to get a license under section 26150. That

12   path was unconstitutional. According to *Shuttlesworth,* faced with an unconstitutional restriction

13   on his constitutional right, defendant was free to engage "with impunity in the exercise of the

14   right..."

15         The Court does not relish the conclusion reached here and understands its ramifications.

16   But this result cannot be avoided in light of *Bruen* and *Shuttlesworth* and the arguments presented

17   by the parties.

18                        *VI. Disposition*

19         The demurrer is SUSTAINED. The People may attempt to remedy the complaint by filing

20   an amended complaint within ten calendar days of the issuance of this order. (§ 1007.) If an

21   amended complaint is not timely filed, the case will be dismissed. (§ 1008.)

22   DATED: 7/27/22

23

24                                                                                                                                                                                                                                                                  HON. STEVE WHITE

25                                                                                                                                                                                                                                                                                        JUDGE OF THE SUPERIOR COURT

26

27

28

                                                                          10