UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
JASON FREY, BRIANNA FREY, JACK          :
CHENG, and WILLIAM SAPPE,               :
                                        :
                        Plaintiffs,     :
                                        :
         - against -                    :
                                        :        Case No. 21 Civ. 5334 (NSR)
STEVEN NIGRELLI, Acting Superintendent of :
the New York State Police, in his official :
capacity, NEW YORK CITY, New York, and  :
KEECHANT SEWELL, in her official capacity :
as NYPD Commissioner,                   :
                                        :
                        Defendants.     :
------------------------------------------------------------ X

### DEFENDANT ACTING SUPERINTENDENT NIGRELLI'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

LETITIA A. JAMES
Attorney General
State of New York
*Attorney for Acting Superintendent Nigrelli*
28 Liberty Street
New York, New York 10005
(212) 416-6295

Suzanna Publicker Mettham
Ian Ramage
Assistant Attorneys General
    *Of Counsel*

## TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................... i

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT .......................................................................... 1

FACTUAL BACKGROUND ............................................................................... 1

   I.   The Supreme Court's Decisions in *Heller* and *Bruen* ............................. 1

   II.  New York Has Consistently Opted for the Licensed Concealed Carriage of Handguns Over Open Carriage ......................................................................................... 3

   III. Facts Concerning the Plaintiffs ................................................................. 5

      A.   Jason and Brianna Frey ..................................................................... 6

      B.   William Sappe ..................................................................................... 8

STANDARD OF REVIEW .................................................................................. 9

ARGUMENT ....................................................................................................... 10

   I.   Plaintiff's CCIA Challenge Exceeds the Court's Leave to Amend ................. 10

   II.  Plaintiffs Still Lack Standing to Challenge Penal Law §§ 265.01, 265.01-b, & 265.03(3) ........................................................ 11

   III. Plaintiffs Have Not Shown a Clear Likelihood of Success on the Merits ........ 13

      A.   Plaintiffs Can Bring Only a Disfavored Facial Challenge ...................... 13

      B.   Plaintiffs Fail to Show a Likelihood of Success on the Merits ................. 13

      C.   Plaintiffs' Challenge to Section 400.00(15) Fails Because Firearm Permitting Is Manifestly Constitutional, and Specifically Endorsed by *Bruen* ................. 14

      D.   Plaintiffs' Challenge to Section 400.00(6) Fails Because There Is a Long Historical Tradition of Gun Licensing ........................................................ 15

      E.   Plaintiffs' Open Carry Challenge Fails Because New York Permits Concealed Carry in Public Places ......................................................................................... 16

      F.   Plaintiffs' Challenge to the Private Property Provision Fails ..................... 18

      G.   New York's Protections for Sensitive Places Are Constitutional ................. 23

   **IV. Plaintiffs Fail to Make a Showing of Irreparable Harm** ........................... 44

   **V.  The Balance of Equities Weighs Against an Injunction** .............................. 46

   **VI. Any Injunction Should Be Limited to the Parties and Stayed to Allow an Appeal** .. 47

**CONCLUSION** .................................................................................................. 49

## TABLE OF AUTHORITIES

**Cases**

*Abed v. United States*, 278 A.3d 114 (D.C. 2022) ........................................................................ 17

*Adderley v. Florida*, 385 U.S. 39 (1966) ..................................................................................... 27

*Alexander v. State*, 27 Tex. App. 533 (Tex. Ct. App. 1889)........................................................ 32

*Antonyuk v. Hochul*, No. 22 Civ. 986 (GTS),
    2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022)........................................................................ 45

*Aymette v. State*, 21 Tenn. 154 (1840) ........................................................................................ 35

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979).......................................... 12

*Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) .................................................................. 24

*Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015) ................................................ 24, 28

*Carr v. State*, 34 Ark. 448, 449 (1879) ....................................................................................... 41

*Christopher v. Ramsey County*, No. 21-2292 (JRT/ECW),
    2022 WL 3348276 (D. Minn. Aug. 12, 2022)...................................................................... 33

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F. 3d 30 (2d Cir. 2010)..................................................................................................... 9

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ...................................................................... 11

*Conn. State Police Union v. Rovella*, 494 F. Supp. 3d 210 (D. Conn. 2020),
    *aff'd*, 36 F.4th 54 (2d Cir. 2022), *cert. denied*, No. 22-116,
    2022 WL 4654636 (Oct. 3, 2022) ........................................................................................... 9

*Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n*, 447 U.S. 530 (1980).................................. 27

*Defense Distrib. v. Bonta*, No. 22 Civ. 6200 (GW),
    2022 WL 15524977 (C.D. Cal. Oct. 21, 2022), *adopted*,
    2022 WL 15524983 (C.D. Cal. Oct. 24, 2022) ..................................................................... 43

*Dickerson v. Napolitano*, 604 F.3d 732 (2d Cir. 2010) .............................................................. 13

*District of Columbia v. Heller*, 554 U.S. 570 (2008)........................................................... 1, 2, 4

*Eslava v. State*, 49 Ala. 355, 357 (1873) .................................................................................... 42

*Frey v. Bruen*, No. 21 Civ. 5334 (NSR), 2022 WL 3996713 (S.D.N.Y. Sept. 1, 2022) .......... 5, 10

*Frey v. Bruen*, No. 21 Civ. 5334 (NSR), 2022 WL 522478 (S.D.N.Y. Feb. 22, 2022).......... 10, 12

*GeorgiaCarry.org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012).......................................... 19

*GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs*,
    212 F. Supp. 3d 1348 (N.D. Ga. 2016) ................................................................................. 24

*GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318 (11th Cir. 2015)............ 43

*Hall v. Garcia*, No. C 10–03799 RS, 2011 WL 995933 (N.D. Cal. Mar. 11, 2011).................. 40

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) ................................... 38

*Jacoby & Meyers, LLP v. Presiding Justs. of the 1st, 2d, 3d & 4th Dep'ts*,
    852 F.3d 17 (2d Cir. 2017)..................................................................................................... 13

*Jones v. Becerra*, 498 F. Supp. 3d 1317 (S.D. Cal. 2020)......................................................... 46

*Kane v. de Blasio*, 19 F. 4th 152 (2d Cir. 2021) ........................................................................ 48

*Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407 (2022).......................................................... 16

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961) ................................................................... 2

*Lederman v. N.Y.C. Dep't of Parks & Recreation*,
   No. 10 Civ. 4800 (RJS), 2010 WL 2813789 (S.D.N.Y. 2010) .......................................... 25, 44
*Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974).......................................................... 27
*Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106 (2d Cir. 2020) ............................... 11, 12
*Lore v. City of Syracuse,* No. 00 Civ. 1833 (HGM),
   2001 WL 263051 (N.D.N.Y. Mar. 9, 2001)................................................................... 45
*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................................ 11
*MacWade v. Kelly*, 460 F.3d 260 (2d Cir. 2006)....................................................................... 38
*Maryland v. King*, 567 U.S. 1301 (2012) ................................................................................ 48
*Maupin v. State*, 89 Tenn. 367 (1890) ...................................................................................... 32
*Mazurek v. Armstrong*, 520 U.S. 968 (1997)............................................................................ 25
*McDonald v. Chicago*, 561 U.S. 74 (2010) ........................................................................ passim
*Miller v. Smith*, No. 18 Civ. 3085, 2022 WL 782735 (N.D. Ill. Mar. 14, 2022) ....................... 40
*Mullins v. City of New York*, 626 F. 3d 47 (2d Cir. 2010)........................................................... 9
*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022) ........................... 2, 3, 5, 14
*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) ...................... 13, 47
*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977) .............................. 48
*Nken v. Holder*, 556 U.S. 435 (2009) ....................................................................................... 47
*Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009), *vacated*,
   611 F.3d 1015 (9th Cir. 2010)......................................................................................... 30
*Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Svcs.*, 769 F.3d 105 (2d Cir. 2014) ...................... 47
*Owens v. State*, 3 Tex. App. 404 (Tex. Ct. App. 1878) ............................................................. 32
*Pagan v. N.Y. State Div. of Parole*, No. 98 Civ. 5840 (FM),
   2002 WL 398682 (S.D.N.Y. Mar.13, 2002) ..................................................................... 10
*Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40 (2d Cir. 2012)........................ 10
*People ex. rel. Schneiderman v. Actavis PLLC*, 787 F. 3d 638 (2d Cir. 2015) ............................ 9
*People v. Thompson*, 92 N.Y.2d 957, 959 (1998)..................................................................... 12
*Person v. United States*, No. 19 Civ. 154 (LGS),
   2019 WL 258095 (S.D.N.Y. Jan. 18, 2019)...................................................................... 12
*Presser v. Illinois*, 116 U.S. 252 (1886) ................................................................................... 29
*Rainey v. State*, 8 Tex. App. 62 (Tex. Ct. App. 1880)............................................................... 32
*Range v. Att'y Gen. United States*, No. 21-2835,
   2022 WL 16955670 (3d Cir. Nov. 16, 2022).................................................................... 10
*Reuters Ltd. v. United Press Int'l, Inc.*, 903 F. 2d 904 (2d Cir. 1990) ....................................... 46
Rev. Ordinances of the City of Danville 83 (1883)................................................................... 35
*S & R Dev. Ests., LLC v. Town of Greenburgh*, 336 F. Supp. 3d 300 (S.D.N.Y. 2018) .............. 18
*Seifullah v. City of N.Y.*, 17 Civ. 5394 (NGG),
   2017 WL 4339478 (E.D.N.Y. Sept. 27, 2017)................................................................... 45
*Sibley v. Watches*, 194 A.D.3d 1385 (4th Dep't 2020).............................................................. 4
*Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*,
   468 F. App'x 43 (2d Cir. 2012)........................................................................................ 45
*Smith v. State*, 50 Tenn. 511 (1871)......................................................................................... 42
*Solomon v. Cook Cty. Bd. of Comm'rs*, 559 F. Supp. 3d 675 (N.D. Ill. 2021)............................ 30

*St. Louis Sw. Ry. Co. v. Berger*, 64 Ark. 613 (1898) ................................................. 43

*State v. Pigg*, 85 Mo. App. 399 (Mo. Ct. App. 1900) ................................................. 32

*State v. Shelby*, 90 Mo. 302 (1886) ................................................................. 33

*Tennant v. Jefferson Cnty. Comm'n*, 567 U.S. 758 (2012) ...................................... 16

*Trump v. Hawaii*, 138 S.Ct. 2392 (2018) ............................................................ 48

*Turley v. Giuliani*, 86 F. Supp. 2d 291 (S.D.N.Y. 2000) ........................................ 46

*U.S. v. Class*, 930 F.3d 460 (D.C. Cir. 2019) ........................................ 25, 28, 30, 39

*U.S. v. King*, No. 21 Cr. 255 (NSR), 2022 WL 5240928 (S.D.N.Y. Oct. 6, 2022) ..................... 3

*U.S. v. Masciandaro*, 648 F. Supp. 2d 779 (E.D. Va. 2009),
     *aff'd on other grounds*, 638 F.3d 458 (4th Cir. 2011) ....................................... 33, 37

*U.S. v. Sprague*, 282 U.S. 716, 732 (1931) ......................................................... 17

*Valenzuela Arias v. Decker*, No. 20 Civ. 2802 (AT),
     2020 WL 1847986 (S.D.N.Y. Apr. 10, 2020) ...................................................... 46

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982) ................ 13

*Vt. Right to Life Cmte. v. Sorrell*, 758 F.3d 118 (2d Cir. 2014) ................................ 13

*Walters v. Kemp*, No. 20 Civ. 1624, 2020 WL 9073550 (N.D. Ga. May 5, 2020) ................... 46

*Warden v. Nickels*, 697 F. Supp. 2d 1221 (W.D. Wash. 2010) ............................... 37, 40

*Warth v. Seldin*, 422 U.S. 490 (1975) ............................................................... 11

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) ..................... 13

*Willis v. State*, 105 Ga. 633 (1898) ................................................................. 43

*Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7 (2008) ............................... 9, 45

*Wynne v. State*, 123 Ga. 566 .......................................................................... 32

*Younger v. Harris*, 401 U.S. 37 (1971) ............................................................... 12

**Statutes**

2 Edw. 3 (1328) .................................................................................. 30, 43

1715 Md. Laws 90 ..................................................................................... 20

1741 N.J. Laws 101 .............................................................................. 21, 22

1771 N.J. Laws 344 .............................................................................. 21, 22

1786 Va. Laws 35 ..................................................................................... 31

1865 La. Extra Acts 14–17 ........................................................................... 21

1870 Ga. Laws 421 ................................................................................... 42

1867 Kan. Sess. Laws 25 ............................................................................. 33

1868 Pa. Sess. Laws 1088, no. 1020 § 21(II) ........................................................ 35

1869–70 Tenn. Pub. Acts 23 ...................................................................... 28, 31

1869–70 Tenn. Pub. Acts 24 ........................................................................... 28

1870 Ga. Laws 421 ................................................................................... 28

1870 Tex. Gen. Laws 63 ........................................................................ 28, 29, 30

1878 Miss. Laws 175 ............................................................................ 29, 33

1883 Mo. Laws 76 ........................................................................... 28, 29, 30, 33

1889 Ariz. Sess. Laws 16 ........................................................................ 28, 30

1889 Ariz. Sess. Laws 17 .................................................................. 28, 29, 31, 41

1890 Okla. Stat. 495 .............................................................................. 31, 33

1890 Okla. Stat. 496.................................................................................................. 28, 30, 31

1893 Or. Laws 79 ................................................................................................................. 21

1895 Mich. Pub. Acts 596 .................................................................................................... 36

2 *Laws of New-York from The Year 1691, to 1773, inclusive* (Hugh Gaine, Printer, 1774) ........ 21

26 Hen. 8 c. 6 § 3 (1534) ................................................................................................ 30, 43

3rd Ann. Rep. of the Park Comm'rs of the City of Lynn 23 (1891) ........................................... 35

61 Ill. Stat. § 29 (1902) ........................................................................................................ 22

Alaska Stat. § 11.61.220(a)(1)(B) ......................................................................................... 18

Charter of the City of Wilmington, Part VII, § 7 (1893) ......................................................... 35

City of Trenton, N.J., Charter & Ordinances 390 (1903) ........................................................ 35

Colo. Stat. ch. 45 § 5 (1883) ................................................................................................ 22

Compiled Ordinances of the City of Grand Rapids 163, § 432 (1907) ..................................... 35

Conn. Gen. Stat. Ann. § 53-202d(f)(1) .................................................................................. 18

D.C. Code § 7-2509.07(b)(1)–(2) .......................................................................................... 18

Del. Laws ch. 435 § 16 (1874)............................................................................................... 22

Digest of the Acts of Assembly Relating to & the Gen. Ordinances
    of the City of Pittsburgh 496 (1897) .................................................................................. 36

Digest of the Laws & Ordinances for the Gov't of the Mun. Corp.
    of the City of Reading, Pa. 240 (1897) .............................................................................. 36

Frederick C. Brightly, Digest of the Laws
    of Pennsylvania from 1700 to May 21, 1861 (1862) ........................................................... 21

Gen. Ordinances of the City of Indianapolis 648, § 1971 (1904)............................................. 36

George W. Paschal, Digest of the Laws of Texas (1874).......................................................... 21

James T. Mitchell & Henry Flanders, 3 *The Statutes at Large*
    *of Pennsylvania from 1682 to 1801: 1712 to 1724* (Clarence M. Busch, Printer, 1896).......... 20

La. Stat. Ann. § 40:1379.3(O) ............................................................................................... 18

Laws & Ordinances for the Gov't of the Mun. Corp.
    of the City of Williamsport, Pa. 141 (1891).......................................................................... 35

Laws & Ordinances Governing the Vill. of Hyde Park 310 (1876) ........................................... 35

Laws & Ordinances of the City of Peoria, Ill. 667 (1892).......................................................... 35

Minutes of Proceedings of the Bd. of Comm'rs of the Central Park 166 (1858) ........................ 35

Mun. Code of Chi. 391, § 1690 (1881).................................................................................... 35

Mun. Code of the City of Spokane, Wash. 123 (1903).............................................................. 35

N.Y. Penal Law § 265.00(3) ................................................................................................... 3

N.Y. Penal Law § 265.00(10) ................................................................................................. 4

N.Y. Penal Law § 265.01 ........................................................................................... 3, 4, 5, 12

N.Y. Penal Law § 265.01-b ............................................................................................ 5, 12

N.Y. Penal Law § 265.03 ............................................................................................ 3, 5, 12

N.Y. Penal Law § 265.04 ....................................................................................................... 3

N.Y. Penal Law § 400.00 .............................................................................................. 3, 12

N.Y. Penal Law § 400.00(1) ................................................................................................... 4

N.Y. Penal Law § 400.00(2) ................................................................................................... 3

N.Y. Penal Law § 400.00(6) ........................................................................................ 4, 5, 15

N.Y. Penal Law § 400.00(7) ................................................................................................ 4
N.Y. Penal Law § 400.00(15) ................................................................................ 5, 12, 14, 15
N.Y. Penal Law § 400.00(17) .............................................................................................. 12
NYC Admin. Code 10-315 ............................................................................................... 5, 11
Park Ordinances, Springfield, Mass. (1891) ....................................................................... 35
Rev. Ordinances of the City of Boulder 157 (1899) ........................................................... 36
Rev. Ordinances of the City of Canton, Ill. 240 (1895) ...................................................... 36
Revised Ordinances of Salt Lake City 248, ch. 27 § 6 (1888) ............................................ 35
Rules & Regs. of the Public Parks & Grounds of the City of Saint Paul (1888) ................. 35
S.C. Code Ann. § 23-31-225 ................................................................................................ 18
Sanborn, Arthur, et al., *Annotated Statutes of Wisconsin* 2226 (1889) ............................ 33
Tower Grove Park of the City of St. Louis 117 (1883) ....................................................... 35

**Other Authorities**

Brad Edmondson, *Environmental Affairs in New York State* at 9 (2001),
    http://www.archives.nysed.gov/
    common/archives/files/mr_pub72.pdf ............................................................................ 35
Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*,
    28 Wm. & Mary Bill Rts. J. 459 (2019) ................................................................... 26, 28
Friends of the Public Garden, *Images of America: Boston Common* 7 (2005) .................. 35
National Park Service, *Firearms Regulations in the National Parks 1897–1936* ............... 36
Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to
    Concealed Carry* (2018) .............................................................................................. 15
Press Release, Governor Kathy Hochul, Governor Hochul Signs Landmark Legislation
    (July 1, 2022), available at https://on.ny.gov/3BM6Hz7 ................................................ 3
Rosanna Smart, *et al.*, The Science of Gun Policy: A Critical Synthesis of Research
    Evidence on the Effects of Gun Policies in the United States, 2d Ed. Santa Monica, CA:
    RAND Corp., 2020. https://www.rand.org/pubs/research_reports/RR2088-1.html ............... 46

Steven Nigrelli, sued in his official capacity as Acting Superintendent of the New York State Police ("Acting Superintendent Nigrelli" or "State Defendant"), by his attorney, Letitia James, Attorney General of the State of New York, respectfully submits this memorandum of law, with the accompanying Declaration of Suzanna Publicker Mettham, with annexed Exhibits A through BBB, dated November 30, 2022 ("SPM Decl."), together with the Declaration of Dr. Brennan Gardner Rivas, PhD, with annexed Exhibits A through B, dated November 28, 2022 ("Rivas Decl."), in opposition to Plaintiffs' Third Motion for a Preliminary Injunction ("Mot.").

## PRELIMINARY STATEMENT

For the third time, Plaintiffs seek extreme and extraordinary relief that would immediately permit any person with a handgun license to openly carry a handgun almost anywhere in New York State and invalidate the State's licensing framework as unconstitutional. Plaintiffs' motion must be denied. To begin with, Plaintiffs cannot demonstrate the necessary clear likelihood of success on the merits. Their demand for the unrestricted ability to openly carry a handgun in public seeks to reverse over one hundred years of consistently upheld state law and is contrary to controlling authority. Plaintiffs also fail to demonstrate that they will suffer irreparable harm in the absence of the requested injunction. As a result, the balance of equities and the public interest counsel strongly in favor of maintenance of the status quo and against granting the relief requested.

## FACTUAL BACKGROUND

### I.    The Supreme Court's Decisions in *Heller* and *Bruen*

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized an individual right to possess a handgun under the Second Amendment. It established that courts should look to the "historical understanding of the scope of the right" to assess whether a law implicates the Second Amendment or burdens the right. *Id.* at 625. This requirement was

emphasized in the Supreme Court's recent decision of *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022).

In *Bruen*, the Supreme Court held for the first time that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 142 S.Ct. at 2122. In doing so, the Court struck down New York's "proper cause" licensing standard, which had required that an applicant for a concealed carry gun license for use in public— as opposed to in their home or premises—"demonstrate a special need for self-protection distinguishable from that of the general community." *Bruen*, 142 S.Ct. at 2123. The Court also adopted a new methodology in place of the previously governing intermediate scrutiny standard:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Id.* at 2129–30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)). The Supreme Court found, in sum, that New York's previous "may-issue" licensing framework inappropriately "limit[ed] public carry only to those law-abiding citizens who demonstrate a special need for self-defense", as opposed to the 43 States who utilized "'shall-issue' licensing regimes . . . [,] which often require applicants to undergo a [criminal] background check" and "are designed to ensure only that those bearing arms in the jurisdiction are, in fact 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (quoting *Heller*, 554 U.S. at 635).

Even after *Bruen*, states retain wide latitude to confront the regulatory challenges posed by modern firearms. *See Bruen*, 142 S.Ct. at 2133. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 142 S.Ct. at 2128 (quoting *Heller*, 554 U.S. at 626). "Justice Alito, in his concurrence opinion, explicitly

2

clarifies that *Bruen* does not 'disturb anything . . . in *Heller* or *McDonald v. Chicago*[, 561 U.S. 74 (2010)] . . . about restrictions that may be imposed on the possession or carrying of guns.'" *U.S. v. King*, No. 21 Cr. 255 (NSR), 2022 WL 5240928, *2 (S.D.N.Y. Oct. 6, 2022) (quoting *Bruen*, 142 S.Ct. at 2157).

## II.    New York Has Consistently Opted for the Licensed Concealed Carriage of Handguns Over Open Carriage

To address the ongoing crisis of gun violence in New York, the State amended New York's existing gun laws via the Concealed Carry Improvement Act ("CCIA"). On July 1, 2022, the CCIA was passed by the New York State Legislature in special session, then promptly signed into law by Governor Kathy Hochul. The bill was specifically designed "to align with the Supreme Court's recent decision in []*Bruen*" *See* Press Release, Governor Kathy Hochul, Governor Hochul Signs Landmark Legislation, https://on.ny.gov/3BM6Hz7 (July 1, 2022). The CCIA updated New York's licensing framework to eliminate the "proper cause" requirement that was held unconstitutional by *Bruen*, to clarify the requirement of "good moral character," and to establish additional requirements, discussed below.

New York maintains a general prohibition on the possession of firearms without a license.[1] *See* N.Y. Penal Law §§ 265.01–265.04, 265.20(a)(3). New York State's firearm licensing law is codified in New York Penal Law § 400.00. Aside from licenses connected to particular employment or professions, New York has two general types of licenses: a premises license for the home or place of business and a concealed carry license. N.Y. Penal Law § 400.00(2)(a)–(b), (c)–(f). Because New York permits concealed carry, it does not permit the open carry of firearms.

---

[1] A "firearm" is defined under New York law to include pistols and revolvers; shotguns with barrels less than eighteen inches in length; rifles with barrels less than sixteen inches in length; "any weapons made from a shotgun or rifle" with an overall length of less than twenty-six inches; and assault weapons. N.Y. Penal Law § 265.00(3).

All licensees must meet general eligibility requirements, including, *inter alia*, requirements that the licensee is over twenty-one years of age, "of good moral character, which, for the purposes of this article, shall mean having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others," and who has not been convicted of a felony or a serious offense. N.Y. Penal Law § 400.00(1).

Licensing is a largely local process in New York State. *See Sibley v. Watches*, 194 A.D.3d 1385, 1386 (4th Dep't 2020). Applications for a license are adjudicated by local licensing officers, who are local judges throughout most of the State. N.Y. Penal Law § 265.00(10). In New York City, Nassau County, and Suffolk County, local police officials serve as licensing officers. *Id.*

The State Police formulate the application form throughout most of New York, and concealed carry licenses issued in New York are valid throughout the State, with the exception of New York City. Pursuant to §§ 400.00(3)(a) and (7), New York City may devise its own licensing application, and it requires that any handgun owner seeking to concealed carry in the City obtain "a special permit . . . issued by the police commissioner." N.Y. Penal Law § 400.00(6). New York City has its own regulations pertaining to the issuance of handgun licenses and provides for premises licenses and different forms of concealed carry licenses. *See* 38 RCNY §§ 5-01, 5-02.

Part of the CCIA enacted the new "Private Property Provision," which prohibits individuals from possessing "a firearm, rifle or shotgun" on private property without the express consent of the property owner or lessee. N.Y. Penal Law § 265.01-d. Additionally, New York Penal Law § 265.01-e enumerates a set of "sensitive locations" in which individuals may not possess "a firearm, rifle or shotgun," in keeping with the Supreme Court's repeated assertion that its case law "should not be taken to cast doubt" on such measures, which are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26; *see McDonald*, 561 U.S. at 786 (plurality op.) ("We repeat those assurances

4

here."); *see also Bruen*, 142 S.Ct. at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald*[] about restrictions that may be imposed on the possession or carrying of guns."). As with the Private Property Provision, this section contains exceptions for police officers, registered security guards, active-duty military, and other designated persons.

## III.    Facts Concerning the Plaintiffs

Plaintiffs commenced this action on June 16, 2021. Plaintiffs requested leave to file a Motion for Preliminary Injunction, which was filed and fully briefed on September 21, 2021. On October 14, 2021, City Defendants filed their Answer while State Defendant filed a Motion to Dismiss on January 3, 2022. Oral arguments on the Preliminary Injunction were held on February 1, 2022, and the Court subsequently issued a decision denying the injunction on February 22, 2022.

On June 23, 2022, the Supreme Court issued its decision in *Bruen*, and on August 22, 2022, Plaintiffs requested permission to file a Second Motion for Preliminary Injunction based on the holding in *Bruen*. On September 1, 2022, the Court issued a Decision and Order denying Plaintiffs' request for a Second Preliminary Injunction and granted State Defendant's Motion to Dismiss as to them. The Court granted Plaintiffs until October 2, 2022 to file an Amended Complaint, but only "as to any claims that have not been dismissed with prejudice." *Frey v. Bruen*, No. 21 CV 5334 (NSR), 2022 WL 3996713, at *5 (S.D.N.Y. Sept. 1, 2022). Plaintiffs filed an Amended Complaint and a Second Amended Complaint on October 4 and October 14, 2022, respectively, adding a host of new allegations targeting provisions of the CCIA. Plaintiffs filed the present motion on October 20, 2022, styling it as an "Emergency Order to Show Cause," but treated by the Court as a Third Motion for Preliminary Injunction.

In sum, Plaintiffs contend that the CCIA infringes on their Second Amendment rights. Plaintiffs' Third Motion for a Preliminary Injunction seeks to enjoin enforcement of New York

Penal Law §§ 400.00(6), 400.00(15), 265.01, 265.01-b, 265.01-d, 265.01-e, 265.03(3), and NYC Admin. Code 10-315 against: (i) Plaintiffs and those similarly situated individuals who possess a valid New York State handgun license who carry a registered handgun, open and exposed on their person within the State; and (ii) Plaintiffs and those similarly situated individuals who possess a valid unrestricted concealed carry handgun license who carry a registered handgun concealed on their person within the State.

### A. Jason and Brianna Frey

Jason and Brianna Frey are both United States citizens who reside in Westchester County. *See* Second Amended Complaint ("Compl.") ¶¶ 12–13; Declaration of Jason Frey ("J. Frey Decl."), at ¶ 2, annexed as Exhibit ("Ex.") 1 to the Declaration of Amy L. Bellantoni in support of Plaintiffs' Motion for Preliminary Injunction ("Bellantoni Decl."); Declaration of Brianna Frey ("B. Frey Decl."), at ¶ 2, annexed to the Bellantoni Decl. as Ex. 2. On an unidentified date, well before the *Bruen* decision, both Freys applied for and were granted concealed carry licenses by a Westchester County judge. B. Frey Decl. at ¶ 3; J. Frey Decl. at ¶ 3. The licenses were restricted "sportsman" licenses, limiting possession of their handguns to the inside of their home, to and from target shooting, and during sporting activities. B. Frey Decl. at ¶ 6; J. Frey Decl. at ¶ 7.

In 2019, both Freys applied for an amendment to allow for unrestricted concealed carry licenses. B. Frey Decl. at ¶ 7; J. Frey Decl. at ¶ 8.[2] The licensing officer denied the applications because neither Frey had met the governing "proper cause" standard. B. Frey Decl. at ¶ 7; J. Frey Decl. at ¶ 9. The Freys did not appeal the denial of their applications by filing an Article 78 proceeding. *See* Init. Compl. at ¶¶ 102 and 135–137. Mr. Frey does not allege that he applied after the *Bruen* decision, or after the enactment of the CCIA legislation, to obtain an unrestricted license

---

[2] Plaintiffs have not attached any of their licensing applications or decisions to the Complaint or to this motion. It is thus unclear what information they shared with the licensing officer or the reasoning for their applications' denials.

to carry his handgun. Mrs. Frey alleges that "[i]n July 2022, [she] applied to have the restrictions on her handgun license removed to allow for 'full carry', which was denied in September 2022." B. Frey Decl. at ¶ 54. Neither Frey alleges that they sought to obtain a handgun license in New York City. J. Frey Decl. at ¶ 26.

Since the Initial Complaint was filed on June 16, 2021, Mrs. Frey indicated that she intended to "carry her handgun open and exposed on her person in public for all lawful purposes." Init. Compl. at ¶ 140. As of October 14, 2022, Mrs. Frey still claimed that she intended "to carry her handgun concealed on her person on a daily basis for self-defense everywhere she goes, on public and private property, commercial and residential, where ordinary people travel, congregate, shop, fill up their cars with gas, and simply exist and she intends to continue such protected conduct on a regular basis until her natural death." Compl. at ¶ 52. However, as of the date of her Declaration, on October 16, 2022, she still had not begun to carry a handgun outside of her licensing restrictions. *See* B. Frey Decl. at ¶¶ 11–13. Mr. Frey, on the other hand, declares that he has begun to "regularly carry a handgun concealed on [his] person in public–not only to and from target shooting or when [he is] engaging in sportsman activities like camping and hiking, for the protection of [him]self and [his] family–but during [his] everyday life…." J. Frey Decl. at ¶ 14. He also states that he "intend[s] to start carrying [his] handgun open and holstered … at times when [he is] not carrying the same handgun concealed." *Id.* at ¶ 21. Mr. Frey states that he carries his weapon to go shopping in shopping centers, restaurants subject to the alcohol and beverage control laws, movie theaters, various parks, and gas stations. J. Frey Decl. at ¶ 14. Mr. Frey alleges that he travels to New York City in order to "get goodies at Junior's," travel to Murray's Bagel's on 8th Avenue, and visit friends in Williamsburg. J. Frey Decl. at ¶ 27. Mrs. Frey does not allege that she has traveled to, or intends to travel to, New York City.

### B.  William Sappe

William Sappe is a resident of Orange County. Declaration of William Sappe ("Sappe Decl."), at ¶ 3, annexed to the Bellantoni Decl. as Ex. 3. He is self-employed and alleges that his business involves transporting "substantial amounts of cash, diamonds, and jewelry for high-end jewelers . . . between the Diamond District and various locations in the 5 boroughs of New York City, throughout New York State, and to other states, including California and Nevada." *Id*. at ¶ 7. Mr. Sappe is licensed as an Armed Guard in New York. *Id*. at ¶ 4. He holds a valid license to carry a concealed handgun everywhere in New York State, with the exception of New York City, which was issued by a judicial licensing officer in Orange County. *Id*. at ¶ 3.

Mr. Sappe states that he "previously applied to the NYPD Licensing Division to obtain a separate concealed carry license, as required by statute, and [his] application was denied." *Id.* at ¶ 9. He does not allege when he applied for the license, when his license was denied, or the reason for the denial. Mr. Sappe has not alleged in his Declaration or in the Complaint that he has applied for a license to carry his handgun in New York City since the Supreme Court's decision in *Bruen*, or since the enactment of the CCIA.

Like Mrs. Frey, Mr. Sappe has alleged since June of 2021 that he "intends to carry his handgun on his person in public for all lawful purposes." Init. Compl. at ¶ 217. He went a step further in the Second Amended Complaint, alleging that "[b]eginning [on October 14, 2022], Mr. Sappe intends to carry his handgun open and exposed on his person for self-defense everywhere he goes, including New York City, every day that he does not otherwise carry his handgun concealed." Compl. at ¶ 81. As of the date of his Declaration, on October 16, 2022, he still had not begun to carry a concealed handgun outside of his licensing restrictions. *See* Sappe Decl. at ¶ 19.

8

**STANDARD OF REVIEW**

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter*

*v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction

bears the burden of establishing that (1) they are likely to succeed on the merits or that there are

sufficiently serious questions going to the merits to make them a fair ground for litigation, (2) they

are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities

tips in their favor, and (4) an injunction is in the public interest. *Citigroup Global Mkts., Inc. v.*

*VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34–35 (2d Cir. 2010).

However, where, as here, "a party seeks an injunction that will affect governmental action

taken in the public interest pursuant to a statutory or regulatory framework, the plaintiff must

typically show a likelihood of success on the merits—a serious question going to the merits is

usually insufficient[.]" *Mullins v. City of New York*, 626 F.3d 47, 52–53 (2d Cir. 2010); *see, e.g.*,

*People ex. rel. Schneiderman v. Actavis PLLC*, 787 F.3d 638, 650 (2d Cir. 2015) ("h[olding] the

movant to a heightened standard" where, as here, an injunction is "mandatory" in that it would

alter the status quo, rather than maintaining it).

Plaintiffs argue that the heightened standard is not applicable here because the regulations

at issue "are the product of Governor Hochul and her administration working in partnership with

NYC Mayor Adams and [New York City Police] Commissioner Sewell…." Mot. at 3. In support

of this argument, Plaintiffs cite *Conn. State Police Union v. Rovella*, 494 F. Supp. 3d 210, 219 (D.

Conn. 2020), *aff'd*, 36 F.4th 54 (2d Cir. 2022), *cert. denied*, No. 22-116, 2022 WL 4654636 (Oct.

3, 2022), for the proposition that deference to a statute is only available when challenged

regulations were the result of "the full play of the democratic process involving both the legislative

and executive branches [which] has produced a policy in the name of the public interest embodied

in a statute and implementing regulations." But there can be no dispute that the legislation at issue

was passed by the New York State Senate after bicameral debate and was lawfully signed by the Governor. It thus falls squarely into the category of governmental action entitled to deference, invoking the heightened preliminary injunction standard, as this Court previously recognized. *Frey v. Bruen*, No. 21 Civ. 5334 (NSR), 2022 WL 522478, at *3 (S.D.N.Y. Feb. 22, 2022); *see also Range v. Att'y Gen. United States*, No. 21-2835, 2022 WL 16955670, at *14, n.28 (3d Cir. Nov. 16, 2022) (*per curium*) ("Deference to state legislatures [in enacting gun regulations] not only accords with longstanding national tradition, but also respects state legislatures' unique ability to channel local concerns and values into criminal law."). As a result, Plaintiffs carry the burdens of showing a clear likelihood of success on the merits and irreparable harm, in addition to proving that the preliminary injunction is in the public interest.

## ARGUMENT

### I.    Plaintiff's CCIA Challenge Exceeds the Court's Leave to Amend

District courts in this Circuit "have routinely dismissed claims in amended complaints where the court granted leave to amend for a limited purpose and the plaintiff filed an amended complaint exceeding the scope of the permission granted." *Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40, 43 (2d Cir. 2012); *see*, *e.g.*, *Pagan v. N.Y. State Div. of Parole*, No. 98 Civ. 5840 (FM), 2002 WL 398682 (S.D.N.Y. Mar. 13, 2002) (collecting cases). In the Court's September 1, 2022 Order, Plaintiffs were granted leave to file an amended complaint "as to any claims that have not been dismissed with prejudice."[3] *Frey*, 2022 WL 3996713, at *5. In their Second Amended Complaint, Plaintiffs now bring several claims that exceed the Court's leave, greatly expanding the scope of their initial claims. Specifically, to the extent Plaintiffs bring claims

---

[3] Claims that were dismissed without prejudice: Count I, challenging §§ 265.01(1), 265.01-b, 265.03(2)–(3), and 400.00(15); Count III, challenging § 400.00(6); and Count IV, challenging §§ 265.01(1), 265.01-b, 265.03(2)–(3), and 400.00(15). *Frey*, 2022 WL 3996713.

challenging the recently enacted provisions of the CCIA—§§ 265.01-d, 265.01-e, and NYC Admin. Code 10-315—those new claims go well beyond the original pleadings. Allowing Plaintiffs to expand their claims to what is effectively a new lawsuit, goes beyond the Court's order. The new claims should therefore be dismissed.

Additionally, Plaintiffs may not further amend their Amended Complaint via a preliminary injunction declaration. In their Complaint, Plaintiffs do not allege to have possessed a gun while riding the New York Metro North Train or the New York City Subway. However, citing Mr. Frey's Declaration, Plaintiffs now raise new claims of threat of prosecution by possessing a firearm on Metro North Trains and the City subways. Mot. at 7. These new allegations are not in the Amended Complaint and therefore should not be considered in the motion for a preliminary injunction. Accordingly, Plaintiffs' present challenge to § 265.01-e(2)(n) is improper and should be denied.

## II.      Plaintiffs Still Lack Standing to Challenge Penal Law §§ 265.01, 265.01-b, & 265.03(3)

Standing is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). In order to have standing in federal court, a plaintiff must show (1) injury in fact, which is a "concrete and particularized" harm to a "legally protected interest"; (2) causation in the form of a "fairly traceable" connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *see also Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 116 (2d Cir. 2020). Justiciable injury for purposes of Article III must be "real and immediate" and not purely speculative and abstract. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Moreover, a credible threat of prosecution cannot rest on fears that are "imaginary or speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)). Plaintiffs bear the burden of establishing standing for each claim asserted, *Libertarian Party*, 970 F.3d at

116, and "[t]he specificity required to establish standing to seek a preliminary injunction 'will normally be no less than that required on a motion for summary judgment.'" *Person v. United States*, No. 19 Civ. 154 (LGS), 2019 WL 258095, at *1 n.2 (S.D.N.Y. Jan. 18, 2019) (quoting *Lujan*, 497 U.S. at 907 n.8). Here, Plaintiffs still lack standing to challenge §§ 265.01(1), 265.01-b, and 265.03(3) because they have not and cannot be injured by those statutes.

The Penal Law creates an exemption from the criminal penalties set out in the Penal Law art. 265 provisions for persons with a valid firearm license. Under § 265.20(3), each of the foregoing sections "shall not apply" to "[p]ossession of a pistol or revolver by a person to whom a license therefor has been issued as provided under" § 400.00.[4] *See also* N.Y. Penal Law § 400.00(17) (making pertinent provisions of § 265 inapplicable to illegal possession of a firearm). As the Court has previously ruled, "[a]s each Plaintiff has been issued such a license, they do not and will not face criminal liability under Section 265."[5] *Frey*, 2022 WL 522478, at *6. To the extent Plaintiffs refer to an advisory email from a sergeant in the NYSP opining on whether an "argument" could be made to prosecute a valid firearm license holder for mere possession pursuant to § 265, that opinion is wrong and goes against the explicit language of the statutes. Bellantoni Decl., Ex. 2. Accordingly, since neither Plaintiffs' circumstances nor those statutes have changed since the Court's prior ruling, they still face no criminal penalties or threats of prosecution for violating §§ 265.01, 265.01-b, and 265.03(3) and thus lack standing to challenge those provisions.

---

[4] Sections 400.00(15) and (17) establish the penalty for licensees who are caught carrying in violation of the license (*e.g.*, carrying in New York City, when not licensed to do so). For a violation of the terms of the license which is not itself a violation of a penal law provision, the result is an administrative penalty like revocation or suspension. *See People v. Thompson*, 92 N.Y.2d 957, 959 (1998).

[5] No statutory exception applies to newly added arts. 265-1(d)–(e), which did not exist at the time of the prior ruling.

**III.    Plaintiffs Have Not Shown a Clear Likelihood of Success on the Merits**

      **A.  Plaintiffs Can Bring Only a Disfavored Facial Challenge**

Plaintiffs style this new action as both a facial and an as-applied challenge, even though none of the challenged measures have ever been applied to them. However, a long line of Second Circuit precedent establishes that a "pre-enforcement" challenge to a state law, defined as one brought "before [any plaintiffs] have been charged with any violation of law," is properly considered a facial challenge. *Jacoby & Meyers, LLP v. Presiding Justs. of the 1st, 2d, 3d & 4th Dep'ts*, 852 F.3d 178, 184 (2d Cir. 2017) (citing *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015)).

Facial challenges to a state statute's constitutionality are "generally disfavored" because "claims of facial invalidity often rest on speculation," they "run contrary to the fundamental principle of judicial restraint," and because "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Dickerson v. Napolitano*, 604 F.3d 732, 741–42 (2d Cir. 2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). Accordingly, "[a] facial [] challenge will succeed only when the challenged law can *never* be validly applied." *Vt. Right to Life Cmte. v. Sorrell*, 758 F.3d 118, 128 (2d Cir. 2014) (emphasis added) (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982)).

      **B.  Plaintiffs Fail to Show a Likelihood of Success on the Merits**

Plaintiffs' attempts to meet the strict preliminary injunction standard consists of five pages of sparse and undeveloped legal arguments attempting to demonstrate a likelihood of success on the merits. Mot. at 12–17. Such thin arguments fail to link facts and law sufficient to demonstrate a "clear" and "substantial" likelihood of success on the merits, let alone make a "strong showing"

of irreparable harm. Accordingly, the Court should deny Plaintiffs' injunction based on their undeveloped argument, alone.

### C. Plaintiffs' Challenge to Section 400.00(15) Fails Because Firearm Permitting Is Manifestly Constitutional, and Specifically Endorsed by *Bruen*

*Bruen* does not call into question the fact that a person is still required under New York law to have a valid license before possessing a handgun. Contrary to Plaintiffs' contention that *Bruen* "stripped New York State of its control" (Mot. at 11) over firearms licensing, the Supreme Court specifically endorsed the permitting of firearms and "reaffirmed that states may impose gun regulations and licensing requirements as long as those regulations and requirements are consistent with historical tradition." *Bruen*, 142 S.Ct. at 2126; *id*. at 2138 n.9 ("To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].'"); *id*. at 2121 (Kavanaugh, J., concurring) ("[T]he Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense.").

Here, Plaintiffs argue that New York's ability to apply criminal penalties to persons violating its firearm licensing framework pursuant to § 400.00(15) is facially unconstitutional. Specifically, Plaintiffs appear to argue that there are no historical analogues to restrictions and penalties for the carrying of firearms outside of licensing restrictions—open or otherwise—and therefore any such restrictions violate the Second Amendment. Mot. at 15. This argument is simply and manifestly wrong.

First, as an as-applied challenge, this argument fails because Plaintiffs have not been injured by § 400.00(15). As a facial challenge, Plaintiffs' argument fails because Plaintiffs have failed to show how a penalty for violating a firearm licensing law could never be validly applied. *Bruen* did not upend New York's licensing provisions; it only held that the "proper cause" standard

under § 400.00(2)(f) violated the Second and Fourteenth Amendment rights of individuals who did not meet that standard. *See Bruen*,142 S.Ct. at 2126. As such, the Court found the remainder of New York's licensing framework constitutionally permissible, including § 400.00(15) which is the enforcement mechanism of New York's entire licensing regime. Accordingly, § 400.00(15) is manifestly constitutional under *Bruen* and Plaintiffs' challenge fails.

### D. Plaintiffs' Challenge to Section 400.00(6) Fails Because There Is a Long Historical Tradition of Gun Licensing

Likewise, for the same reasons listed above in Point III.C, § 400.00(6) is also manifestly constitutional and left undisturbed by *Bruen*. To the extent Plaintiffs claim that § 400.00(6) is not consistent with the Nation's historical tradition of firearm regulation, that claim also fails. There is a long historical tradition of distinct firearm licensing by cities and other municipalities, who are after all, political subdivisions of the State.

In the Fourteenth Amendment era, licensing laws appeared in cities across the United States. In New York alone, examples of such laws appear in Brooklyn (at the time an independent city), SPM Decl. Ex. A at 2; Buffalo, SPM Decl. Ex. B at 176–77; Elmira, SPM Decl. Ex. C at 3; Syracuse, SPM Decl. Ex. D at 243; Troy, SPM Decl. Ex. E at 425; Lockport, SPM Decl. Ex. F at 337; and Albany, SPM Decl. Ex. G at 849–50. Nationally, more than two dozen various municipalities required an individual to obtain written permission from the local mayor, town marshal, or other authority figure to carry a weapon between 1881 and 1910. *See* Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 156 & n.219 (2018) (collecting ordinances from more than two dozen cities, passed between the mid-19th century and early 20th century, requiring a person to carry firearms in cities across the United States subject to the discretionary determination of a local official). Accordingly, Plaintiffs' claims that no historical record exists are false. The historical record abounds with analogous precedents

15

consistent with the Nation's historical tradition of firearm regulation justifying New York City's own licensing laws and ordinances.

### E.  Plaintiffs' Open Carry Challenge Fails Because New York Permits Concealed Carry in Public Places

#### 1.  Regulation, Even Prohibition, of the Open Carry of Firearms in Public Are Outside the Scope of the Second Amendment

It is Plaintiffs' burden to make the initial showing that the Second Amendment's text covers their proposed conduct, which "accords with how [the Court] protect[s] other constitutional rights." *Bruen*, 142 S.Ct. at 2130 (likening Second Amendment analysis to First Amendment analysis). The burden shifts to the government to justify a challenged regulation only after the plaintiff shows, as an initial matter, that her rights have been infringed. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421 (2022); *Tennant v. Jefferson Cnty. Comm'n*, 567 U.S. 758, 760 (2012). Plaintiffs have made no effort to satisfy their burden of showing that the Second Amendment's text covers the open carriage of firearms. Indeed, Plaintiffs ignore the first part of the *Bruen* test entirely, notwithstanding *Bruen*'s repeated pronouncements that the Second Amendment "demands a test rooted in the Second Amendment's text, as informed by history," 142 S.Ct. at 2127.

The Second Amendment's text does not guarantee Plaintiffs' proposed conduct: the open carriage of firearms. The Amendment provides a right to "bear arms" but says nothing about a right to bear arms in a particular manner, such as openly. *See* U.S. Const., amend. II. As the Courts in *Heller* and *Bruen* explicitly recognized, "the right to 'bear arms' refers to the right to 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'" *Bruen*, 142 S.Ct. at 2134 (quoting *Heller*, 554 U.S. at 584). If the framers had intended to guarantee a right to bear arms openly, "nothing would have been simpler" than to say so. *U.S. v. Sprague*,

16

282 U.S. 716, 732 (1931). Because the Second Amendment's text does not guarantee a right to carry firearms in public in a particular manner, the Amendment does not "presumptively protect[ ]" the open carriage of firearms and Plaintiffs' challenge fails on this basis alone. *Bruen*, 142 S.Ct. at 2130.

It is clear, therefore, that the "persuasive historical evidence" shows that governments had the right, and expectation, of regulating how firearms may be carried in the public sphere. Accordingly, there is no Second Amendment right to openly carry a firearm and any restrictions regulating that conduct are outside its scope.

### 2.   Restrictions on Open Carry Are Permitted Under the Second Amendment

As the only appellate court to have addressed the issue thus far explained, "nothing in the [*Bruen*] opinion implies that a State must allow open carry." *Abed v. United States*, 278 A.3d 114, 129 n.27 (D.C. 2022). Indeed, the Court in *Bruen* recognized that as a historical matter, states were able to "lawfully eliminate one kind of public carry . . . so long as they left open the [other] option." *Bruen*, 142 S.Ct. at 2150. Eliminating or more closely regulating one kind of public carry while leaving another option available does nothing to "prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose," and so does not violate the Second Amendment. *Id.*

Plaintiffs claim that "New York's ban on open carry leaves no alternative channels for the general population of non-prohibited people to bear arms in self-defense." Mot. at 18. This is false. Plaintiffs already possess valid firearms licenses under New York's current licensing framework. Given that every Plaintiff has a firearm license, there is no evidence that New York State's licensing Statutes operate as a "ban" in any way. Those Plaintiffs with restricted licenses are not challenging particular licensing decisions on this motion and have not submitted documentary evidence of attempts to obtain different licenses, the outcomes thereof, or appeals of such

decisions.

Given these facts, it is nonsensical to claim that no "alternative channels" are available for self-defense within current New York firearm licensing laws.

### F. Plaintiffs' Challenge to the Private Property Provision Fails

#### 1. Plaintiffs Do Not Demonstrate that the Second Amendment's Text Includes a Right to Carry on Other People's Property without Consent

At the outset, Plaintiffs' challenge to the Private Property Provision fails because they do not satisfy their threshold burden under *Bruen* of demonstrating that the law applies to conduct covered by the Second Amendment's text. Nor could they because the Second Amendment simply does not reach their conduct.

The Provision provides a framework to facilitate communication between property owners and their visitors by requiring the owner or lessee to provide "express consent" before a visitor enters with a gun. *See* N.Y. Penal Law § 265.01-d(1). By letting property owners know when a visitor has a gun and decide whether to permit it, the Provision undergirds existing property rights.

Ultimately, the ability to carry guns on private property must be subject to one of two default rules: either such conduct is presumptively prohibited absent affirmative consent, or it is presumptively permitted absent affirmative prohibition. The choice between the two is a quintessential policy judgment reserved for state legislatures. *See S & R Dev. Ests., LLC v. Town of Greenburgh*, 336 F. Supp. 3d 300, 315 (S.D.N.Y. 2018) (finding that property law is an area occupied by the historic police powers of the state). Like New York, several states have adopted a version of the former approach. *See, e.g.*, Alaska Stat. § 11.61.220(a)(1)(B); La. Stat. Ann. § 40:1379.3(O); S.C. Code Ann. § 23-31-225; D.C. Code § 7-2509.07(b)(1)–(2); *see also* Conn. Gen. Stat. Ann. § 53-202d(f)(1).

In challenging this Provision, Plaintiffs do not satisfy their threshold burden to show that the Provision implicates conduct protected by the Second Amendment, nor can they. *See Bruen*, 142 S.Ct. at 2129–30. Then—and only then—does the burden shift to the government to justify a law's historicity. *Id.* at 2130. Here, the Provision would apply to armed individuals who carry on private land without the owners' consent. Plaintiffs, then, must be requesting a construction of the Second Amendment that would include a right to carry guns on other people's private property without their knowledge or consent. *See GeorgiaCarry.org, Inc. v. Georgia*, 687 F.3d 1244, 1261 (11th Cir. 2012) (recognizing that, in a challenge to a similar provision, plaintiffs bringing a facial challenge "must take the position that the Second Amendment protects a right to bring a firearm on the private property of another against the wishes of the owner"), *abrogated on other grounds by Bruen*, 142 S.Ct. at 2127, n.4.

But Plaintiffs never make this claim. In their memorandum of law, Plaintiffs fail to analyze *Bruen*'s first step at all. They instead quote the *Bruen* test and, in a single sentence, state that "[t]he Constitution presumptively protects Plaintiffs' conduct—carrying a handgun for self-defense," before immediately discussing City and State Defendants' "affirmative obligation" to offer historical analogues. Mot. at 13. Elsewhere, in a discussion of open carry, Plaintiffs baldly state that all the challenged laws "violate the free exercise of rights protected by the plain language of the Second Amendment." Mot. at 16. Such broad, conclusory statements do not satisfy their burden. Plaintiffs have made no effort to explain how the "plain text" of the Second Amendment includes a right to carry arms on someone else's property and without informed consent. And for good reason: such a textual reading is unsupportable. The Supreme Court has never held that carrying firearms onto others' private property equates with "carrying handguns publicly," *Bruen*,

19

142 S.Ct. at 2134, or keeping arms in one's own home, *see Heller*, 554 U.S. at 628–29. The Court did not so hold in *Heller*. Nor in *McDonald*. Nor in *Bruen*.

The Second Amendment was ratified with property rights in mind. In *Heller*, the Supreme Court observed that the Second Amendment "codified a pre-existing right." 554 U.S. at 592. Thus, rather than "expand, extend, or enlarge the individual right to bear arms at the expense of other fundamental rights[,] . . . the Second Amendment merely preserved the status quo of the right that existed at the time." *GeorgiaCarry.org.*, 687 F.3d at 1264. Longstanding legal principles, like the right to exclude, remained. *See id.* at 1266 (noting that the Second Amendment did not "abrogate[] the right of a private property owner . . . to determine for itself whether to allow firearms on its premises and, if so, under what circumstances").

As the Supreme Court has confirmed, the right to bear arms "is not unlimited." *Heller*, 554 U.S. at 626. Yet Plaintiffs' challenge to the Private Property Provision requires an interpretation of the Second Amendment that would conflict with private property rights. Plaintiffs do not—and cannot—support such a textual reading.

### 2. Longstanding American Tradition Supports Requiring an Owner's Consent for Others to Carry Deadly Weapons onto His or Her Property

Even if the Private Property Provision somehow implicates the Second Amendment, it is supported by a longstanding and robust historical tradition.

#### a. Historical Restrictions on Carrying Guns on Private Property

At the time of the Second Amendment's ratification in 1791, at least four states—nearly a third of all states then in the Union—restricted the carrying of arms on private property absent the owner's express permission. *See* 1715 Md. Laws 90 (Maryland's law passed in 1715), SPM Decl. Ex. H; James T. Mitchell & Henry Flanders, *Statutes at Large of Pennsylvania from 1682 to 1801: 1712 to 1724*, at 255–56 (Clarence M. Busch, Printer, 1896) (Pennsylvania's law passed in 1721),

SPM Decl. Ex. I; Frederick C. Brightly, *Digest of the Laws of Pennsylvania from 1700 to May 21, 1861*, at 534 (1862) (Pennsylvania's law strengthened in 1760), SPM Decl. Ex. J; 1741 N.J. Laws 101 (New Jersey's law passed in 1722), SPM Decl. Ex. K; 1771 N.J. Laws 344 (New Jersey's law strengthened in 1771), SPM Decl. Ex. L; *Laws of New-York from The Year 1691, to 1773, inclusive*, 441–42 (Hugh Gaine, Printer, 1774) (New York's law passed in 1763), SPM Decl. Ex. M. Several other states passed similar laws in the years surrounding the 1868 ratification of the Fourteenth Amendment. *See* 1865 La. Extra Acts 14–17 (Louisiana's law passed in 1865), SPM Decl. Ex. N; George W. Paschal, *Digest of the Laws of Texas*, at 1321–22 (1874) (Texas's law passed in 1866), SPM Decl. Ex. O; 1893 Or. Laws 79 (Oregon's law passed in 1893), SPM Decl. Ex. P.

These laws span 178 years of American history, evincing a rich tradition of regulating guns on private property. By penalizing the possession of a gun on another's property, they imposed a burden "comparable" to that of the Private Property Provision. *See Bruen*, 142 S.Ct. at 2133. And because they were motivated, at least in part, by an interest in protecting private property, they are also "comparably justified." *Id.* Indeed, several of the laws expressly identify their purpose as the prevention of armed trespass. *See, e.g.*, 1771 N.J. Laws 344 ("to prevent trespassing with guns"), SPM Decl. Ex. L; 1865 La. Extra Acts 14–17 ("to prohibit the carrying of firearms on premises ... of any citizen"), SPM Decl. Ex. N; Paschal, *supra* (similar statute in Texas) SPM Decl. Ex. O; 1893 Or. Laws 79 ("Prevent a Person from Trespassing upon Any Enclosed Premises or Lands not His Own Being Armed"), SPM Decl. Ex. P. While some of these laws also encompassed hunting, none were limited to that context. Indeed, the statutes' use of the disjunctive "or" reveals that simply carrying a gun onto another's property—regardless of whether one had the intention of hunting—could lead to sanctions. *See, e.g.*, 1715 Md. Laws 90 (Maryland statute penalizing

21

persons who "shoot, kill or hunt, or be seen to carry a gun"), SPM Decl. Ex. H; Mitchell & Flanders, *supra* (Pennsylvania statute penalizing persons who "carry any gun or hunt"), SPM Decl. Ex. I; 1741 N.J. Laws 101 ("to carry any Gun, or hunt"), SPM Decl. Ex. K; *Laws of New-York*, *supra* ("carry, shoot or discharge"), SPM Decl. Ex. M. These laws also applied to all types of private property: "improved or inclosed lands," *e.g.*, Brightly, *supra* (Pennsylvania), SPM Decl. Ex. J; 1741 N.J. Laws 101, SPM Decl. Ex. K; "woods or unenclosed lands," *e.g.*, Mitchell & Flanders, *supra* (Pennsylvania), SPM Decl. Ex. I; 1741 N.J. Laws 101, SPM Decl. Ex. K; "premises," *e.g.*, 1865 La. Extra Acts 14–17, SPM Decl. Ex. N; Paschal, *supra* (Texas), SPM Decl. Ex. O; "plantations," *e.g.*, 1865 La. Extra Acts 14–17, SPM Decl. Ex. N; Paschal, *supra* (Texas), SPM Decl. Ex. O; and "any lands not his own," 1771 N.J. Laws 344, SPM Decl. Ex. L. Taken together, these laws are near perfect analogues to the Private Property Provision.

### b. Restrictions on Carrying Guns to Hunt on Private Property

Moreover, *Bruen* instructs that the government need only identify "historical analogue[s]," not "historical twin[s]." *Bruen*, 142 S.Ct. at 2133. Several laws in other states "impose[d] a comparable burden" to the challenged Provision. *Id.*

For example, many states prohibited carrying a gun to hunt on another's land without the owner's permission. *See, e.g.*, Del. Laws ch. 435 § 16 (1874) ("If any person or persons shall enter upon any lands, not owned by himself, with gun and dog, or with gun alone, for the purpose of shooting any kind of birds or game without first obtaining permission to do so by the owner or occupant, he shall forfeit and pay a fine of five dollars . . ."), SPM Decl. Ex. Q; Colo. Stat. ch. 45 § 5 (1883) (enacted 1877) ("It shall not be lawful for any person to . . . enter [the enclosure of any other person] with a gun for the purpose of hunting, without the consent of the owner."), SPM Decl. Ex. R. Similarly, Illinois in 1871 made it unlawful "for any person or persons to hunt with a

gun, dog or net within or upon the grounds or lands of another without first obtaining from the owner . . . permission so to do." 61 Ill. Stat. § 29 (1902), SPM Decl. Ex. S. The mere fact that an individual was "within or upon the grounds or lands of another with gun . . . without permission" served as *prima facie* evidence of guilt. *Id.* at § 30. Under these laws, liability attached to the mere act of entering another's land with a firearm and an improper intention; individuals need not actually hunt to violate the statutes. While not historical twins, these laws imposed a comparable burden on the right to bear arms: individuals were presumptively unable to carry on private property absent the owner's permission.

Plaintiffs' challenge here fails because they never satisfy their threshold burden. And even if they could surmount this initial hurdle, "the Second Amendment allows a 'variety' of gun regulations." *Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636). With its robust roster of historical analogs, the Private Property Provision is one of them.

### G.  New York's Protections for Sensitive Places Are Constitutional

#### 1.  Any Sensitive Locations Not Mentioned in Plaintiffs' Moving Brief or Declarations Should Be Disregarded

The CCIA provides a list of locations categorized as sensitive, in which handguns are prohibited. Of these sensitive locations, Plaintiffs' Declarations and the Third Motion for a Preliminary Injunction only mention Plaintiffs' intentions to carry handguns in locations that serve alcohol, movie theaters, public transit, and public parks. Despite describing a narrow subset of sensitive locations to where they have expressed an intention of traveling, Plaintiffs seek to overturn the *entirety* of the Sensitive Locations Law, with the limited exceptions of polling places and courthouses. Proposed OSC at 1, n1. Plaintiffs have failed to submit any evidence indicating their past, present, or future intention to carry a handgun for self-defense in locations not expressly addressed and they have not submitted any argument supporting a clear likelihood of success on

the merits or a strong showing of irreparable harm if the statute were to be applied to them in those locations. They have, therefore, waived any argument that they may be entitled to injunctive relief regarding those sensitive locations.

If, however, the Court intends to address locations other than those specifically identified by Plaintiffs in their Declarations and Motion for a Preliminary Injunction, Acting Superintendent Nigrelli respectfully requests the right to file a supplemental brief addressing those locations.

### 2. Prohibitions on Guns in Sensitive Locations are Presumptively Lawful

The Supreme Court has long declared that "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful." *Heller*, 554 U.S. at 626–27 & n.26; *Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring); *McDonald*, 561 U.S. at 786. Because sensitive places are those where, historically, carrying weapons was "altogether prohibited," *Bruen*, 142 S.Ct. at 2133, these locations fall outside the textual scope of the Second Amendment. *See Binderup v. Att'y Gen.*, 836 F.3d 336, 343 (3d Cir. 2016) (sensitive place laws "comport with the Second Amendment because they affect . . . conduct unprotected by the right to keep and bear arms"), *abrogated on other grounds*, *Bruen*, 142 S.Ct. 2111; *see also Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015) ("the Second Amendment right to carry firearms does not apply to federal buildings, such as post offices"); *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs*, 212 F. Supp. 3d 1348, 1366–67 (N.D. Ga. 2016) (finding that location was sensitive meant that "the conduct regulated by the [challenged measure] falls outside the scope of the Second Amendment. Consequently, no further evaluation of the [challenged measure] need occur.").

Federal courts have treated the presumptive lawfulness of sensitive places like any other legal presumption, requiring a plaintiff to make a showing that carrying weapons in the protected area is covered by the Second Amendment's text. *See, e.g.*, *U.S. v. Class*, 930 F.3d 460, 463 (D.C. Cir. 2019) ("A challenger may rebut this presumption only by showing the regulation has more

than a *de minimis* effect upon his right to bear arms." (quotation omitted)). Plaintiffs alone bear the initial burden of showing that a location designated as "sensitive" in fact falls within the Second Amendment's ambit. But whatever that burden entails—a question that *Bruen* left open—Plaintiffs, in their *third* attempt, still do not even attempt to satisfy it, alone compelling the denial of preliminary injunctive relief against this aspect of the CCIA.

Plaintiffs merely declare that "[t]he Constitution presumptively protects Plaintiffs' conduct—carrying a handgun for self-defense" (Mot. at 13), and that the CCIA's ban on handguns in sensitive locations, aside from polling places and courthouses, is "inconsistent with this Nation's robust right to open carriage of handguns." *Id.* at 15. Even a final judgment would "demand *some evidence*" to support these elements, and this is a "motion for preliminary injunctive relief, as to which the requirement for substantial proof is much higher." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Plaintiffs' empty incantations of the governing standards do not shift the burden to City and State Defendants to present historical analogues for § 265.01-e(2)'s sensitive locations to avoid the drastic a remedy of a preliminary injunction. *See Lederman v. N.Y.C. Dep't of Parks & Recreation*, No. 10 Civ. 4800 (RJS), 2010 WL 2813789, at *5 (S.D.N.Y. 2010) (denying preliminary injunction on First Amendment claim for which defendants bore ultimate burden of proof, without requiring them to "develop[] the record sufficiently to rebut all possible assertions of pretext").

### 3. New York's Sensitive Locations Law Is Constitutional and Deeply Rooted in Anglo-American Property Law and Tradition

Assuming, *arguendo*, that barring loaded weapons from sensitive places is considered within the scope of the Second Amendment, the sensitive locations law nonetheless satisfies the *Bruen* "historical tradition" test. For this purpose, the Supreme Court explained that reasoning by analogy, comparing modern regulations to historical analogues, would be required and

appropriate. *Bruen*, 142 S.Ct. at 2132. Here, review of such analogues reveals that the historical record contains a broad and well-established body of laws restricting the carrying of weapons in the sensitive locations challenged by Plaintiffs, demonstrating that restricting firearms in those locations is deeply rooted in American society.

Notably, the applicable standard does not demand tracking down and tallying up nearly identical precursor statutes until some unspecified threshold is reached. Rather, the core question is whether the Second and Fourteenth Amendment's ratifiers could naturally have concluded that States possessed the authority, consistent with the Constitution, to prohibit weapons in particular areas if the legislative need and will arose. Directly on point precursor laws—which New York has adduced here *en masse*—answer that question in the affirmative. But even in the absence of historical twins, a comparison of "how and why" old and new "regulations burden a law abiding citizen's right to armed self defense" can sustain a modern law. *Bruen*, 142 S.Ct. at 2132–33.

New York's sensitive locations law aligns with a recognized purpose of sensitive places, which is to promote the exercise of other fundamental rights (*e.g.*, free exercise of religion, freedom of speech, the fundamental right to vote, access to the courts or assemblage in the public square). In other words, sensitive places are such because "they produce the kinds of public goods protected by other constitutional rights," to allow "them to effectively produce the public good and political culture that we also consider valuable." Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 462 (2019). A brief description of the broad categories of places that have historically been understood as sensitive follows.

### a.   The Government May Prohibit Guns on Its Own Property

The government, like any other property owner, may prohibit the carrying of deadly weapons on its own property. The Supreme Court has repeatedly emphasized as much, first declaring in *Heller* that "nothing in our opinion should be taken to cast doubt on . . . laws forbidding

the carrying of firearms in sensitive places such as . . . government buildings," 554 U.S. at 626, and that such measures are "presumptively lawful," *id.* at 627 n. 26; *accord McDonald*, 561 U.S. at 786 (repeating this assurance). And the *Bruen* Court again mentioned "government buildings" as places where firearms could be prohibited, stating that "we are [] aware of no disputes regarding the lawfulness of such prohibitions" and "[w]e therefore can assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." 142 S.Ct. at 2133; *see id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (referencing bans on guns in "government buildings" as example of permissible regulation).

This conclusion is entirely consistent with decisions affirming that the government as owner may exclude even normally constitutionally protected activity "that would disrupt the legitimate governmental purpose for which the property has been dedicated." *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n*, 447 U.S. 530, 538 (1980); *see also, e.g.*, *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304 (1974) (plurality opinion) (rejecting First Amendment challenge to advertising policy on public transit because "[n]o First Amendment forum is here to be found" and the city was acting "in a proprietary capacity"); *Adderley v. Florida*, 385 U.S. 39, 47 (1966) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.").

Accordingly, a government's decision to prohibit guns on its own property does not implicate the Second Amendment, as multiple Circuit Courts have found. *See, e.g.*, *Class*, 930 F.3d at 463 (no need for judicial scrutiny because ban on guns on Capitol grounds "does not impinge upon a right protected by the Second Amendment" (quotation omitted)); *Bonidy*, 790 F.3d at 1123 (regulation banning guns was "constitutional as to all USPS property," including outdoor

property open to public, "because the Second Amendment right to bear arms has not been extended

to 'government buildings.'"). Indeed, the text of the Constitution itself speaks to the ability of

governments, including state governments, to control their own property. *See* U.S. Const. Art. IV

§ 3 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations

respecting the Territory or other Property belonging to the United States and nothing in this

Constitution shall be so construed as to Prejudice any Claims of the United States, or any particular

State."). Accordingly, any argument against a government's ability to prohibit guns on its own

property must fail the first part of the *Bruen* test, which requires a plaintiff to show that "the Second

Amendment's plain text covers an individual's conduct." *Bruen*, 142 S.Ct. at 2129–30.

**b.    Guns May Be Barred in Places Critical to Other Constitutional Rights**

History demonstrates that states can protect the people from political violence by

prohibiting deadly weapons in places where the public gathers for First Amendment activity. *Id.*

at 38 ("it appears permissible for New York State to restrict concealed carry in 'any gathering of

individuals to collectively express their constitutional rights to protest or assemble . . ." (citing

1869–70 Tenn. Pub. Acts 23–24, SPM Decl. Ex. T (any "public assembly of the people"); 1870

Ga. Laws 421, SPM Decl. Ex. U (any "public gathering"); 1870 Tex. Gen. Laws 63, SPM Decl.

Ex. V (any "public assembly"); 1883 Mo. Laws 76, SPM Decl. Ex. W (any "public assemblage of

persons met for any lawful purpose"); 1889 Ariz. Sess. Laws 16–17, SPM Decl. Ex. X (any "public

assembly"); 1890 Okla. Stat. 496, SPM Decl. Ex. Y (any "public assembly")); *see also* Miller,

*supra*, at 475–78 (discussing the history of "the public square" as a sensitive location). The

conclusion finds further support in longstanding Supreme Court precedent establishing that armed

assemblies of people may be prohibited, precedent recently reaffirmed in *Heller. See Presser v.*

*Illinois*, 116 U.S. 252, 264–65 (1886) ("We think it clear that the sections under consideration,

which only forbid bodies of men to associate together as military organizations, or to drill or parade

with arms in cities and towns unless authorized by law, do not infringe on the right of the people to keep and bear arms."); *accord Heller*, 554 U.S. at 621.

History also indicates that the places discussed above are not the only areas where the Second Amendment may conflict with other fundamental legal rights. *See* 1870 Tex. Laws 63, SPM Decl. Ex. V (prohibiting deadly weapons in "any other place where people may be assembled . . . to perform any other public duty"); 1889 Ariz. Sess. Laws 17, SPM Decl. Ex. X (same language). But each of these groups of analogues demonstrate the historical understanding that the right to bear arms is one of many fundamental constitutional rights, and that it does not apply in places where the presence of deadly weapons would destroy or disrupt the exercise of other constitutionally protected rights.

### c. Places Performing Important Public Functions May Be Protected

Historical statutes also reveal many instances of sensitive locations where guns may be prohibited in order to protect important public functions that do *not* implicate federal constitutional rights. The most obvious of these locations are schools, which are unquestionably capable of protection, as recognized by the Supreme Court. *See Bruen*, 142 S.Ct. at 2133 (noting "*Heller's* discussion of longstanding laws forbidding the carrying of firearms in sensitive places such as schools" and declaring that "we are [] aware of no disputes regarding the lawfulness of such prohibitions"). Nor do either the historical statutes or the Supreme Court's jurisprudence limit the ability to protect students from guns to only government-run schools. *See, e.g.*, 1870 Tex. Gen. Laws 63, SPM Decl. Ex. V ("any school room or other place where persons are assembled for educational . . . purposes"); 1878 Miss. Laws 175, SPM Decl. Ex. Z ("any student of any university, college or school"); 1883 Mo. Laws 76, SPM Decl. Ex. W ("any school room or place where people are assembled for educational . . . purposes"); 1889 Ariz. Sess. Laws 17, SPM Decl. Ex. X ("any school room, or other place where persons are assembled for . . . educational

purposes"); *Bruen*, 142 S.Ct. at 2133; *Heller*, 554 U.S. at 626. The historical statutes also provide several examples of other areas that were considered sensitive based on the activities that occurred there. For instance, several statutes barred weapons in areas conducting "educational," "literary," or "scientific" activities. *See, e.g.*, 1870 Tex. Gen. Laws 63, SPM Decl. Ex. V; 1883 Mo. Laws 76, SPM Decl. Ex. W; 1889 Ariz. Sess. Laws 16, SPM Decl. Ex. X; 1890 Okla. Stat. 496, SPM Decl. Ex. Y. These examples indicate that areas of public importance may be protected even without a direct connection to federally protected constitutional activity.

### d.   Places Containing Vulnerable Populations Are Sensitive Locations

As the D.C. Circuit has noted, places are "sensitive for the purposes of the Second Amendment not only because of the "activities that take place there," but also "because of the people found there." *Class*, 930 F.3d 460. In the paradigmatic example of a sensitive place, schools, the presence of children is a powerful reason why the place is deemed sensitive. *See Nordyke v. King*, 563 F.3d 439, 459 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir. 2010) (noting that the *Heller* court "listed schools and government buildings as examples, presumably because possessing firearms in such places risks harm to great numbers of defenseless people (e.g., children)"); *Solomon v. Cook Cty. Bd. of Comm'rs*, 559 F. Supp. 3d 675, 693 (N.D. Ill. 2021) ("When a location is designated as a 'sensitive place,' all examples of that location tend to have the trait that justifies the designation…[f]or instance, all schools have groups of children present").

### e.   Places Containing Large Groups, Especially in Confined Spaces Where Self-Defense Is Impracticable, Can Be Protected

History also clearly supports prohibitions on firearms in places where people gather in large crowds and confined spaces. Such prohibitions extended back to English law, which included general prohibitions on carrying weapons in fairs or markets, and also appeared in American law after the founding and into the Reconstruction period. *See* 2 Edw. 3, 320, ch. 3 (1328) (No man

may "go no ride armed by night nor by day, in Fairs, Markets . . ."), SPM Decl. Ex. AA; 26 Hen. 8 c. 6 § 3 (1534) (no one may bring a "handgun" or "any other manner of weapon," to "any town, church, fair, market, or other congregation" within Wales), SPM Decl. Ex. BB; 1786 Va. Laws 35, SPM Decl. Ex. CC ("in fairs or markets"); 1869–70 Tenn. Pub. Acts 23–24, SPM Decl. Ex. T (no person may carry a "deadly or dangerous weapon" when attending "any fair"). Likewise, statutes enacted during the Reconstruction period further recognized that places involving large gatherings of people were particularly vulnerable, and that deadly weapons did not belong there. *See, e.g.*, 1869–70 Tenn. Pub. Acts 23, SPM Decl. Ex. T ("fair, race course, or other public assembly of the people"); 1870 Tex. Gen. Laws 63, SPM Decl. Ex. V ("a ball room, social party or other social gathering composed of ladies and gentlemen"); 1890 Okla. Stat. 495–96, SPM Decl. Ex. Y ("any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering"); 1889 Ariz. Sess. Laws 17, SPM Decl. Ex. X (any "place where persons are assembled for amusement . ., or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering").

Case law interpreting the statutes cited above demonstrates that the presence of the public was understood as the reason for the locations' sensitivity. *See Rainey v. State*, 8 Tex. App. 62, 63 (Tex. Ct. App. 1880) ("The evident intent and purpose of the law is to protect the several assemblies mentioned in the article . . . from intrusion by any person . . . going into them and carrying or having about his person any of the arms mentioned"); *see, e.g.*, *Owens v. State*, 3 Tex. App. 404, 406 (Tex. Ct. App. 1878) (sustaining indictment against person who "did unlawfully and willfully go into a ball-room with a pistol about his person, the said ball-room being at Mrs. Simpson's, where an assembly was then and there congregated for social purposes."); *Alexander v. State*, 27 Tex. App. 533, 537 (Tex. Ct. App. 1889) (sustaining conviction where "defendant went

into a place where persons were assembled for amusement, carrying about his person a pistol");
*Maupin v. State*, 89 Tenn. 367 (1890) ("[t]he mill was a public place, -a place to which customers
were constantly invited and daily expected to go. In such a place a man . . . may not lawfully carry
pistols concealed about his person."); *Wynne v. State*, 123 Ga. 566 ("A barbecue on the 4th of July,
at which people assembled to the number of 400 or 500, is a 'public gathering'" within the meaning
of the Georgia law); *State v. Pigg*, 85 Mo. App. 399, 402 (Mo. Ct. App. 1900) (sustaining
conviction "for going into the dwelling house of Josiah Jones, where there was a social gathering,
having about his person a deadly weapon").

These laws recognize that the presence of groups of people, often in confined spaces,
renders a location uniquely vulnerable to firearm violence. In many cases the nature of such places
may render armed self-defense impracticable—it may not be possible to practice armed self-
defense with precision in a crowded theater or stadium. *See Owens*, 3 Tex. App. at 407 (need for
self-defense "affords no excuse in my wearing deadly weapons to church, or in a ball-room, or
other places mentioned where . . . the lives of innocent people there assembled [would be] placed
in jeopardy or sacrificed."). Modern courts likewise recognized that the presence of large groups
of people in confined spaces renders a location sensitive for Second Amendment purposes. *See,
e.g.*, *Christopher v. Ramsey County*, No. 21-2292 (JRT/ECW), 2022 WL 3348276, at *5 (D. Minn.
Aug. 12, 2022) ("During the State Fair, the Fairgrounds are a sensitive location with thousands of
people and children present in often crowded conditions."); *U.S. v. Masciandaro*, 648 F. Supp. 2d
779, 790 (E.D. Va. 2009), *aff'd on other grounds*, 638 F.3d 458 (4th Cir. 2011) (sensitive places
include "public properties where large numbers of people, often strangers (and including children)
congregate for recreational, educational, and expressive activities.").

To be sure, this category of sensitive places is not so expansive as to cover "all places of public congregation that are not isolated from law enforcement," *Bruen*, 142 S.Ct. 2134, but a clear-eyed reading of history reveals that many places where crowds gather were in fact understood as places where access to deadly weapons could be restricted to protect a vulnerable public.

### 4. Plaintiffs Have Not Shown a Substantial Likelihood of Success on a Challenge to Any Specific Sensitive Location

#### a. Places Where Alcohol Is Consumed, N.Y. Penal Law § 265.01-e(2)(o)

Bars and places where alcohol is consumed are also places where people may gather in large groups in confined spaces and are therefore supported by the precedents discussed in Section III.G.3.e, *supra*.

Moreover, modern laws prohibiting firearms in places where alcohol is consumed are relevantly similar to historic laws prohibiting the carrying of arms by intoxicated persons. *See, e.g.*, 1867 Kan. Sess. Laws 25, SPM Decl. Ex. DD; 1883 Mo. Laws 76, SPM Decl. Ex. W; Sanborn, Arthur, et al., *Annotated Statutes of Wisconsin* 2226 (1889), SPM Decl. Ex. EE; *cf. State v. Shelby*, 90 Mo. 302 (1886) (discussing Missouri's sensitive places law previously upheld as constitutional and stating "[t]he mischief to be apprehended from an intoxicated person going abroad with fire-arms upon his person is equally as great as that to be feared from one who goes into an assemblage of persons with one of the prohibited instruments. . . The statute is designed to promote personal security and to check and put down lawlessness, and is thus in perfect harmony with the constitution.").[6] Indeed, the one conclusion naturally flows from the other—if someone carries a deadly weapon into a bar or place where alcohol is consumed, it is entirely to be expected

---

[6] These are only some of the many ways that States throughout American history have tried to prevent tragedy by keeping firearms out of the hands of intoxicated persons. *See, e.g.*, 1878 Miss. Laws 175, SPM Decl. Ex. Z, ("it shall not be lawful for any person to sell to any . . . person intoxicated, knowing him to be . . . in a state of intoxication, any weapon . . . or any pistol cartridge"); 1890 Okla. Stat. 495, SPM Decl. Ex. Y (peace officers normally exempt from the firearms laws, but "if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty . . . as though he were a private person").

that he or she will be carrying that weapon while intoxicated upon leaving. Obviously, otherwise law-abiding individuals may carry a weapon into a bar or restaurant not intending to become intoxicated. However, alcohol's effects on the human psyche and its interactions with medications can be unexpected and upend a person's best-laid plans. Moreover, because only individuals carrying a properly issued license may handle a handgun, a barkeep, well-intentioned stranger, or underage family member could not immediately deescalate a situation by removing a weapon in the same way they may take car keys from someone who becomes too intoxicated to drive home.

### b. Movie Theatres, N.Y. Penal Law § 265.01-e(2)(p)

While moving pictures could not have been envisioned at the time of the Nation's founding, or at the time of the Fourteenth Amendment's ratification, modern movie theaters are easily analogized to "public exhibition[s]," "places where persons are assembled for amusement," and "social gathering[s] composed of ladies and gentlemen." And they are clearly analogous to "fair[s]," "race course[s]," "circus[es]," "show[s]," and other sensitive places discussed in Section III.G.3.e, *supra*, where laws prevented the carrying of firearms where large groups of people gathered in confined spaces. Indeed, concerns regarding the bearing of weapons in theaters are not new, and courts have long recognized the need to regulate such behavior. As described by the Supreme Court of Tennessee in 1840, in evaluating its state constitutional right to bear arms, the constitutional right must be weighed against the "social relations of the citizens" and the regulation of "the manner in which they are worn and circumstances under which they are carried" is permissible.[7] *Aymette v. State*, 21 Tenn. 154, 160 (1840).

---

[7] "Supose it were to suit the whim of a set of ruffians to enter the theatre in the midst of the performance, with drawn swords, guns, and fixed bayonets, or to enter the church in the same manner, during service, to the terror of the audience, and this were to become habitual; can it be that it would be beyond the power of the Legislature to pass laws to remedy such an evil? Surely not. If the use of arms in this way can not be prohibited, it is in the power of fifty armed ruffians to break up the churches, and all other public assemblages, where they might lawfully come, and there would be no remedy. But we are perfectly satisfied that a remedy might be applied. The convention, in securing the

34

### c.   Public Parks, N.Y. Penal Law § 265.01-e(2)(d)

Although public parks were still in their infancy in the late 19th century,[8] the historical record contains an extensive body of laws that restricted the carrying of firearms in local, state, and national parks.[9] *See, e.g.*, Minutes of Proceedings of the Bd. of Comm'rs of the Central Park 166 (1858), SPM Decl. Ex. FF; 1868 Pa. Sess. Laws 1088, no. 1020 § 21(II), SPM Decl. Ex. GG; Laws & Ordinances Governing the Vill. of Hyde Park 310 (1876) (enacted 1875), SPM Decl. Ex. HH; Mun. Code of Chi. 391, § 1690 (1881), SPM Decl. Ex. II; Tower Grove Park of the City of St. Louis 117 (1883), SPM Decl. Ex. JJ; Rev. Ordinances of the City of Danville 83 (1883), SPM Decl. Ex. KK; Rev. Ordinances of Salt Lake City 248, ch. 27 § 6 (1888), SPM Decl. Ex. LL; Rules & Regs. of the Public Parks & Grounds of the City of Saint Paul (1888), SPM Decl. Ex. MM; City of Trenton, N.J., Charter & Ordinances 390 (1903) (enacted 1890), SPM Decl. Ex. NN; Park Ordinances, Springfield, Mass. (1891), SPM Decl. Ex. OO; 3rd Ann. Rep. of the Park Comm'rs of the City of Lynn 23 (1891), SPM Decl. Ex. PP; Laws & Ordinances for the Gov't of the Mun. Corp. of the City of Williamsport, Pa. 141 (1891), SPM Decl. Ex. QQ; Compiled Ordinances of the City of Grand Rapids 163, § 432 (1907) (enacted 1891, amended 1892 & 1897), SPM Decl. Ex. RR; Mun. Code of the City of Spokane, Wash. 123 (1903) (enacted 1892), SPM Decl. Ex. SS; Laws & Ordinances of the City of Peoria, Illinois 667 (1892), SPM Decl. Ex. TT; Charter of the

---

public political right in question, did not intend to take away from the Legislature all power of regulating the social relations of the citizens upon this subject." *Aymette*, 21 Tenn. at 159.

[8] While modern parlance sometimes uses "commons" and "greens" interchangeably with "parks," they historically had a different function. In the 17th and 18th centuries, town commons and greens were usually places for cattle grazing and military training. *See* Friends of the Public Garden, *Images of America: Boston Common* 7 (2005). For example, the Boston Common—considered America's oldest "park"—was largely a pasture for livestock until the 19th century. *See* https://www.thefreedomtrail.org/trail-sites/boston-common. Accordingly, the relevant historical record began to develop as true public parks began to flourish in the mid-to-late 1800s.

[9] The world's first publicly funded park opened in Britain in 1847. *See* https://www.wirral.gov.uk/leisure-parks-and-events/parks-and-open-spaces/birkenhead-park. America's answer—New York's Central Park—followed in 1858. *See* https://www.centralparknyc.org/articles/central-park-history. The nation's first state park was not established until 1864. *See* Brad Edmonson, *Environmental Affairs in New York State* at 9 (2001), http://www.archives.nysed.gov/common/archives/files/mr_pub72.pdf.

City of Wilmington, Part VII, § 7 (1893), SPM Decl. Ex. UU; Digest of the Acts of Assembly
Relating to & the Gen. Ordinances of the City of Pittsburgh 496 (1897) (enacted 1893), SPM Decl.
Ex. VV; 1895 Mich. Pub. Acts 596, SPM Decl. Ex. WW; Rev. Ordinances of the City of Canton,
Ill. 240 (1895), SPM Decl. Ex. XX; Gen. Ordinances of the City of Indianapolis 648, § 1971 (1904)
(enacted 1896), SPM Decl. Ex. YY; Digest of the Laws & Ordinances for the Gov't of the Mun.
Corp. of the City of Reading, Pa. 240 (1897) SPM Decl. Ex. ZZ; Rev. Ordinances of the City of
Boulder 157 (1899), SPM Decl. Ex. AAA.

      This "historical tradition of firearm regulation" in public parks also existed at the federal
level. Although the first national park was not established until 1872—and the National Park
Service itself was not formed until 1916[10]—federal leaders quickly recognized the
inappropriateness of firearms within park boundaries. *See generally* National Park Service,
*Firearms Regulations in the National Parks 1897–1936*, SPM Decl. Ex. BBB. In 1897,
Yellowstone Park adopted a regulation stating that "[f]irearms will only be permitted in the park
on written permission from the superintendent thereof."[11] *Id.* at 1. Upon arrival, gunowners had to
turn over their firearms. *Id.* Soon, more than a dozen other national parks issued similar
regulations. By the time a federal regulation prohibiting firearms in all national parks took effect
in 1936, over twenty parks—nearly every park then in existence[12]—had enacted their own firearm
restrictions. *See id.* at 66 (1936 regulation prohibiting firearms "within the parks and monuments,
except upon written permission of the superintendent or custodian"); *id.* at iii–vi.

---

[10] https://www.nps.gov/parkhistory/hisnps/npshistory/timeline_annotated.htm.
[11] This policy appears to have existed before the regulation's formal enactment. In 1896, a year before the regulation
took effect, the park's acting superintendent wrote that "[o]ver 200 stand of arms have been taken from persons
entering the park." *Id.* at 2.
[12] https://web.archive.org/web/20120311003821/http://home.nps.gov/applications/budget2/
documents/chronop.pdf.

As discussed, courts can also compare "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S.Ct. at 2133. Like other sensitive-place laws, New York's Public Parks Provision promotes the exercise of fundamental rights.[13]

Public parks fit "have immemorially been open to the public for the purpose of communicating and assembling." *Id.* at 475 (internal quotations and citations omitted). "The public square is a kind of First Amendment institution; designed for the people to be better able to exercise related rights to assemble 'to speak' and to petition the government." *Id.* Throughout American history, public parks have been sites of paradigm-shifting protests: the March on Washington in the National Mall,[14] the Stonewall demonstrations in Christopher Park,[15] antiwar protests in Central Park.[16] Today, March for Our Lives, Black Lives Matter, and the Women's March frequently fill parks across the country.[17] Thus, not only is the Public Parks Provision supported by an extensive record of analogous laws, but it is also the embodiment of an American tradition that cherishes public parks as places of refuge, assembly, and free speech.

### d.  Public Transportation, N.Y. Penal Law § 265.01-e(2)(n)

Like publicly funded parks, public transportation is an anachronism–Americans in the Founding or Reconstruction Era would have had no concept similar to a government-run transportation system serving millions of citizens on a daily basis, offered as a public service. Nor could the citizens of those times imagine the distances travelled by modern transportation, the scale of the systems, or their importance to American life. The Metropolitan Transit Authority has

---

[13] Public parks are analogous to other sensitive places because they are places owned by the government that are frequently visited by large crowds and vulnerable groups. *See Masciandaro*, 648 F. Supp. 2d at 790 (places where vehicles travel in National Parks are sensitive places because they are "public properties where large numbers of people . . . congregate for recreational, education, and expressive activities."); *Warden v. Nickels*, 697 F. Supp. 2d 1221, 1229 (W.D. Wash. 2010) (public parks "where children and youth recreate" are sensitive places).

[14] https://www.nps.gov/articles/march-on-washington.htm.

[15] https://www.nps.gov/places/stonewall-national-monument.htm.

[16] https://www.nytimes.com/1971/11/07/archives/thousands-join-in-war-protest.html.

[17] *See, e.g.*, https://time.com/4642399/womens-march-united-states-cities/.

a daily bus and subway ridership of approximately 7.5 million people—adding up to over 2.3 billion riders per year. *See* Metro. Transp. Auth., Subway & Bus Ridership for 2019, https://new.mta.info/agency/new-york-city-transit/subway-bus-ridership-2019 (Apr. 14, 2020). Each day, the number of people who use public transportation in New York City is nearly double the entire American population in 1790. As aptly described by the Second Circuit in *MacWade v. Kelly,*

> [t]he subway is an icon of the City's culture and history, an engine of its colossal economy, a subterranean repository of its art and music, and, most often, the place where millions of diverse New Yorkers and visitors stand elbow to elbow as they traverse the metropolis. Quantified, the subway system is staggering. . . . By any measure, the New York City subway system is America's largest and busiest.

460 F.3d 260, 264 (2d Cir. 2006). Because of the scale and technological advancement inherent in these systems—and because of their importance to public life—there is no possible direct Founding or Reconstruction-era analogue for a modern public transportation system. *Cf. Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 681 (1992) ("When new methods of transportation develop, new methods for [constitutionally] accommodating that transportation are also likely to be needed."). The *Bruen* test does not require one.

*Bruen* "assume[d] it settled" that guns could be prohibited in several specified types of locations, while announcing that "modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." 142 S.Ct. at 2133. The Court also emphasized that "cases implicating unprecedented societal concerns or dramatic technological changes"—both of which are unquestionably present when considering modern public transportation—would "require a more nuanced approach." *Id.* at 2132. The *Bruen* Court gives us an example of how this "nuanced approach" should function, pointing to the fact that the historical understanding of the Second Amendment does not limit its protection "only to those arms in

existence in the 18th century"—in other words, to direct historical analogues—but instead creates a "general definition" that includes "modern instruments that facilitate self-defense." *Id.* at 2132; *see also Heller*, 554 U.S. at 582. Appropriately analyzed, New York's ban on firearms in public transportation facilities is constitutionally permissible.

### 1) The Government, as Property Owner, May Prohibit Firearms on Public Transportation

As an initial matter, it is not disputed that public transportation systems are government property, and as discussed in Section III.G.4.c, above, federal, state, and local governments have long prohibited deadly weapons in government-owned parks. And several statutes from the relevant period contained broad language covering public functions beyond the examples above. Each of these categories of laws demonstrates the ability and propriety of governments to ban the carrying of deadly weapons on government property. Application of § 265.01-e to relatively modern forms of public transportation, simply continues that longstanding tradition.

### 2) Public Transportation Must Be Protected Based on Its Critical Role in the School System

Public transportation must also be protected from firearms due to its integral role in the education system, and in order to protect the children who depend on it to get to and from school. Schools are "the paradigmatic 'sensitive places' identified in *Heller*," *Class*, 930 F.3d at 465, having been specifically designated as sensitive by the Supreme Court not once, but three times. *See Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786; *Bruen*, 142 S.Ct. at 2133. And the ability (and necessity) to protect children from deadly weapons applies not only at the schoolhouse, but also when "traveling to and from it." *Hall v. Garcia*, No. C 10–03799 RS, 2011 WL 995933, at *4 (N.D. Cal. Mar. 11, 2011). The conclusion is consistent with the bulk of post-*Heller* federal case law, which broadly holds "that the presence of children militates in favor of a given place being 'sensitive.'" *Miller v. Smith*, No. 18 Civ. 3085, 2022 WL 782735, at *8 (N.D. Ill. Mar. 14, 2022)

(collecting cases); *see, e.g.*, *Nickels*, 697 F. Supp. 2d at 1229 (law barring firearms in place "where children or youth are likely present" was "a perfectly acceptable prohibition on gun possession in a sensitive place"). Indeed, *Bruen* "assume[d] it settled that" schools full of children "were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." 142 S.Ct. at 2133; *see also id.* at 2157 (Alito, J., concurring).

Public transportation plays an integral role in the school system and must be afforded the same protections as the school system. In New York City, all K-12 students in public and private schools are eligible to ride the Metropolitan Transportation Authority's buses and subways for free to and from school, for certain extracurricular activities on school days, and for certain programming on weekends, so long as they live more than half a mile from their school. *See* Metro. Transp. Auth., Student MetroCards, https://new.mta.info/fares/student-metrocard (Sept. 6, 2022); N.Y. City Dep't of Educ., Transportation Overview, https://www.schools.nyc.gov/school-life/transportation/transportation-overview (last accessed on Nov. 29, 2022). That means that, every day, there could be over 1.1 million students traveling on the MTA system. *See* Explore NYC Schools, N.Y. City Council, https://council.nyc.gov/data/school-explorer/ (last accessed on Nov. 29, 2022).

Children do not cease being worthy of protection when they are dismissed from school, and the locations where they gather to get to and from school are just as sensitive as the places where they assemble once there.

### 3) Places Where People Gather in Large Numbers and Confined Spaces Were and Are Considered Sensitive

The concerns addressed above in Section III.G.3.e regarding the public in confined places are amplified in the case of public rail systems: enclosed spaces where strangers cram together and frequently jostle each other, in train hurtling at speeds of 55mph, increasing the risk of accidental

gun discharge and decreasing the chance of successful, tactical armed self-defense. To be sure, this category of sensitive, confined places is not so expansive as to cover "all places of public congregation that are not isolated from law enforcement," nor could New York "effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Bruen*, 142 S.Ct. 2134. But *Bruen* does not state, or even imply, that the concentration of people in a location is entirely irrelevant to whether that location is sensitive. All of Manhattan may not be sensitive, but a crowded subway car is.

### 4)  History Shows That the Right to Armed Travel Did Not Extend to the Kinds of Travel Done on Public Transportation

The appropriateness of prohibiting guns on public transportation is further supported by case law demonstrating that any conception of a right to defend oneself while traveling did not extend to day-to-day travel within a local community, such as is conducted on modern public transit. And although some statutes from the relevant period had exceptions for travelers or persons on a journey, *see, e.g.*, 1889 Ariz. Sess. Laws 17 (ban on carrying weapons does not apply "to persons traveling"), SPM Decl. Ex. X, the case law demonstrates that these exceptions applied to long-distance travel, not to the sort of commute conducted on modern public transportation. *See* Rivas Decl. ¶ 9. For instance, in *Carr v. State*, 34 Ark. 448, 449 (1879), the Arkansas Supreme Court held that "[t]he exception in the statute is to enable travelers to protect themselves on the highways, or in transit through populous places—not to allow them the privilege of mixing with the people in ordinary intercourse, about the streets, armed in a manner which, upon a sudden fit of passion, might endanger the lives of others." Likewise, in *Eslava v. State*, 49 Ala. 355, 357 (1873), the Alabama Supreme Court held that "the 'travelling or setting out on a journey,' which under the statute excuses the act, must be a travel to a distance from home, and not within the ordinary line of the person's duties, habits, or pleasure." Tennessee likewise emphasized that the

travel exception should not cover typical travel of five or six miles or "across the lines of contiguous counties"—in the way one might travel on modern public transit—because the travel exception was designed to protect against "such possible perils of the highways as are not supposed to exist among one's own neighbors," while the law prohibited the "carrying of deadly weapons on the streets, in society, in the community, or among the people with whom we are in the habit of associating." *Smith v. State*, 50 Tenn. 511, 513–14 (1871).

### 5) History Establishes That Firearms Could Be Prohibited on Trains

The *Bruen* test does not require specific, direct historical analogues for public transportation or any sensitive place. Rather, the decision countenances argument by analogy, with appropriate leeway for "dramatic technological changes." *Bruen*, 142 S.Ct. at 2132. As discussed, there was no public transportation as such during the relevant time period; instead, train travel was provided by private transportation systems, sometimes operating under a government charter. Rivas Decl. ¶¶ 13–17. For instance, the Georgia Legislature declared in the 1880s that "[t]he conductors of a train carrying passengers are invested with all the powers duties, and responsibilities of police officers while on duty on their trains." *Id.* ¶ 15. This was at the same time that a contemporary Georgia law banned the carrying of deadly weapons in "any [] public gathering in this State." 1870 Ga. Laws 421, SPM Dec. Ex. U; *see* Rivas Dec. ¶¶ 6–12.

And history indicates that train systems could and did prevent passengers from carrying guns. *See* Rivas Dec. ¶¶ 6–20. The North Pennsylvania Railroad's June 1875 "rules and regulations," for instance, state that conductors must prevent passengers from taking "into the cars guns, dogs, valises, large bundles or baskets." *Id.* ¶¶ 13–17. Court cases from the relevant period likewise demonstrate that the firearms laws were applied to train passengers. *See id.* ¶¶ 6–20 (citing, *inter alia*, *Willis v. State*, 105 Ga. 633 (1898) and *St. Louis Sw. Ry. Co. v. Berger*, 64 Ark. 613 (1898)).

42

Because the regulation of train travel in the 19th Century was predominantly done by private companies, historical research is difficult and time-consuming, requiring in-person review of records that frequently exist only in paper form in archives spread across the country. *See* Rivas Decl. ¶¶ 18–20. This sort of historical research is expensive and is not conducive to performance on an abbreviated preliminary injunction schedule. *See GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1321 (11th Cir. 2015) (noting the difficulty of "undertak[ing] this historical inquiry on an accelerated preliminary injunction timeline"); *Defense Distrib. v. Bonta*, No. 22 Civ. 6200 (GW), 2022 WL 15524977, at *5 n.9 (C.D. Cal. Oct. 21, 2022) (tentative ruling) (preliminary injunction motion "was wishful-thinking, at best" because "there is no possibility this Court would expect [California] to be able to present the type of historical analysis conducted in *Bruen* on 31 days' notice (or even 54 days' notice)"); *adopted*, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022) (denying relief).

Thus, even if the Court were to require mirror-image historical analogs (which *Bruen* does not), the motion for a preliminary injunction should be denied based on the preliminary historical findings discussed here. *See Lederman*, 2010 WL 2813789, at *5 (noting that even where "the ultimate burden of proof rests with the [government] on the underlying constitutional challenge, the plaintiffs must show a likelihood of success on the merits in order to secure a preliminary injunction. As such, the fact that the Defendants have not yet developed the record sufficiently to rebut all possible assertions . . . will not be enough to warrant a preliminary injunction.").

### e.   Times Square, N.Y. Penal Law § 265.01-e(2)(t)

History strongly supports the conclusion that Times Square is a quintessentially sensitive place where guns may be prohibited. It is directly analogous to statutes banning guns in fairs and markets. Indeed, Times Square is the location of one of the most important markets in the world—

the Nasdaq stock market located at 151 West 42nd Street. *See, e.g.*, 2 Edw. 3, 320, ch. 3 (1328) (barring weapons "in Fairs, Markets"), SPM Decl. Ex. AA; 26 Hen. 8 c. 6 § 3 (1534) (barring handguns in "any town, church, fair, market, or other congregation" within Wales), SPM Decl. Ex. BB; 1869–70 Tenn. Pub. Acts 23–24, (barring weapons at "any fair, race course, or other public assembly of the people"), SPM Decl. Ex. T.

In addition to its status as a market and its location as a place where large number of people congregate in confined spaces, *see* Section III.G.3.e, *supra*, the Times Square area is a major hub of First Amendment activity. It is home to cultural institutions, such as Broadway theatres and Radio City Music Hall, and is central to freedom of the press, including *The New York Times*, the CBS Broadcasting Network, the Viacom cable networks, News Corporation (home to Fox News, the *Wall Street Journal*, and the *New York Post*), *Time* magazine, and a host of other media organizations. And its extensive entertainment and recreational options are certainly analogous to "a ball room, social party or other social gathering composed of ladies and gentlemen," 1870 Tex. Gen. Laws 63, SPM Decl. Ex. V, a "circus, show or public exhibition of any kind," 1890 Okla. Stat. 495–96, SPM Decl. Ex. Y, or a "place where persons are assembled for amusement . . , or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering," 1889 Ariz. Sess. Laws 17, SPM Decl. Ex. X. *See Antonyuk v. Hochul*, No. 22 Civ. 986 (GTS), 2022 WL 16744700, at *37 n.66 (N.D.N.Y. Nov. 7, 2022) ("[I]f Plaintiffs had shown standing regarding [Times Square], the Court would have likely found an American historical tradition of banning firearms in this unique regularly congested commercial area filled with expressive conduct.").

## IV.   Plaintiffs Fail to Make a Showing of Irreparable Harm

A finding of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*, 468 F. App'x

43, 45 (2d Cir. 2012). To satisfy the irreparable harm requirement, a plaintiff "must demonstrate that absent a preliminary injunction [they] will suffer an injury that is neither remote nor speculative, but actual and imminent." *Seifullah v. City of N.Y.*, 17 Civ. 5394 (NGG), 2017 WL 4339478, at *1 (E.D.N.Y. Sept. 27, 2017) (citations and quotations omitted); *see also Winter*, 555 U.S. at 22.

Here, Plaintiffs argue that they are irreparably harmed by not being able to open carry in the state, and that unless this Court enjoins enforcement of New York State's laws that criminalize possession of handguns, they face severe consequences if they choose to open carry, such as arrest, imprisonment, and confiscation of their handguns. This argument fails for a number of reasons.

To begin with, Plaintiffs rely almost entirely upon the misplaced argument that there is a conclusive presumption of irreparable injury because they allege a constitutional violation. Many courts in this Circuit "have held that the mere allegation of a constitutional infringement itself does not constitute irreparable harm." *Lore v. City of Syracuse,* No. 00 Civ. 1833 (HGM), 2001 WL 263051, at *6 (N.D.N.Y. Mar. 9, 2001) (collecting cases). In the Second Amendment context, there has been no finding of irreparable harm justifying a preliminary injunction where plaintiffs fail to show that they are likely to succeed on their Second Amendment claim, particularly where plaintiffs still had some avenues to exercise their right, even though they may prefer to exercise their rights in another manner. *See Jones v. Becerra*, 498 F. Supp. 3d 1317, 1331 (S.D. Cal. 2020); *Walters v. Kemp*, No. 20 Civ. 1624, 2020 WL 9073550, at *11 (N.D. Ga. May 5, 2020). Indeed, even the case Plaintiffs cite for the proposition that this Circuit recognizes a presumption of irreparable injury in this context, stated that only in dicta, and only after conducting an extensive factual analysis of whether plaintiff established an irreparable injury. *See Valenzuela Arias v. Decker*, No. 20 Civ. 2802 (AT), 2020 WL 1847986, at *3–5 (S.D.N.Y. Apr. 10, 2020).

Although Plaintiffs broadly allege that their constitutional rights have been violated, inflicting an irreparable injury, their imagined injuries are insufficient to warrant a preliminary injunction. "Irreparable harm must be shown by the moving party to be imminent, not remote or speculative…." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (citation omitted). When a plaintiff alleges an irreparable harm in the form of constitutional injury, "'the two prongs of the preliminary injunction threshold merge into one' and 'in order to show irreparable injury, plaintiff must show a likelihood of success on the merits.'" *Frey*, 2022 WL 522478, at \*9 (quoting *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000)).

Thus, Plaintiffs must demonstrate that *they personally* will suffer an *imminent* violation of their constitutional rights. But they cannot because they have not alleged *any* constitutional injury, let alone an irreparable one. New York State permits the concealed carrying of handguns in public with a license and each Plaintiffs has a license of some sort. Moreover, for the reasons already discussed, Plaintiffs lack standing or have failed to allege a constitutional violation. Because Plaintiffs are unlikely to succeed on the merits of their claims, they have not made a strong showing of irreparable harm required to obtain a mandatory injunction against a validly enacted statute.

## V.    The Balance of Equities Weighs Against an Injunction

Finally, the balance of equities and considerations of the public interest weigh heavily against granting Plaintiffs the relief they seek. "[A] plaintiff seeking a preliminary injunction must demonstrate not just that they have some likelihood of success on the merits and will suffer irreparable harm absent an injunction, but also that the balance of the equities tips in his favor and an injunction is in the public interest." *Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Svcs.*, 769 F.3d 105, 112 n.4 (2d Cir. 2014) (cleaned up). "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 435, 435 (2009).

46

Here, a preliminary injunction would pose an imminent risk to public safety and well-being. "[I]t is beyond cavil" that there is a "substantial, indeed compelling, governmental interest[] in public safety and crime prevention." *Cuomo*, 804 F.3d at 261. Broad carrying of deadly weapons in dense settings can result in spontaneous, unplanned violence even by otherwise law-abiding citizens, or in accidental shootings leading to injuries or deaths. State Defendant notes, for example, that New York State has the fifth-lowest firearms homicide rate in the nation; undoubtedly due, at least in part, to the challenged licensing regime and restrictions on the open carry of handguns.[18] By seeking to enjoin the challenged provisions, Plaintiffs ignore the immediate and serious public consequences that are equally or more likely to result from the unchecked carrying of deadly weapons in sensitive locations and would vastly outweigh any claims of injury allegedly suffered by Plaintiffs.

Both the equities and the public interest require that the motion be denied.

## VI.   Any Injunction Should Be Limited to the Parties and Stayed to Allow an Appeal

If the Court is inclined to issue a preliminary injunction, its effect should be limited to Plaintiffs Mr. and Mrs. Frey and Sappe. "[A]s a general rule, injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Kane v. de Blasio*, 19 F. 4th 152, 173 (2d Cir. 2021) (collecting cases); *see also Trump v. Hawaii*, 138 S.Ct. 2392, 2427 (2018) (Thomas, J., concurring) ("American courts' tradition of providing equitable relief only to parties [i]s consistent with their view of the nature of judicial power."). This Court should heed these principles and issue relief no broader than necessary to protect only those who allege irreparable harm. It bears noting that only three of the four named Plaintiffs in this action

---

[18] *See* CENTS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/nchs/pressroom/sosmap/firearm_mortality/firearm.htm/ (last reviewed Mar. 1, 2022); Rosanna Smart, *et al.*, The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States, 2d Ed. Santa Monica, CA: RAND Corp., 2020. https://www.rand.org/pubs/research_reports/RR2088-1.html.

filed Declarations and join in the Motion for a Preliminary Injunction. If Plaintiffs do not—and indeed, cannot—allege that all four parties to the underlying litigation face irreparable harm, it would be inappropriate to extend the application of such a decision to all citizens of New York.

Moreover, if the Court were to issue a preliminary injunction, State Defendant respectfully requests that this Court stay the injunction pending appeal, or at a minimum, stay it for three business days to allow him to seek emergency relief in the Second Circuit. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J. in chambers)). That injury is particularly stark where, as here, a proposed injunction would impact the State's performance of its public safety functions. *See id.* (staying an injunction which would otherwise inflict "an ongoing and concrete harm to Maryland's law enforcement and public safety interests").

**CONCLUSION**

For the reasons set forth above, Acting Superintendent Nigrelli respectfully requests that the Court deny Plaintiffs' motion for a preliminary injunction in its entirety, together with such other relief that the Court deems just and proper.

Dated: New York, New York
       November 30, 2022

                                    Respectfully submitted,

                                    LETITIA JAMES
                                    Attorney General of the State of New York
                                    *Attorneys for Superintendent Nigrelli*
                                    By:
                                    /s/ Suzanna Publicker Mettham

                                    Suzanna Publicker Mettham
                                    Ian Ramage
                                    Assistant Attorneys General
                                    28 Liberty Street
                                    New York, New York 10005
                                    (212) 416-6295/8659
                                    Suzanna.Mettham@ag.ny.gov
                                    Ian.Ramage@ag.ny.gov