Index No. 21-cv-5334 (NSR)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JASON FREY, BRIANNA FREY, JACK CHENG, and
WILLIAM SAPPE,

                                            Plaintiffs,

-against-

NEW YORK CITY, New York, STEVEN NIGRELLI, in
his Official Capacity, KEECHANT SEWELL, in her
Official Capacity,

                                            Defendants.

## CITY DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

***HON. SYLVIA O. HINDS-RADIX***
*Corporation Counsel of the City of New York*
*Attorney for City Defendants*
*100 Church Street*
*New York, NY 10007*

*Of Counsel:* Nicholas R. Ciappetta
*Tel: (212) 356-4036*
*Matter No. 2021-0135454*

MICHELLE GOLDBERG-CAHN,
RACHEL K. MOSTON,
NICHOLAS R. CIAPPETTA
CLAUDIA BRODSKY,
Of Counsel.

November 30, 2022

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. iv

PRELIMINARY STATEMENT ...................................................................................... - 1 -

PRELIMINARY INJUNCTION STANDARD......................................................... - 4 -

ARGUMENT

     POINT I

          PLAINTIFFS CANNOT DEMONSTRATE A
          SUBSTANTIAL LIKELIHOOD OF SUCCESS
          ON THE MERITS .............................................................................. - 8 -

          A.     Plaintiffs Lack Standing to Challenge
                  Sensitive Locations Set Forth in Penal Law
                  § 265.01-e(2). .............................................................. - 8 -

          B.     Plaintiffs Lack Standing to Invalidate
                  Restrictions Placed on the Concealed Carry
                  Licenses Issued to Jason Frey, Brianna Frey,
                  and Jack Cheng. ...................................................... - 11 -

          C.     Plaintiffs Lack Standing to Challenge Penal
                  Law § 265.01-d ........................................................ - 13 -

          D.     Plaintiffs Cannot Demonstrate a Violation of
                  the Second Amendment as to the Claims for
                  Which They Arguably Have Standing. .................... - 14 -

                1.     Governing Legal Principles. ......................... - 14 -

                2.     The Second Amendment Does Not
                    Protect the Open Carry of Firearms ............................. - 17 -

                  3.     Penal Law § 400.00(6) Does Not
                    Violate the Second Amendment .................................. - 18 -

                4.     Penal Law § 265.01-e Does Not
                    Violate the Second Amendment .................................. - 24 -

**Page**

a) Times Square – Penal Law §
   265.01-e(2)(t) ................................... - 25 -

b) Public Parks – Penal Law §
   265.01-e(2)(d) ................................... - 28 -

c) Establishments Licensed for
   the On-Premise Consumption
   of Alcohol – Penal Law §
   265.01-e(2)(o) ................................... - 31 -

d) Subway (and Rail) Cars –
   Penal Law § 265.01-e(2)(n) ............................ - 34 -

5.   Penal Law § 265.01-d Does Not
     Violate the Second Amendment ................................. - 38 -

a) Plaintiffs Cannot Meet Their
   Initial Burden as Penal Law §
   265.01-d Merely Establishes
   a Default Rule Based Upon a
   Property Owner's
   Fundamental and Historic
   Right to Exclude................................ - 38 -

1.   Property Owners' Right to Exclude
     is Fundamental ............................ - 39 -

2.   Penal Law § 265.01-d Sets a Default
     Presumption Regarding Property
     Owners' Consent, but Does not
     Implicate the Second Amendment................................ - 40 -

b) There is a Historical
   Tradition of Consent-
   Dependent Firearm
   Regulation. ...................................... - 43 -

POINT II ...................................................................................... - 44 -

PLAINTIFFS    WOULD    NOT    SUFFER
IRREPARABLE HARM IN THE ABSENCE OF A
PRELIMINARY INJUNCTION ........................................... - 44 -

**Page**

POINT III.............................................................................................................- 46 -

AN INJUNCTION IS NOT IN THE PUBLIC
INTEREST..........................................................................................- 46 -

CONCLUSION........................................................................................................- 48 -

# TABLE OF AUTHORITIES

**Cases**  **Pages**

Bill Johnson's Rests., Inc. v. NLRB,
    461 U.S. 731 (1983)..................................................................................................28

Burson v. Freeman,
    504 U.S. 191 (1992)..................................................................................................29

Cedar Point Nursery v. Hassid,
    141 S. Ct. 2063 (2021).............................................................................................39

Citibank, N.A. v. Citytrust,
    756 F.2d 273 (2d Cir. 1985).....................................................................................45

DaimlerChrysler Corp. v. Cuno,
    547 U.S. 332 (2006)....................................................................................................8

District of Columbia v. Heller,
    554 U.S. 570 (2008)..........................................................................................*passim*

GeorgiaCarry.Org, Inc v. Georgia,
    687 F.3d 1244 (11th Cir. 2012) .........................................................................40, 41

Gill v. Whitford,
    138 S. Ct. 1916 (2018)................................................................................................8

Hague v. Committee for Indus. Org.,
    307 U.S. 496 (1939)..................................................................................................29

Hedges v. Obama,
    724 F.3d 170 (2d Cir. 2013).......................................................................................8

Hessel v Christie's Inc.,
    399 F. Supp. 2d 506 (S.D.N.Y. 2005).....................................................................45

Jolly v. Coughlin,
    76 F.3d 468 (1996)....................................................................................................44

Kamerling v. Massanari,
    295 F.3d 206 (2d Cir. 2002).....................................................................................44

Keyishian v. Bd. of Regents of Univ. of State of N.Y.,
    385 U.S. 589 (1967)..................................................................................................28

Loretto v. Teleprompter Manhattan CATV Corp.,
    458 U.S. 419 (1982)..................................................................................................39

**Cases**                                                                 **Pages**

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992)................................................................8, 10, 14

Mastrovincenzo v. City of New York,
    435 F.3d 78 (2d Cir. 2006)...........................................................7

McDonald v. Chicago,
    561 U.S. 742 (2010).................................................................19

Minzer v. Keegan,
    1997 WL 34842191 (E.D.N.Y. Sept. 22, 1997) ................................45, 46

Moore v. Consol. Edison Co.,
    409 F.3d 506 (2d Cir. 2005).........................................................4

Munaf v. Geren,
    553 U.S. 674 (2008)..................................................................4

National Council of Arab Americans v. City of New York,
    331 F. Supp. 2d 258 (S.D.N.Y. 2004)..............................................46

New York State Rifle & Pistol Ass'n, Inc. v. Bruen,
    142 S. Ct. 2111 (2022).........................................................*passim*

New York v. Actavis PLC,
    787 F.3d 638 (2d Cir. 2015).........................................................5

North Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,
    883 F.3d 32 (2d Cir. 2018)..........................................................6

Oneida Nation of N.Y. v. Cuomo,
    645 F.3d 154 (2d Cir. 2011).........................................................4

Plaza Health Labs., Inc. v. Perales,
    878 F.2d 577 (2d Cir. 1989).........................................................4

Polymer Tech. Corp. v. Mimran,
    37 F.3d 74 (2d Cir. 1994)...........................................................4

Rager v. McCloskey,
    305 N.Y. 75 (N.Y. 1952)............................................................39

Richard A. Leslie Co. v. Birdie, LLC,
    07-5933, 2007 WL 4245847 (S.D.N.Y. Nov. 26, 2007)...........................45

**Cases**                                                                   **Pages**

Rodriguez ex rel. Rodriguez v. DeBuono,
    175 F.3d 227 (1998)...................................................................................44

Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.,
    17 F.3d 38 (2d Cir. 1994)............................................................................46

Weight Watchers Int'l v. Luigino's, Inc.,
    423 F.3d 137 (2d Cir. 2005)........................................................................45

**Statutes**

ALASKA STAT. § 11.61.220(a)(1)(B) (2022) ........................................................41

ALASKA STAT. § 11.61.220(a)(2) (2022) ..............................................................34

ARK. CODE ANN. § 5-73-306(11) (2022) .............................................................34

D.C. CODE § 7-2509.07(a)(7) ...............................................................................34

D.C. CODE § 7-2509.07(b)(1) (2022) ...................................................................41

English LAW 41 .....................................................................................................39

FLA. STAT. ANN. § 790.06(12)(a)(12) (LexisNexis 2022) ...................................34

ILL. COMP. STAT. ANN. 5/24-1(a)(8) (LexisNexis 2022) ...................................34

KY. REV. STAT. ANN. § 244.125(1) (LexisNexis 2022) ......................................34

LA. REV. STAT. ANN. § 14:95.5 (2022) ...............................................................34

LA. REV. STAT. ANN. § 1379.3(O) (2022)............................................................41

ME. REV. STAT. ANN. tit. 17-A, § 1057 (2022) ...................................................34

MICH. COMP. LAWS SERV. § 28.425o(1)(d) (LexisNexis 2022) .......................34

MISS. CODE ANN. § 45-9-101(13) (2022) ...........................................................34

N.C. GEN. STAT. § 14-269.3 (2022) (effective Dec. 1, 2022) .............................34

N.D. CENT. CODE § 62.1-02-04 (2021).................................................................34

N.M. STAT. ANN. § 30-7-3 (LexisNexis 2022) .....................................................34

**Satutues**                                                                    **Pages**

1963 N.Y. Laws § 8 Ch. 136 ..................................................................................6

2022 N.Y. Laws § 26 Ch. 371 ...............................................................................5

NEB. REV. STAT. ANN. §69-2441(1)(a) (LexisNexis 2022)............................34

New York Civil Practice Law Article 78 .......................................................12, 44

NYCity Admin. Code §10-315 ....................................................................1, 6, 25

OKLA. STAT. ANN. tit. 21, § 1272.1 (2022) .......................................................34

Penal Law § 265.01.........................................................................................1, 6

Penal Law § 265.01-b ..........................................................................................6

Penal Law § 265.01-d .................................................................................*passim*

Penal Law § 265.01-d(1).....................................................................................41

Penal Law § 265.01-e .................................................................................*passim*

Penal Law § 265.01-e(2)..........................................................................8, 10, 45

Penal Law § 265.01-e(2)(a)-(t) ...........................................................................10

Penal Law § 265.01-e(2)(d) ..........................................................................28, 31

Penal Law § 265.01-e(2)(n) ...........................................................................34, 35

Penal Law § 265.01-e(2)(o) – ............................................................................33

Penal Law § 265.01-e(2)(o) ...............................................................................34

Penal Law § 265.01-e(2)(p) ...............................................................................24

Penal Law § 265.01-e(2)(t) .....................................................................5, 25, 28

Penal Law § 265.03(3) .....................................................................................1, 6

Penal Law § 400.00(6) ...............................................................................*passim*

Penal Law § 400.00(15) ...................................................................................1, 6

S.C. CODE ANN. § 23-31-225 (2022) ..................................................................42

S.D. CODIFIED LAWS § 23-7-70 (2022) ...............................................................34

**Satutues**                                                                    **Pages**

TEX. PENAL CODE ANN. § 30.05(c) ...............................................................42

TEX. PENAL CODE ANN. § 46.03(a)(7) (2021) ...............................................34

TEX. PENAL CODE ANN. § 46.15(o) ...............................................................42

WASH. REV. CODE ANN. § 9.41.300(1)(d) (LexisNexis 2022) .......................34

WYO. STAT. ANN. § 6-8-104(t)(vii) (2022) ...................................................34

**Other Authorities**

Carina Bentata Gryting & Mark Anthony Frassetto, *NYSRPA v. Bruen and the
   Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government
   Security Approach*, 63 B.C. L. Rev. ..........................................................16

*Central Park*, YOUTUBE, https://www.youtube.com/watch?v=z520TWV_4qw; .......................30

Chancellor Regulation A-801 ......................................................................36

City of New York. https://www2.census.gov/programs-
   surveys/decennial/2020/data/apportionment/apportionment-2020-table02.pdf
   (last visited November 21, 2022) .............................................................24

Darrell A.H. Miller, *Symposium: Constitutional Rights: Intersections, Synergies,
   and Conflicts: Constitutional Conflict and Sensitive Places* .....................28, 29, 30

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine:
   Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 263
   (2018) ....................................................................................................16

Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing
   Southern Antebellum Case Law in Context*, 125 Yale L.J. F. 121, 123 n. 11
   (2015) ....................................................................................................16

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:
   An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443,
   1446-47, 1461, 1473 (2009) ...................................................................29

HISTORY, *The Race to Construct the First Subway: The Engineering that Built the
   World* ...................................................................................................37

Joseph Blocher & Reva B. Siegel, When Guns Threaten the Public Sphere: A
   New Account of Public Safety Regulation Under Heller, 116 Nw. U.L. Rev.
   139, 165 (2021) ......................................................................................25

## Other Authorities                                                                    **Pages**

Joseph Blocher, *Cities, Preemption, and the Statutory Second Amendment*, 89 U. Chi. L. Rev. 557, 557 (2022) ...............................................................................20

Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82, 85 (2013) .................................20

Mark Anthony Frassetto, *Judging History: How Judicial Discretion in Applying Originalist Methodology Affects the Outcome of Post-Heller Second Amendment Cases* ...........................................................................................21

Patrick J. Charles, *The Faces of the Second Amendment Outside the Home; History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 8 (2012)....................................................................................................................25

Robert H. Churchill, *Rethinking the Second Amendment: Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 162-63 (2007) .....................20

Thomas W. Merrill, *Property and the Right to Exclude*, 77 NEB. L. REV. 730, 730, 752 (1998).............................................................................................................39

W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 58 (5th ed. 1984)...........................39

4 WILLIAM BLACKSTONE, COMMENTARIES *147..........................................................40

3 WILLIAM BLACKSTONE, COMMENTARIES *209..........................................................39

## PRELIMINARY STATEMENT

Plaintiffs filed this third scattershot, unstructured motion for a preliminary injunction to enjoin Defendants, including the City of New York and Keechant Sewell, Commissioner of the New York City Police Department ("NYPD")[1], from enforcing various provisions of the New York Penal Law ("Penal Law"), the New York City Administrative Code, and unidentified NYPD rules against individuals holding valid handgun licenses.   More specifically, the list of laws implicated by this motion are "Penal Law sections 400.00(6), 400.00(15), 265.01, 265.01-d, 265.01-e, 265.03(3), and NYC Admin. Code 10-315 and the NYPD Rules promulgated thereunder…."  Plaintiffs' Memorandum of Law in Support of Order to Show Cause for a Preliminary Injunction ("Plaintiffs' Memo") at 2.  Plaintiffs' third attempt to obtain a preliminary injunction in this case is a grab-bag approach that targets a number of unrelated sections of law.   In essence, Plaintiffs seek to carry firearms in New York State whenever, wherever, and in whatever manner they desire without any government regulation.  If granted, their motion would allow them to carry firearms open and exposed throughout New York State, including New York City (even though they are not licensed there), regardless of the sensitivity of a location.   Plaintiffs lack standing to assert many of these challenges, and offer scant legal analysis as to those statutes that they do have standing to challenge.   Nor is there any urgent need for an injunction given that the provisions at issue are already operative, some for decades.  In addition to upsetting the status quo, an injunction would not be in the public interest as it would imperil public safety.

Plaintiffs' motion follows the United States Supreme Court's decision in <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 142 S. Ct. 2111 (2022), which struck down New

---

[1] Hereinafter, the City of New York and Commissioner Sewell will be referred to collectively as the "City Defendants."

York State's requirement that an applicant seeking a license to publicly carry a firearm outside of the home or place of business must demonstrate "proper cause" to the applicable licensing official.  While Bruen also established a modified test to evaluate Second Amendment claims, contrary to Plaintiffs' understanding, the Court's decision did not instantaneously lay waste to every municipal firearm regulation.  Indeed, the majority and concurring opinions took great pains to confirm that municipalities are not powerless to address the epidemic of gun violence that afflicts our country.  Moreover, the burden rests with a plaintiff to first prove that its proposed conduct is actually protected by the Second Amendment by conducting a textual analysis.  Throughout its moving papers, Plaintiffs utterly disregard this threshold requirement.

The core of the preliminary injunction motion is a claim that Penal Law §§ 265.01-d and 265.01-e, which became effective over two months ago on September 1, 2022, violate the Second Amendment.  These sections are part of the comprehensive law known as the Concealed Carry Improvement Act ("CCIA") (S.51001/A.41001) that was enacted on July 1, 2022, during an extraordinary session of the New York State Legislature that was called to amend the State's firearm licensing laws in accordance with Bruen.  Penal Law § 265.01-d prohibits the possession of firearms in a number of sensitive locations, and § 265.01-e, prohibits the possession of firearms on private property without the permission of the owner of such property.  With respect to the latter section, Plaintiffs seek to extinguish the right of a private property owner to exclude firearms from such property, whether the property is a private residence or open to the public.  As for Penal Law § 265.01-e, the State Legislature identified twenty categories of places where the possession of firearms would be incompatible with the nature of the activity conducted therein.  No constitutional right is unlimited, and the Second Amendment is similarly not so expansive that a licensee can carry a firearm wherever they

choose.  Additionally, while the Plaintiffs seek to challenge every single sensitive location (with the exception of courthouses and polling places), they only allege an intention to carry a firearm in a handful of such places.  This pleading failure deprives them of standing to enjoin the bulk of Penal Law § 265.01-e.

Plaintiffs also face standing problems with respect to their attempt to eliminate the restrictions placed on the State licenses of Jason Frey, Brianna Frey, and Jack Cheng.  According to Plaintiffs, the licenses of Jason Frey, Brianna Frey, and Jack Cheng were issued with restrictions by licensing officials that are not a party to this action.  See Second Amended Complaint at ¶¶ 23, 25, 46-47, 88-89.  If Plaintiffs contend that Bruen no longer permits a licensing officer to limit the time, place or manner of a concealed carry license, then they should seek to upgrade their licenses from the applicable judicial licensing officers in Westchester County and Nassau County.  Plaintiffs do not allege that they have first pursued this route and obtained an unfavorable outcome.  As such, this court simply cannot provide relief from those restrictions at this point in time.

Next, Plaintiffs ask this court to permit them to carry firearms open and exposed. The issue of open carry, however, was not before the Supreme Court in Bruen.  The Bruen decision simply held that the right to possess and carry firearms in the case of confrontation could not be limited to the home.  There was no holding by the Supreme Court that the Second Amendment requires that a citizen be able to publicly carry both openly *and* concealed.  In fact, the Court opined that so long as public carry is permitted, the manner of public carry may be regulated.  Thus, there is no basis for this court to expand the right identified in Bruen.

Lastly, the Plaintiffs ask this court to abolish the requirement in Penal Law § 400.00(6) that a State concealed carry licensee obtain an independent license from New York

City, a city with more than 8.8 million residents, to carry concealed therein.  This section of the Penal Law is consistent with the history of firearm regulation in the United States as there has always been a special concern for gun possession in densely populated areas.  That Plaintiffs may find it inconvenient to obtain a separate license does not establish a constitutional violation warranting an injunction against a vital public safety measure.

For these reasons, and the others that follow in this memorandum of law, the City Defendants request that the court deny Plaintiffs' omnibus motion for a preliminary injunction.

## PRELIMINARY INJUNCTION STANDARD

There are different formulations of the standard for a preliminary injunction depending on the nature of the relief sought and against whom the relief is sought.  Under any formulation, the issuance of a preliminary injunction is considered a drastic and extraordinary remedy, see Moore v. Consol. Edison Co., 409 F.3d 506, 510 (2d Cir. 2005), and "never awarded as of right."  Munaf v. Geren, 553 U.S. 674, 689-90 (2008).

To obtain preliminary injunctive relief in a federal case, a plaintiff must generally establish (a) irreparable harm; and (b) "either (1) a likelihood of success on the merits of its case, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly" in its favor.  See e.g., Polymer Tech. Corp. v. Mimran, 37 F.3d 74, 77-78 (2d Cir. 1994).  Additionally, the moving party is required to show that the preliminary injunction is in the public interest.  See Oneida Nation of N.Y. v. Cuomo, 645 F.3d 154, 164 (2d Cir. 2011).  But where, as here, "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," a preliminary injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard.  Plaza Health Labs., Inc. v. Perales, 878 F.2d 577, 580 (2d Cir.

1989).[2]  Further, if the preliminary injunction is mandatory, rather than prohibitory, in nature, a heightened standard is applied and the movant must make a "clear" or "substantial" showing of likelihood of success on the merits and a "strong" showing of irreparable harm, in addition to the public interest element.  See New York v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015).  As set forth in the next paragraphs, the nature of the relief sought by Plaintiffs necessitates treating this motion as a request for a mandatory injunction.

Plaintiffs challenge a number of unrelated laws and regulations enacted at different times.  Penal Law §§ 265.01-d and 265.01-e, establishing restricted locations and sensitive locations, respectively, were included in the CCIA, which became effective on September 1, 2022.  See Ch. 371, 2022 N.Y. Laws § 26.  One such sensitive location is the area commonly known as Times Square, as identified by the City of New York.  See Penal Law § 265.01-e(2)(t).  The City of New York established the boundaries of Times Square, for the purpose of Penal Law § 265.01-e(2)(t), by emergency rules promulgated by the NYPD on August 23, 2022, which became immediately effective[3], and Local Law 91 of 2022 ("Local Law

---

[2] Plaintiffs argue that no deference is due to the State Legislature or New York City Council with respect to the CCIA and related New York City regulations or the non-CCIA regulations, and, as such, the "sufficiently serious questions" test should apply.  See Plaintiffs' Memo at 3-5. Plaintiffs' attempt to relax the applicable preliminary injunction standard should be rejected as it is unsupported by any case law.

[3] The emergency rules were signed by New York City Mayor Eric Adams and NYPD Commissioner Sewell on August 23, 2022, and published in The City Record on August 31, 2022.  See Exhibit 1 to the Declaration of Nicholas R. Ciappetta ("Ciappetta Declaration") at 4441-4446.  The boundaries of Times Square were set forth in Section 5-34(a) of Title 38 of the Rules of the City of New York.  By its terms, the rules expired and were deemed repealed upon the enactment of Local Law 91 of 2022.

All exhibits referenced hereinafter are annexed to the Ciappetta Declaration.

91"), which was signed into law by Mayor Eric Adams on October 11, 2022, and became effective thereupon.[4]

The five remaining Penal Law provisions challenged by Plaintiffs – Penal Law §§ 400.00(6) 400.00(15), 265.01, 265.03(3), and 265.01-b – were enacted well before the CCIA. Penal Law § 400.00(6), enacted in 1963[5], is a lengthy section, but Plaintiffs' challenge appears to be only with respect to the requirement that a licensee obtain a separate special carry permit from the NYPD to carry concealed in the City of New York.   Plaintiffs do not state why they seek an injunction against Sections 400.00(15), 265.01, 265.03(3), and 265.01-b, so City Defendants must presume that they seek to prevent enforcement of these laws against the following conduct:  (a) carrying a handgun open and exposed and (b) carrying firearms outside the restrictions placed on the licenses of Jason Frey, Brianna Frey, and Jack Cheng.   In essence, Plaintiffs are asking this court to expand the right to public carry established in <u>Bruen</u> to include both open *and* concealed carry.   Plaintiffs also want this court to nullify location restrictions placed on the licenses of Jason Frey, Brianna Frey, and Jack Cheng, which have likely existed for a number of years.[6]

An injunction that seeks to alter the status quo is considered mandatory in nature. <u>See</u> <u>North Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.</u>, 883 F.3d 32, 36 (2d Cir. 2018). This is exactly what Plaintiffs are attempting to accomplish through their motion for a

---

[4] Local Law 91 is now codified at New York City Administrative Code ("Administrative Code") §10-315.

[5] <u>See</u> Ch. 136, 1963 N.Y. Laws § 8.  A copy of this law is annexed to the Ciappetta Declaration as Exhibit 2.

[6] Neither Plaintiffs' preliminary injunction moving papers nor the Second Amended Complaint specifically identify when Jason Frey, Brianna Frey, and Jack Cheng were issued carry licenses with restrictions.  It can be inferred, however, that these restrictions have existed for several years.

preliminary injunction.  The core provisions of the CCIA became effective over two months ago, and the relevant stakeholders (licensees, applicants, police departments, and licensing officials) adjusted their behavior accordingly.  Since 1963, concealed carry licensees have understood that a special carry license is required to carry in New York City; Plaintiffs' motion would thus disrupt the status quo.  With respect to open carry, Plaintiffs are essentially seeking a declaration that the Second Amendment protects such conduct.  This would create a new right that has never existed and is clearly not appropriate at this stage of the litigation.  Lastly, by asking this court to annul restrictions placed on a pistol permit by licensing officials not a party to this lawsuit, Plaintiffs' motion commands a positive act.  See Mastrovincenzo v. City of New York, 435 F.3d 78, 89 (2d Cir. 2006) (citing case law reasoning that a preliminary injunction that alters the status quo by commanding a positive act is mandatory in nature).

Accordingly, the relevant standard for this case is as follows:  Plaintiffs must demonstrate a "clear" or "substantial" likelihood of success on the merits and a "strong" showing of irreparable harm, in addition to showing that the preliminary injunction is in the public interest.[7]

---

[7] Even if the court deems Plaintiffs' motion as seeking a prohibitory, rather than mandatory, injunction, he cannot satisfy the non-heightened standard.

**ARGUMENT**

**POINT I**

**PLAINTIFFS CANNOT DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS**

**A.**     **Plaintiffs Lack Standing to Challenge Sensitive Locations Set Forth in Penal Law § 265.01-e(2).**

Article III of the United States Constitution serves as a gatekeeper to invoking the jurisdiction of the federal courts.  See Hedges v. Obama, 724 F.3d 170, 188 (2d Cir. 2013).  The doctrine of standing demonstrates that a plaintiff has a personal stake in the outcome of the litigation.  This ensures that federal courts hear real controversies, and not generalized grievances about government.  See Gill v. Whitford, 138 S. Ct. 1916, 1929 (2018).  To establish standing, a plaintiff must prove three elements.  "First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks and citations omitted).  Additionally, a plaintiff bears the burden of demonstrating standing for each claim asserted.  See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006).

**Plaintiff Jason Frey.**  Plaintiff Jason Frey, who currently holds a concealed carry license restricted to sportsman in Westchester County, seeks to carry a firearm open and/or concealed in the following locations outside of New York City:  (1) the Jefferson Valley Mall

and Acme in Yorktown; (2) Shop Rite and Walmart in the Cortland Town Center; (3) restaurants subject to the alcohol beverage control laws, including Primavera Restaurant in Croton Falls, BLT Steakhouse in White Plains, Antonella's in Fishkill, La Famiglia in Carmel, and "other restaurants"; (4) Regal Cinema and Barnes and Noble bookstore in the Cortland Town Center; (5) the BP gas station in Jefferson Valley; (6) "various parks" in and around Westchester County, such as Sunnyside Park, London Woods, Legacy Field, Pound Ridge Reservation, FDR, Lake Taconic and Fahnestock Park.  Within New York City, Jason Frey intends to carry a handgun open and/or concealed in the following locations:  (1) the Metro North train into Grand Central Station; (2) the "number 4 train" and "L train"; and (3) to Times Square to get "goodies at Junior's" and "Murray's Bagels on 9th Avenue"; and (4) throughout New York City generally. See Plaintiffs' Memo at 7; Declaration of Jason Frey, dated October 16, 2022 ("Jason Frey Dec.") at ¶¶ 14-15, 18-19.

   **Plaintiff Brianna Frey.**  Plaintiff Brianna Frey holds a concealed carry license restricted to sportsman, issued in Westchester County.  She seeks to carry a handgun outside of her "sportsman" concealed carry restriction at the following locations outside of New York City: (1) the Jefferson Valley Mall and Acme in Yorktown; (2) Shop Rite and Walmart in the Cortland Town Center;  (3) various restaurants, including Primavera Restaurant in Croton Falls, BLT Steakhouse in White Plains, Antonella's in Fishkill, La Famiglia in Carmel, and "other restaurants subject to the alcohol and beverage laws"; and (4) Regal Cinema in the Cortland Town Center.  Plaintiff Brianna Frey does not allege that she seeks to carry a handgun anywhere within the confines of New York City.  See Plaintiffs' Memo at 8; Declaration of Brianna Frey, dated October 16, 2022 ("Brianna Frey Dec.") at ¶¶ 12-14, 17-18.

**Plaintiff William Sappe.**   Plaintiff Sappe holds a concealed carry handgun license issued by a judicial licensing officer in Orange County, New York.  Plaintiff Sappe intends to carry concealed "in New York City for self-defense on a daily basis."  Plaintiffs' Memo at 8.  Sappe seeks to carry a handgun in the City because he transports "substantial amounts of cash, diamonds, and jewelry for high-end dealers in the Diamond District."  See Declaration of William Sappe, dated October 16, 2022 ("Sappe Dec.") at ¶ 7.  Sappe claims he intends to carry in "the Times Square area for self-protection."  Id. at ¶ 13.[8]

Accordingly, based on their own allegations, Jason Frey, Brianna Frey, and William Sappe intend to visit only a handful of the "sensitive" locations listed in Penal Law § 265.01-e – namely, public parks, Times Square, subway and train cars, theaters, and establishments licensed for the on-premises consumption of alcohol.  Plaintiffs do not allege that they seek to carry their handguns in the vast majority of locations deemed "sensitive" under Penal Law § 265.01-e(2)(a)-(t) – e.g., places of worship, zoos, nursery schools, etc.  Thus, Plaintiffs cannot demonstrate an injury-in-fact with a "fairly traceable connection" to the *entirety* of Penal Law § 265.01-e.  Lujan, 504 U.S. at 560; Penal Law § 265.01-e(2)(a)-(t).  Plaintiffs lack standing to challenge *all* sensitive locations enumerated in Penal Law § 265.01-e(2)(a)-(t) because they do not claim to have been aggrieved by the majority of the restrictions in Penal Law § 265.01-e(2).

---

[8] Plaintiffs' motion papers are conspicuously silent with respect to plaintiff Jack Cheng's intentions to carry in sensitive and/or restricted locations anywhere in New York State, including the City.  Indeed, Cheng did not submit a declaration in support of Plaintiffs' motion and does not appear to be the subject of the instant request for injunctive relief.  In any event, Cheng summarily alleges in the Second Amended Complaint that he intends to carry "where ordinary people travel, congregate, shop, fill up their cars with gas, and simply exist."  Second Amended Complaint at ¶ 91.

As for the "sensitive" locations where Plaintiffs have established standing (i.e., parks, theaters, restaurants with on-premise alcohol consumption, subway and train cars, and Times Square), enforcement action against Plaintiffs by the NYPD is only possible for Times Square, the subway, and restaurants in New York City with on-premise alcohol consumption (e.g., Junior's restaurant where Jason Frey intends to carry).[9]  Plaintiffs do not allege that they intend to carry guns in any of the City parks or theaters.  Accordingly, other than Times Square, the subway, and City restaurants with on-premise alcohol consumption, the NYPD cannot take enforcement action against Plaintiffs in all other places outside of New York City where plaintiffs intend to carry.  Thus, Plaintiffs' claims of injury in these particular locations cannot be traced to enforcement action taken by the City Defendants.

**B.**     **Plaintiffs Lack Standing to Invalidate Restrictions Placed on the Concealed Carry Licenses Issued to Jason Frey, Brianna Frey, and Jack Cheng.**

Plaintiffs also lack standing to invalidate the restrictions placed on the concealed licenses issued to Jason Frey, Brianna Frey, and Jack Cheng.  The licenses of Jason Frey, Brianna Frey, and Jack Cheng were issued with restrictions by licensing officials that are not a party to this action.  See Second Amended Complaint at ¶¶ 23, 25, 46-47, 88-89.  Jason Frey was issued a New York State pistol license by a judicial licensing officer in Westchester County.  Id. ¶ 23.  The handgun license was restricted to "sportsman," thus limiting possession of the handguns registered to this license to inside of Mr. Frey's home, to and from target shooting, and during sports activities.  Id. ¶ 25.  Mr. Frey fails to allege that he applied to the Westchester County licensing official to remove the restrictions on his license.

---

[9] It is axiomatic that the NYPD lacks jurisdiction to take enforcement action against plaintiffs – or anyone – for unlawfully carrying firearms in sensitive locations in other parts of New York State outside of the City, including Yorktown, Cortland, White Plains, Fishkill, and Carmel.

Brianna Frey holds a New York State pistol license issued by a judicial licensing officer in Westchester County.  Id. ¶ 46.  The license was restricted to "sportsman," limiting possession of the handguns to Ms. Frey's home, to and from target shooting, and during sports activities.  Id. ¶ 47.  It appears that, in July 2022, Ms. Frey applied to remove the restrictions on her carry license to allow for "full carry[,]" but the application was denied in September 2022.  Id. ¶ 54.

Plaintiff Jack Cheng holds a New York State pistol license issued by a judicial licensing officer in Nassau County.  Id. ¶ 88.  Cheng's license to carry is restricted to possession in his home, target shooting, and hunting activities.  Id. ¶ 89.  Cheng claims that he should not be required to request permission to amend his license to remove the restrictions.  Id. ¶ 90.

To the extent that these Plaintiffs challenge these restrictions placed on their licenses under Bruen, they should apply to the applicable judicial licensing officers in Westchester County and Nassau County to upgrade their licenses.  Jason Frey should apply to remove the restrictions on his license in Westchester County.  Brianna Frey should challenge the Westchester County judicial licensing officer's determination, denying her application in September 2022 (id., ¶ 54), in New York State Supreme Court, pursuant to Article 78 of the New York Civil Practice Law and Rules.  And Jack Cheng should apply to upgrade his license to the Nassau County licensing officer.  Plaintiffs do not allege that they have exhausted these options and obtained adverse determinations.

Accordingly, Plaintiffs lack standing to assert their claims against the named defendants, as the City and State Defendants cannot redress these alleged violations.  The restrictions on the Plaintiffs' licenses were put in place by Westchester and Nassau County licensing officials who are not a party to this action.  The named City and State Defendants

cannot remove those restrictions.  Thus, Plaintiffs lack standing to invalidate these restrictions on their licenses.

### C.      Plaintiffs Lack Standing to Challenge Penal Law § 265.01-d

Plaintiffs also lack standing to challenge Penal Law § 265.01-d, which states that one shall not carry firearms onto private property without permission of the owner or lessee of that property.  According to Plaintiffs, they refuse to ask for permission from private property owners or lessees to carry their guns on private property.  This compels dismissal of Plaintiffs' claims.  If Plaintiffs ask and obtain permission from private property owners and/or lessees, they would not be aggrieved by the statute.

As noted above, Jason Frey intends to carry his gun in restricted locations, including book stores, malls, grocery stores, drug stores, and gas stations outside of New York City.  Jason Frey Dec. at ¶¶ 14-15.  Frey claims he is "not going to seek permission from any or every property owner or lessee[.]"  Id. at ¶ 16.  Brianna Frey also intends to carry her gun in restricted locations, including stores, malls, grocery stores and gas stations outside of New York City that do not display conspicuous signage permitting on-site carry.  Brianna Frey Dec. at ¶¶ 12-15.  Like her husband, Brianna Frey refuses to ask for permission to carry from the locations she frequents "or from every property owner or lessee[.]"  Id. at ¶ 15.  Plaintiff Sappe does not seek to carry in restricted locations.  See generally, Sappe Dec.  Plaintiff Cheng claims he has not sought or obtained express consent, "nor will he."  Second Amended Complaint at ¶ 92.

Plaintiffs have not established injury-in-fact from Penal Law § 265.01-d.  If Plaintiffs ask for permission to carry firearms from the owners/lessees at the BP gas station, grocery stores, drug stores, and other restricted locations where they wish to carry, they might obtain approval, thus undercutting any claim of injury under the challenged statute.  Plaintiffs'

- 13 -

claims of injury at this juncture are entirely speculative, and a far cry from the concrete and particularized injury necessary to confer standing. <u>Lujan</u>, 504 U.S. at 560-61.

**D.**     **Plaintiffs Cannot Demonstrate a Violation of the Second Amendment as to the Claims for Which They Arguably Have Standing.**

    **1.  Governing Legal Principles**

In <u>Bruen</u>, the Supreme Court continued the development of modern Second Amendment jurisprudence by declaring that there is a constitutional right to carry a firearm in public for purposes of self-defense. <u>See Bruen</u>, 142 S. Ct. at 2156. The Court also dispensed with the two-part means-end scrutiny (whether intermediate or strict scrutiny) applied by many of the federal circuits, and clarified that the Second Amendment "demands a test rooted in the Second Amendment's text, as informed by history." <u>Id.</u> at 2127. The new test formulated by the Court is as follows: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." <u>Id.</u> at 2129-30 (internal quotation marks and citations omitted).

Notwithstanding this sea change, the Second Amendment is not an unlimited right and it is not a right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." <u>Id.</u> at 2128 (<u>quoting</u> <u>District of Columbia v. Heller</u>, 554 U.S. 570, 626 (2008)). Indeed, the Constitution leaves a "variety of tools" to address the problem of gun violence. <u>See Heller</u>, 554 U.S. at 636. In fact, <u>Heller</u> and <u>Bruen</u> identified a number of "longstanding," "presumptively lawful regulatory measures." <u>Heller</u>, 554 U.S. at 626-27, n.26, <u>Bruen</u>, 142 S. Ct. at 2133-34, 2138 n.9, 2150, 2162 (Kavanaugh, *J.*, concurring). Further, the

Court stated that the regulatory measures identified were not meant to be an exhaustive list.  See Bruen, 142 S. Ct. at 2162.

Included in the above list, and relevant to the instant matter, are laws prohibiting the carrying of firearms in "sensitive places."  Heller and Bruen together identified "sensitive places" *such as* schools, government buildings, legislative assemblies, polling places, and courthouses.  Heller, 554 U.S. at 626; Bruen, 142 S. Ct. at 2133.  It is not by accident that both Heller and Bruen use the phrase "such as" in their discussion of "sensitive places."  In neither case was the Court attempting to "comprehensively define 'sensitive places.'"  Bruen, 142 S. Ct. at 2133.  Rather, the Court was simply providing a list of well-settled "sensitive places," and "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible."  Id.  Moreover, Bruen does not require a "historical twin;" rather, a "well-established and representative historical *analogue*" will suffice.  Id.  "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."  Id.  Thus, the Supreme Court, in stating that its list of "sensitive places" was not exhaustive, and in permitting *both* new *and* analogous sensitive places, provided a significant degree of latitude to municipalities.  Further, the only constraint on such latitude was the caution not to expand "the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement…."  Id. at 2134.

Despite the guidance offered by the Supreme Court, Bruen leaves a number of questions unanswered for municipalities considering firearm regulations and litigants who seek to defend or challenge such laws, including what period of history is relevant to analyzing the Nation's tradition of firearm regulation.  While leaving that particular question for another case,

the Court strongly suggested that evidence contemporaneous with the ratification of the Fourteenth Amendment (all well as the Second Amendment) is highly relevant.[10]   First, the Court itself explored evidence from the years preceding and post-dating ratification to evaluate the constitutionality of New York State's "proper cause" requirement.   See id. at 2150-53. Second, the Court noted a scholarly debate as to whether "courts should *primarily* rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope."   Id. at 2138 (emphasis added).   This language demonstrates that the debate concerns *how much* importance to attribute to historical evidence from the Fourteenth Amendment's ratification period, and not whether that evidence deserves any weight.   Indeed, some scholars have argued that the Reconstruction era is the most relevant period for determining the validity of state laws.   See Carina Bentata Gryting & Mark Anthony Frassetto, *NYSRPA v. Bruen and the Future of the Sensitive Places Doctrine:   Rejecting the Ahistorical Government Security Approach*, 63 B.C. L. Rev. E. Supp. 60, 64 n.22 (2022); see also Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry:   Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. F. 121, 123 n. 11 (2015).   Lastly, with respect to sensitive places, the Court deemed laws prohibiting firearm possession in schools "longstanding" based on laws that were enacted in the latter part of the twentieth century.   See David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine:   Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 263 (2018) (noting that laws banning guns in schools "came in the later part of the twentieth century").[11]

---

[10] This was also very clearly stated by the majority opinion in Heller.   The Court in that case stated that post-enactment history that sheds light on "the public understanding of a legal text … is a critical tool of constitutional interpretation."   554 U.S. at 605.

[11] The Supreme Court in Bruen cited approvingly to this law review article for authority.   See Bruen, 142 S. Ct. at 2133.

The Supreme Court in <u>Bruen</u> also did not provide guidance on how to define the proposed course of conduct – perhaps because the conduct therein was relatively straightforward (carrying handguns in public for self-defense) and the textual analysis was not complex. Nevertheless, this step is vital to the standard endorsed by the Supreme Court and it requires analysis by the party challenging the statute/regulation in question.   Plaintiffs do no more than pay lip service to the first <u>Bruen</u> step, arguing that the proposed conduct for each law at issue is simply public carry of firearms for self-defense. <u>See</u> Plaintiffs' Memo at 13.  City Defendants submit that this is not an accurate definition of the conduct at issue, at least for certain of Plaintiffs' challenges.  For example, with respect to open carry, the question should be whether the Second Amendment protects *openly* carrying handguns publicly for self-defense. Additionally, with respect to Penal Law § 400.00(6), City Defendants submit that Plaintiffs' proposed course of conduct, is as follows:  owning or possessing a firearm in the City of New York without the need for a license from the NYPD.  Finally, as to the challenge to Penal Law § 265.01-d (restricted locations), the proposed conduct is possessing a firearm on private property without obtaining consent from the owner of such property.  Plaintiffs have essentially ignored the first step in the <u>Bruen</u> analysis because the Second Amendment *does not* protect such conduct.  The defendants should not have to justify the laws challenged herein with historical analogues until the Plaintiffs first show that their conduct is indeed protected by the Second Amendment.

### 2.  The Second Amendment Does Not Protect the Open Carry of Firearms

Plaintiffs ask this court to permit them to carry firearms open and exposed throughout New York State, including the City.  However, New York State has banned open carry for over a century; rather, New York State permits licensed concealed carry.  Relying on

<u>Bruen</u>, Plaintiffs claim that they are entitled to open carry.  But the issue of open carry was not before the Supreme Court in <u>Bruen</u>.

In <u>Bruen</u>, the Court held that the right to possess and carry firearms in the case of confrontation could not be limited to the home.  The Supreme Court did not hold, as Plaintiffs appear to contend, that the Second Amendment mandates that citizens be able to publicly carry both openly *and* concealed.  In fact, the Court expressly noted that so long as public carry is permitted, the manner of public carry may be regulated:  "The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation….State's could lawfully eliminate one kind of public carry – concealed carry – so long as they left open the option to carry openly."  <u>Bruen</u>, 142 S. Ct. at 2150 (emphasis in original).  In line with <u>Bruen</u>, New York State lawfully and properly regulates the *manner* of public carry by eliminating open carry and permitting another type of public carry – concealed carry.  Contrary to Plaintiffs' allegations, <u>Bruen</u> does not permit them to carry weapons both open *and* concealed, in any manner they choose.  <u>Id.</u>; <u>see</u> <u>Heller</u>, 554 U.S. at 626.  There is simply no basis for this court to expand the right identified in <u>Bruen</u>.

### 3.  Penal Law § 400.00(6) Does Not Violate the Second Amendment

New York Penal Law § 400.00(6) provides, in relevant part, that "[a] license to carry or possess a pistol or revolver, or to purchase or take possession of a semiautomatic rifle, not otherwise limited as to place or time of possession, shall be effective throughout the state, except that the same shall not be valid within the city of New York unless a special permit granting validity is issued by the police commissioner of that city."[12]  Because Plaintiffs gloss over the first step of the <u>Bruen</u> test, there is no analysis in Plaintiffs' memo as to why Penal Law

---

[12] As stated above, Jason Frey and Brianna Frey do not have unrestricted carry licenses; thus, they would not be eligible to apply for a special carry license.

§ 400.00(6) violates the Second Amendment.  Plaintiffs' claim that a special permit requirement in New York City violates the Second Amendment is not supported by a review of the relevant history.

Nothing in Bruen suggests that the Second Amendment protects the right to carry a firearm without a license.  Nor did Bruen decide which level(s) of government may adopt licensing schemes or whether a firearm license must have statewide effect.  Instead, Bruen held that a specific standard for the issuance of a carry license – a requirement of showing a special need distinct from that of the general community – violated the Second Amendment because it prevented law-abiding New Yorkers from carrying a gun for purposes of self-defense.  This limited holding was emphasized in the concurring opinions.  For example, Justice Alito stressed that the holding "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun…. Nor have we disturbed anything that we said in Heller or McDonald v. Chicago, 561 U.S. 742 (2010), about restrictions that may be imposed on the possession or carrying of guns."  Bruen, 142 S. Ct. at 2157 (Alito, J., concurring).[13]  Penal Law § 400.00(6) does not implicate the narrow holding of Bruen because it does not restrict licenses to those who have demonstrated a special need. Citizens with ordinary self-defense needs are allowed to carry their licensed firearms in New York City so long as they apply for and receive a special permit.[14]

The historical tradition of firearm regulation in the United States reveals that firearm regulation has always been a matter of local concern and city-specific gun regulations

---

[13] Justice Kavanaugh also wrote separately to "underscore … the Court's decision does not prohibit … the imposition of licensing requirements for carrying a handgun for self-defense." Id. at 2161 (Kavanaugh, J., concurring).

[14] City Defendants again maintain that this is the type of analysis that Plaintiffs must engage in at step one of the Bruen framework.

fall within the historical tradition.  See Joseph Blocher, *Cities, Preemption, and the Statutory Second Amendment*, 89 U. Chi. L. Rev. 557, 557 (2022).  "Indeed, perhaps no characteristic of gun control in the United States is as "longstanding" as the stricter regulation of guns in cities than in rural areas."  Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82, 85 (2013).  Clearly the rationale for treating cities differently than rural areas is based on the density of the former.  Even though Justice Thomas authored the majority opinion in Bruen, his questioning during oral argument seemingly recognized that cities possess unique characteristics that may require customized solutions.[15]

The special concern exhibited for urban areas dates back prior to the adoption of the Second Amendment and was expressed through varied legislative initiatives.  One common type of regulation prohibited the discharge of firearms within the bounds of towns/cities and/or any public street or highway.  See Robert H. Churchill, *Rethinking the Second Amendment:  Gun Regulation, the Police Power, and the Right to Keep Arms in Early America:  The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 162-63 (2007) (discussing laws prohibiting the shooting of guns in the cities of Boston, New York, and Philadelphia, among other places); see also Exhibit 3 (collecting laws from Pennsylvania in 1750, Tennessee in 1821, Virginia in 1847, Arizona in 1867, Texas in 1871, and North Carolina in 1899)[16].  Another set of laws regulated or empowered municipalities to regulate the storage, sale, or transport of gunpowder.

---

[15] "So I think what we're asking is, if you can have that difference for the purpose of hunting specifically, why can't you have a similar tailored approach for Second Amendment based upon, if it's density in New York City, if that's a problem, the subway, then you have a different set of concerns in upstate New York?"  Transcript of Oral Argument at 78, Bruen, No. 20-843 (U.S. Nov. 3, 2021).

[16] For the convenience of the court, City Defendants are highlighting the relevant portions of all statutes offered as exhibits.  Such statutes are also being grouped together based on subject matter and ordered by date of enactment.  Further, where the statute is lengthy, only the relevant page(s) are included.

See Exhibit 4 (collecting laws from Pennsylvania in 1782, Connecticut in 1836, New Jersey in 1837, Florida in 1838, Iowa in 1846, and Nebraska in 1867 and 1869). A number of states and territories addressed the problem of gun violence through flat-out bans on public carry in populated areas. See Exhibit 5 (collecting a sample of laws from Colorado in 1862; Montana in 1864; New Mexico in 1869; Maryland in 1872 addressing only the city of Annapolis; Wyoming in 1875; Kansas in 1881; Idaho in 1889); see also Mark Anthony Frassetto, *Judging History: How Judicial Discretion in Applying Originalist Methodology Affects the Outcome of Post-Heller Second Amendment Cases*, 29 Wm. & Mary Bill of Rts. J. 413, 433 (2020) (stating that numerous western states completely prohibited the carrying of firearms in "cities and towns, and especially sanctioned in places of public gathering such as schools, markets, and dance halls"); See ADAM WINKLER, GUN FIGHT 164 (W.W. Norton & Company, Inc. eds.) (2011) (asserting that the most common gun laws in the 1880s were those that banned the possession of concealed firearms in public).

Particularly relevant to the issue at hand are a number of state laws permitting towns and cities to regulate the carrying of firearms. For example, in 1891, the New York State Legislature revised the charter of the City of Buffalo allowing the superintendent to issue permits to carry pistol(s) in the city. See Exhibit 6. A few years later, the state of Florida authorized the Mayor and City of Jacksonville to "regulate and license the sale of firearms and suppress the carrying of concealed weapons." Exhibit 7. Many other state statutes conferred even broader power on cities to regulate, or even prohibit, the carrying of guns. See Exhibit 8 (collecting laws from the following states: Tennessee in 1825 said the mayor and aldermen of Reynoldsburgh could make laws and rules regarding the shooting and carrying of guns; Wisconsin in 1883 authorizing the common council of Oshkosh to "regulate or prohibit the carrying or wearing by

any person" of any pistol; Idaho in 1901 gave the council of Boise City authority to "regulate and prohibit the use of guns, pistols and firearms"; in 1902, Georgia permitted the city of Forsyth to license and regulate gun shops and dealers in guns or pistols; a 1905 North Carolina law provided that the Town of Pine Bluff could impose conditions under which guns may be sold and used; a 1905 New Jersey statute prohibiting the carry of any revolver or pistol without a written permit from a designated locality; and Michigan and Texas granted cities similar power via laws adopted in 1901 and 1909, respectively).

In addition to these state statutes, a number of cities passed their own laws establishing licensing or permitting schemes.  See Exhibit 9 (collecting ordinances from Kansas City, Missouri in 1880; New York City, New York in 1881; Chicago, Illinois in 1881; Milwaukee, Wisconsin in 1896; Salt Lake City, Utah in 1888; Wheeling, West Virginia in 1891; Evanston, Illinois in 1893; Oakland, California in 1895; Lincoln, Nebraska in 1895; Spokane, Washington in 1896; Oregon City, Oregon in 1897; St. Louis, Missouri in 1901; and Stockton, California in 1901[17]).  In addition, in 1892, Congress passed a law prohibiting both open and concealed carry in Washington D.C. without a permit.  See Exhibit 9.  Other local laws went much further, banning public carry, concealed or otherwise, in its entirety.  See Exhibit 10 (collecting ordinances from Jersey City, New Jersey in 1871; Nebraska City, Nebraska in 1872; Nashville, Tennessee in 1873; Los Angeles, California in 1878; Salina, Kansas in 1879; La Crosse, Wisconsin in 1880; Syracuse, New York in 1885; Dallas, Texas in 1887; Checotah, Oklahoma in 1890; New Haven, Connecticut in 1890; Rawlins, Wyoming in 1893; Superior, Wisconsin in 1896; Wichita, Kansas in 1899; McKinney, Texas in 1899; and San Antonio, Texas in 1899).

---

[17] While this law was enacted in 1901, the date of the book that published the codification is from 1908.

The above historical evidence demonstrates that government officials have always been particularly concerned about the presence of firearms in populated areas such as cities.  The evidence also demonstrates a strong tradition of local regulation of firearms as the statutes identified are geographically diverse, fall within the historical time period deemed relevant by the Supreme Court, and govern a considerable percentage of the population of the United States.

The historical analogues must also be "relevantly similar" to the modern regulation to survive the Bruen test.  See 142 S. Ct. at 2132.  The metrics used to determine "relevant similarity" "is how and why the regulations burden a law-abiding citizen's right to armed self-defense."  Id. at 2133.  In addition, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry."  Id. (omitting internal emphasis and quotation marks).

The purpose of the historical analogues and Penal Law § 400.00(6) are clearly the same:  to avoid accidental or purposeful misuse of firearms in populated areas.  Further, the burden imposed by Penal Law § 400.00(6) is actually *less* than the historical analogues because the former provides a pathway through a special carry license for the concealed carry of firearms in New York City, while many of the historical laws authorize outright prohibitions on carry in cities and other densely populated areas.   Moreover, the concern for the unlawful or inappropriate use of a firearm in the City of New York is more acute than the cities discussed above.  Put more simply, New York City has no peer in the United States when it comes to population or density.  In April 2020, New York City's population was 8,804,190.  See Exhibit 11 at page 5.  This compromises a whopping 43.6 percent of New York State's population.  See id. at page 2.  For comparison purposes, New York City has almost five million more residents

than Los Angeles – the next most populous city.  See id. at page 5.  Excluding the State of New York, only 10 *states* have a greater population than the City of New York. https://www2.census.gov/programs-surveys/decennial/2020/data/apportionment/apportionment-2020-table02.pdf (last visited November 21, 2022).  And when it comes to population per square mile, New York City is far and away the leader among large cities.  See *The most (and least) densely populated cities in America*, THE BUFFALO NEWS (January 28, 2021), https://buffalonews.com/lifestyles/the-most-and-least-densely-populated-cities-in-america/article_3006340e-00fa-5554-8720-6ce1f9f27387.html.

For all these reasons, this court should find Penal Law § 400.00(6) proportionate to the historical analogues and deny Plaintiffs' Second Amendment claim.

### 4.  Penal Law § 265.01-e Does Not Violate the Second Amendment

As argued above, Plaintiffs only allege an intention to visit a handful of the dozens of "sensitive locations" set forth in Penal Law § 265.01-e, and even fewer within the confines of the City of New York.  This deprives Plaintiffs of standing to challenge all "sensitive locations" except for, arguably, Times Square, public parks[18], subway and train cars, and establishments licensed for the on-premises consumption of alcohol.[19]  As to these locations, the possession of firearms may be prohibited consistent with the Second Amendment because they are relevantly similar to historical analogues and/or such locations are consistent with the list of well-settled sensitive places identified by the Supreme Court in Bruen.

---

[18] While Plaintiffs do not allege an intention to visit any parks in New York City, City Defendants analyze this location given the ubiquitous nature of parks in the City.

[19] As discussed above, Jason and Brianna Frey also state that they visit movie theaters, albeit outside of the confines of the City of New York.  If movie theaters are deemed "restricted locations," then the analysis in Section I(D)(5) is applicable.  If the court treats a movie theater as a sensitive location under Penal Law § 265.01-e(2)(p), then the statutes annexed in Exhibit 12-16 are relevant, along with the arguments set forth in Section I(D)(4)(a).

### a) Times Square – Penal Law § 265.01-e(2)(t)[20]

The prior section of this memo highlighted the deep-rooted legislative emphasis placed upon the possession and use of firearms in cities and population centers. A related area of traditional regulation focused on places of public congregation. The origins of this concern can be traced all the way back to the 1328 English Statute of Northampton. See Statute of Northampton, 2 Edw. 3, ch. 3 (1328), *reprinted in* 1 THE STATUTES OF THE REALM 258. While there is considerable debate as to whether the Statute banned all armed travel or simply carrying with the intent to cause terror[21], for this purposes of this case, the significance of the Statute is that it "was geographically contextual and tailored to public places like 'Fairs' and 'Markets.'" Blocher, supra, at 113. "The 'fairs' and 'markets' of fourteenth-century England were important sites of community life, meaning that the Statute had a significant reach in *public places*." Joseph Blocher & Reva B. Siegel, When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller, 116 Nw. U.L. Rev. 139, 165 (2021) (emphasis added). Thus, one can view the Statute of Northampton as a modern day "sensitive places" regulation.

The Statute of Northampton is significant because its language was adopted, almost verbatim, very early on in American history by several states including Virginia in 1786

---

[20] As discussed above, Plaintiffs also challenge Administrative Code § 10-315, and any rules promulgated in furtherance of such law. Administrative Code § 10-315, however, simply determined the boundaries of the area commonly known as Times Square, and Plaintiffs do not allege that the City improperly defined Times Square. Additionally, as Section 5-34(a) of Title 38 of the Rules of the City of New York was repealed by operation of law when Local Law 91 became effective, there are not any current rules implementing or expounding upon Administrative Code § 10-315. Accordingly, there is no basis to invalidate Administrative Code § 10-315 or any portion of the Rules of the City of New York.

[21] See Patrick J. Charles, *The Faces of the Second Amendment Outside the Home; History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 8 (2012).

and North Carolina in 1792. See Exhibit 12. The Virginia and North Carolina also contained the "fairs" and "markets" prohibition.   See id. Tennessee followed the example of Virginia and North Carolina in 1869 with a law proscribing both open and concealed carry at any "fair, race course, or other public assembly of the people…." Exhibit 13. In 1870, Texas enacted a similar but much broader law that encompassed churches, schools, ballrooms, social parties, election sites, and the catchall language "other public assembly." Exhibit 14. The Texas statute appears to have served as a model for Missouri (1883), Arizona (1889 and 1901), Oklahoma (1890), and Montana (1903), as the laws adopted by these states closely tracked the Texas language. See Exhibit 15.[22]  Georgia and Idaho, in 1879 and 1889 respectively, adopted their own sensitive location statutes prohibiting firearms in places of public assembly or public gatherings. See Exhibits 5 and 16.[23]

The review of the laws cited above, from Virginia in 1786 to Arizona in 1903, cover the relevant portions of American history for this Second Amendment analysis and apply to a substantial amount of the country's population.  Taken together, they stand for the proposition that laws prohibiting the carrying of firearms in public locations where people have gathered for social or recreational purposes are part of the Nation's history of firearm regulation. It is apparent that the state officials adopting such laws perceived of an increased danger from the improper use of firearms when large numbers of people are gathering for such purposes.

Times Square, known informally as the "The Crossroads of the World," is one-of-one when it comes to public gathering spaces.  Put simply, there is nothing quite like it in the United States.  It is a location with many sensitive places therein.  As one of the most

---

[22] These laws also added circuses, shows, places of amusement, and exhibitions to the list of sensitive places.

[23] The Idaho statute referenced herein is part of Exhibit 5.

recognizable and iconic sites, with plentiful shopping, street vendors, and displays of public art, it attracts residents and visitors like the "fairs" and "markets" of colonial times. See https://www.timessquarenyc.org/locations/shopping and http://arts.timessquarenyc.org/times-square-arts/index.aspx (last visited November 21, 2022). In addition, within its boundaries are places specially designed for public gathering. See https://www.nyc.gov/site/cecm/permitting/times-square.page (last visited November 21, 2022). There are also endless entertainment options that include shows, places of amusement, and exhibitions of the type listed in the Missouri, Arizona, Oklahoma, and Montana laws. See https://www.timessquarenyc.org/locations/entertainment (last visited November 21, 2022).[24]

The concern animating the Statute of Northampton and its American progeny appears to be that the consequences of an accidental (greater risk of a bystander being struck) or purposeful misuse of a firearm (more potential victims) are greater in public places. Such consequences are magnified exponentially in Times Square given the activity within the area. For example, in September 2022, there were an average of 312,611 daily visitors to Times Square. See Exhibit 17. In 2021, Times Sq-42 St was the busiest of the 472 subway stations in New York City's transit system; the total ridership for the year was almost double that of the second busiest station. See https://new.mta.info/agency/new-york-city-transit/subway-bus-ridership-2021 (last visited Nov. 28, 2022).[25]

While Times Square is an unparalleled location, its uniqueness does not deprive it of a historical comparator. City Defendants have identified well-established and representative

---

[24] Of course, Times Square is much more than a tourist attraction as it also contains residential buildings, hotel rooms, and office space.

[25] This webpage contains weekday and annual subway (and bus) ridership data for 2021, along with background information on the New York City subway system and the top ten busiest subway stations (and bus routes) for 2021.

historical analogues that were likely enacted for the same reasons as Penal Law § 265.01-e(2)(t). Moreover, the analogues and Penal Law § 265.01-e(2)(t) regulate in the same manner – by enacting blanket bans on the possession of firearms in places where people have assembled for social or recreational purposes.  For all these reasons, this court should not disturb the State's classification of Times Square as a sensitive location and Plaintiffs have failed to demonstrate a substantial likelihood of success on the merits.

### b)  Public Parks – Penal Law § 265.01-e(2)(d)

Bruen recognized several well-established sensitive places and stated that courts can use that list to analogize to new locations, presumably without the need to search for analogues from the eighteenth and nineteenth centuries.  The Court did not, however, offer any guidance as to commonalities among the well-settled locations.  One scholar has opined that the locations all facilitate and advance constitutional rights.  See generally Darrell A.H. Miller, *Symposium:  Constitutional Rights:  Intersections, Synergies, and Conflicts:  Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill of Rts. J. 459 (2019).  Educational institutions, for instance, foster the First Amendment's protection of speech as classrooms serve as the "marketplace of ideas."  Id. at 471 (quoting Keyishian v. Bd. of Regents of Univ. of State of N.Y., 385 U.S. 589, 603 (1967)).  To cite another example, polling places are "Fifth, Fourteenth, and Fifteenth Amendment institutions."  Miller, supra, at 472.  Similarly, courthouses promote the First Amendment's right to petition the government for the redress of grievances.  See Bill Johnson's Rests., Inc. v. NLRB, 461 U.S. 731, 741 (1983) (stating that "the right of access to the courts is an aspect of the First Amendment right to petition the government for the redress of grievances").  To close the loop on this reasoning, according to Miller, private firearms have traditionally been excluded from these locations because they can curtail the advancement of other kinds of constitutional rights.  See Miller, supra, at 466.

- 28 -

Miller argues that public parks are a logical candidate to be added to the list of well-established locations. Id. at 475. Parks are considered quintessential public forums. See Burson v. Freeman, 504 U.S. 191, 196 (1992). Further, they have "immemorially been held in trust for the use of the public … for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hague v. Committee for Indus. Org., 307 U.S. 496, 515 (1939).[26] Thus, a public park is a natural location for the exercise of First Amendment protected speech. Vital to the exercise of the right to freedom of speech, is the ability to do so safely and peacefully, and it its logical to conclude, or at least presume, that firearms in a public park will undermine or chill the assembly and exchange of ideas. See Miller, supra, at 475-78. Under this analysis, public parks find a natural home as a "sensitive place" since they support and facilitate the First Amendment's freedom of speech. It is just this sort of "reasoning by analogy" that the Court endorsed in Bruen. See Bruen, 142 S. Ct. at 2132. And, in this case, that "reasoning by analogy" supports the addition of public parks to the non-exhaustive list of "sensitive places" identified by the Supreme Court in Heller and Bruen without the need to scour for historical analogues.[27]

---

[26] In addition to serving as a location for the communication of political speech, parks "host" a variety of other First Amendment activities such as public art displays, whether temporary or permanent, concerts, theatrical performances, solicitors, and vendors selling expressive material, among others.

[27] The argument discussed above justifies prohibiting the possession of firearms in places where they may cause a conflict with other constitutional rights. As the Supreme Court has not defined "sensitive places," other features or a different analytical framework may support the addition of a location to the list of well-established locations identified in Heller and Bruen. For example, those locations are largely municipal owned properties, so the government-as-proprietor concept may provide the government special power to regulate conduct on its properties. See Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1446-47, 1461, 1473 (2009). This approach would also support the inclusion of parks, as the overwhelming majority of such are municipally owned given the expense to maintain and the lack of revenue that would be necessary to make a profit. Additionally, if the Supreme Court added schools to the list out of

The inclusion of public parks in the list of "sensitive places" finds further support in the annals of history.   First, the "fairs" and "markets" referenced in the Statute of Northampton and incorporated into laws passed by Virginia, North Carolina, and Tennessee, see Exhibits 12 and 13, were places, like parks, open to the public to assemble and communicate. See Miller, supra, at 475-76.   Second, a number of the statutes discussed in Section I(D)(4)(a) of this memo forbid firearms in any place where people gather for scientific or education purposes. See Exhibit 14.   While parks of course provide space for recreation and tranquility, they also undeniably offer important learning opportunities.   Parks teach about history, environmental sustainability, ecosystems, and wildlife, to name a few topics.   See https://www.nycgovparks.org/learn (last visited November 22, 2022).[28]   Finally, beginning with New York City in 1861, a proliferation of laws and regulations, mostly at the local level, banned firearms in parks.   See Exhibit 18 (state statutes) and 19 (local laws and regulations).[29]   These laws and rules constitute historical "dead ringers," which, while not required by Bruen, certainly

---

concern for the safety of minors, such a rationale would extend to parks as well given that many parks contain playgrounds, recreational fields, and other activities that attract youths.  The New York City Department of Parks & Recreation, for instance, operates summer camps, recreation centers, and schedules events and runs programs for kids.  See https://www.nycgovparks.org/facilities/recreationcenters (last visited Nov. 22, 2022), https://www.nycgovparks.org/programs/recreation/youth-sports (last visited Nov. 22, 2022), https://www.nycgovparks.org/events/kids (last visited Nov. 22, 2022), and https://www.nycgovparks.org/programs/recreation/summer-camp (last visited Nov. 22, 2022).

[28] No park is created equal, making the analysis conducted herein difficult and requiring a high level of generality.  New York City alone is home to more than *1,700* parks, each offering different features and differing dramatically in size, with the largest (Pelham Bay Park Bronx) covering 2,765 acres.  See https://www.nycgovparks.org/about/faq (last visited Nov. 22, 2022).

[29] These regulations appear to track the urban park movement ushered in by Central Park.  See Harvard Online, *History of Central Park*, YOUTUBE, https://www.youtube.com/watch?v=z520TWV_4qw; see also *How America's Public Parks Were Born,* SMITHSONIAN MAGAZINE, at 00:43, https://www.smithsonianmag.com/videos/category/history/how-americas-public-parks-were-born.

make the comparison between the analogue and modern regulation far simpler.  Given the similarity between the analogues cited herein and Penal Law § 265.01-e(2)(d), and the fact that the analogues and Penal Law § 265.01-e(2)(d) burden Second Amendment rights in the same manner (by restricting possession by all individuals at these locations), Plaintiffs are not likely to succeed on the merits of their claim that the State's prohibition on the possession of firearms in parks violates the Second Amendment.

### c) Establishments Licensed for the On-Premise Consumption of Alcohol – Penal Law § 265.01-e(2)(o)

The combination of a deadly weapon with a substance that slows reflexes, distorts vision, leads to a loss of coordination, and causes poor judgement is a dangerous one.  See https://emerson.edu/departments/emerson-wellness-center/wellness-health-promotion/alcohol-other-drugs (last visited Nov. 22, 2022).  Thus, it is not surprising that states have historically regulated in this area.  Yet Plaintiffs believe that the Second Amendment removes policy choices with respect to alcohol and the possession of firearms from the purview of municipalities.

The applicable historical analogues fall into three discrete buckets:  (a) laws preventing the sale of a firearm to an intoxicated person; (b) laws prohibiting the carrying of firearms when intoxicated; and (c) locational restrictions.  With respect to the first category, Mississippi adopted a law in 1878 making it unlawful to sell any pistol or pistol cartridge to a person in a state of intoxication.  See Exhibit 20.  A 1881 Florida law, while not specifically referencing alcohol or intoxication, made it a misdemeanor to sell a pistol to a person of "unsound mind;" certainly a person who is drunk qualifies as being of "unsound mind," even if only for a temporary period of time.  See id.  The second category includes laws adopted by Kansas in 1867,[30] and Missouri and Wisconsin, both in 1883.  See Exhibit 21.[31]  Oklahoma and

_____

[30] The law was included in a 1897 compilation of laws.

Arizona adopted narrower laws in 1890 and 1907, respectively, prohibiting public officers from carrying firearms while in a state of intoxication.   See Exhibit 22.[32]   Finally, several states enacted sensitive area laws, albeit with different language.  The same Oklahoma law cited in this paragraph specifically outlawed the carrying of any pistol or revolver into "any place where intoxicating liquors are sold…."  Exhibit 14.  Texas in 1870 prohibited firearms in any ballroom, social party, or other social gathering, presumably due to the size of the crowd and the presence of alcohol.  See Exhibit 13.   Arizona's law included language identical to Texas, but, in a separate section of the statute, required the "keeper of each and every hotel, boarding house, and drinking saloon, to keep posted upon in a conspicuous place in his bar room, or reception room if there be no bar in the house, a plain notice to travelers to divest themselves of their weapons…." Exhibit 14.

The statutes cited in this section of the brief demonstrate that a number of states were concerned about the potentially fatal mix of alcohol and firearms.   These laws were compiled from different geographic regions of the United States and govern a significant number of Americans.  As such, this court should find that these regulations constitute well-established and representative historical analogues.[33]   These analogues also share the same concerns as Penal

---

[31] The Missouri statute was cited above and attached as part of Exhibit 14; as such, it is not included again as part of Exhibit 21.

[32] The Oklahoma law was also part of Exhibit 14; as such, it is not included again as part of Exhibit 22.

[33] Another issue left unresolved by Bruen is how many laws are necessary to establish that an area of regulation is consistent with the Nation's tradition of firearm regulation.  Bruen simply reiterated the "rule" established in Heller that interpretations of the Second Amendment cannot be based upon "a single law, in effect in a single [State], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense."  Bruen, 142 S. Ct. at 2153 (quoting Heller, 554 U.S. at 632).  For all of the laws discussed thus far in this memo, City Defendants have far surpassed the floor established by Heller and Bruen.

Law § 265.01-e(2)(o) – that intoxicated individuals may act irrationally and a minor dispute could turn deadly.[34]

The Arizona, Oklahoma, and Texas laws regulate and therefore, burden Second Amendment rights in the same way as Penal Law § 265.01-e(2)(o) – through bans on firearm possession in public establishments where alcohol may be consumed.[35]   Admittedly, the remainder of the laws identified in the above paragraph focus on the state of the individual receiving or possessing firearms rather than the location where they are possessed.   These laws do burden Second Amendment rights differently, but <u>Bruen</u> does not require the historical and modern regulations to be identical twins.   Further, regulating differently does not necessarily burden Second Amendment rights to a greater extent.   In fact, it is arguable that laws regulating the carrying of firearms by intoxicated individuals are *broader* than Penal Law § 265.01-e(2)(o) in that they apply in any public setting; Penal Law § 265.01-e(2)(o), on the other hand, governs only locations licensed for on-premise consumption.   Such laws also present significant enforcement challenges.   First, they require a numerical intoxication threshold that a law enforcement official would need to measure, presumably through a breathalyzer.[36]   Second, the

It is also important to bear in mind, particularly with respect to sensitive locations, that some states and territories may not have legislated in this area because they already enacted total bans on the carrying of firearms, whether open or concealed.

[34] An intoxicated individual may also experience a loss of coordination resulting in an accidental discharge or misfire that could strike an innocent person.

[35] The court may also look to the laws set forth above prohibiting firearm possession in places of public assembly.   <u>See</u> Exhibits 12-16.   Certainly restaurants and bars are places where the general public gathers, often in large numbers and in confined spaces.   They are also places where passionate disagreements can and do occur regarding politics, sports, and relationships, to name a few topics.

[36] This would also likely require a third party to notify law enforcement that a person is intoxicated *and* in possession of a firearm, two facts that may be difficult, if not impossible, for a lay person discern.

police officer would need to remove the firearm from the intoxicated person, potentially putting the officer in harm's way.   Third, the law would only be applicable once someone is already intoxicated and it would not cover an individual, for example, who has consumed one or two drinks and is slightly impaired but not yet drunk.   Nothing in <u>Bruen</u> requires lawmakers to adopt less effective policy choices, provided, of course, that there is historical support for the regulation.   For all these reasons, the court should deny Plaintiffs' motion for a preliminary injunction with respect to Penal Law § 265.01-e(2)(o).[37]

### d)  Subway (and Rail) Cars[38] – Penal Law § 265.01-e(2)(n)

Plaintiffs challenge the constitutionality of Penal Law § 265.01-e(2)(n) so that they can carry firearms in one of the most congested and highly trafficked spaces in the United States.   As with the other sensitive locations discussed herein, Plaintiffs offer no arguments as to why the Second Amendment is violated by a restriction on the possession of firearms in the

---

[37] A finding that Penal Law § 265.01-e(2)(o) violates the Second Amendment would invalidate over a dozen similar laws enacted throughout the country.   See ALASKA STAT. § 11.61.220(a)(2) (2022); ARK. CODE ANN. § 5-73-306(11) (2022); D.C. CODE § 7-2509.07(a)(7); FLA. STAT. ANN. § 790.06(12)(a)(12) (LexisNexis 2022); 720 ILL. COMP. STAT. ANN. 5/24-1(a)(8) (LexisNexis 2022); KY. REV. STAT. ANN. § 244.125(1) (LexisNexis 2022); LA. REV. STAT. ANN. § 14:95.5 (2022); ME. REV. STAT. ANN. tit. 17-A, § 1057 (2022): MICH. COMP. LAWS SERV. § 28.425o(1)(d) (LexisNexis 2022); MISS. CODE ANN. § 45-9-101(13) (2022); NEB. REV. STAT. ANN. §69-2441(1)(a)  (LexisNexis 2022); N.M. STAT. ANN. § 30-7-3 (LexisNexis 2022); N.C. GEN. STAT. § 14-269.3 (2022) (effective Dec. 1, 2022); N.D. CENT. CODE § 62.1-02-04 (2021); OKLA. STAT. ANN. tit. 21, § 1272.1 (2022); S.D. CODIFIED LAWS § 23-7-70 (2022); TEX. PENAL CODE ANN. § 46.03(a)(7) (2021); WASH. REV. CODE ANN. § 9.41.300(1)(d) (LexisNexis 2022); WYO. STAT. ANN. § 6-8-104(t)(vii) (2022).

[38] As discussed previously, Plaintiffs challenge the entirety of Penal Law § 265.01-e(2)(n) despite identifying only two types of mass transit that they travel on.   While Plaintiff Jason Frey alleges using the Metro-North to visit the City of New York, this section of the brief will principally address the New York City subway system as the possibility of enforcement action by the NYPD on Metro-North trains is speculative.   In any event, the arguments raised herein would equally apply to the Metro-North system.

subway system. As discussed below, Penal Law § 265.01-e(2)(n) does not violate the Second Amendment.

The arguments developed above for public parks apply with equal, if not greater, force to subways.[39]  See supra note 20.  The government-as-proprietor concept should allow the government to control whether firearms are allowed on its property.  Indeed, Plaintiffs cannot answer why the government has unquestioned (as already decided by the Supreme Court in Heller and Bruen) power to exclude firearms from public property such as courthouses and legislative buildings, but not subway cars.  Ownership comes with certain privileges and responsibilities.  Surely, the privilege of ownership is broad enough to allow an owner to decide whether it wants deadly weapons on its property.  An owner also owes a duty of protection to those it invites to its facilities.  It is hardly irrational for an owner to conclude that excluding firearms would keep its patrons safer.  Under this argument, subways are consistent with the list of well-established sensitive places identified in Heller and Bruen and no further discussion is required.

City Defendants also previously equated parks with schools because of the fact that the former are frequented by children who are encouraged to visit by the types of facilities and programming offered therein.  See supra note 20.  The same is also true with respect to subways.  Not only is the subway system open to school-age children in New York City, they are incentivized to utilize mass transit.  Indeed, during the school year, the subway is the equivalent of a yellow school bus on rails.  The subway is a vital component of the means by which the New York City Department of Education provides school transportation to students in public,

---

[39] The New York City subway system is owned by the City of New York and leased to the New York City Transit Authority to operate.  This arrangement is pursuant to a lease that was first executed in 1953.  See Exhibit 23.

charter, and non-public schools. See https://www.schools.nyc.gov/school-life/transportation/transportation-overview (last visited Nov. 25, 2022). Eligible transportation is based upon grade level, distance from home to school, and any existing accommodations, medical or otherwise. See https://www.schools.nyc.gov/school-life/transportation/bus-eligibility (last visited Nov. 25, 2022). For some students, the issuance of a MetroCard is the sole available transit option to their schoolhouse. See id.[40] For the school year ending in June 2022, 451,923 public and charter school students received or were assigned a MetroCard. See https://infohub.nyced.org/reports/government-reports/office-of-pupil-transportation-bi-annual-reports.[41] In addition, 66,867 non-public school students were eligible or assigned MetroCards. See id. This amounts to a combined 518,790 MetroCards for the January-June portion of the 2021-2022 school year. This staggering total puts in perspective the impact of the subway system on New York City Schools and demonstrates that subways, like yellow buses, are an extension of the classroom. As such, the subway should be viewed as a subcategory of school facilities and be deemed a "sensitive location" without the need to identify an appropriate historical analogue.

The New York City subway system consists of 6,455 subway cars, 665 miles of track and 472 stations, the most of any public transit subway system in the world. See https://new.mta.info/agency/new-york-city-transit/subway-bus-ridership-2021 (last visited Nov. 28, 2022). On an average weekday in 2019, the last year before the Covid-19 pandemic, the

---

[40] Pupil transportation is governed by Chancellor Regulation A-801, which is available online at https://www.schools.nyc.gov/docs/default-source/default-document-library/a-801-9-5-2000-final-combined-remediated-wcag2-0.

[41] This information is available by clicking on the link entitled "Local Law 34 report on school bus transportation services." This opens up a Microsoft Excel file and the information on MetroCards can be viewed by clicking on the tab marked "MetroCards" at the bottom of the file.

system's ridership was nearly 5.5 million.  See id.  For the same year, there were almost 1.7 *billion* total riders.  See id.  After years of construction and planning, the first stage of the New York City subway system opened in October 1904, with nine miles and twenty-eight stations. See HISTORY, *The Race to Construct the First Subway:  The Engineering that Built the World* (S1), at 05:22, YOUTUBE, https://www.youtube.com/watch?v=cVBhvKxw4ow.[42]    While streetcars and rails existed earlier, they obviously bore no resemblance to the City's subway system in 1904, let alone what the system would eventually become once expanded further in Manhattan and into Queens, the Bronx, and Brooklyn.  Bruen fails to account for changes in innovation and lifestyle, such as the subway system, that might leave a modern regulation without any close analogue in historical law.

While the Court does recognize that some cases might implicate "unprecedented societal concerns or dramatic technological changes [that] require a more nuanced approach.," Bruen, 142 S. Ct. at 2132, it does not explain what such an approach would entail.  City Defendants submit that a proper approach for such situations would be to identify historical laws that have a similarity of purpose to the modern regulation, even if the historical analogue regulated a different subject.  For the purposes of this case, the historical regulations included in Exhibits 12-16 serve as valid comparators (even though they do not concern early forms of public transportation such as trolleys, omnibuses, or horse carts) as they share the same concern (the presence of firearms in populated spaces) as Penal Law § 265.01-e(2)(o) and regulate in the same manner (by completely banning the possession of firearms in such locations).  This approach recognizes the unique nature of modern life and eliminates the need to make comparisons between things that only bear a superficial similarity (trolleys and subway cars).  It

---

[42] The "race" to build the first subway was won by Boston in 1897.  See id.

also credits the fact that the typical New York City subway car operates underground with riders standing shoulder-to-shoulder with dozens of perfect strangers.   These facts are relevant to whether a concern about the possession of firearms in crowded locations is valid.

For all these reasons, Penal Law § 265.01-e(2)(o) is a constitutional regulation of a sensitive location under the Second Amendment and Plaintiffs are unlikely to succeed on the merits of this claim.

### 5.   Penal Law § 265.01-d Does Not Violate the Second Amendment

Plaintiffs also seek to invalidate Penal Law § 265.01-d, which merely provides that one shall not carry firearms onto private property without permission from the owner or lessee of such property.   As discussed throughout, the holding in Bruen is narrow and certainly does not disturb traditional property rights.   As such, Penal Law § 265.01-d does not implicate conduct protected by the Second Amendment, and, even if it did, there are historical analogues with similar goals and similar regulatory schemes.

### a)   Plaintiffs Cannot Meet Their Initial Burden as Penal Law § 265.01-d Merely Establishes a Default Rule Based Upon a Property Owner's Fundamental and Historic Right to Exclude.

Plaintiffs entirely disregard the first step of the Bruen test even though it involves a threshold determination as to whether the Second Amendment presumptively protects the conduct at issue.   Properly defined, the only plausible formulation of conduct regulated by Penal Law § 265.01-d, and allegedly covered by the Second Amendment's "plain text," would be a "right to enter or remain on or in private property while possessing a firearm, without the express consent of the owner."[43]

---

[43] The conduct cannot be defined otherwise, because if the owner did consent, there would be no injury upon which to base standing.

## 1.  Property Owners' Right to Exclude is Fundamental

The Supreme Court has described the power to exclude others as "one of the most treasured strands in an owner's bundle of property rights."  Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982); see also Cedar Point Nursery v. Hassid, 141 S. Ct. 2063, 2072 (2021); Thomas W. Merrill, *Property and the Right to Exclude*, 77 NEB. L. REV. 730, 730, 752 (1998) (calling the right to exclude the "*sine qua non*" of property).

Tort law has similarly emphasized the fundamental nature of the right to exclude. Not only is the tort of trespass established where an individual enters the property of another without express or implied invitation, but also in refusing to leave after that permission has been withdrawn. See Rager v. McCloskey, 305 N.Y. 75, 79 (N.Y. 1952).  As Blackstone explained:

> But in the limited and confined sense, in which we are at present to consider [the wrong of trespass], it signifies no more than an entry on another man's ground without a lawful authority, and doing some damage, however inconsiderable, to his real property. For the right of *meum* and *tuum*, or property, in lands being once established, it follows as a necessary consequence, that this right must be exclusive; that is, that the owner may retain to himself the sole use and occupation of his soil: every entry therefore without the owner's leave, and especially if contrary to his express order, is a trespass or transgression.

3 WILLIAM BLACKSTONE, COMMENTARIES *209; see also W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 58, at 393 (5th ed. 1984) ("The possessor of land has a legally protected interest in the exclusiveness of his possession. In general, no one has any right to enter without his consent, and he is free to fix the terms on which that consent will be given.").

Similarly, criminal law reinforces a property owner's right to exclude by rendering trespass, under the same definition, a crime. Historical sources emphasize that the rationale behind such criminalization is to better defend the right of possession – and, by the same token, the right of exclusion – so as to maintain peace.  See, e.g., 2 FREDERICK POLLOCK & FREDERIC WILLIAM MAITLAND, THE HISTORY OF English LAW 41 ("In the first place, the

protection given to possession may be merely a provision for the better maintenance of peace and quiet. It is a prohibition of self-help in the interest of public order."); 4 WILLIAM BLACKSTONE, COMMENTARIES *147 (describing trespass as an "offence against the public peace"). This crime, as in tort, frequently included "any forcible entry, or forcible detainer after peaceable entry, into any lands." 4 WILLIAM BLACKSTONE, COMMENTARIES *147.

These common law principles regarding the right to exclude – grounded in property, tort, and criminal law – are deeply rooted in English historical tradition, and have endured across the country, including in New York, prior to and following the passage of the Second Amendment. See 2 POLLOCK & MAITLAND, supra, at 41 (Legal Classic Library special ed. 1982) (2d ed. 1899) (noting that one should look to "the law of crimes" and "the law of torts and civil injuries" for offenses against property). As noted by the Court in Heller, the Second Amendment merely "codified a *pre-existing* right." Heller, 554 U.S. at 591 (emphasis in original). The Second Amendment therefore cannot be understood to "expand, extend, or enlarge the individual right to bear arms at the expense of other fundamental rights" that coexisted with such right for centuries, namely, the rights concomitant with private property. GeorgiaCarry.Org, Inc v. Georgia, 687 F.3d 1244, 1264–65 (11th Cir. 2012) (quoting Blackstone for the proposition that the Founding Fathers would have recognized the right of private property as one of three fundamental rights, alongside the rights of personal security and liberty).

### 2. Penal Law § 265.01-d Sets a Default Presumption Regarding Property Owners' Consent, but Does not Implicate the Second Amendment.

Penal Law § 265.01-d does not *regulate* any conduct whatsoever. New York State is not prohibiting a person from carrying firearms on the property of a consenting owner, nor is it regulating the manner by which such person carries the firearm. The "restricted location" provision is more appropriately characterized as a policy decision:  the State is

selecting a default rule for the interaction of two, fundamental and coexisting rights. See supra Section I(D)(5)(a)(1). Given that property owners have the fundamental right to exclude, either outright or by revoking permission, the ability to carry guns must be subject to one of two possible defaults: either carrying firearms is presumptively prohibited absent affirmative consent, or it is presumptively permitted absent affirmative prohibition. The "ultimate decision" as to whether carry is permitted on a person's private property is not state action, regardless of which default is chosen, as the choice remains with such owner.[44]

      This interpretation is further supported by the fact that other states engage in default rule selection. Several states have adopted the New York default rule – requiring that an individual who is carrying a concealed firearm notify the private property owner or otherwise obtain permission in order to enter or remain on the premises. See, e.g., GeorgiaCarry.Org, 687 F.3d 1244 (upholding law requiring persons carrying in specific locations to notify security or management personnel upon arrival and obtain consent to carry a weapon on the property), abrogated in part on other grounds by Bruen, 142 S.Ct. 2111 (2022); ALASKA STAT. § 11.61.220(a)(1)(B) (2022) (person may not carry concealed weapon "within the residence of another person unless the person has first obtained the express permission of an adult residing there to bring a concealed deadly weapon within the residence."); D.C. CODE § 7-2509.07(b)(1) (2022) (carrying concealed pistol "on private residential property shall be presumed to be prohibited unless otherwise authorized by the property owner or person in control of the premises and communicated personally to the licensee in advance of entry onto the residential property"); LA. REV. STAT. ANN. § 1379.3(O) (2022) ("No individual to whom a concealed

---

[44] If the owner posts "clear and conspicuous signage" permitting firearms on the private property, then the individual seeking to carry thereon does not even need to ask for permission. See Penal Law § 265.01-d(1).

handgun permit is issued may carry such concealed handgun into the private residence of another without first receiving the consent of that person."); S.C. CODE ANN. § 23-31-225 (2022) (providing that a person may not "carry a concealable weapon into the residence or dwelling place of another person without the express permission of the owner or person in legal control or possession, as appropriate.").

Texas, on the other hand, provides an example of a state that has elected to codify the opposite default, and, in order to do so, has also explicitly set forth that default and its contours in state law. Under Texas law, private property owners must set forth clear signage indicating that firearms are *not* allowed on the premises in order to exclude those who carry firearms consistent with state law. See TEX. PENAL CODE ANN. § 30.05(c) (rendering carrying of firearms in violation of such signage a criminal trespass offense); see also TEX. PENAL CODE ANN. § 46.15(o)) (rendering carrying of firearms in violation of such signage an offense for carrying weapons in prohibited places). In the same way that Penal Law § 265.01-d does not encroach on Second Amendment rights by creating a default presumption for permission to carry on private property, the Texas statute does not encroach on the property rights of business owners by requiring them to make their preference known.  Regardless of how the presumption is stated, private property owners always maintain the ability to exclude firearms from their land.

Given that the "restricted location" provisions of the CCIA are therefore best understood as a default rule regarding the interaction between two overlapping, fundamental rights, codified in a similar way to numerous other state laws, plaintiffs challenging these provisions should therefore fail at step one of the Bruen test.

**b) There is a Historical Tradition of Consent-Dependent Firearm Regulation.**

History demonstrates a strong tradition of legislation designed to fortify the rights of landowners to exclude individuals carrying firearms from their property, in order to mitigate the danger and disruption that often accompanies such weapons. Moreover, such laws all contain default presumptions like Penal Law § 265.01-d – carrying is not permitted *unless* permission is *first* obtained. See Exhibit 24 (collecting statutes from Maryland in 1715, Pennsylvania in 1721, New Jersey in 1741 and 1771, New York in 1763, Louisiana in 1865, Texas in 1866, and Oregon in 1893).

The sheer number of laws, the number of citizens governed by such laws, and the fact that such laws span the pre and post-ratification periods of both the Second and Fourteenth Amendments, demonstrates a well-established and representative tradition. Although the exact danger and disruption targeted by a handful of these laws might be different than that targeted by the CCIA, the core goal of protecting the rights of the respective property owners remains the same. This category of laws also regulated carry in the same fashion as the "restricted locations" provision: requiring that individuals seeking to carry weapons on private property obtain the consent of the respective owner in advance. These similar features are "central" considerations of the analogical inquiry mandated by the second step of the test set forth in Bruen, *i.e.*, establishing "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." Bruen, 142 S. Ct. at 2133.

Thus, were Plaintiffs to meet their burden under step one – asserting that the CCIA's "restricted locations" provision regulates conduct covered by the "plain text" of the Second Amendment – it does not stand to reason that the law should fail at step two. Not only

have far more comprehensive restrictions been historically imposed on the right to concealed carry, but there exist almost identical historical analogs to the CCIA, that were enacted with similar goals and similar "regulatory schemes." Id. at 2122–23. For all these reasons, Plaintiffs cannot demonstrate that Penal Law § 265.01-d violates the Second Amendment and are not likely to succeed on the merits of their claim.

### POINT II

### PLAINTIFFS   WOULD   NOT   SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION

The existence of irreparable harm has been called the "single most important prerequisite for the issuance of a preliminary injunction." Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227, 234 (1998) (internal citation omitted). While courts generally presume that the loss of constitutional rights, even for a limited period of time, constitutes irreparable harm – thereby merging the first two elements of the standard into one – such a presumption results only after a plaintiff has shown a likelihood of success on the merits. See Jolly v. Coughlin, 76 F.3d 468, 482 (1996). As discussed above, Plaintiffs cannot demonstrate a likelihood of success on the merits, let alone, a substantial likelihood of success.

Additionally, the alleged irreparable harm must be actual and imminent. See Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002). In this case, much of the alleged harm is entirely remote and speculative. First, Plaintiffs Jason Frey, Brianna Frey, and Jack Cheng can seek the upgrade of their restricted permits from the applicable licensing officials in Westchester and Nassau County. If granted, then they could no longer assert a cognizable injury as to any license limitations. If denied, they can challenge that determination via an Article 78 proceeding in New York Supreme Court. Second, while the Jason and Brianna Frey object to the fact that Penal Law § 400.00(6) requires a separate license from the NYPD to carry in New York

City, unless the current restrictions are removed from their limited carry licenses, they could not carry in the City, even if Penal Law § 400.00(6) was a nullity.   As for Jack Cheng, since the filing of this latest motion for a preliminary injunction, the NYPD has approved his application for a business carry license, making his challenge to Penal Law § 400.00(6) moot because he can now carry statewide.   See Exhibit 25.   Finally, Plaintiffs challenge every single sensitive location established by Penal Law § 265.01-e(2), even though they allege an intent to visit only a handful of such locations.   Moreover, for those places that they do have standing to challenge, most are outside the borders of New York City, making it highly unlikely that they would ever be the subject of enforcement action by the NYPD.

Finally, because preliminary injunctions are predicated on urgency, a "delay in seeking the remedy suggests that the remedy is not really needed or that the harm is not really irreparable."   See Minzer v. Keegan, 97-4077, 1997 WL 34842191, at *6 (E.D.N.Y. Sept. 22, 1997) (internal citation omitted).   To be sure, a short delay does not necessarily bar the issuance of a preliminary injunction if a "good reason" caused the delay. See Weight Watchers Int'l v. Luigino's, Inc., 423 F.3d 137, 144 (2d Cir. 2005).   But courts frequently decline to grant preliminary injunctions when plaintiffs unreasonably fail to seek injunctive relief in a timely manner.   See, e.g., Citibank, N.A. v. Citytrust, 756 F.2d 273, 276–77 (2d Cir. 1985) (ten-week delay); Hessel v Christie's Inc., 399 F. Supp. 2d 506, 521 (S.D.N.Y. 2005) (two-month delay); Richard A. Leslie Co. v. Birdie, LLC, 07-5933, 2007 WL 4245847, at *2 n.5 (S.D.N.Y. Nov. 26, 2007) (collecting cases).

Plaintiffs attack the constitutionality of Penal Law § 400.00(6), which has been in effect for decades; thus, they could have challenged this statute at any point since they were issued carry licenses.   With respect to the provisions of the CCIA at issue herein, Governor

Hochul signed the new legislation on July 1, 2022, to take effect on September 1, 2022. Plaintiffs filed this motion on October 20, 2022 — over three months after the enactment of the new statute and more than a month beyond its effective date. By delaying their motion, Plaintiffs have undermined their argument that they are faced with irreparable harm and entitled to the extraordinary remedy of a preliminary injunction. See Minzer, 1997 WL 34842191, at *6. Because Plaintiffs waited to bring their request for injunctive relief until long after they were aware of the new statute, the Court should deny this motion.

Relatedly, the doctrine of laches prohibits Plaintiffs from obtaining the equitable remedy of a preliminary injunction. Indeed, this Circuit has held that laches bars injunctive relief when the movant has unreasonably delayed in seeking the injunction. See National Council of Arab Americans v. City of New York, 331 F. Supp. 2d 258, 265 (S.D.N.Y. 2004) (citing Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V., 17 F.3d 38, 44 (2d Cir. 1994). In that case, the court found that a delay of about six weeks was unreasonable and held that plaintiffs were barred by laches. See id. at 265-66. Here, the delay is far greater and Plaintiffs offer no justification for their delay. Delay is one of the equities that recommends against the grant of a preliminary injunction. See id. at 266.

For all these reasons, Plaintiffs also cannot establish the second prong of the standard for the issuance of a preliminary injunction.

## POINT III

## AN INJUNCTION IS NOT IN THE PUBLIC INTEREST

The Supreme Court's decision in Bruen resulted in the invalidation of a requirement that was in place for over one hundred years. While the decision was celebrated by some, it is likely to cause angst and fear for many others. The CCIA steps into the chasm of

uncertainty created by the <u>Bruen</u> decision and addresses public safety concerns while respecting the holding and guidance of the Supreme Court.  <u>Bruen</u> confirms that municipalities are not left with "both hands tied behind their back" with respect to the grave societal harm of gun violence. As the Court's decision demanded fast action, an extraordinary session of the State Legislature was convened.  The legislative product of that session is now the operative law of the State, and municipalities and public officials, along with their residents, have adapted to this new reality.

The regulation of firearms is as well-established as firearms themselves.  And these early gun control were intrusive and pervasive.  <u>See</u> WINKLER, <u>supra</u>, at 12.  "[T]he founding generation had many forms of gun control.  They might not have termed it 'gun control,' but the founders understood that gun rights had to be balanced with public safety needs. Government efforts to enhance public safety by regulating guns are as old as guns themselves." <u>Id.</u> at 114.  The statutes challenged herein are similar in nature and purpose to those adopted in colonial times, the revolutionary period, and the years preceding and post-dating the Civil War. As <u>Bruen</u> requires a historical-based test under which modern regulations are faithful to relevant history, the decision *supports* the constitutionality of the laws at issue herein.  As history demonstrates, gun rights and laws regulating firearms in the name of public safety can co-exist. For all these reasons, a preliminary injunction is not in the public interest.

## <u>CONCLUSION</u>

For all the reasons set forth herein, the court should deny Plaintiffs' motion for a

preliminary injunction in its entirety with such other and further relief as this court deems proper.

Dated:      New York, New York
              November 30, 2022

                            HON. SYLVIA O. HINDS-RADIX
                            Corporation Counsel of the City of New York
                            Attorney for City Defendants
                            100 Church Street
                            New York, New York  10007
                            (212) 356-4036

                                  */s/ Nicholas R. Ciappetta*

By:    _____
                    NICHOLAS R. CIAPPETTA