# EXHIBIT

# 23

COMPOSITE COPY

OF

AGREEMENT OF LEASE

BETWEEN

THE CITY OF NEW YORK

AND

NEW YORK CITY TRANSIT AUTHORITY

(Dated, June 1, 1953; Amended April 19, 1960 and
March 6, 1962; Supplemented by Agreement dated
March 20, 1962; Amended and Renewed by
Agreement dated October 5, 1962;
Amended April 7, 1965;
Amended by Agreement
dated March 31, 1982

# TABLE OF CONTENTS

| Article | | Page |
|---|---|---|
| I | Definitions | 2 |
| II | Lease | 3 |
| III | Treatment of capital costs | 8 |
| IV | Payments by the City | 9 |
| V | Pending actions and proceedings | 10 |
| VI | Particular covenants | 11 |
| VII | Declarations of intention and understanding | 18 |
| VIII | Sewer and other rights reserved to the City | 20 |
| IX | Advancement and completion of Rockaway improvement | 21 |
| X | South Brooklyn Railway Company | 21 |
| XI | Disposition of bus lines | 22 |
| XII | Inspection of accounts | 23 |
| XIII | Adjustments | 23 |
| XIV | Procedure in event of disputes | 24 |
| XV | Covenant of further assurances | 26 |
| XVI | Term and renewal | 26 |
| XVII | Effect of termination of Agreement | 27 |
| XVIII | Personal liability | 28 |
| XIX | Waivers and amendments | 28 |
| XX | Notices | 29 |
| XXI | Separability | 29 |
| XXII | Headings | 30 |
| XXIII | Execution of Agreement | 30 |
| XXIV | Financing of certain capital costs | 30 |

## AGREEMENT OF LEASE

AGREEMENT OF LEASE made this 1st day of June, 1953 between THE CITY OF NEW YORK ("City") and the NEW YORK CITY TRANSIT ALTHOHITY ("Authority"), a public benefit corporation existing by virtue of Chapters 200 and 201 of the Laws of 1953, being Sections 1200 to 1221, inclusive, of Article 5, Title 9 of the Public Authorities Law* ("Act").

### WITNESSETH:

WHEREAS pursuant to the Act there was created the Authority for the purposes of the acquisition of the transit facilities operated by the Board of Transportation of the City and the operation of transit facilities in accordance with the provisions of the Act for the convenience and safety of the public on a basis which will enable the operations thereof, exclusive of capital costs, to be self-sustaining; and

WHEREAS pursuant to the provisions of the Act, the Authority and the City may enter into an agreement for the transfer from the City to the Authority, for use in the execution of the corporate purposes of the Authority, of the transit facilities now owned or hereafter acquired or constructed by the City and any other materials, supplies and property incidental to or necessary for the operation of such transit facilities; and

WHEREAS pursuant to the provisions of Section 1203 of the Act, the City, by resolution of the Board of Estimate, has duly authorized the execution of this Agreement on its behalf; and

WHEREAS the Authority by resolution has duly authorized the execution of this Agreement on its behalf; and

WHEREAS, the Act, as amended by the Laws of 1981, provides that the Authority may incur certain capital costs and may issue its bonds or notes or lease, sublease and other contractual obligations in connection therewith; and

---

' In this Composite Copy, the provisions of the Public Authorities Law are numbered in accordance with L. 1957. C. 914, §3, eff. April 24, 1957.

2

WHEREAS, the Act, as so amended, authorizes the extension and amendment of this Agreement in a manner not inconsistent with the provisions of or in derogation of the powers of the Authority as provided in the Act; and

WHEREAS, pursuant to the provisions of Section 1207-m of the Act, the City and the Authority have each duly authorized the execution of and the Metropolitan Transportation Authority has approved the Amendment of this Agreement dated March 31, 1982;

NOW THEREFORE, in consideration of the premises and of the mutual covenants hereinafter contained, it is agreed as follows:

## ARTICLE I

### DEFINITIONS

SECTION 1.1.   Except where the context hereof otherwise requires, all words and terms defined in the Act when used herein shall have the meanings now assigned to them by the Act, except that the term "transit facilities" shall also be deemed to include street surface railroads and the term "property" shall also be deemed to include personal property.

SECTION 1.2.   As used herein the word "Agreement" shall mean this Agreement of Lease.

SECTION 1.3.   As used herein the following terms shall have the following meanings:

"Board of Transportation" shall mean the Board of Transportation of the City as existing on the effective date of the Act.

"Leased Property" shall mean the transit facilities and any other materials, supplies and property incidental to or necessary for the operation of such transit facilities referred to in Section 2.1 of Article II hereof and the real property referred to in Section 2.2 of Article II hereof, provided, however, that the term "Leased

3

Property" shall, except as provided in Section 6.9 of Article VI of this Agreement, not include any facilities, materials, supplies or property which have not been furnished to the Authority by *the* City or the Board of Transportation. or the total cost of *which* has not been paid for by the City, or for the cost of which the Authority has not been totally reimbursed by the City.

"Financing Agreement" shall mean any bond resolution of the Authority, any bonds or notes or leases, subleases or other contractual obligations or agreements issued or incurred by the Authority or its subsidiaries pursuant to Sections 1207, 1207-b or 1207-m of the Act, including such corres $^P$ onding sections as may from time to time be in effect during the term of this Agreement, including any agreement of the Authority with Metropolitan Transportation Authority pursuant to subdivision 4 of Section 1266-c of the Public Authorities Law, and any lease or sublease entered into by the Authority or its subsidiaries for equipment or facilities sold or transferred by the Authority or its subsidiaries to a lessor or sublessor or entered into in connection with the financing thereof.

SECTION 1.4.   Words in the singular number shall include the plural, and those in plural number shall include the singular.

ARTICLE II

LEASE

SECTION 2.1.   The City hereby leases to the Authority for a term of 10 years commencing with 12:01 A.M. Eastern Daylight Saving Time, June 15, 1953 (herein called the "effective date") for use in the execution of the corporate purposes of the Authority all of the transit facilities now owned or hereafter acquired or constructed by the City and any other materials, supplies and property incidental to or necessary for the operation of such transit facilities. The City hereby authorizes the Authority to take jurisdiction, control, possession and supervision of such transit facilities, materials, supplies and property on the effective date. The foregoing provisions of this Section 2.1

4

limiting the term of this Agreement shall be superseded by, but only to the extent of the provisions of, Article XVI of this Agreement. (Amended October 5, 1962)*

Notwithstanding the provisions of Section 2.1 of the Agreement of Lease between the City and the Authority, dated June 1, 1953, as amended, renewed and supplemented or any other provisions of said Lease, the City hereby transfers to the Authority title and ownership to the materials and supplies incidental to or necessary for the operation of the transit facilities which were heretofore leased to the Authority. (Amended April 7, 1965.)

SECTION 2.2.    The Authority shall have on the effective date the use and possesion of all real property owned or leased by the City and used or occupied by the Board of Transportation on March 15, 1953 in connection with or incidental to the operation of such transit facilities. The Authority agrees to reimburse the City for any rentals paid from and after the effective date by the City to the owners of the property leased by the City (hereafter in this Section 2.2 referred to as "rented property") which shall be used and possessed by the Authority pursuant to this Section 2.2; provided, however, that the obligation of the Authority to make such reimbursement to the City shall cease on the date when the Authority shall surrender or tender the surrender of the use and possession of any of such rented property to the City, except that the Authority shall not surrender possession of the rented property now used by the Board of Transportation as the Jamaica Bus Terminal if such surrender shall have the effect of causing the City to incur any liability.

SECTION 2.3.    Upon the filing by the Authority with the Clerk of the City and the Secretary of State of a copy of this Agreement, the Authority shall take possession and control of the Leased Property, together with all contracts, books, maps, plans, papers and records of or in the possession of the Board of Transportation of whatever description incidental to or necessary for the operation of the facilities transferred by this Agreement or the performance of the duties of

---

* By supplemental agreement between the City and the Authority, dated March 20, 1962, provision was made for the operation of certain omnibus facilities to be acquired by the City by the Manhattan and Bronx Surface Transit Operating Authority.

5

the Authority as provided by the Act.

SECTION 2.4.   The City does not by this Agreement lease to the Authority (a) property under the jurisdiction of the Board of Transportation prior to June 1, 1953 which the Board of Transportation had declared prior to such date, by formal communication to the Board of Estimate, to be property not used in connection with, incidental to, or necessary for, the operation of the Leased Property, or (b) the property or lease pursuant to which The Long Island Rail Road Company operates in and on Atlantic Avenue.

SECTION 2.5.   All other property under the jurisdiction of the Board of Transportation on the effective date which is not expressly excepted pursuant to Section 2.4 of this Article II, is hereby transferred to the jurisdiction of the Authority until there is a determination whether such property is incidental to, necessary for, or connected with the operation of the transit facilities or other property leased herein or the performance of the duties of the Authority as provided by the Act. Such determination shall be made by a committee composed of a person or persons chosen by the Authority and of a person or persons chosen by the City; the Authority and the City shall have equal representation on such committee. The Authority and the City recognize that determinations pursuant to the provisions of this Section 2.5 whether property is incidental to, necessary for, or connected with, the operation of the transit facilities or other property leased herein or the performance of the duties of the Authority as provided by the Act need not be made on the basis of lot descriptions but may be made on the basis of an appropriate severance of the property under determination. In the event that such committee is unable to make such determination by December 31, 1953, the Authority and the City agree to submit the matter in controversy for determination in the manner provided by Section 14.1 of Article XIV hereof. Pending determination as hereinabove prescribed, all net revenues derived from the operation of property subject to such determination shall be held in escrow by the Authority. Jurisdiction of any of such property determined not to be incidental to, necessary for, or connected with the operation of the transit facilities or other property leased herein or the performance of the duties of the Authority as provided by the Act, shall be promptly surrendered

6

by the Authority to the City and any net revenues derived from the operation of such property from the effective date to the date of such surrender shall be remitted to the City. Such property as is finally determined to be property incidental to, necessary for, or connected with the operation of the transit facilities or other property leased herein or the performance of the duties of the Authority as provided by the Act, shall be deemed to be part of the Leased Property.

SECTION 2.6.   The City has asserted that there may be rental or other income derived from the Leased Property which is not revenue as defined by the Act and the Agreement. (Such income is hereinafter in this Section 2.6 referred to as "non-transit income".) Not later than November 1, 1953, the City will serve a notice on the Authority specifying the items which the City claims are non-transit income. After the effective date all net income from such items shall be collected and held by the Authority until there is a determination whether the same is revenue as so defined. Such determination shall be made by the committee and otherwise in the time and manner prescribed in Section 2.5 of this Article II. The net amount of any such income so determined not to be revenue as so defined shall be released and remitted to the City and the remainder shall be retained by the Authority for use in its operations.

SECTION 2.7.   The Authority and the City will execute and deliver to each other such further documents as may be necessary to carry out the purposes of Sections 2.5 and 2.6 of this Article II.

SECTION 2.8.   The Authority may use and occupy real property (in addition to that transferred pursuant to Sections 2.1 and 2.2 of this Article II) now or hereafter owned or leased by the City on such terms as may, from time to time, be mutually agreed upon by the City and the Authority.

SECTION 2.9.   a. If any Leased Property, consisting of real property or any interest therein, is determined by the Authority to be no longer required by it, the Authority shall surrender its interest therein to the City.

b.   If any Leased Property, not consisting of real property or any

7

interest therein, is determined by the Authority to be no longer required by it, the Authority shall notify the Director of Management and Budget of the City or such other City official as the Mayor may designate in writing of such determination and identify the property which is the subject of such determination. The Authority shall surrender to the City its interest in any of such property requested by the City within 30 days of such notice. If no such request shall be made by the City with respect to such property or any portion thereof within such period, the interest of the City in such property shall be deemed to have been transferred to the Authority and the Authority may dispose of such property in such manner and for such consideration as it shall determine and any proceeds realized upon such disposition shall be retained by the Authority.

    c.  If the Authority determines that any real property owned by it is no longer required by it, the Authority shall notify the Director of Management and Budget of the City or such other City official as the Mayor may designate in writing of such determination, which notice shall identify the property and the nature of any liens or encumbrances thereon. If, pursuant to the terms of any Financing Agreement the Authority is prohibited from transferring such property except for value, such notice shall also identify the Financing Agreement or Agreements containing such prohibition and describe the manner in which the Authority intends to dispose of such property. The City acknowledges that if proceeds of a Financing Agreement are utilized to acquire or substantially improve any real property owned by the Authority or if a Financing Agreement is entered into in connection with the acquisition of any real property, such Financing Agreement will prohibit the disposition of such property by the Authority otherwise than for value. If the transfer of such property is not subject to such prohibition and if so requested by the City within 60 days of such notice, the Authority shall transfer its interest in any such property, subject to such liens and encumbrances, to the City without consideration upon the City undertaking, in a form satisfactory to the Authority, to assume and hold the Authority harmless with respect to any remaining or continuing obligations of the Authority with respect to such property. (Amended March 31, 1982.)

8

ARTICLE III

TREATMENT OF CAPITAL COSTS

SECTION 3.1.   Capital costs of a nature not heretofore charged as operating expenses and not paid or financed through Financing Agreements or not paid or financed with funds granted to the Authority for such purposes, shall be paid by the City, or at the option of the Authority, may be paid in the first instance by the Authority, but in such event, the Authority shall be entitled to recover from the City the amount of such costs; provided, however, that the total amount of such capital costs to be paid by or recovered from the City which the Authority may incur without the approval of the Mayor in any fiscal year of the City shall not exceed $5,000,000, and that no other such capital costs to be paid by or recovered from the City may be incurred by the Authority without such approval. Where the City is required to reimburse the Authority for the amount of any capital costs pursuant to the Agreement, serial bonds or capital notes may be issued by the City, pursuant to the local finance law, to finance any such reimbursement in the same manner and to the same extent as if such costs were to be paid directly by the City. (Amended March 31, 1982.)

SECTION 3.2.   The Authority shall submit annually to the Director of Management and Budget on such date as the Mayor may direct City agencies to submit departmental estimates for capital projects pursuant to Section 214 of the New York City Charter, an estimate, for inclusion in the Capital Budget of the City, of all capital costs of a nature not heretofore charged as operating expenses and which are to be paid by or recovered from the City. The City shall not be required to include any proposed expenditure in its Capital Budget nor shall the City be required, pursuant to this Agreement, to pay or reimburse the Authority for any expenditure as a capital cost if such expenditure is by reason of its nature or purpose such that it is not classifiable as a capital expenditure under generally accepted accounting principles and therefore not legally includable in the City's Capital Budget pursuant to Chapter 9 of the City Charter, the Municipal Assistance Corporation for the City of New York Act or the New York State Financial Emergency Act for the City of New York, all as the same

9

may be amended from time to time. (Amended March 31, 1982.)

SECTION 3.3.   (Deleted by amendment dated March 31, 1982.)

SECTION 3A. (Deleted by am Pndrnent. dated March 31. 1982.)

SECTION 3.5.   (Deleted by amendment date October 5, 1962.)

SECTION 3.6.   Neither the Authority's right or power to issue or enter into Financing Agreements as provided in the Act nor the payment or financing of any capital costs through the issuance or incurrence of any such Financing Agreements or with funds granted to the Authority for such purposes shall relieve the City of any obligations it may have under the Act or this Agreement with respect to capital costs. (Amended March 31, 1982.)


ARTICLE IV

PAYMENTS BY THE CITY

SECTION 4.1   The City shall pay liabilities of the City or the Board of Transportation for:

(a)   Pension or retirement contributions on behalf of persons who were employed on transit facilities acquired by the City prior to the effective date of the Act.

(b)   Contributions to the New York City Employees' Retirement System on behalf of officers or employees whose compensation has been paid out of the operating revenues of the Board of Transportation, which contributions have or shall after the effective date of the Act become due or payable for fiscal years of the City ending on or before dune 30, 1953; provided, however, that the City shall have no liability for such contributions in respect of services rendered by such officers or employees after the effective date.

(c)   The City shall pay into the IRT Voluntary Relief Fund any amount which the `Company' (Interborough Rapid Transit Coin-

10

pany) was or would be required to pay into said fund under the regulations of the IRT Voluntary Relief Department in effect when the City acquired the facilities and assets of the Interborough Rapid Transit Company. (Amended April 1, 1965.)

SECTION 4.2.   The City shall pay all other liabilities of the Board of Transportation accruing to the effective date.

SECTION 4.3.   (Deleted by amendment dated October 5, 1962.)

ARTICLE V

PENDING ACTIONS AND PROCEEDINGS

SECTION 5.1.   The City hereby assumes, and agrees that it shall be responsible for, the payment of, discharge of, defense against, and final disposition of, any and all claims, actions or judgments, including compensation claims and awards and judgments on appeal, based upon any claim or a cause of action arising prior to the effective date and heretofore or hereafter asserted against the Board of Transportation, the City or the Authority.

SECTION 5.2.   Subject to the provisions of Section 5.3 of this Article V, the Authority agrees to permit the use by the City of its facilities, including the services of the Torts Division of its Law Department, its Workmen's Compensation Bureau and its Medical Department in connection with the defense against and disposition of such claims, actions and judgments.

SECTION 5.3.   The City and the Authority shall cooperate in determining methods of allocating to the City, and of assuring payment by the City to the Authority, of the City's proportionate share of the cost of maintaining and conducting the facilities mentioned and described in the foregoing Section 5.2 hereof. In the event of failure by the City and the Authority to agree upon such methods prior to September 1, 1953 the Authority shall not be bound by the provisions of Section 5.2 hereof and in such event the City shall pay its proportionate share of the cost of maintaining and conducting such facilities to such date.

11

## ARTICLE VI

### PARTICULAR COVENANTS

SECTION 6.1.   If in the opinion of the Board of Estimate and the Mayor the continued maintenance and operation of existing transit facilities, service on which is discontinued by any present private operator. would be expedient, practicable and in the public interest, the Authority shall, subject to such prohibitions, limitations, restrictions and conditions as may be contained in any Financing Agreements, prepare a plan for the acquisition by the City of such transit facilities and maintenance and operation thereof by the Authority, and when such plan shall have been approved by the Board of Estimate and the Mayor and such transit facilities shall have been acquired by the City, the Authority shall, subject to such prohibitions, limitations, restrictions and conditions as may be contained in any Financing Agreements, maintain and operate the same in accordance with the provisions of the Act and this Agreement. (Amended March 31, 1982.)

SECTION 62.   The Authority covenants that it will not, without the consent of the Board of Estimate, enter into any contracts requiring the payment of funds or the performance of work or the delivery of goods beyond the term of this Agreement, or any renewal thereof: provided, however, that nothing herein contained shall be deemed to limit or restrict the power granted the Authority to manage, control or direct the maintenance and operation of the Leased Property or any other ofits property incidental to or necessary for the operation of the transit facilities or the service thereof or to fulfill its obligations, covenants and agreements contained in any Financing Agreements. (Amended March 31, 1982.)

SECTION 6.3   The Authority does hereby assume all contracts made by the Board of Transportation or by the Board of Transportation on behalf of the City which require the payment of money or the performance of any service by the City or the Board of Transportation for or in connection with the construction, maintenance and operation of the Leased Property; provided, however, that the City shall remain liable for the payment of money required to be paid by

12

any contract involving expenditure of capital costs pursuant to a project contained in a capital budget and for which moneys have heretofore been appropriated by the Board of Estimate; and provided further that nothing herein contained shall he deemed to restrict, alter ordiminish the liabilities accruing to the effective date which are to be paid by the City pursuant to Section 4.2 of Article IV hereof. The Authority shall succeed to all rights reserved to the City under and pursuant to the provisions of any such contracts, except as otherwise provided in Section 9.2 of Article IX hereof.

SECTION 6.4.   The Authority shall be responsible for the payment of all charges for the furnishing of water, gas and electricity used by or on behalf of the Authority in connection with the Leased Property. In the event that gas or electricity is furnished to the Authority under contracts between the City and private gas or electric companies, the rates charged the Authority by the City shall not be in excess of the rates charged to the City or any department thereof for such service.

SECTION 6.5.   The Authority will endeavor, during the presence of ice or snow, to maintain the operation of the transit facilities on the regularly established schedules therefor; provided, however, that nothing herein contained shall be deemed to create any duty, obligation or liability on the part of the Authority not heretofore imposed upon the Board of Transportation in connection with its operation of transit facilities.

SECTION 6.6.   The City, through its properly authorized officers and employees in the performance of their official duties, but subject to the provisions of such reasonable rules and regulations as may be promulgated from time to time by the Authority to prevent undue interference with the operation of the Leased Property, shall have the right to free access to make reasonable inspection of the Leased Property.

SECTION 6.7.   The Authority agrees that in its operations of transit facilities it will comply with all rules and regulations relating to parking and traffic, including one-way operation on streets corn-

13

prising all or part of a route, promulgated from time to time by the
City through any duly authorized agency thereof. In the event the
City intends to establish one-way operation or re-establish two-way
operation of traffic on any route or major portion of a route on which
transit facilities under the jurisdiction of the Authority are operated,
the City will give fifteen (15) days' notice to the Authority to afford it
an opportunity to adjust its operations to conform to such
regulations.

SECTION 6.8.   The Authority covenants that, during the term of
this Agreement, it shall be responsible for the payment of, discharge
of, defense against, and final disposition of, any and all claims,
actions or judgments, including compensation claims and awards
and judgments on appeal, resulting from any accident or occurrence
arising out of or in connection with the operation, management and
control by the Authority of the Leased Property.

SECTION 6.9.   The Authority covenants that title to all transit
facilities and other property acquired by the Authority for its use
during the term of this Agreement, the total cost of which has been
paid for by or reimbursed by the City, will be taken in the name of the
City, and the City covenants that all such transit facilities and other
property shall be deemed leased to the Authority pursuant to the
terms of this Agreement. Any property heretofore acquired by the
Authority in the name of the City which by virtue of the amended
definition of the term "Leased Property" is no longer included within
such defined term shall be deemed to be the property of the Authority,
and, upon request of the Authority, the City shall execute such docu-
ments or conveyances as may be necessary or appropriate to evi-
dence the ownership of such property by the Authority. Title to any
property hereafter acquired by the Authority, neither the total cost of
which is paid for or reimbursed by the City nor any portion of the cost
of which is financed by the sale of obligations of the City, shall be
taken in the name of the Authority or as the Authority may desig-
nate. The Authority further covenants that if any portion of the cost
of any property hereafter acquired by it is financed by the sale of
obligations of the City, title to such property will be taken in the name
of the City and such property shall be deemed Leased Property for
purposes of this Agreement, unless or until the Authority shall

14

receive a notice from the Director of Management and Budget of the City stating with respect to any such property that. the inclusion thereof as Leased Property will not be or is no longer required to effect such financing in accordance with applicable law, upon receipt of which notice such property shall be deemed to be property of the Authority.

If, pursuant to Subdivision 9, Section 553 or Section 1266-c of the Public Authorities Law, the Authority shall request Triborough Bridge and Tunnel Authority (TBTA) or Metropolitan Transportation Authority (MTA) to reconstruct, rehabilitate or improve any Leased Property, and if no portion of the cost thereof is or is to be paid by the City, the City shall, by action of its Mayor alone as provided in Sections 553-e and 1266-c of the Public Authorities Law, upon the request of the Authority and upon its representation that such transfer will facilitate the reconstruction, rehabilitation or improvement or the financing thereof, transfer title to such Leased Property to the Authority. Subject to the conditions hereinafter set forth, and upon its representation that such transfer will facilitate the reconstruction, rehabilitation or improvement of such property or the financing thereof, the Authority may designate the transfer by the City to be made directly to TBTA or MTA. As a condition to any such transfer to TBTA or MTA, the Authority shall represent to the City that the TBTA or MTA, as the case may he, has agreed:

(a)   that title to such property will be transferred by TBTA or MTA to the Authority upon completion of the reconstruction, rehabilitation or improvement unless prohibited by the terms of the financing of the project or unless such financing involves a sale-leaseback which requires title to such property to he transferred to the purchaser-lessor;

(b)   if the financing involves a sale-leaseback of the property, that the Authority shall either he the lessee thereof or, if TBTA or MTA is to he the lessee, that the property shall be subleased to the Authority under a sublease which shall contain an assignment to the Authority of any option or right which the lessee may have to purchase the property;

15

(c)   if the financing arrangements prohibit the transfer of the property to the Authority *upon* completion of the reconstruction, rehabilitation or improvement, that such transfer shall be made when the financing arrangements have been satisfied; and

(d)   that prior to satisfying the financing arrangements TBTA or MTA shall not dispose of the property for non-transit purposes without first offering the property, subject to the offeree satisfying or assuming the requirements of the financing arrangements, to the Authority and, if the Authority declines such offer, to the City, and if both the Authority and the City decline such offer and the property is sold by MTA or TBTA, that any net proceeds realized upon such sale, after satisfying the financing arrangements, shall be remitted to the Authority for its corporate purposes. (Amended March 31, 1982.)

SECTION 6.10.   The Authority accepts the Leased Property *in* its condition as of the effective date, without warranty or representation by the City, subject to existing encumbrances and leases affecting such Leased Property.

SECTION 6.11.   The Authority recognizes that its statutory purposes are the acquisition of the transit facilities operated by the Board of Transportation and the operation of transit facilities in accordance with the provisions of the Act for the convenience and safety of the public on a basis which will enable the operations thereof, exclusive of capital costs, to be self-sustaining as provided in the Act; provided, however, that the Authority may incur and obligate.itself for the payment of capital costs in the manner and to the extent provided herein or to the extent authorized or provided by law and the Authority may operate the transit facilities and fix and adjust fares, fees, rentals and other charges as will enable it to discharge such obligations and satisfy any of its covenants or undertakings given in connection therewith. (Amended March 31, 1982.)

SECTION 6.12.   The Authority agrees that, with respect to the Leased Property, it will not charge depreciation or obsolescence as an expense of the operations of the Authority for the purpose of fixing or adjusting the rate or rates of fare to be charged for the use of any transit facility operated by the Authority; provided, however, that

16

nothing herein contained shall be deemed to limit or prohibit the Authority from setting aside reserves and fixing or adjusting the rate or rates of fares, fees, rentals or other charges in the manner and to the extent required by any Financing Agreements. (Amended March 31, 1982.)

SECTION 6.13.   The Authority will provide police for patrolling and for guarding in and about the Leased Property, and the City will reimburse the Authority for the total cost of furnishing such police, including in addition to salaries and wages, payments for such necessary police expenses as pension, health and hospitalization insurance, Social Security, sick leave, uniform allowance, equipment, etc. The City will reimburse the Authority for the costs actually paid for maintaining a Transit Police Department and a uniformed Transit Police force. The City further agrees to reimburse the Authority for the pension-providing-for-increased-take-home-pay adjustments, which have accrued during the period covered by this agreement, but which are not paid by the Authority during the fiscal year in which they accrue. Payment for the cost of furnishing such police shall be made to the Authority monthly. The City will have no responsibility for maintaining fire or police personnel in the Leased Property. The City agrees that its Police Department will respond to calls from the Authority in the event of the commission of crime, rioting, disasters, and other emergencies in the Leased Property, and its Fire Department will respond to calls to put out fires and handle emergencies.

Payments for each month shall be made on the first day of the next succeeding month, and within 30 days after the conclusion of each twelve-month period of such payments, the Authority and the City shall, subject to the limitations set forth above, adjust all of the payments thus made during the said period to conform to the actual police costs incurred by the Authority for such period. The Authority agrees to submit such documents and vouchers as the City shall deem necessary for such adjustments.

The City may terminate the reimbursement for police costs provided for in this section upon 90 days' written notice to the Authority. In the event of such termination, however, the City agrees to reim-

17

burse the Authority for all costs incurred or accrued until such termination, including pensions and the pension-for-increased-take-home-pay adjustments (Amended April 19, 1960, March 6, 1962 and April 7, 1965.)

SECTION 6.14.   In view of the fact that materials and supplies are expendable, the Authority agrees that it will replace materials and supplies in the regular course of business as may be required to keep the Leased Property in safe operating and reasonable working condition.

SECTION 6.15.   The Authority agrees to maintain reasonable reserves for tort and workmen's compensation claims in accordance with the uniform system of accounts prescribed by the Public Service Commission. (Amended April 7, 1965.)

SECTION 6.16.   The Authority covenants that, so long as it shall continue to use or maintain street surface railroad tracks on any street, it shall have and keep in permanent repair that portion of such street between its tracks, the rails of its tracks and two feet in width outside of its tracks to the extent and as required by Section 178 of the Railroad Law; provided, however, that in the event that any such requirement necessitates expenditure by the Authority of capital costs of a nature not charged to operating expense prior to the effective date of the Act within the purview of subdivision (1)(b) of Section 1203 of the Act, the City shall reimburse the Authority therefor.

SECTION 6.17.   The Authority agrees to repair damage to sidewalks and roadways directly attributable to its elevated and subway operations and constructions; provided, however, that if the costs of such construction are of a capital nature the repairs made necessary thereby shall be paid by the City.

SECTION 6.18.   (Deleted by amendment dated October 5, 1962.)

18

## ARTICLE VII

### DECLARATIONS OF INTENTION AND UNDERSTANDING

SECTION 7.1    The Authority declares that, in connection with the exercise of the powers granted to it by subdivision 15 of Section 1204 of the Act to extend, modify, discontinue, curtail or change routes or methods of transportation, it will consult and confer with the Board of Estimate and give due consideration to the views of the Board of Estimate in the premises. It is the intention of the Authority that it will not make any substantial extension of existing routes of transportation without the prior approval of the Board of Estimate.

SECTION 7.2.    The Authority declares that it is its present intention that it will not revise the rate or rates of fares to be charged for the use of any transit facilities leased herein without having first studied and considered, to the extent feasible, the operations, finances and revenues of such transit facilities, provided, however, that nothing contained in this Agreement shall be deemed to limit or restrict the Authority's right or obligation to comply with any covenant relating to the rate or rates of fare to be charged for the use of any transit facility operated by the Authority made with the holders of or parties to any of its Financing Agreements. (Amended March 31, 1982.)

SECTION 7.3.    The Authority declares that it is its present intention to conduct and make surveys and studies of the Leased Property with a view to ascertaining whether and to what extent insurance, if any, should be procured and maintained with respect to such Leased Property, or any part thereof.

SECTION  7.4.    The Authority recognizes the unique public transportation problem confronting the residents of the Borough of Richmond in that direct transportation between that Borough and the remainder of the City necessarily involves the use of ferries operated by the City through its Department of Marine and Aviation. The Authority declares that it is its present intention, as soon as it is practicable and feasible in its judgment to do so, to undertake a study and survey of the entire transportation system in said Borough in

19

order to determine whether it is desirable and feasible to integrate and synchronize the scheduling of the omnibus operations of the Authority **in** said Borough with the passenger rail service rendered by the Staten Island Rapid Transit Railway Company and the afore-said ferries. In connection with such study, it is the present intention of the Authority to:

(a)   give due regard to the development of a transportation pro-gram which would further the economic development of said Borough and

(b)   consult with the President of said Borough and such others as may be designated by him. The City declares that it is its present intention, whenever the Authority shall give notice to the Board of Estimate in accordance with the provisions of subdivision 15 of Section 1204 of the Act that the Authority proposes to modify, discon-tinue, curtail or change any transit route or method of transportation in said Borough, to request a public hearing as permitted by said subdivision of the Act. The Authority agrees that, upon the issuance by it of a notice of such a public hearing, it will furnish the Board of Estimate and the President of said Borough with copies of all its public reports and studies, if any, upon which any proposed modifi-cation, discontinuance, curtailment or change is predicated. In respect of the time and place of such public hearing, the Authority will give due regard to the convenience of such residents of said Borough as may wish to attend and be heard. Nothing contained in this Section 7.4 shall be deemed to limit or restrict, or have the effect of limiting or restricting, any of the rights or powers of the City or of the Authority under the Act or under any other applicable provision of law, charter or administrative code.

SECTION 7.5.   The City acknowledges and agrees that nothing in this Agreement shall be deemed to prevent the Authority from exercising any of its powers under the Act, as the same may from time to time be amended, and that in the event of any conflict between any of the provisions of this Agreement and the provisions of the Act or of any general resolution pursuant to which the Authority is to issue any of its bonds or notes or Metropolitan Transportation Authority is to issue any of its special obligation bonds or notes, provided in each

20

case such resolution has been approved by the Metropolitan Transportation Authority Capital Review Board as provided in Section 1269-b of the Public Authorities Law, the provisions of the Act and such resolution or resolutions shall be controlling. (Amended March 31, 1982.)

SECTION 7.6.   Each reference in this Agreement to the intent or present intention of either of the parties hereto shall be deemed to refer to and to describe an intent at the time such provision was first included in this Agreement, and, unless the context otherwise requires, shall not be deemed to constitute a reaffirmation of such intent at the time of any amendment heretofore or hereafter made to this Agreement. (Amended March 31, 1982.)

## ARTICLE VIII

### SEWER AND OTHER RIGHTS RESERVED TO THE CITY

SECTION 8.1.   The Authority and the City recognize that in, on or across the Leased Property there are presently located sewers, water mains, sludge lines, tanks, power lines, telephone lines and other service facilities of the City used *for* other than transit purposes and also recognize that the maintenance of such service facilities is reserved to and the duty of the City.

SECTION 8.2.   Subject to the provisions of Section 8.3 of this Article VIII, the City, through its duly designated officers and employees, shall have the right to enter upon the Leased Property with men, equipment, trucks and vehicles for the purpose of making repairs, replacements, extensions and relocations of such service facilities as shall be necessary in the opinion of the City.

SECTION 8.3.   Repairs, replacements, extensions, relocations and installations of such service facilities and other public improvements shall be made at times and in a manner consistent with present practices and such reasonable rules and regulations as may be promulgated from time to time by the Authority to prevent unnecessary interference with the operation of the Leased Property for the convenience and safety of the public.

21

# ARTICLE IX

## ADVANCEMENT AND COMPLETION OF ROCKAWAY IMPROVEMENT

SECTION 9.1.   The Authority agrees that, at the request of the City, and to the extent that the capital funds therefor have been appropriated by the Board of Estimate, it will complete the construction and improvement of the Rockaway Lines defined in that certain agreement made the 5th day of September, 1952, between William Wyer, as Trustee of the property of The Long Island Rail Road Company, Debtor, and the City, acting by the Board of Transportation (which agreement is hereinafter in this Article IX called "the Rockaway agreement"). The Authority agrees that, at the request of the City, it will execute that certain proposed lease annexed as Schedule D to the Rockaway agreement.

SECTION 9.2.   The Authority agrees that the rentals which may become due under the proposed lease referred to in Section 9J of this Article IX will be paid and turned over to the City. The City agrees to assume and pay such grade crossing elimination costs and charges as are payable pursuant to Article Sixth of the Rockaway agreement.

# ARTICLE X

## SOUTH BROOKLYN RAILWAY COMPANY

SECTION 10.1.   The Authority hereby agrees that it will perform, to the same extent as heretofore performed by the Board of Transportation, the obligations presently imposed upon the Board of Transportation by the provisions of agreements now in existence between South Brooklyn Railway Company and the Board of Transportation, and the Authority shall be entitled to all of the rights and privileges of the Board of Transportation under such agreements; provided, however, that the Authority shall have the right, from time to time, on thirty (30) days' notice to the City, to request revisions of the terms of any such agreements whenever the Authority believes that the provisions of such agreements do not adequately provide for full reimbursement of the Authority for the entire cost (including, without

22

limiting the generality of the foregoing, overhead, social security taxes, pension contributions, if any, and other expenses paid by the Authority) incurred in the performance of such obligations as are imposed upon it by such assumption or that the rentals payable to South Brooklyn Rails=. ay Company by the Authority under any of such agreements are excessive. The City agrees to cause South Brooklyn Railway Company to execute and deliver to the Authority any supplemental or amendatory agreement setting forth any revisions of such agreements as may be mutually agreed upon between the City and the Authority as being necessary in order to assure that the Authority shall be fully reimbursed for any expenses or charges incurred by it in connection with the obligations imposed upon the Authority under the terms of such agreements.

## ARTICLE XI

### DISPOSITION OF BUS LINES

SECTION 11.1.   It is hereby declared to be the intent and policy of the City and the Authority that, to the extent feasible, it is in the best interests of the City, the Authority and the traveling public that the surface omnibus operations of the Authority be replaced by private bus operation. Section 363 of the New York City Charter provides that every grant of or consent to a franchise of any character must be by authority of the Board of Estimate. The Authority and the City agree that no act or actions will be taken by the Authority that would result in the establishment of omnibus operations on or over any of the streets of the City by private omnibus operation without the granting of a certificate of public convenience and necessity from the Public Service Commission, and without the granting of a franchise by the Board of Estimate to the private omnibus operator. The Authority recognizes that any plan for the sale of surface lines, or the property used on such lines requires the separate approval of the Board of Estimate. (Amended March 31, 1982.)

23

## ARTICLE XII

### INSPECTION OF ACCOUNTS

SECTION 12.1.   The Comptroller and his duly designated representatives shall have the right to inspect the books, records and accounts of the Authority during regular business hours and subject to such reasonable rules and regulations as may be promulgated from time to time by the Authority.

SECTION 12.2.   The Authority will deliver to the Mayor, the Comptroller and the Board of Estimate a copy of its annual report on or before the 1st day of February of each year and will furnish to the Comptroller a copy of any audit report made to the Authority by its internal auditors or by independent accountants relating to the Leased Property.

## ARTICLE XIII

### ADJUSTMENTS

SECTION 13.1.   The operation of the Leased Property shall be continued without interruption, and for all purposes of adjustment or closing of accounts it is agreed that the Leased Property and the operations thereof shall be deemed to be subjected to the control of the Authority as of the effective date. The accounts of the Board of Transportation shall be adjusted, closed and disposed of as of the effective date, in accordance with the provisions of this Article XIII, under the direction and supervision of representatives of the City and the Authority.

SECTION 13.2.   All revenues derived, directly or indirectly, from or in connection with the operation by the Board of Transportation of any transit facility, including moneys derived from fares charged for the use thereof, rentals or fees charged for concessions or privileges on or in connection with any transit facility, the sale of surplus power or any other receipts from whatever source derived, in the amounts thereof as may exist at 12:00 Midnight, Eastern Daylight Saving

24

Time, June 14, 1953, shall belong to the City. Except as otherwise provided in Sections 2.5 and 2.6 of Article II hereof, all such revenues derived after such time shall belong to the Authority.

SECTION 13.3.   All property, including *ccch* and choses in action, of or under the jurisdiction of the Board of Transportation at 12:00 Midnight, Eastern Daylight Saving Time, June 14, 1953, which is not part of the Leased Property and which is not subject to determination under Section 2.5 of Article II hereof, shall be retained by the City.

SECTION 13.4.   As soon as practicable after the execution and delivery of this Agreement, the City and the Authority will determine and devise an appropriate and convenient method for the adjustment or the closing of all accounts and all other matters related to, connected with, or arising out of, the Leased Property.

SECTION 13.5.   The City will cause all deposits held by the Board of Transportation as security under leases or concessions made by the Board of Transportation in connection with the Leased Property to be turned over on the effective date by the Board of Transportation to the Authority.

SECTION 13.6.   In the event of any dispute between the City and the Authority as to the manner of making any- adjustment as required by the provisions of this Article XIII, or with respect to any payments required to be made by the provisions of this Article XIII, the matter in controversy shall be determined in the manner provided for by Article XIV hereof.


ARTICLE XIV

PROCEDURE IN EVENT OF DISPUTES

SECTION 14.1.   In the event of any controversy arising out of or connected with this Agreement concerning any question of fact, such controversy shall be settled by arbitration in accordance with the rules then obtaining of the American Arbitration Association.

25

SECTION 14.2.   In the event of any controversy arising out of or connected with this Agreement concerning any question of law, the City and the Authority shall cooperate in the preparation of a case containing a statement of the facts upon which the controversy depends and in the presentatiio a of a -riven submission the Appellate Division of the Supreme Court of the State of New York, First Judicial Department, of such case and of all other documents necessary for the purpose of determining the rights of the parties.

SECTION 14.3.   a. Except as hereinafter provided in paragraph b of this Section 14.3, nothing contained in this Agreement shall be construed to confer any rights on any person other than the City and the Authority and no other person other than the City and the Authority shall have any right to sue for breach or the enforcement of any of its provisions.

b.   In the event of an agreement between the Authority and the City for termination of this Agreement otherwise than as provided in this Agreement or in the event of an agreement between the Authority and the City for a surrender by the Authority of a substantial portion of the Leased Property which would affect the revenues to be derived from the operation of the Leased Property by the Authority contrary to the provisions of any Financing Agreement or to 'an extent which would materially and adversely affect the rights of any holders under or parties to such Financing Agreements, the City shall, prior to such termination or surrender, pay or make provision for payment of, at maturity, or redeem or make provision for redemption of, prior to maturity on the next succeeding redemption date, or prepay or make provision for prepayment of at the time of such termination or surrender, or assume, if such assumption by the City is permitted by the terms of the Financing Agreement and has the effect of releasing the Authority from all further liability or obligation thereunder, all Financing Agreements of the Authority in accordance with their terms and all special obligation bonds, notes and other obligations of Metropolitan Transportation Authority issued in connection with transit projects as provided in Section 1266-c of the Public Authorities Law. The Authority may grant or extend to Metropolitan Transportation Authority and to the holders of any of its special obligation bonds, notes or other obligations and to the holders

26

of or parties to any Financing Agreements and to any trustee acting on behalf of any of them the right to enforce the foregoing provisions for payment, prepayment, redemption or assumption as herein provided. (Amended March 31, 1982.)

## ARTICLE XV

### COVENANT OF FURTHER ASSURANCES

SECTION 15.1.   The City and the Authority hereby covenant, from time to time, to make or enter into and deliver any contracts, agreements, leases, conveyances or other instruments as may be necessary or appropriate to effectuate the purposes of this Agreement.

SECTION 15.2.   Any such contracts, agreements, leases, conveyances or other instruments shall be in form to be approved by the Corporation Counsel of the City and by counsel for the Authority.

SECTION 15.3.   Nothing contained in this Article XV shall be deemed to permit a change in this Agreement otherwise than as provided in Section 19.2 of Article XIX hereof. (Amended March 31, 1982.)

## ARTICLE XVI

### TERM AND RENEWAL

SECTION 16.1.   Notwithstanding the provisions of Section 2.1 of this Agreement, the term of this Agreement, which originally provided for a term of 10 years commencing at 12:01 a.m. Eastern Daylight Saving Time, June 15, 1953, and which was thereafter renewed and extended, is hereby renewed and extended for a further term terminating on November 1, 1989; provided, however, that the term of this Agreement shall not be terminated and this Agreement shall remain in full force and effect so long as any special obligation bonds, notes or other obligations of Metropolitan Transportation Authority

27

issued pursuant to the provisions of Section 1266-c of the Public Authorities Law remain outstanding and unpaid or any Financing Agreements of the Authority remain outstanding and unpaid unless in each case provision for such payment has been duly provided for in accordance with their respective terms; and provided further that the City shall have the option to terminate this Agreement at any time on one year's written notice of its election so to do provided that upon exercising such option prior to the expiration date of this Agreement the City shall pay or make provision for the payment of, at maturity, or redeem or make provision for redemption of, prior to maturity on the next succeeding redemption date, or prepay or make provision for prepayment of at the time of such termination, or assume, if such assumption by the City is permitted by the terms of the Financing Agreement and has the effect of releasing the Authority from all further liability or obligations thereunder, unpaid Financing Agreements of the Authority and special obligation bonds, notes and other obligations of Metropolitan Transportation Authority issued in accordance with the provisions of Section 1266-c of the -Public Authorities Law and outstanding on the date of such termination, together with interest thereon and premiums, if any, all in compliance with the requirements of the resolution or resolutions or agreements pursuant to which such bonds, notes or other obligations or Financing Agreements shall have been issued or entered into. (Amended March 31, 1982.)

SECTION 16.2.   Upon the expiration of the stated term of this Agreement under the provisions of Section 16.1, unless the City shall have previously terminated this Agreement by exercise of the option reserved to the City in Section 16.1 upon compliance with the provisions thereof, this Agreement shall continue thereafter from year to year until either the City or the Authority gives to the other one year's written notice of termination. (Amended October 5, 1962.)

## ARTICLE XVII

### EFFECT OF TERMINATION OF AGREEMENT

SECTION 17.1.   Upon the termination of this Agreement or any

28

renewal thereof pursuant to the provisions of Article XVI hereof, all the rights and properties, including cash and choses in action, of the Authority shall pass to the City and the City shall succeed to the rights, powers, duties, liabilities and obligations of the Authority. (Amended October 5, 1962.)

## ARTICLE XVIII

### PERSONAL LIABILITY

SECTION 18.1.   Nothing contained in this Agreement and no act of the Board of Estimate or of the Authority performed in pursuance, effectuation or implementation thereof shall be construed to give rise to or create any personal liability whatsoever on the part of any present or future individual member or group of individual members of the Board of Estimate or of the Authority.

## ARTICLE XIX

### WAIVERS AND AMENDMENTS

SECTION 19.1.   No failure to exercise, and no delay in exercising on the part of the City or the Authority, as the case may be, any right, power or privilege hereunder, shall operate as the waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof, or the exercise of any other right, power or privilege. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law. (Amended March 31, 1982.)

SECTION 19.2.   This Agreement may not be changed except in writing. Any such writing shall be authorized by appropriate resolution of the Authority, shall be authorized on behalf of the City either by action of its Mayor alone or by resolution of its Board of Estimate pursuant to Section 1207-m 7(a) of the Act, and, so long as any special obligation bonds, notes or other obligations of Metropolitan Transportation Authority issued pursuant to the provisions of Section

29

*1266-c* of the Public Authorities Law shall remain outstanding, shall be approved by resolution of the Metropolitan Transportation Authority. This agreement shall not be changed in any way inconsistent with the provisions of any Financing Agreements or of any special obligation bonds, notes or other obligations of Metropolitan Transportation Authority and, notwithstanding the provisions of Section 14.3 of this Agreement, the Authority may grant or extend to the Metropolitan Transportation Authority and to the holders of or parties to any of the Authority's Financing Agreements and to the holders of any special obligation bonds, notes and other obligations of Metropolitan Transportation Authority and to any trustee acting on behalf of any of them the right to enforce the provisions of this Section 19.2. (Amended March 31, 1982.)

## ARTICLE XX

### NOTICES

SECTION 20.1.   All notices, requests and other communications under this Agreement shall be deemed to have been duly served if in writing and delivered or mailed (a) to the Authority at 370 Jay Street, Brooklyn 1, New York and (b) to the City at the office of the Secretary of the Board of Estimate, Municipal Building, New York 7, N. Y., or such other address as the Authority or the City, as the case may be, shall hereafter designate by notice in writing.

## ARTICLE XXI

### SEPARABILITY

SECTION 21.1.   In the event that any one or more of the provisions contained in this Agreement is or are invalid, irregular or unenforceable in any respect, the validity, regularity and enforceability of the remaining provisions contained in this Agreement shall be in no wise affected, prejudiced or disturbed thereby. (Amended October 5, 1962.)

30

## ARTICLE XXII

### HEADINGS

SECTION 22.1.   The table of contents and the descriptive headings of the several articles of this Agreement are inserted in this Agreement for convenience only and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

## ARTICLE XXIII

### EXECUTION OF AGREEMENT

SECTION 23.1.   This Agreement shall be executed and delivered on behalf of the City and the Authority on June 1, 1953 and may be executed in any number of counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

## ARTICLE XXIV

### FINANCING OF CERTAIN CAPITAL COSTS

SECTION 24.1.   The City hereby consents to and approves the purchase by the Authority of no more than 724 cars for the rapid transit lines constituting a part of the Leased Property. Title to all such cars so purchased by the Authority shall vest in the Authority, subject to such agreements with the holders of bonds and notes issued in accordance with the provisions of this Article XXIV as the Authority may make or provide in the resolution or resolutions authorizing the issuance of such bonds and notes pursuant to the provisions of §1207-b of the Public Authorities Law. In the event title to such cars shall not have previously passed to the City upon the purchase thereof pursuant to Section 24.2 of this Agreement, title to all cars so purchased by the Authority then remaining in the Authority shall pass to the City upon the termination of this Agreement, as provided in Section 17.1 of this Agreement. (Amended October 5, 1962.)

31

SECTION  24.2.    The Authority agrees that, subject to such agreements with the holders of bonds and notes of the Authority issued in accordance with the provisions of this Article XXIV, which may then exist, the Authority, upon the written request of the City, will sell at negotiated sale and transfer to the City any or all such cars purchased by the Authority in accordance with Section 24.1 of this Agreement upon such terms and for such price as may be mutually agreed upon by the City and the Authority. All such cars so purchased by the City shall thereupon become a part of the Leased Property as defined in and covered by this Agreement. (Amended October 5, 1962.)

SECTION 24.3.    The City hereby consents to and approves the issuance of bonds and notes by the Authority pursuant to the provisions of and for the purposes stated in §1207-b of the Public Authorities Law, provided, that:

(a)    in no event shall there be outstanding at any one time more than $92,000,000 in such bonds and notes;

(b)    no such bonds shall mature more than twenty-five (25) years from the date of issue;

(c)    all such bonds so issued shall be callable, as a whole on any date, or in part on any interest payment date occurring on or after twelve (12) years from the date of issue of the first bonds issued;

(d)    such bonds and notes shall not be a debt of the City and the City shall not be liable thereon;

(e)    such bonds and notes shall not be payable out of any funds other than those of the Authority; and

(f)    the revenues or other monies of the Manhattan and Bronx Surface Transit Operating Authority shall not be pledged or used for the payment of any such bonds and notes.

The Authority agrees that the City shall have the right to require the Authority to redeem any such bonds issued by the

32

Authority, as a whole on any date, or in part on any interest payment date, occurring on or after twelve (12) years from the date of issue of the first bonds issued, upon the City furnishing the Authority with sufficient funds therefor determined in accordance with the terms upon which such bonds are redeemable under the resolution or resolutions authorizing the issuance thereof. (Amended October 5, 1962.)

SECTION 24.4.   (Deleted by Amendment dated March 31, 1982.)

SECTION 24.5.   The Authority agrees that its Financing Agreements shall not constitute a debt or obligation of the City and that the City shall not be liable thereon, except to the extent the City may assume the same as elsewhere in this Agreement provided, nor shall the special obligation bonds, notes or other obligations of Metropolitan Transportation Authority issued pursuant to Section 1266-c of the Public Authorities Law constitute a debt or obligation of the City and that the City shall not be liable thereon, except to the extent the City may agree, pursuant to said Section 1266-c, to pay to the Authority amounts sufficient to pay when due the principal, redemption premium, if any, and interest upon any special obligation bonds or notes of Metropolitan Transportation Authority issued to effect the defeasance, refunding or repayment of outstanding bonds, notes or other obligations of the Authority. The Authority further agrees that upon furnishing sufficient funds therefor the City may require the Authority to cause Metropolitan Transportation Authority to redeem as a whole any issue of its special obligation bonds or notes or prepay any other special obligations at the time or times and in accordance with the terms upon which such special obligation bonds, notes or other obligations are redeemable or repayable and may require the Authority to redeem or prepay any Financing Agreement as a whole at the time or times and in accordance with the terms upon which such Financing Agreement is redeemable or prepayable. (Amended March 31, 1982.)

*33*

IN WITNESS WHEREOF, THE CITY OF NEW YORK, by its Mayor thereunto duly authorized by the Board of Estimate of said City has caused the coporate name of said City to be hereunto signed and its corporate seal to be hereunto affixed and the NEW YORK CITY TRANSIT AUTHORITY by its Chairman thereunto duly authorized has caused the corporate name of said Authority to be hereunto signed and its corporate seal to be hereunto affixed this 1st day of June, 1953.

THE CITY OF NEW YORK

By:          VINCENT R. IMPELLITTERI
*Mayor*

(Official Seal)

Attest:

MURRAY W. STAND
*City Clerk*

NEW YORK CITY TRANSIT AUTHORITY

By:          HUGH J. CASEY
*Chairman*

(Official Seal)

Attest:

WM. JEROME DALY
*Secretary*

34

SIGNATURES

Instruments amending the Agreement of Lease between The City of New York and New York City Transit Authority were executed as follows:

| Date | For City | For NYCTA |
|------|----------|-----------|
| April 19, 1960 | Robert F. Wagner, *Mayor** | Charles L. Patterson, *Chairman* |
| March 6, 1962 | Robert F. Wagner, *Mayor* | Charles L. Patterson, *Chairman* |
| March 20, 1962 | Robert F. Wagner, *Mayor* | Charles L. Patterson, *Chairman* |
| October 5, 1962 | Robert F. Wagner, *Mayor* | Charles L. Patterson, *Chairman* |
| April 7, 1965 | Robert F. Wagner, *Mayor* | Daniel T. Scannell, *Member* |
| March 31, 1982 | Edward I. Koch, *Mayor* | Richard Ravitch *Chairman* |

*   With respect to amendments prior to March 31, 1982, authorization of Board of Estimate was required.