**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JASON FREY, BRIANNA FREY, JACK CHENG, and WILLIAM SAPPE, | |
| *Plaintiffs*, | Civil Action No. 7:21-cv-5334-NSR |
| v. | |
| STEVEN NIGRELLI, Acting Superintendent of the New York State Police, in his official capacity, NEW YORK CITY, New York, and KEECHANT SEWELL, in her official capacity as NYPD Commissioner, | |
| *Defendants*. | |

**AMICUS BRIEF OF EVERYTOWN FOR GUN SAFETY**
**IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, #4184
New York, NY 10017
wtaylor@everytown.org
(646) 324-8215
*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

**CORPORATE DISCLOSURE STATEMENT**

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ............................................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

ARGUMENT ............................................................................................................................... 2

    I.    Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Conduct ............................................................................................. 2

    II.    The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791 ....................... 4

    III.    This Court Should Not Dismiss the State's Historical Analogues as "Outliers" .............. 10

    IV.    Plaintiffs' Arguments Regarding Historical Restrictions Are Mistaken .......................... 11

CONCLUSION ......................................................................................................................... 15

# TABLE OF AUTHORITIES

***Cases***

*Antonyuk v. Hochul*,
    No. 1:22-cv-00986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022), *appeal docketed*, No. 22-
    2908 (2d Cir. Nov. 9, 2022) ................................................................................................. 14

*Davenport v. Wash. Educ. Ass'n*,
    551 U.S. 177 (2007) .............................................................................................................. 11

*Defense Distributed v. Bonta*,
    No. 2:22-cv-06200, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022), *adopted*, 2022 WL
    15524983 (C.D. Cal. Oct. 24, 2022) ................................................................................... 13

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ...................................................................................................... passim

*Drummond v. Robinson Twp.*,
    9 F.4th 217 (3d Cir. 2021) ...................................................................................................... 4

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ............................................................................................. 4, 7

*Friedman v. City of Highland Park*,
    784 F.3d 406 (7th Cir. 2015) ............................................................................................... 11

*Gould v. Morgan*,
    907 F.3d 659 (1st Cir. 2018) .................................................................................................. 4

*Hardaway v. Nigrelli*,
    No. 1:22-cv-00771, 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022), *appeal docketed*, No. 22-
    2933 (2d Cir. Nov. 15, 2022) ............................................................................................... 10

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ............................................................................................ 9

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ..................................................................................................... 4, 7, 11

*New York State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) ................................................................................................. passim

*Oregon Firearms Fed'n v. Brown*,
    No. 2:22-cv-01815, 2022 WL 17454829 (D. Or. Dec. 6, 2022) .......................................... 13

*Salinger v. Colting*,
    607 F.3d 68, 79 (2d Cir. 2010) ............................................................................................ 13

*United States v. Greeno*,
    679 F.3d 510 (6th Cir. 2012) .................................................................................................. 4

*United States v. Tilotta,*
    No. 3:19-cr-4768, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022)........................................... 3

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7, 24 (2008) ............................................................................................................. 13

**Statutes**

N.Y. Penal Law § 265.01-e ......................................................................................................... 3, 12

**Other Authorities**

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998)............................. 6, 7

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen,*
    No. 20-843 (U.S.) ................................................................................................................. 8, 10

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine,* 13 Charleston L.
    Rev. 205 (2018) .................................................................................................................... 8, 10

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021),
    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ............................................ 6, 7

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation,* 97 Ind. L.J. 1439
    (2022) ........................................................................................................................................ 5

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen,* No. 20-843
    (U.S. Nov. 3, 2021) ................................................................................................................... 8

Transcript of Remote Conference, *Corbett v. Hochul,* No. 1:22-cv-05867-LGS
    (S.D.N.Y. Nov. 29, 2022) ........................................................................................................ 13

**INTEREST OF AMICUS CURIAE**

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization. Everytown has filed more than 50 amicus briefs in Second Amendment and other gun cases, including in challenges to New York's Concealed Carry Improvement Act ("CCIA"). *See, e.g.*, *Christian v. Nigrelli*, No. 1:22-cv-00695 (W.D.N.Y. Nov. 12, 2022), Dkt. 45; *Hardaway v. Nigrelli*, 1:22-cv-00771 (W.D.N.Y. Oct. 29, 2022), Dkt. 47; *Goldstein v. Hochul*, No. 1:22-cv-08300 (S.D.N.Y. Oct. 20, 2022), Dkt. 46; *Antonyuk v. Hochul*, No. 1:22-cv-00986 (N.D.N.Y. Oct. 19, 2022), Dkt. 63.[1]

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The challenged restrictions in New York's law are constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons stated in Defendant Acting Superintendent Nigrelli's Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction (Dkt. 63) ("State's Mem.") and the City Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction (Dkt. 66) ("City's Mem.").[2] Everytown submits this amicus brief to expand on four points. *First*, on the initial, textual inquiry of the *Bruen* framework, Plaintiffs have the burden to show that their proposed conduct, i.e., carrying firearms, without restriction, openly or concealed, everywhere they go—including in parks, places that serve alcohol, movie theaters, crowded subway cars, Times Square, and on the private property of others—falls within the Second

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

[2] This amicus brief addresses only aspects of Plaintiffs' claims. The Court should decline to issue a preliminary injunction, as to all defendants, for the reasons in the State's and the City's oppositions.

Amendment's plain text, and they have failed to meet that burden. *Second*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified, not 1791. Moreover, 1868 is not a cutoff; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added). *Third*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. *Fourth*, Plaintiffs misread *Bruen*'s discussion of sensitive places and have not carried their heavy burden to establish an entitlement to the extraordinary remedy of a preliminary injunction.

## ARGUMENT

I.  **Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Conduct**

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. The court first must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)).

As the State and City explain, Plaintiffs have the burden on the initial, textual inquiry. *See* State's Mem. at 16; City's Mem. at 2. Plaintiffs make virtually no effort to carry their textual burden. In the operative Second Amended Complaint, Plaintiffs broadly allege that they seek to

carry handguns, both openly and concealed, "everywhere [they] go[]," without "hav[ing] to seek permission from anyone." Plaintiffs' Second Amended Complaint (Dkt. 47) ¶¶ 4, 29, 31, 40, 51, 53, 61, 73, 76, 81, 91, 93, 142.[3] But it is well established that "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626; *see also Bruen*, 142 S. Ct. at 2128 (quoting *Heller*). Plaintiffs do not explain how the Second Amendment's text protects their desire to carry firearms in whatever manner they choose, wherever they go (or even in the more limited set of specific locations where they express an intention to carry, *see supra* note 3). *See, e.g.*, State's Mem. at 16-17, 18-20, 23-25; City's Mem. at 17, 38.

New York's regulations on the manner of carrying firearms and the specific locations where they may be carried stand in stark contrast to the laws struck down in *Heller* and *Bruen*—respectively, an unusually "severe" restriction that "totally ban[ned] handgun possession in the home," *Heller*, 554 U.S. at 628-29, and a carry regime that "prevent[ed] law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose," *Bruen*, 142 S. Ct. at 2150.[4] Accordingly, Plaintiffs cannot rest their textual claim on the simple assertion that they wish to carry handguns in public, as the *Bruen* petitioners did. They have failed to do anything more,

---

[3] As the State and City explain, with respect to sensitive places, although Plaintiffs seek to have this Court enjoin the entirety of Penal Law § 265.01-e (with the exception of courthouses and polling places), Plaintiffs' motion papers specifically mention an intention to carry a firearm only in public parks, places that serve alcohol, movie theaters, public transit, and Times Square. *See* State's Mem. at 23-24; City's Mem. at 24. The Court should thus properly limit its review of Plaintiffs' § 265.01-e challenge to those specifically-identified locations.

[4] *See United States v. Tilotta*, No. 3:19-cr-4768, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) (noting that the firearm regulation at issue "is not equivalent to near total bans on the possession of handguns in the home or in public" as in *Heller*, *McDonald*, and *Bruen*, and that, "[t]herefore, the Second Amendment's text does not cover [the challenger]'s course of conduct").

and so, for this reason alone, they are not entitled to a preliminary injunction.

## II.    The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791

In analyzing whether the challenged restrictions are "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, this Court should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states.

Several circuits reached this conclusion in analyzing state and local laws under the Second Amendment at the first, historical step of the framework that applied prior to *Bruen*.[5] *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and Fourteenth* Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)).

*Bruen* does not alter that conclusion. The Supreme Court expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second

---

[5] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

Amendment was ratified—"when defining its scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it did not need to resolve issue because public understanding "for all relevant purposes" in case before it was the same in 1791 and 1868). Moreover, *Bruen* concluded that "[s]tep one of the predominant framework [applied in the lower courts] is broadly consistent with *Heller*." *Id.* at 2127. Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

To begin with, in a case involving a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states under the U.S. Constitution until 1868; as *Bruen* observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Id.* at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the public understanding of the Bill of Rights changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. *Bruen*, 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth

Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[6] More recently, Professor Lash wrote—

---

[6] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the

as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

There is good reason for this to be the leading originalist view: insisting that the 1791 understanding should apply against the states does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See* 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Any claim that the founding era is the only relevant period is also inconsistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive places restrictions. There, the Court indicated that restrictions on guns in legislative assemblies, polling places, and courthouses found in "18th- *and 19th-century*" laws are adequate to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if it believed that the 18th century was the only relevant period. Notably, in the pages of

---

federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

the article and brief the Court cited for that proposition, all the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[7]

Finally, further confirmation that 1868 is the correct focus occurred in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?

> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8, *Bruen* (No. 20-843).

In sum, any historical inquiry this Court chooses to conduct should focus on the period around 1868, not 1791. Moreover, 1868 is not a cutoff; *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2136-37 & 2154 n.28. But it emphasized that, conversely, "a regular

---

[7] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. As Amicus Curiae at 11-17, *Bruen* (No. 20-843) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison). Furthermore, *Bruen* recognized that new societal conditions may "require a more nuanced approach" to the historical inquiry. *Id.* at 2132; *see also Heller v. District of Columbia*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that "constitutional principles … must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers"). If a modern societal condition that warrants a modern firearms regulation did not exist in the time period a court is examining, then self-evidently there will be no historical restrictions addressing the condition to be found in that period.

Here, state and local laws from the period beginning around Reconstruction—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of the provisions of New York's law challenged in this case. *See, e.g.*, State's Mem. at 15-16, 20-23, 28-36, 40-42, 44; City's Mem. at 20-22, 26, 30-32, 43.[8] And even if this Court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, and even if the Court is uncertain whether the State's earlier evidence establishes the constitutionality of the challenged provisions in this case, it should then consider this later historical evidence and recognize that this evidence "settle[s] the meaning of" the right as one that allows for firearm regulations like those at issue here.

---

[8] To be clear, the question before this Court is not whether laws precisely like New York's existed in 1868 (or 1791). *Bruen* stressed that in applying analogical reasoning, the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133. Therefore, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

**III.    This Court Should Not Dismiss the State's Historical Analogues as "Outliers"**

In preliminarily enjoining a different provision of the New York law at issue here—the prohibition on firearms in places of worship—another district court recently concluded that the historical laws the State presented in support of that restriction were "outlier enactments" and "insufficient … in the search for an American tradition." *Hardaway v. Nigrelli*, No. 1:22-cv-00771, 2022 WL 16646220, at *16 (W.D.N.Y. Nov. 3, 2022), *appeal docketed*, No. 22-2933 (2d Cir. Nov. 15, 2022). No such argument is remotely tenable in this case, given the State's and the City's robust and extensive record of historical laws. But to the extent this Court chooses to address the issue here, it should observe that a small number of laws can establish a tradition in light of *Bruen*'s discussion of the historical laws justifying sensitive places.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations—legislative assemblies, polling places, and courthouses—were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. as Amicus Curiae at 11-12, *Bruen* (No. 20-843). Under *Bruen*'s sensitive places analysis, therefore, a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[9]

---

[9] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative statement should not be given undue weight given the Supreme Court's discussion of sensitive places.

Concluding that a small number of state laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.

## IV.   Plaintiffs' Arguments Regarding Historical Restrictions Are Mistaken

This Court should conclude that Plaintiffs have failed to establish a likelihood of success on the merits for the reasons set out in the State's and City's briefs. Congruent with those arguments, we respond to two specific points in the Plaintiffs' submission.

11

*First*, Plaintiffs insist that "[n]o challenge is made at this time to those sections of the CCIA that ban possession of firearms in polling places, courts and other locations that have been enumerated by the Supreme Court as 'sensitive places.'" Plaintiffs' Mem. at 3 n.2; *see also id.* at 8, 9, 15 n.7 (similarly disclaiming any challenge to "courthouses" and "polling places"). That characterization betrays a misguidedly narrow reading of the Supreme Court's precedent on sensitive places. To begin with, Plaintiffs seem to ignore *Heller*'s endorsement of "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. at 626. Plaintiffs' assurances that they do not plan to carry firearms in locations "enumerated by the Supreme Court as 'sensitive places,'" Plaintiffs' Mem. at 3 n.2, are difficult to square with one plaintiff's declaration that he is currently carrying concealed weapons "into Grand Central," *id.* at 7—a government building that New York has designated as a sensitive location, *see* N.Y. Penal Law § 265.01-e(n). Further, *Bruen* not only repeated *Heller*'s reference to "sensitive places such as schools and government buildings," it introduced three additional examples—"*e.g.*, legislative assemblies, polling places, and courthouses." 142 S. Ct. at 2133. Self-evidently, *Heller*'s use of "such as" and *Bruen*'s use of "*e.g.*" establish that schools, government buildings, legislative assemblies, polling places, and courthouses are merely *examples* of sensitive places where guns may be prohibited, not an exhaustive list.[10] *Bruen* then said expressly that it "ha[d] no occasion to comprehensively define 'sensitive places' in this case." *Id.*; *see also id.* at 2134 (confirming that, as in *Heller*, the Court "d[id] not undertake an exhaustive historical analysis … of the full scope of the Second Amendment" (second alteration in original) (quoting *Heller*, 554 U.S. at 626)).

---

[10] *See also Heller*, 554 U.S. at 627 n.26 (explaining that the "presumptively lawful regulatory measures" it identified, which included sensitive places restrictions, were only examples; "our list does not purport to be exhaustive"); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (same).

Accordingly, sensitive places are not limited to the "courthouses" and "polling places" in Plaintiffs' disclaimer, nor are they limited to the other locations "enumerated" by the Supreme Court.

*Second*, Plaintiffs have made barely any effort to carry their heavy burden of establishing their likelihood of success on the merits. *See* Plaintiffs' Mem. at 12-17. Merely asserting that their proposed conduct falls within the Second Amendment's text and then insisting that the government "cannot meet [its] burden," *id.* at 13, cannot be enough. *See generally* Tr. of Remote Conf. at 26, *Corbett v. Hochul*, No. 1:22-cv-05867-LGS (S.D.N.Y. Nov. 29, 2022) (oral ruling, concluding that "plaintiff has failed to show a likelihood of success on the merits," where defendants, who "ultimately have the burden of proof on this issue," had "made a sufficient showing *without any contrary evidence from plaintiff* that the [challenged] training requirement is consistent with the Nation's historical tradition of firearm regulation" (emphasis added)); *cf. Oregon Firearms Fed'n v. Brown*, No. 2:22-cv-01815, 2022 WL 17454829, at *12 (D. Or. Dec. 6, 2022) ("[T]he fact that Defendants carry the burden of demonstrating the constitutionality [under the Second Amendment of an Oregon gun safety measure] … does not eliminate Plaintiffs' initial burden at the TRO stage of showing likelihood of success on the merits. A TRO is still an extraordinary remedy that this Court may only award upon Plaintiffs' clear showing of entitlement to relief.").

A court should be particularly wary to award the "extraordinary remedy" of a preliminary injunction, *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)), under an analysis, like *Bruen*'s, that involves the painstaking and time-consuming work of historical research. *Cf. Defense Distributed v. Bonta*, No. 2:22-cv-06200, 2022 WL 15524977, at *5 n.9 (C.D. Cal. Oct. 21, 2022), *adopted*, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022) ("In order to even be able to assess whether or not [Plaintiff] could

demonstrate a 'likelihood' of prevailing on the merits … there is no possibility this Court would expect Defendants to be able to present the type of historical analysis conducted in *Bruen* on 31 days' notice (or even 54 days' notice)."); Decl. of Prof. Zachary Schrag, *Angelo v. District of Columbia*, No. 1:22-cv-01878, Dkt. 18-13 (Sept. 16, 2022) (explaining historical research process and basis for conclusion (at ¶ 41) that 60 days would be inadequate even for a team of professional historians to "adequately research the questions presented in *Bruen*" in challenge to firearms prohibition on DC's metro system).

The vicissitudes and exigencies of expedited, preliminary litigation should not be allowed to thwart states' ability to enact and enforce life-saving gun safety laws.[11] *Bruen* instructs that "[c]ourts are … entitled to decide a case based on the historical record compiled by the *parties*"— plural. *See* 142 S. Ct. at 2130 n.6 (emphasis added). And historical laws are matters of public record, as accessible to plaintiffs as they are to defendants. At least at the preliminary injunction stage, plaintiffs should have to do more than assert, without explication, that examples a government has provided to establish a historical tradition are inadequate.

---

[11] *Compare, e.g., Antonyuk v. Hochul*, No. 1:22-cv-00986, 2022 WL 16744700, at *64-66 (N.D.N.Y. Nov. 7, 2022)  (considering eight park ordinances in addressing CCIA's restriction on guns in parks), *appeal docketed*, No. 22-2908 (2d Cir. Nov. 9, 2022), *with* State's Mem. at 35-36 (citing and exhibiting over twenty 19th-century laws prohibiting guns in parks, plus a compilation of National Parks restrictions), *and* State's Exhibits 12 to 78, *Christian v. Nigrelli*, No. 1:22-cv-00695, Dkt. 33-3, 33-4, 34, 35 (W.D.N.Y. Nov. 4, 2022) (in a case focused more narrowly on CCIA's parks restriction, exhibiting over sixty 19th- and early-20th-century parks prohibitions).

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: December 7, 2022

Respectfully submitted,

/s/ William J. Taylor, Jr.
Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, #4184
New York, NY 10017
wtaylor@everytown.org
(646) 324-8215
*Counsel for Amicus Curiae*
*Everytown for Gun Safety*