UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

JASON FREY, BRIANNA FREY,                    Case No. 21 Civ. 05334 (NSR)
JACK CHENG, and WILLIAM SAPPE,

                          Plaintiffs,

         -against-

NEW YORK CITY, New York, STEVEN NIGRELLI,
in his Official Capacity, KEECHANT SEWELL,
in her Official Capacity,

                          Defendants.
----------------------------------------------------------------x

# PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION

**THE BELLANTONI LAW FIRM, PLLC**
*Attorneys for Plaintiffs*
**2 Overhill Road, Suite 400**
**Scarsdale, New York 10583**
**(914) 367-0090**
**abell@bellantoni-law.com**

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ............................................................................... i

PRELIMINARY STATEMENT ....................................................................... 1

LEGAL ARGUMENT..................................................................................... 2

I. NO DEFERENCE TO THE LEGISLATURE IS WARRANTED ............................................. 3

    A. No Deference to Regarding CCIA and Related NYC Regulations ............................ 3

    B. No Deference to the non-CCIA Regulations................................................... 5

II. PLAINTIFFS HAVE STANDING TO SEEK INJUNCTIVE RELIEF ................................... 5

    A. Plaintiffs' Intent to Violate the Statutes ...................................................... 6

    B. Defendants Have Promised Enforcement Against All Licensees ............................. 9

II. THERE ARE SUFFICIENTLY SERIOUS QUESTIONS GOING TO THE MERITS TO MAKE THEM A FAIR GROUND FOR LITIGATION AND PLAINTIFFS HAVE A SUBSTANTIALLY HIGH LIKELIHOOD OF SUCCESS .................................................. 12

    A.The Statutes Cannot Pass the *Bruen* Test................................................... 12

    B. Defendants Must Prove the Regulations Are Consistent with Historical Tradition .. 13

    C. Concealed Carry ................................................................................ 14

    D. Banning Open Carry Presumptively Violates the Constitution ............................. 14

    E. This Court Is Bound By the Supreme Court's Historical Analysis.......................... 17

III. PLAINTIFFS ARE SUFFERING AND WILL CONTINUE TO SUFFER IRREPARABLE HARM ..................................................................................... 17

IV. THE EQUITIES TIP IN PLAINTIFFS' FAVOR AND THE REQUESTED RELIEF SERVES THE PUBLIC INTEREST................................................................... 20

IV. CONCLUSION........................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abed v. United States,*
   278 A.3d 114 (D.C. 2022) ................................................................................ 11

*Adderley v. State of Fla.,*
   385 U.S. 39 (1966) ................................................................................ 13, 19

*Andrews v. State,*
   50 Tenn. 165 (1871) ................................................................................ 9

*Arizona Dream Act Coalition,*
   757 F.3d 1053 (9th Cir. 2014) ................................................................ 20

*Ashcroft v. Am. C.L. Union,*
   542 U.S. 656 (2004) ................................................................................ 19

*Balintulo v. Daimler AG,*
   727 F.3d 174 (2d Cir. 2013) ................................................................ 4

*Barker v. Wingo,*
   407 U.S. 514 (1972) ................................................................................ 15

*Benton v. Maryland,*
   395 U.S. 784 (1969) ................................................................................ 2

*Bliss v. Commonwealth,*
   12 Ky. 90 (1822)................................................................................ 9

*Caetano v. Massachusetts,*
   577 U.S. 411 (2016) ................................................................................ 11

*County of Allegheny v. ACLU, Greater Pittsburgh Chapter,*
   492 U.S. 573 (1989) ................................................................................ 4

*Crawford v. Washington,*
   541 U.S. 36 (2004) ................................................................................ 2

*D.C. v. Heller,*
554 U.S. 570 (2008)................................................................................ 1, 3, 8, 9

*Douglass v. Nippon Yusen Kabushiki Kaisha,*
   46 F.4th 226 (5th Cir. 2022) ................................................................ 1, 4, 5

i

# TABLE OF AUTHORITIES (con't)

**Page(s)**

**Cases**

*Dred Scott v. Sandford*,
    19 How. 393, 15 L.Ed. 691 (1857) .................................................................... 5, 6

*Duncan v. Louisiana*,
    391 U.S. 145 (1968) ................................................................................................ 2

*Fulton v. City of Philadelphia*,
    141 S.Ct. 1868 (2021) ............................................................................................. 2

*Gamble v. United States*,
    139 S.Ct. 1960 (2019) ............................................................................................ 2

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006) .............................................................................................. 18

*Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*,
    565 U.S. 171 (2012) ................................................................................................ 2

*Hudson v. Michigan*,
    547 U.S. 586 (2006) .............................................................................................. 15

*In re Oliver*,
    333 U.S. 257 (1948) ................................................................................................ 2

*J.S.R. by & through J.S.G. v. Sessions*,
    330 F. Supp. 3d 731 (D. Conn. 2018) ................................................................... 20

*Jones v. Becerra*,
    498 F.Supp.3d 1317 (S.D.Cal 2020) ..................................................................... 11

*Klopfer v. North Carolina*,
    386 U.S. 213 (1967) ................................................................................................ 2

*Lynch v. Donnelly*,
    465 U.S. 668 (1984) ................................................................................................ 2

*Malloy v. Hogan*,
    378 U.S. 1 (1964) .................................................................................................... 5

*McDonald v. City of Chicago, Ill.*,
    561 U.S. 742 (2010) ............................................................................................ 1, 5

# TABLE OF AUTHORITIES (con't)

**Page(s)**

**Cases**

*Miranda v. Arizona,*
384 U.S. 436 (1966) ........................................................................................................ 15

*Ms. L. v. U.S Immigr. & Customs Enf't ("ICE,*
310 F. Supp. 3d 1133 (S.D. Cal. 2018) ............................................................................ 20

*Near v. Minnesota,*
283 U.S. 697 (1931) .......................................................................................................... 2

*Nevada Comm'n on Ethics v. Carrigan,*
564 U.S. 117 (2011) .......................................................................................................... 2

*NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229, AFL-CIO,*
974 F.3d 1106 (9th Cir. 2020) .......................................................................................... 4

*Nunn v. State,*
1 Ga. 243 (1846) ............................................................................................................... 9

*NYSRPA v. Bruen,*
142 S.Ct. 2111 (2022) ................................................................................................ Passim

*NYSRPA v. Cuomo,*
804 F.3d 242 (2d Cir. 2015) ........................................................................................... 19

*Powell v. Alabama,*
287 U.S. 45 (1932) ............................................................................................................ 2

*Ramos v. Louisiana,*
140 S.Ct. 1390 (2020) .................................................................................................. 2, 4

*Reynolds v. United States,*
98 U.S. 145 (1878) ............................................................................................................ 2

*Rhode Island v. Massachusetts,*
37 U.S. (12 Pet.) 657 (1838) ............................................................................................ 1

*South Carolina v. United States,*
199 U.S. 437 (1905) .......................................................................................................... 1

*Sprint Communications Co. v. APCC Servs., Inc.,*
554 U.S. 269 (2008) .......................................................................................................... 3

# TABLE OF AUTHORITIES (con't)

**Page(s)**

**Cases**

*State v. Reid*,
   1 Ala. 612 (1840) ...................................................................................................... 9

*Timbs v. Indiana*,
   586 U.S. ——, 139 S.Ct. 682 (2019) ...................................................................... 4

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ........................................................................................... 20

*United States v. Jackson*,
   390 U.S. 570 (1968) ............................................................................................... 16

*Virginia v. Moore*,
   553 U.S. 164 (2008) ................................................................................................. 2

*Walters v. Kemp*,
   2020 WL 9073550 (N.D. Ga. May 5, 2020) ........................................................... 11

*Washington v. Texas*,
   388 U.S. 14 (1967) ................................................................................................... 2

*Wilson v. Arkansas*,
   514 U.S. 927 (1995) ................................................................................................. 2

*Wyoming v. Houghton*,
   526 U.S. 295 (1999) ................................................................................................. 2

**Other Authorities**

D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine,
   13 Charleston L. Rev. 205 (2018) ..................................................................... 14, 15

# I. *BRUEN* AND SUPREME COURT JURISPRUDENCE REQUIRE THE REJECTION OF "POST-ENACTMENT" (1791) HISTORY

## A. Supreme Court Jurisprudence Looks to the Founding Era, Not 1868

Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, at 2136 (emphasis supplied) citing, *D.C. v. Heller*, 554 U.S. 570, 634–635 (2008); see also, *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 245 (5th Cir. 2022) (Ho, J. concurring) ("Bill of Rights protections like the Second Amendment must be enforced against the States under the Fourteenth Amendment according to the *same standards* that protect those personal rights against federal encroachment.") quoting *McDonald*, 561 U.S. at 765 (cleaned up) (emphasis supplied); *Bruen*, 142 S.Ct. 2111 (same).

"Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the Founding Period, not 1868. The conception that the Constitution has a fixed, original meaning goes far back in constitutional jurisprudence.

> When interpreting the Free Speech and Press Clauses, we must be guided by their original meaning, for "[t]he Constitution is a written instrument. *As such its meaning does not alter. That which it meant when adopted, it means now*." *South Carolina v. United States*, 199 U.S. 437, 448 (1905). We have long recognized that the meaning of the Constitution "must necessarily depend on the words of the constitution [and] the *meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions* ... in the several states." *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 721 (1838)." [1]

---

[1] Smith, Mark W., "Not All History Is Created Equal," October 1, 2022 [Bellantoni Declaration at Ex. 1 at p. 9 (emphasis supplied). Professor Mark W. Smith is a Presidential Scholar and a Senior Fellow in Law and Public Policy at The King's College, a Visiting Fellow in Pharmaceutical Public Policy and Law in the Department of Pharmacology at the University of Oxford, an attorney, and a former adjunct professor of law at the University of Kansas School of Law, where he researched and taught a course on constitutional law, the Second Amendment, and related topics. See, additional biographical information at Exhibit 1.

Recognizing that "the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right *when the Bill of Rights was adopted in 1791*," *Bruen* pointed to *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment); and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (First Amendment). *Bruen*, at 2137–38 (emphasis added). Justice Thomas may have acknowledged an "ongoing scholarly debate" concerning 1868, but the *Bruen* Court adhered to Supreme Court jurisprudence, which "looks to the Founding era as the period of sole or primary relevance." Bellantoni Ex. 1 at 11-15.

Professor Smith goes on to discuss just a few of the "numerous cases involving all of the amendments in the Bill of Rights that have been incorporated" in which the Founding Period was the temporal focal point, *not* when the amendments were incorporated into the Fourteenth Amendment in 1868. Bellantoni Ex. 1 at 17-30 discussing First Amendment: *Near v. Minnesota*, 283 U.S. 697 (1931)*, Reynolds v. United States*, 98 U.S. 145 (1878), *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171 (2012), *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021), *Lynch v. Donnelly*, 465 U.S. 668 (1984); Fourth Amendment: *Wyoming v. Houghton*, 526 U.S. 295 (1999), *Wilson v. Arkansas*, 514 U.S. 927 (1995): Fifth Amendment: *Benton v. Maryland*, 395 U.S. 784 (1969), *Gamble v. United States*, 139 S.Ct. 1960 (2019); Sixth Amendment: *Ramos v. Louisiana*,140 S.Ct. 1390 (2020), *Powell v. Alabama*, 287 U.S. 45 (1932), *Klopfer v. North Carolina*, 386 U.S. 213 (1967), *In re Oliver*, 333 U.S. 257 (1948), *Duncan v. Louisiana*, 391 U.S. 145 (1968), *Washington v. Texas*, 388 U.S. 14 (1967); Eighth Amendment: *Timbs v. Indiana*, supra.

"[I]n the discourse that led to the Fourteenth Amendment, the right to keep and bear arms was represented as its text dictates, consistent with the same meaning as at the Founding. The focus

of the discourse was the need to ensure that newly freed slaves had the same right to possess firearms in their homes and to carry them on the person as citizens in general and to prevent them from being disarmed by the states. Second Amendment deprivations were debated in connection with bills leading to the enactment of the Freedmen's Bureau Act and the Civil Rights Act of 1866." Bellantoni Ex. 1 at 42-45, discussing the debates leading to the Freedmen's Bureau Act and the Civil Rights Act of 1866.

### B.  No Supreme Court Cases Look to 1868 to Interpret the Bill of Rights

Professor Smith "has not found, and litigants in post-*Bruen* litigation have so far not pointed to, a single Supreme Court case in which in which the Supreme Court has looked to the time of ratification of the Fourteenth Amendment as the principal period for determining the scope or meaning of a provision of the Bill of Rights." Bellantoni Ex. 1 at p. 27.

### C.  Defendants, Their Historian, and Amicus Everytown[2] Fail to Identify <u>Any</u> Supreme Court Case That Looks to 1868 to Interpret the Bill of Rights

Much ink is spilled over Defendants' 1868 theory, a time period the *Bruen* Court found unreliable for determining the original meaning of the Bill of Rights.[3] Neither Defendants, the State's historian, nor amicus Everytown[4], identify a ***single*** Supreme Court case that looked to 1868

---

[2] Everytown represents that no party's counsel authored their brief [n. 1] but Everytown is no 'neutral advisor' to the Court, as an amicus must be. The CCIA was created by Gov. Hochul's administration in partnership with her "partnership" with New York City, Police Commissioner Sewell and "advocates" like the Gifford Law Center and Senior Counsel for "Everytown for Gun Safety" with whom  she admitted she has "been joined at the hip" who were "helpful in the whole process of ***writing legislation*** (the CCIA) that we believe is responsive to the Supreme Court decision [in *Bruen*]". (2:17). Hochul worked with them for a year to be "ready for it"; they "fought back" against a ruling on the U.S. Constitution from our Nation's highest Court -  using the same 'public interest', 'means-end', 'collective rights' arguments (7:00) that have been resoundingly rejected by the Supreme Court since its decision in *Heller*. https://www.youtube.com/watch?v=gC1L2rrztQs

[3] "As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources… *Heller*'s interest in mid- to late-19th-century commentary was secondary. *Bruen*, at 2137 quoting, *Heller*, at 614; cf. *Sprint Communications Co.*, 554 U.S. at 312 (ROBERTS, C. J., dissenting) ("The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]").

[4] Turning a blind eye to Supreme Court jurisprudence, Everytown cites four circuit cases to support their 1868 narrative: two were abrogated by *Bruen* (*Gould v. Morgan*, and *United States v. Greeno*). The remaining two (*Ezell v.*

as the principal period for determining the scope or meaning of a provision of the Bill of Rights. Supreme Court jurisprudence does not support Defendants' narrative. The Bill of Rights does not have one meaning at its ratification but another, different meaning in 1868. Notwithstanding the 1868 theory touted by Everytown and two other 'scholars', "a radical departure from the Supreme Court's incorporation jurisprudence,"[5] this Court is constrained to follow *Bruen* and adhere to Supreme Court jurisprudence for interpreting the Bill of Rights.[6] The 1868 theory "candidly contradicts and seeks to overturn, at least in principle and methodology, every case in which history has been used to determine the meaning of an incorporated provision of the Bill of Rights."[7]

"But the Supreme Court has held on numerous occasions that, whether we define the right as it existed in 1791 or in 1868, the right is the same against the federal government and the states alike. *Douglass v. Nippon*, at 245. "[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the *same scope* as against the Federal Government." *Ibid.* (emphasis supplied) quoting *Bruen*, at 2137 citing, *Ramos v. Louisiana*, 590 U.S. ——, ——, 140 S.Ct. 1390 (2020) ("This Court has long explained ... that incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government.") (emphasis added); *Timbs v. Indiana*, 586 U.S. ——, ——, 139 S.Ct. 682, 203 L.Ed.2d 11 (2019) ("[I]f a Bill of Rights protection is incorporated, there is *no daylight* between the federal and state conduct it prohibits

---

*City of Chicago* and *Drummond v. Robinson Twp.*) do not support their position, nor do they overrule *Bruen* or alter Supreme Court jurisprudence.

[5] Bellantoni Ex. 1 at 46.

[6] "Lower court judges don't have license to adopt a cramped reading of a case in order to functionally overrule it." *Douglass*, at 246, quoting, *NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229, AFL-CIO*, 974 F.3d 1106, 1116 (9th Cir. 2020). As Justice Kennedy has stated, courts are bound to adhere not only to results of cases, but also to their explications of the governing rules of law. *County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 668 (1989) (Kennedy, J., dissenting); see also *Balintulo v. Daimler AG*, 727 F.3d 174, 190 (2d Cir. 2013) (Lower courts are bound and are without authority to "reinterpret" the Supreme Court's binding precedent).

[7] Bellantoni Ex. 1 at 46.

or requires.") (emphasis supplied); *Malloy v. Hogan*, 378 U.S. 1, 10–11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) ("The Court thus has rejected the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights.") (quotations omitted). *Douglass*, at 245.

"Even before the Civil War commenced in 1861, this Court indirectly affirmed the importance of the right to keep and bear arms in public. Writing for the Court in *Dred Scott v. Sandford*, 19 How. 393, 15 L.Ed. 691 (1857), Chief Justice Taney offered what he thought was a parade of horribles that would result from recognizing that free blacks were citizens of the United States. If blacks were citizens, Taney fretted, they would be entitled to the privileges and immunities of citizens, including the right 'to keep and carry arms *wherever they went*.' *Id.* at 417 (emphasis added). Thus, even Chief Justice Taney recognized (albeit unenthusiastically in the case of blacks) that public carry was a component of the right to keep and bear arms—a right free blacks were often denied in antebellum America." *Bruen*, at 2150–51.

### D.  Post-Ratification Regulations Must Be Summarily Rejected

The Supreme Court has "[n]ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities, generally very shortly after the Founding, remained consistent with the public understanding in 1791."[8] *McDonald* made clear that the Supreme Court "decades ago abandoned the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights." *McDonald*, at 785–86. Incorporated Bill of Rights guarantees are "enforced against the States under the

---

[8] Bellantoni Ex. 1 at 3.

Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Id.,* at 765 (internal quotation marks omitted). Bellantoni Ex. 1 at 7-8.

"But to the extent later history contradicts what the text says, the text controls. *Bruen,* at 2137. Where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision. *Bruen,* at 2137 (citations omitted).

> **"Thus, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text."** *Bruen,* at 2137 (citation omitted) (emphasis added).

## II. THE PLAIN TEXT – 'BEARING ARMS' - COVERS ALL PUBLIC CARRY

### A. The Plain Text - "Bear Arms" - Presumptively Protects All Public Carry

The plain text does not identify "concealed carry" or "open carry" – it need not. *Heller* and *Bruen* establish that "bear" encompasses open and concealed carry.

*Bruen* was not the "first time" the Supreme Court held that the Second Amendment protects the individual right to carry a handgun for self-defense outside the home. [State MOL at p. 2].  "As we explained in *Heller*, the textual elements of the Second Amendment's operative clause – the right of the people to keep and bear Arms, shall not be infringed - guarantees the individual right to possess and carry weapons in case of confrontation." *Bruen,* at 2117, 2134 (citation omitted).

Defendants' claim that open carry is not protected by the plain text of the Second Amendment is so frivolous as to be sanctionable.[9] "*Heller* confirmed that the right to 'bear arms' refers to the right to 'wear, bear, or carry ... **upon the person or in the clothing** or in a pocket, for

---

[9] "We therefore turn to whether the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense. *We have little difficulty concluding that it does.* Respondents [the same NY State Attorney General's Office] do not dispute this. See Brief for Respondents 19. Nor could they." *Bruen,* at 2134. (emphasis added).

the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person….This definition of "bear" naturally encompasses public carry." *Bruen*, at 2134 (emphasis added).  Carrying a weapon "upon the person" is open carry; carrying "in the clothing or in a pocket" is concealed carry. "At the time of the founding, ***as now***, to "bear" meant to "carry." *Heller*, at 584. Full stop.

The text need not distinguish between the 2 because the manner of carry was of no import until well past the Founding Era. Indeed, the *Bruen* Court "had little difficulty concluding" that "the plain text of the Second Amendment protected [the plaintiffs'] proposed course of conduct - carrying handguns publicly for self-defense." *Bruen*, at 2134. Like the plaintiffs in *Bruen*, where the Supreme Court found that the "Second Amendment's plain text thus ***presumptively guarantees*** petitioners Koch and Nash a right to 'bear' arms [concealed] in public for self-defense [*Bruen*, at 2135 (emphasis added)], the plain text also ***presumptively guarantees*** Plaintiffs' right to 'bear' arms [open and holstered], notwithstanding Defendants' inability to grasp the plain text of the Amendment.

### B.  Manner of Public Carry Was Not Regulated in 1791[10]

Public carry was not regulated until well past 1791. *Bruen*, at 2120. Even the State's historian acknowledges that the regulation of public carry began with concealed carry and did not occur until the 19th Century. Rivas Dec. at ¶¶7-8.[11]

---

[10] The "manner of carry" regulated throughout history – from England through ratification and into the 1800s - was carrying weapons (of any type) to terrorize the public and disrupt public order. Into the Antebellum period, people "who sought to carry firearms publicly and peaceably" "were generally free to do so." *Bruen*, at 2146. Even those accused of breaching the peace were not banned from carrying weapons, simply required in some jurisdictions to post a bond beforehand. *Bruen*, at 2148.

[11] The *Bruen* Court discussed Antebellum-era firearm regulations (1836-1860) pressed by the State, but it did not rely on them to interpret the scope of the Second Amendment. Defendants "misunderstand" *Bruen* and *Heller*, just as the Court concluded they misunderstood English and colonial statutes. *Bruen*, at 2143.

"[T]here is little evidence of an early American practice of regulating public carry by the general public." *Bruen*, at 2142. It was not until "the early to mid-19th century, [that] some States began enacting laws that proscribed the ***concealed carry*** of pistols and other small weapons. As we recognized in *Heller*, 'the majority of the 19th-century courts to consider the question held that [these] prohibitions on carrying ***concealed weapons*** were lawful under the Second Amendment or state analogues.' 554 U.S. at 626, 128 S.Ct. 2783." *Bruen*, at 2145-46 (emphasis added).

The indisputable conclusion: open carry has always been a historical traditional modality of carrying weapons – from long swords to long guns to holstered handguns. But even the post-ratification regulations on concealed carry conflict with the plain text of the Second Amendment; 'bearing' arms swathes both modalities of carrying weapons with the protections of the Second Amendment, consistent with *Bruen*'s holding that the plaintiffs' conduct (concealed carry) was ***presumptively protected*** by the Second and Fourteenth Amendments.[12]

Plaintiffs' individual conduct – bearing arms – is covered by the plain text.

## III. SUBSTANTIALLY HIGH LIKELIHOOD OF SUCCESS ON THE MERITS

### A.  No Founding-Era Tradition of Banning Open Carry

Plaintiffs challenge New York State's open carry ban through Defendants' enforcement of criminal statutes under Penal Laws 265.00, *et seq.* and 400.00(15). Plaintiffs' conduct – bearing arms - is presumptively protected by the plain text of the Second Amendment. "The Second Amendment's plain text thus presumptively guarantees [Plaintiffs'] right to 'bear' arms in public for self-defense." *Bruen*, at 2135.

---

[12] The City's authority - ADAM WINKLER, GUN FIGHT 164 (W.W. Norton & Company, Inc. eds.) (2011) provides support for the fact that "the most common gun laws in the ***1880s*** [post-ratification] were those that banned the possession of concealed firearms in public." [City MOL at 21].

*Bruen*, a concealed carry case, held that the plaintiffs had a "presumptively protected" right to carry in public. The Supreme Court made no distinction between open and concealed carry, and none existed in 1791.  Public carry regulations did not exist until the Antebellum era, which is outside of the relevant historical window. *Bruen*, at 2145.[13] The first states to restrict the ability to bear arms were Kentucky and Alabama[14], which banned *concealed carry*. *Bliss v. Commonwealth*, 12 Ky. 90 (1822) overturned the ban, restoring *all* modes of carry; *State v. Reid*, Ala. 612, 616 (1840) upheld the ban of concealed carry because open carry was consistent with "the safety of the people and the advancement of public morals."[15] That there is a distinction between the mode of carry, revealed by some jurisdictional disdain for concealed carry, confirms that open carry was an unregulated Right.

Defendants failed the *Bruen* test.[16] No evidence of a historical tradition of banning open carry exists, and none has been identified by Defendants.[17] As such, New York's criminal penalties

[13] Justice Sotomayor's historical account spanning the British Parliament through colonial times and post-civil war confirms societal bans on the carrying of *concealed* arms. *https://www.supremecourt.gov/oral_arguments/ argument_transcripts/2021/20-843_7m5e.pdf*. The Bill of Rights came just after 'ordinary people' fought the Revolutionary War with rifles, muskets, and close-range weapons like 'holster pistols', swords, and sabers. https://www.americanrevolutioninstitute.org/exhibition/a-revolution-in-arms/

[14] Kentucky and Alabama are now constitutional carry states.

[15] Amicus Brief of Professors of Second Amendment Law, *NYSRPA v. Bruen*. https://www.supremecourt.gov/ DocketPDF/20/20-843/183844/20210713180558628_20-843-Law%20Professors-Amicus%20Brief.pdf

[16] "We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Bruen*, at 2129-30 (citation omitted).

[17] Even Antebellum-era statutes reveal that open carry was preserved and preferred over the concealment of weapons. *Bruen*, at 2147 (2022); citing, *Andrews v. State*, 50 Tenn. 165, 187 (1871) (1870 Tenn. Acts ch. 13, § 1, p. 28 (permitting the public carry of larger, military-style pistols because any categorical prohibition on their carry would "violat[e] the constitutional right to keep arms."; see also *Heller*, 554 U.S. at 629, 128 S.Ct. 2783 (discussing *Andrews*); *Nunn v. State*, 1 Ga. 243 (1846) (upholding ban on "carrying certain weapons secretly" but prohibiting "bearing arms openly" was "in conflict with the Constitutio[n] and void."); *State v. Reid*, 1 Ala. 612 (1840) (holding laws "suppress[ing] the evil practice of carrying weapons secretly does not, either directly or indirectly, tend to devest the citizen of the right to bear arms in defense of himself and the state"); but see, *Bliss v. Com.*, 12 Ky. 90, 91 (1822) (striking law banning concealed carry because the "right of the citizens to bear arms in defence of themselves and the state, must be preserved entire.").

for open carry are presumptively *inconsistent* with the Second and Fourteenth Amendments. Plaintiffs' likelihood of success on the merits is substantially high.

### B.  No Founding-Era Tradition of Intrastate Geographical Restrictions (§ 400.00(6))

Defendants failed to identify a Founding Era historical tradition to justify the enforcement of its intrastate geographical restriction - Penal Law section 400.00(6) - which requires a separate NYS handgun license to lawfully carry a handgun in the City. Defendants rely exclusively on post-ratification discretionary licensing regulations from 1881 to 1910, which must be rejected.

Of the regulations cited by the City, only two fall within the Founding Era timeline: Pennsylvania (1750), which required a license for fireworks, setting chimneys on fire to clean them, and firing a gun or other firearm [City Ex. 3, p. 2] and Tennessee (1821) prohibited target shooting in public within 200 yards of a public road and levied a nominal $10 fine. [City Ex. 3, p. 6].   Even regulations during the mid-late 1800s proscribe the "unlawfully shooting" at others in the public square (VA), "improper use" of firearms and "disturbing the peace" (AZ), "shooting guns" "wantonly or in sport" (NC) [City Ex. 3] – not peaceable carry for self-defense as protected by the Second Amendment.

Defendants' modern day historical record may "abound" but under *Bruen* the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791, not the mid-late 1800s and beyond. *Bruen*, at 2137-38. The regulations relied upon by Defendants contradict the text ("the right to keep and bear Arms *shall not be infringed*") and "to the extent later history contradicts what the text says, the text controls." *Bruen*, at 2137.[18] Plaintiffs' likelihood of success challenging section 400.00(6) is substantially high.

---

[18] The local regulations cited by the State appear to require a license to carry but nevertheless ban *concealed* carry.

### C. 'Alternative Channels' Not Part of the *Bruen* Test[19]

At every turn, Defendants advance theories inconsistent with *Bruen*. No part of *Bruen*, *Heller, McDonald*, or *Caetano* provide an exemption to the plain text of the Second Amendment so long as there are "alternative channels." [Def. MOL at p. 17]. The State's made-up test must be rejected. nor does the State cite any support. [Def. MOL at p. 17-18].[20] The State's made up 'alternative means' test must be rejected. The two cases cited by the State, *Jones v. Becerra,* 498 F.Supp.3d 1317 (S.D.Cal 2020) and *Walters v. Kemp*, 2020 WL 9073550 (N.D. Ga. May 5, 2020) are not binding and pre-date *Bruen* and the test to be applied to Second Amendment challenges.

### D. No Founding-Era Tradition Banning Weapons on Private Property (§ 265.01-d)

Defendants identify no Founding-Era tradition of banning the possession of firearms on private property for self-defense.[21] Under the State's theory, Plaintiffs would be required to justify the government's regulation for them – an improper shifting of the burdens under the *Bruen* test. The regulations were aimed at punishing ***poaching and hunting*** on other people's land – ***not*** the protected right of ***bearing arms for self-defense***.

Maryland's 1715 law was not a blanket restriction, but only declared one cannot "shoot, kill or hunt, or be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave, ***having been once before warned***…" [State Ex. H, p. 4]. Pennsylvania forbade, "***carrying guns and presuming to hunt*** on other people's lands [State Ex. I at p. 4] or "***carry any gun, or hunt*** in the woods or uninclosed [sic] lands, without ***license or***

---

[19] The State's reference to the only "appellate court" to have addressed the issue of open carry, *Abed v. United States*, 278 A.3d 114 (D.C. 2022) is not from a circuit court.

[20] Buying into the State's logic, New York could ban all firearms and restrict the masses to the use of bladed weapons as an 'alternatives', but the Second Amendment protects all "Arms" - knives, electric stun guns, firearms, long guns – all weapons in common use. *Bruen*, 2132 ("Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.") (emphasis added) citing, *Caetano v. Massachusetts*, 577 U.S. 411, 411–412 (2016) (per curiam) (stun guns).

[21] The State's reliance on cases that do not incorporate the *Bruen* test into a Second Amendment analysis must be disregarded.

*permission* obtained from the owner or owners of such lands…" *Id.* at p. 5. State Exhibit J (PA) is specifically titled, "Hunting"; Exhibit K (New Jersey) also punished persons "***carrying of guns and presuming to hunt*** on other peoples [sic] land" without permission of the landowner.[22] [State Ex. K at p. 4]. Exhibit L (New Jersey) (same); and Exhibit M (New York) punished people who "***hunt*** with Fire-Arms" on private land "***without a license*** in writing first obtained" from the landowner. Similarly, regulations punishing terrorizing behavior with firearms do not also prevent peaceable carry for self-defense. [State Ex. N (Texas) "persons disguised and armed with deadly weapons", discharging firearms in city limits punished as disturbing the peace.]. Trespassing on another's land to hunt (poach) without permission is not the protected right to bear arms for self-defense protected by the Second Amendment.[23]

The City fares no better. A property owner's 'fundamental right' to exclude others[24] does not translate into governmental authority to presumptively prohibit constitutionally protected conduct on behalf of a property owner. Criminal trespass laws are consistent with prohibiting offenses against the public peace, which peaceable carry is not. [City MOL at 39-41]. An individual has no right to enter or remain on another's private property; but if lawfully thereon, the individual right to self-defense travels with him.[25]

---

[22] In New Jersey it was also illegal or for "an Indian, Negro or Mulatto slave" to…carry a gun or hunt "without license from his ***Master*** [State Ex. K at p. 5] – this is a tradition New York desires to resurrect?

[23] Ex. Q (DE, 1874); Ex. R (Ill, 1871); Ex. S (Ill. 1902).

[24] City MOL at 40. The City's reliance on similar state laws enacted in 2022 fails for lack of temporal proximity.

[25] Regarding the statutes from the early 1700s cited by the City [City Ex. 24] that imposed criminal penalties for carrying firearms on private land without permission: (i) Maryland required the property owner to have previously warned against such trespass (1715); (ii) a Pennsylvania law aimed at illegal poaching, which proscribed carrying a gun or hunting on a plantation, but exempted "free native Indians carrying guns, hunting, killing…" (1721). The remaining state statutes, which fall between 1741 and 1893 and outside of the Founding Era, likewise seek to prohibit poaching (hunting without permission); the act of carrying a firearm on such open land being presumptive evidence of poaching. Again, not a regulation banning the possession of firearms for the purpose of self-defense.

### E.  Sensitive Locations Ban (Penal Law 265.01-e)

No Founding-Era tradition is identified by Defendants to support banning possession of firearms for self-protection in the various locations challenged herein. Rather, the State advances a made-up test under which Plaintiffs must show that "a location designated as 'sensitive' in fact falls within the Second Amendment's ambit." [State MOL at p. 25]. No cite is provided and nowhere in *Bruen*, *Heller, McDonald,* or *Caetano* does this requirement exist.

The *Bruen* test is clear. Once Plaintiffs demonstrate their conduct (bearing arms) is covered by the plain text, which it is [see, *Heller*, *McDonald, Caetano,* and *Bruen*], their burden is satisfied. "*The government* must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. ***Only then*** may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, at 2130 (emphasis added). The *Bruen* test is not an "empty incantation" by Plaintiffs[26] but an edict this Court is required to follow.

### i. Government (Public) Property

Post-ratification statutes and caselaw[27] contrary to the plain text of the Amendment must be rejected. *Bruen*, at 2137. The State fails to cite ***any*** regulations in support of its theory that firearms can be banned from any property owned by the government. [State MOL at 26-28].

---

[26] State MOL at pp. 25-28.

[27] Time, place, and manner restrictions for First Amendment claims as set forth *Consol. Edison Co. of New York* employ a different test than *Bruen* for Second Amendment challenges. As much as it hates the idea of being confined to the *Bruen* test, the State must point to a Founding Era analogue to demonstrate a historical tradition for its regulations to survive. Nor does preventing disruptive trespassing on government property equate to a justification for banning peaceable carry for self-defense on government property as in *Adderley v. State of Fla.*, 385 U.S. 39, 47 (1966), which was also not decided in the Founding Era. Public property is just that – *public*.

### ii. Places Critical to Other Constitutional Rights and Public Functions, Vulnerable Populations, Large Groups, Confined Spaces Where Self-Defense is 'Impracticable', Fairs, Movies, Trains, Amusement Parks, Times Square, and Parks

Every statute offered by the State to support banning the peaceable carry of firearms for self-defense in the unilaterally declared 'sensitive places' was enacted in the late 1800's[28] and, therefore, not a historical tradition, nor has the State identified a Founding Era historical analogue. [State MOL at 28-33 and Ex. T - Z; Ex. CC; Ex. FF-BBB (parks) ].[29] The Statute of Northampton[30] banned terrorizing and breaching the peace, "but it was no obstacle to public carry for self-defense in the decades leading to the founding." *Bruen*, at 2142.[31]  Like the State, New York City submits no Founding Era analogue, because there is none.

*Bruen* relied on D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018)[32], which reveals a "short" list of the only "sensitive places" from the colonial period and the Founding Era because "carrying firearms when going anywhere was normal in many parts of the United States, as St. George Tucker noted. *Id.* The "United States Congress had no rules against legislative armament, and through the mid-nineteenth century, it was common for Congressmen to be armed." *Id.*[33] But, not until the Reconstruction Period of the 19th Century (post-Civil War 1865-1877) did states enacted laws against guns in polling places, misconduct with arms, and armed trespass; for most of the century, however, "there were ***few laws***

---

[28] Ex. AA, BB (England).

[29] The State's expert also recognizes public carry restrictions were limited to preventing 'terrorizing' the public, like the Statute of Northampton, not peaceable carry. Rivas Dec. at ¶¶ 5-7. Rivas' citations to American travel restrictions fall in the late 1800s into the 1900s – far outside of the Founding Era.

[30] City MOL at p. 25-26.

[31] See also, [31] Amicus Brief of Professors of Second Amendment Law, *NYSRPA v. Bruen*. https://www.supremecourt.gov/DocketPDF/20/20-843/183844/20210713180558628_20-843-Law%20Professors-Amicus%20Brief.pdf

[32] *Bruen*, at 2133.

[33] Also noting the ban on hunting on private land without permission and carrying arms with the purpose of terrorizing people.

about arms at schools, and none of them attempted to make schools 'gun-free.' In the latter part of

the century, several former slave states enacted broad laws against guns at schools and most other

public assemblies, and even in private social gatherings." *Id.*

     Defendants and their amicus press the same public safety, interest balancing justifications

that have been *thrice rejected* by the Supreme Court. See, *Heller,* at 634 (rejecting the dissent's

interest balancing test seeking to prevent the "problem" of "handgun violence" in "urban area");

*McDonald*, at 785-86, and 783 (comparing the exclusionary rule "which generates 'substantial

social costs" and "sometimes include setting the guilty free and the dangerous at large) citing,

*Hudson v. Michigan*, 547 U.S. 586, 591 (2006); *Barker v. Wingo*, 407 U.S. 514, 522 (1972)

(dismissal for speedy trial violation); *Miranda v. Arizona*, 384 U.S. 436, 517 (1966) (Harlan, J.,

dissenting) (White, J., dissenting) (the Court's rule "will return a killer, a rapist or other criminal

to the streets ... to repeat his crime").

     As in *McDonald*, Defendants "cite no case in which [the Supreme Court has] refrained

from holding that a provision of the Bill of Rights is binding on the States on the ground that the

right at issue has disputed public safety implications." *McDonald*, at 783; and *Bruen*, at 2126-27,

and 2160-61 ("Like that dissent in *Heller*, the real thrust of today's dissent is that guns are bad and

that States and local jurisdictions should be free to restrict them essentially as they see fit. That

argument was rejected in *Heller*, and while the dissent protests that it is not rearguing *Heller*, it

proceeds to do just that." (footnote omitted)].

*Heller* and *Bruen* addressed "the same alleged societal problem" - "handgun violence primarily in urban areas"[34] and ***explicitly rejected*** public safety arguments.[35] *Bruen*, at 2131–32 (cleaned up). The State's regulations not only prevent the ability to protect oneself at that particular location; they force disarmament, creating vulnerability while traveling to and from each location, greatly expanding the reach of the constitutional harm.

And banning the ability to peaceably carry a firearm for self-defense because the location is one where other rights, like the First Amendment are or may be exercise, improperly pits one constitutional right against another. [City MOL at 24-31; State MOL at 43-44]. See, e.g., *United States v. Jackson*, 390 U.S. 570, 581 (1968) (If a law has no other purpose than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it is patently unconstitutional.). Section 265.01-e forces the choice. Individuals do not abandon the right to be armed for self-defense because they live in an urban area, go to the movies, visit a restaurant where alcohol is served[36], take the train, visit the park, or take transportation that 'vulnerable persons' also utilize.[37]

---

[34] In *Bruen*, the State leaned on 'population density' to justify its firearm regulations; Justice Thomas sought the State's position on how small a population size needs to be for firearm restrictions to no longer apply. Of course, the State could not come up with a number. The Court obviously rejected the State's philosophy that the individual right to self-defense diminishes as population density increases [*Bruen* oral argument transcript at p. 57-62. https://www.supremecourt.gov/oral_arguments/argument_transcripts/2021/20-843_7m5e.pdf], which mandates the same result here.

[35] There is no location where the individual right to defend one's life is "impracticable." [State MOL at p. 30]. The State's bizarre and imaginary scenario where firearms spontaneously 'go off' because people "jostle each other" and the illusion that carrying in a confined space "decreases the chance of successful, tactical armed self-defense" – both unsupported by even one example – are delusional and wildly speculative. The State's "going-fetal-compliance with evil" approach is entirely inconsistent with the preexisting right to be "armed in case of confrontation" for self-defense. *Bruen*, at 2177 citing, *Heller*, at 592.

[36] State Ex. DD (1867), EE (1889) prohibited possession by intoxicated persons, not a particular location.

[37] A private company prohibiting weapons on their transportation is *not* analogous to government conduct, which implicates the Constitution.

### III.  PLAINTIFFS HAVE STANDING

#### A.  A Judicial Declaration is Required Before Rejecting the Application of Penal Law Section 265.00, *et seq.* to Open Carry

The ambiguity in the law, and risk of arrest, calls for a judicial declaration before finding that Plaintiffs do not have standing to challenge Penal Law 265.00, *et seq.* [Bellantoni Ex. 2].

#### B.  400.00(15) is A Criminal Penalty, Not Merely 'Licensing Statute'

To be clear, *Bruen* did not find licensing "Manifestly Constitutional" [State MOL at p. 14], particularly in New York. The Court correctly held that "New York's outlier 'may-issue' licensing regime for carrying handguns for self-defense violates the Second Amendment" and approved "the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so." *Bruen*, at 2161-62.  *Bruen* also cautioned, "the 6 States including New York potentially affected by today's decision may continue to require licenses for carrying handguns for self-defense *so long as those States employ objective licensing requirements* like those used by the 43 shall-issue States." *Bruen*, at 2161-62.  Yet, New York's concealed carry scheme remains subjective and discretionary. See, 400.00(1); 400.00(1)(b); 400.00(1)(o).

The State also mischaracterizes section 400.00(15) - a criminal statute, not a licensing provision. [State MOL at 14-15]. Whether punished under 265 or 400.00(15), presumptively protected conduct is unconstitutionally subject to criminal penalties.

### IV.  PLAINTIFFS ARE SUFFERING ACTUAL AND IRREPARABLE HARM

Having a "license of some sort" does not satisfy the *Bruen* test. [State MOL at p. 46].[38] Plaintiffs' harm exists now and is not speculative or imagined, and they will continue to suffer irreparable harm without the requested relief.

---

[38] As of June 2020, only 1.27% of the of the adult population in New York State was issued an unrestricted concealed carry license. https://www.supremecourt.gov/DocketPDF/20/20-843/167032/20210122172033496_Brief% 20of%20LE%20and%20firearms%20rights%20groups%20FINAL.pdf

Mr. Sappe cannot protect himself in New York City because of the restrictions of section 400.00(6), (15) and he cannot open carry for self-defense anywhere in New York State. The Freys' concealed carry licenses[39] prevent them from carrying a handgun for self-defense because they are restricted to the target range and sportsman activities, are invalid in New York City[40], and do not authorize open carry. Ordinary people doing ordinary activities, like Plaintiffs, still cannot carry a handgun for self-defense in New York, which is the "central component of the Second Amendment right" [*Bruen*, at 2133; *McDonald*, at 767; *Heller*, at 599].[41]

Plaintiffs have not delayed in seeking a remedy; they sought a remedy upon filing their complaint and again after *Bruen* was decided. Regarding section 400.00(6), it would have been futile in this circuit to challenge the restriction; *every* challenge to handgun regulations in this Circuit failed under the intermediate scrutiny test. New York's CCIA provisions did not take effect until September 1; a pre-enactment pre-enforcement challenge would have been futile, and it was hoped that the *Antonyuk* case in NDNY would have obviated the need for additional cases to be filed. Plaintiffs' brief delay in filing their second motion for an injunction was not unreasonable.

## V. BALANCE OF EQUITIES AND PUBLIC INTEREST

The *Bruen* test is to be applied here, as it would be applied at trial. See, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (The "burdens at the preliminary injunction stage track the burdens at trial."). Thus, Plaintiffs having demonstrated that their conduct is protected by the plain text of the Second Amendment, they "must be deemed likely to prevail," unless Defendants demonstrate that their statutes are consistent with the Founding Era

---

[39] Concealed carry remains a mere 'privilege' under New York's discretionary 'may issue' licensing scheme. See, § 400.00(1), (1)(b), (1)(o).

[40] Penal Law § 400.00(6).

[41] The State does not challenge Plaintiffs' Declarations, which conclusively bear out an imminent risk of enforcement. The State argues only that Plaintiffs "failed to allege a constitutional violation" [State MOL at 46] which is without merit.

historical traditions of firearm regulation. See, e.g., *Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 666 (2004).

Defendants again improperly urge this Court to engage in public safety and interest balancing. Quoting the intermediate scrutiny test applied in *NYSRPA v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015) but *explicitly rejected* in *Bruen*, *Heller,* and *McDonald*[42], the State theorizes that an injunction "would pose an imminent risk to public safety"[43], [44] and that "there is a substantial, indeed compelling, government interest in public safety and crime prevention." The City fears the "grave societal harm of gun violence", but peaceable carry for self-defense is not a criminal act nor does it increase crime.[45], [46] Because these arguments are palpably improper and have been rejected multiple times by the Supreme Court, Defendants should be found to have abandoned opposition to this factor.[47]

---

[42] *Heller,* at 634; *McDonald*, at 785-86; and *Bruen*, at 2126-27.

[43] The State fails to identify any tangible threat to public safety posed by the peaceable carry of handguns for self-defense, including the 36 states where open carry is permitted (without a license); open carry does not increase public danger. See, Declaration of Chuck Haggard submitted in *Baird v. Bonta*, 19 Civ. 0617 (KJM) (E.D. Cal.) at Bellantoni Ex. 3.

[44] The brief of *Amici curiae* Law Enforcement Groups, which include National Association of Chiefs of Police, Western States Sheriffs' Association, and California State Sheriffs' Association, and State and Local Firearms Rights Groups in support of Petitioner in *Bruen*, noted that states with "discretionary" or "may-issue" licensing regimes for carry outside the home, like New York, are contrary to the individual right recognized *Heller* and strip their citizens of the ability to protect themselves lawfully against murder, rape, deadly assaults, armed robbery, and other serious crimes.https://www.supremecourt.gov/DocketPDF/20/20-843/167032/20210122172033496_Brief%20of%20LE%20and%20firearms%20rights%20groups%20FINAL.pdf

[45] There are between 2.2 and 2.5 million defensive uses of firearms annually (DGU); most involved handguns, and the large majority of defensive uses do not involve firing the weapon, but merely displaying it to deter an attacker (80 percent of DGUs are with handguns; 76 percent do not involve a shot being fired)." *Id.*

[46] The State lobs a complete guess, unsupported by fact, that New York's "fifth-lowest firearms homicide rate" nationwide is "undoubtedly due to, at least in part, to the challenged licensing regime and restrictions on the open carry of handguns." [State MOL at 47], then goes on to cite Rand publication, The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States, 2d Ed. Santa Monica, CA: RAND Corp., 2020. https://www.rand.org/pubs/research_reports/RR2088-1.html. But that same publication determined, from an examination of several qualifying studies, that "licensing and permitting requirements have uncertain effects on total homicides and firearms homicides" and that the evidence for any relationship between the two is "inconclusive." *Id.* at p. 160. Evidence for a relationship between licensing and suicide, and licensing and mass shootings is also inconclusive. *Id.* at 156, 162. No studies met Rand inclusion criteria for examining the effect of gun-free zones on violent crime. *Id.* at 318.

[47] Consistent with the plain text "shall not be infringed", and illustrated by Defendants' shortfall of evidence, the "founding generation **did not** have "many forms of gun control [City MOL at 47].

"As with irreparable injury, when a plaintiff establishes 'a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction.'" *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 743 (D. Conn. 2018) citing, *Ms. L. v. U.S Immigr. & Customs Enf't ("ICE")*, 310 F. Supp. 3d 1133, 1146 (S.D. Cal. 2018), modified, 330 F.R.D. 284 (S.D. Cal. 2019), and enforcement granted in part, denied in part sub nom. *Ms. L. v. U.S. Immigr. & Customs Enf't*, 415 F. Supp. 3d 980 (S.D. Cal. 2020) quoting, *Arizona Dream Act Coalition*, 757 F.3d 1053, 1069 (9th Cir. 2014) (balance of equities favors preventing the violation of a party's constitutional rights).

Plaintiffs seek to enjoin statewide statutes that are facially unconstitutional. If the state statutes are enjoined, the State believes the only individuals who should benefit from the injunction are Plaintiffs – but cites no case where a court found a state statute facially unconstitutional but only enjoined its application to the plaintiffs in the litigation. Imagine if a court found pro-slavery statutes unconstitutional and enjoined them, but only from being applied to the plaintiffs in the suit. This is not a case where a narrower remedy will fully protect the plaintiffs.[48]

Plaintiffs also object to the State's request for a stay pending appeal. "While judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here. The Second Amendment is the very product of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Bruen*, at 2118 quoting, *Heller*, at 635.

## CONCLUSION

Plaintiffs' application should be granted in its entirety.

---

[48] Justice Thomas' concurrence in *Trump v. Hawaii*, 138 S. Ct. 2392, 2424 (2018) was directed at 'nationwide' injunctions, not the injunction of a state statute. [State MOL at 47].

Dated: December 15, 2022
       Scarsdale, New York

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiffs*

By:   *Amy L. Bellantoni*
_____
Amy L. Bellantoni (AB3061)
2 Overhill Road, Suite 400
Scarsdale, New York 10583
abell@bellantoni-law.com