UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

JASON FREY, BRIANNA FREY,                                Case No. 21 Civ. 05334 (NSR)
JACK CHENG, and WILLIAM SAPPE,

                                    Plaintiffs,

                -against-                                 **NOTICE OF**
                                                         **INTERLOCUTORY APPEAL**

NEW YORK CITY, New York, STEVEN NIGRELLI,
in his Official Capacity, KEECHANT SEWELL,
in her Official Capacity,
                                    Defendants.
-----------------------------------------------------------------x

        PLEASE TAKE NOTICE that the plaintiffs, JASON FREY, BRIANNA FREY, JACK

CHENG, and WILLIAM SAPPE hereby appeal to the United States Court of Appeals for the

Second Circuit from the attached Opinion and Order dated March 13, 2023 of the Hon. Nelson S.

Roman denying Plaintiffs' motion for a Preliminary Injunction, and each and every part thereof

that was and is contrary to and/or prejudiced the plaintiffs' rights, claims, and interests.

Dated: March 16, 2023, 2023
       Scarsdale, New York

                                    THE BELLANTONI LAW FIRM, PLLC
                                    *Attorneys for Plaintiffs*

                                    _____/s/_____
                                    Amy L. Bellantoni (AB3061)
                                    2 Overhill Road, Suite 400
                                    Scarsdale, New York 10583
                                    abell@bellantoni-law.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/13/2023

JASON FREY, BRIANNA FREY, JACK CHENG, and WILLIAM SAPPE,

                Plaintiffs,

        v.

STEVEN NIGRELLI, Acting Superintendent of the New York State Police, in his official capacity, NEW YORK CITY, New York, and KEECHANT SEWELL, in her official capacity as NYPD Commissioner,

                Defendants.

21 CV 05334 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

        Plaintiffs Jason Frey, Brianna Frey, Jack Cheng, and William Sappe bring this action against the Acting Superintendent of the New York State Police, Steven Nigrelli ("Acting Superintendent" or "State Defendant"), and New York City and the NYPD Police Commissioner, Keechant Sewell (together, the "City Defendants"), alleging various violations of the Second Amendment.  (ECF No. 47.)  Presently before the Court is Plaintiffs Jason Frey, Brianna Frey, and William Sappe's (hereinafter, "Plaintiffs") motion for preliminary and permanent injunction seeking to enjoin the enforcement of the following New York State and New York City gun laws: N.Y. Penal Law §§ 400.00(6), 400.00(15), 265.01, 265.01-b, 265.01-d, 265.01-e, 265.03(3), and NYC Admin. Code § 10-315.  (ECF No. 48.)  For the following reasons, Plaintiffs' motion is DENIED in part and STAYED in part.

## BACKGROUND

## I.   NEW YORK STATE AND NEW YORK CITY FIREARM LAWS

On September 1, 2022, the State of New York amended its existing gun laws via the Concealed Carry Improvement Act ("CCIA").  On July 1, 2022, the CCIA had been passed by the New York State Legislature in a special session, then promptly signed into law by Governor Kathy Hochul.  The bill was designed "to align with the Supreme Court's recent decision in []*Bruen*"  *See* Press Release, Governor Kathy Hochul, Governor Hochul Signs Landmark Legislation, https://on.ny.gov/3BM6Hz7 (July 1, 2022).  The CCIA updated New York's licensing framework to eliminate the "proper cause" requirement that was held unconstitutional by *Bruen*, to clarify the requirement of "good moral character," and to establish additional requirements, as discussed below.

New York maintains a general prohibition on the possession of firearms without a license.  *See* N.Y. Penal Law §§ 265.01–265.04, 265.20(a)(3).  New York State's firearm licensing law is codified in New York Penal Law § 400.00.  Aside from licenses connected to particular employment or professions, New York has two general types of licenses: a premises license for the home or place of business and a concealed carry license.  N.Y. Penal Law § 400.00(2)(a)–(b), (c)–(f).  Because New York permits concealed carry, it does not permit the open carry of firearms.  A violation of licensing restrictions is a Class A misdemeanor under N.Y. Penal Law § 400.00(15).

All licensees must meet general eligibility requirements, including, *inter alia*, requirements that the licensee is over twenty-one years of age, "of good moral character," and has not been convicted of a felony or a serious offense.  N.Y. Penal Law § 400.00(1).

Licensing is a largely local process in New York State.  *See Sibley v. Watches*, 194 A.D.3d 1385, 1386 (4th Dep't 2020).  Applications for a license are adjudicated by local licensing officers, who are local judges throughout most of the State.  N.Y. Penal Law § 265.00(10).  In New York City, Nassau County, and Suffolk County, local police officials serve as licensing officers.  *Id.*

The State Police formulate the application form throughout most of New York, and concealed carry licenses issued in New York are valid throughout the State, with the exception of New York City.   Pursuant to §§ 400.00(3)(a) and (7), New York City may devise its own licensing application, and it requires that any handgun owner seeking to conceal carry in the City obtain "a special permit . . . issued by the police commissioner."  N.Y. Penal Law § 400.00(6).  New York City has its own regulations pertaining to the issuance of handgun licenses and provides for premises licenses and different forms of concealed carry licenses.  *See* 38 RCNY §§ 5-01, 5-02.

Part of the CCIA enacted the new "Private Property Provision," which prohibits individuals from possessing "a firearm, rifle or shotgun" on private property without the express consent of the property owner or lessee.  N.Y. Penal Law § 265.01-d.  Additionally, New York Penal Law § 265.01-e enumerates a set of "sensitive locations" in which individuals may not possess "a firearm, rifle or shotgun." As with the Private Property Provision, this section contains exceptions for police officers, registered security guards, active-duty military, and other designated persons.

## II.   THE PLAINTIFFS

### A.  *Jason and Brianna Frey*

Jason and Brianna Frey are both United States citizens who reside in Westchester County. (*See* ECF No. 47, Second Amended Complaint ("SAC") ¶¶ 12–13; Declaration of Jason Frey ("Jason Frey Decl.") ¶ 2, annexed as Exhibit ("Ex.") 1 to the Declaration of Amy L. Bellantoni in support of Plaintiffs' Motion for Preliminary Injunction ("Bellantoni Decl."); Declaration of Brianna Frey ("Brianna Frey Decl.") ¶ 2, annexed to the Bellantoni Decl. as Ex. 2).  Before the *Bruen* decision, both Freys applied for and were granted concealed carry licenses by a Westchester County judge. (Brianna Frey Decl. ¶ 3; Jason Frey Decl. ¶ 3.)  The licenses were restricted "sportsman" licenses, limiting possession of their handguns to the inside of their home, to and

from target shooting, and during sporting activities.  (Brianna Frey Decl. ¶ 6; Jason Frey Decl. ¶ 7.)

In 2019, both Freys applied for an amendment to allow for unrestricted concealed carry licenses.  (Brianna Frey Decl. ¶ 7; Jason Frey Decl. ¶ 8.)  The licensing officer denied the applications because neither Frey had met the governing "proper cause" standard.  (Brianna Frey Decl. ¶ 7; Jason Frey Decl. ¶ 9.)  The requirement that concealed carry license applicants show "proper cause" in order to be eligible to get a license was struck down by the Supreme Court on June 23, 2022 in a decision captioned *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022).

Jason Frey does not allege that he applied for a concealed carry license after the *Bruen* decision, or after the enactment of the CCIA legislation, to obtain an unrestricted license to carry his handgun.  Brianna Frey alleges that "[i]n July 2022, [she] applied to have the restrictions on her handgun license removed to allow for 'full carry', which was denied in September 2022." (SAC ¶ 54.)  Brianna Frey does not allege that she appealed that decision through an Article 78 proceeding in New York State court.  Neither Brianna or Jason Frey alleges that he or she sought to obtain a separate handgun license in New York City, and Jason Frey states that he is not going to apply for a separate handgun license to legally carry in New York City.  (Jason Frey Decl. ¶ 26.)

As of October 14, 2022, Brianna Frey alleged that she intended "to carry her handgun concealed on her person on a daily basis for self-defense everywhere she goes, on public and private property, commercial and residential, where ordinary people travel, congregate, shop, fill up their cars with gas, and simply exist and she intends to continue such protected conduct on a regular basis until her natural death."  (SAC ¶ 52.)  As of the date of her declaration, on October

16, 2022, she continued to indicate that she intended on carrying a handgun outside of her licensing restrictions.  (*See* Brianna Frey Decl. ¶¶ 11–13.)  Mr. Frey declares that he has begun to "regularly carry a handgun concealed on [his] person in public–not only to and from target shooting or when [he is] engaging in sportsman activities like camping and hiking, for the protection of [him]self and [his] family–but during [his] everyday life…." (Jason Frey Decl. ¶ 14.)  He also states that he "intend[s] to start carrying [his] handgun open and holstered . . .  at times when [he is] not carrying the same handgun concealed."  (*Id*. ¶ 21.)  Mr. Frey states that he carries his handgun to go shopping in shopping centers, restaurants subject to the alcohol and beverage control laws, movie theaters, various parks, and gas stations.  (*Id*. ¶ 14.)  Mr. Frey alleges that he travels to New York City in order to "get goodies at Junior's," travel to Murray's Bagel's on 8th Avenue, and visit friends in Williamsburg.  (*Id*. ¶ 27.)  Brianna Frey does not allege that she has traveled to, or intends to travel to, New York City.

### B.  *William Sappe*

William Sappe is a resident of Orange County.  *See* Declaration of William Sappe ("Sappe Decl."), ¶ 3, annexed to the Bellantoni Decl. as Ex. 3.)  He is self-employed and alleges that his business involves transporting "substantial amounts of cash, diamonds, and jewelry for high-end jewelers . . . between the Diamond District and various locations in the 5 boroughs of New York City, throughout New York State, and to other states, including California and Nevada."  (*Id*. ¶ 7.) Mr. Sappe is licensed as an Armed Guard in New York.  (*Id*. ¶ 4.)  He holds a valid license to carry a concealed handgun everywhere in New York State, with the exception of New York City, which was issued by a judicial licensing officer in Orange County.  (*Id*. ¶ 3.)

Mr. Sappe states that he "previously applied to the NYPD Licensing Division to obtain a

separate concealed carry license, as required by statute, and [his] application was denied." (*Id.* ¶ 9.)  He does not allege when he applied for the license, when his license was denied, or the reason for the denial.  Mr. Sappe has not alleged whether he has applied for a license to carry his handgun in New York City since the Supreme Court's decision in *Bruen*, or since the enactment of the CCIA.

Mr. Sappe alleges that "[b]eginning [on October 14, 2022], Mr. Sappe intends to carry his handgun open and exposed on his person for self-defense everywhere he goes, including New York City, every day that he does not otherwise carry his handgun concealed." (SAC ¶ 81.)  Mr. Sappe alleges that he "intend[s] to begin carrying my handgun open and exposed on those days that [he is] not carrying a handgun concealed on my person, both inside New York City and throughout the state." (*See* Sappe Decl. ¶ 19.)  Mr. Sappe also alleges that as part of his daily employment, he travels through Times Square.  (*Id.* at ¶ 13.)  He states that "I am going to carry my handgun in the Times Square area for self-protection." (*Id.*)

## III.   PROCEDURAL BACKGROUND

Plaintiffs commenced this action on June 16, 2021. (ECF No. 1.) Plaintiffs requested leave to file a Motion for Preliminary Injunction, which was filed and fully briefed on September 21, 2021.  (ECF No. 20.)  On October 14, 2021, City Defendants filed their Answer while State Defendant filed a Motion to Dismiss on January 3, 2022. (ECF No. 31.) Oral arguments on the Preliminary Injunction were held on February 1, 2022, and the Court subsequently issued a decision denying the injunction on February 22, 2022.  (ECF No. 37.)

On June 23, 2022, the Supreme Court issued its decision in *Bruen*, and on August 22, 2022, Plaintiffs requested permission to file a Second Motion for Preliminary Injunction based on the holding in *Bruen*.  (ECF No. 42.)  On September 1, 2022, the Court issued a Decision and Order

denying Plaintiffs' request for a Second Preliminary Injunction and granted State Defendant's Motion to Dismiss as to them.  (ECF No. 44.)  Plaintiffs filed an Amended Complaint and a Second Amended Complaint on October 4 and October 14, 2022, respectively, along with a stipulation signed by all parties agreeing to the filing of the amended complaints.[1]  (*See* ECF Nos. 46 and 47.)  Plaintiffs Jason Frey, Brianna Frey, and William Sappe filed the present motion on October 20, 2022, styling it as an "Emergency Order to Show Cause," but which the Court construed as a Third Motion for Preliminary Injunction.[2]  (ECF No. 48.)  The parties fully briefed their arguments on the Third Motion for Preliminary Injunction on December 15, 2022.

On March 20, 2023, the Court held oral argument on Plaintiff's challenge to N.Y. Penal Law § 265.01-e (banning guns in sensitive places), with a focus on § 265.01-e(2)(n) which bans firearms in public transportation, including Metropolitan Transit Authority ("MTA") subway cars and train cars and § 265.01-e(2)(t) which bans the carrying of firearms in the Times Square area.

## LEGAL STANDARD

## I.   PRELIMINARY AND PERMANENT INJUNCTION STANDARD

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  A party seeking a preliminary injunction "must demonstrate that it will suffer irreparable harm absent injunctive relief and either (1) that it is likely to succeed on the merits of the action, or (2) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, provided that the balance of hardships tips decidedly in favor of the

---

[1]     The Second Amended Complaint, which was filed 10 days after the First Amended Complaint was filed, replaces formerly named Defendant Kevin Bruen, the former Superintendent of the New York State Police, with Steven Nigrelli, the Acting Superintendent of the New York State Police, and adds a new count challenging NYC Admin. Code 10-315 and NYPD rules promulgated thereunder.  (SAC ¶¶ 245–48.)

[2]     Plaintiff Jack Cheng is not a party to the instant preliminary injunction motion.

moving party." *Mullins v. City of New York*, 626 F.3d 47, 52–53 (2d Cir. 2010) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd*., 598 F.3d 30, 34–35 (2d Cir. 2010)).

Where "a party seeks an injunction that will affect governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the plaintiff must typically show a likelihood of success on the merits—a serious question going to the merits is usually insufficient[.]" *Mullins*, 626 F.3d at 53. However, where a party seeks a mandatory injunction "altering, rather than maintaining, the status quo," such as in this case, that party "must meet [a] more rigorous standard." *Almontaser v. N. Y. City Dep't of Educ*., 519 F.3d 505, 508 (2d Cir. 2008) (internal alterations omitted); *see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc*., 60 F.3d 27, 33 (2d Cir. 1995) ("[W]e have required the movant to meet a higher standard where . . . an injunction will alter, rather than maintain, the status quo . . . ."). The moving party must establish "a clear showing that the moving party is entitled to the relief requested," or show that "extreme or very serious damage" would result in the absence of preliminary relief. *Tom Doherty Assocs*., 60 F.3d at 34.

## II.    ANALYSIS FOR SECOND AMENDMENT CLAIMS POST-*BRUEN*

On June 23, 2022, the U.S. Supreme Court announced a new standard of review when evaluating whether a regulation violates the Second Amendment, and expressly rejected the previous approach widely used by federal courts. *See Bruen*, 142 S. Ct. at 2126.

Finding that the second step was inconsistent with the principles articulated in *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) and *McDonald v. City of Chicago, Ill*., 561 U.S. 742 (2010), the Court pronounced a new standard consistent with the approach used in Heller: (i) "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"; (ii) "[t]he government must then justify its regulation by

demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen,* 142 S. Ct. at 2129–30.   In other words, at the second step, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Id.* at 2127.

The "historical inquiry . . . will often involve reasoning by analogy . . ."  *Bruen*, 142 S. Ct. at 2132.  Such "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*. at 2133.  Moreover, to "enabl[e] [courts] to assess which similarities are important and which are not" during this analogical inquiry, they must use at least "two metrics," which are "central" considerations to that inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2132–33.  More specifically, courts must consider the following: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense"; and (2) "whether that [regulatory] burden is comparably justified." *Id*. at 2133.

In addition, when courts review historical sources, those that arose around when the Second Amendment was adopted (1791) and when the Fourteen Amendment was adopted (1868) are particularly instructive, whereas laws that long predated the adoption of the Constitution or long post-dated the enactment of the Fourteenth Amendment are given less weight, though courts may still consider them:

> "We categorize these historical sources because, when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them. The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years. It is one thing for

> courts to reac[h] back to the 14th century for English practices that prevailed up to the period immediately before and after the framing of the Constitution. It is quite another to rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies."

*Bruen*, 142 S. Ct. at 2136 (internal quotations and citations omitted).

> "Similarly, we must also guard against giving post-enactment history more weight than it can rightly bear. It is true that in *Heller* we reiterated that evidence of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represented a critical tool of constitutional interpretation. We therefore examined "a variety of legal and other sources to determine *the public understanding* of [the Second Amendment] after its . . . ratification. And, in other contexts, we have explained that a regular course of practice' can 'liquidate & settle the meaning of disputed or indeterminate 'terms & phrases in the Constitution."

*Id*. at 2136 (internal quotations and citations omitted) (emphasis in original)

Lastly, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 142 S. Ct. at 2132.  This is because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868."  *Id*.  Nonetheless, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated."  *Id*.

## DISCUSSION[3]

Plaintiffs are requesting a preliminary and permanent injunction that will enjoin Defendants from enforcing N.Y. Penal Law §§ 400.00(6), 400.00(15), 265.01, 265.01-b, 265.01-d, 265.01-e, 265.03(3), and NYC Admin. Code § 10-315 against those who (i) possess a valid New York State handgun license and who carry a handgun open and exposed (holstered) on their person,

---

[3]      In addition to the parties' moving papers and accompanying exhibits, the Court has considered the amicus brief filed by Everytown for Gun Safety (ECF No. 72) as well as the Declaration of Dr. Brennan Rivas, a historian and independent scholar on behalf of defendant Nigrelli. (ECF No. 64.)

and (ii) possess a valid unrestricted New York State concealed carry handgun license who carry a handgun concealed on their person within New York City. (*See* ECF No. 52 (Pls.' Br.) and ECF No. 74 (Pls.' Reply")).   Defendants argue that Plaintiffs do not have standing to assert claims against several of the statutes and have otherwise failed to satisfy their burden for a preliminary injunction.   The Court will first examine Plaintiffs' standing, and then will discuss the merits of Plaintiffs' injunctive request.

## I.   STANDING

The Supreme Court has called the doctrine of standing "perhaps the most important" of the case-or-controversy doctrines. *Allen v. Wright*, 468 U.S. 737, 750 (1984). The doctrine requires a plaintiff to have a "personal stake," in the outcome of the action. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).   That is, a plaintiff must allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen*, 468 U.S. at 751.   "[T]he 'irreducible constitutional minimum' of standing consists of three elements[:] [t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).   The party seeking to invoke federal jurisdiction has the burden of establishing each element.  *Id.* at 561.

To have standing to seek injunctive relief, a plaintiff must establish a "real or immediate threat" of injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury.").

Mere "allegations of possible future injury are not sufficient"; the "injury must be certainly impending." *Izquierdo v. Panera Bread Co.*, 450 F.Supp.3d 453, 460 (S.D.N.Y. 2020) (quoting *Daniel v. Tootsie Roll Indus., LLC*, No. 17 CIV. 7541 (NRB), 2018 WL 3650015, at *6 (S.D.N.Y. Aug. 1, 2018)).  Justiciable injury for purposes of Article III must be "real and immediate" and not purely speculative and abstract.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).  Moreover, with respect to pre-enforcement challenges to statutes, a credible threat of prosecution cannot rest on fears that are "imaginary or speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)).  That being said, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 134 S. Ct. 2334, 2342 (2014) (quoting *Babbitt*, 442 U.S. at 298).  In addition, "courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) (citing *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (quoting *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013)).

### A.  Standing to raise a challenge against N.Y. Penal Law §§ 265.01, 265.01-b, & 265.03(3)

The City Defendants point out that Plaintiffs do not state why they seek an injunction against NPYL §§ 265.01, 265.03(3), and 265.01-b, but it appears that Plaintiffs do so because they seek to prevent enforcement of these laws against the following conduct: (i) carrying a handgun open and exposed; and (ii) carrying concealed firearms outside the restrictions placed on the licenses of Jason Frey and Brianna Frey.  (ECF No. 63 ("City Defs.' Opp.") at 6.)

The Court finds, like it did in denying Plaintiff's first motion for preliminary injunction, that Plaintiffs continue to lack standing to challenge N.Y. Penal Law §§ 265.01(1), 265.01-b, and 265.03(3) because they have not and cannot be injured by those statutes.  These three provisions impose misdemeanor and felony penalties for the illegal carrying of firearms without a license. *See* N.Y. Penal Law §§ 265.01(1); 265.01-b; 265.03(3).  For the reasons discussed below, the Court agrees and DENIES Plaintiffs' preliminary and permanent injunction motion as to their challenge against these three statutes.

The Court previously found that Plaintiffs failed to establish standing to challenge N.Y. Penal Law §§265.01(1), 265.01-b, and 265.03(3) in its Order and Opinion on Plaintiff's first motion for preliminary injunction, dated February 22, 2022. *See Frey v. Bruen*, No. 21 CV 05334 (NSR), 2022 WL 522478, at *6 (S.D.N.Y. Feb. 22, 2022).  There the Court reasoned that, *inter alia*, as "each Plaintiff has been issued such a license, they do not and will not face criminal liability under Section 265."  *Id*.  As previously discussed by the Court in the prior Order and Opinion, "Section 265.20(a)(3) explicitly states that these Sections 'shall not apply' to '[p]ossession of a pistol or revolver by a person to whom a license therefor has been issued as provided under section 400.00 or 400.01.'" *Id*. (citing N.Y. Penal Law § 265.20(a)(3).  "In addition, Section 400.00(17) states:

> "[t]he provisions of article two hundred sixty-five of this chapter relating to illegal possession of a firearm, shall not apply to an offense which also constitutes a violation of this section by a person holding an otherwise valid license under the provisions of this section and such offense shall only be punishable as a class A misdemeanor pursuant to this section."

N.Y. Penal Law § 400.00(17).

As each Plaintiff has been issued such a license, they do not and will not face criminal liability under Section 265."  (*Id*. (citing N.Y. Penal Law § 400.00(17)).

That same reasoning continues to apply here in the instant motion for preliminary and permanent injunction.  The Court agrees with the State Defendant that since neither Plaintiffs' circumstances, as expressed in their recent declarations, nor those statutes have changed since the Court's prior ruling on February 22, 2022, Plaintiffs still face no criminal penalties or threats of prosecution for violating §§ 265.01, 265.01-b, and 265.03(3).  (*See* State Def's Opposition at 12.).[4]

Plaintiffs fail to present any meaningful arguments to the contrary.  In their opening brief, Plaintiffs merely argue that they have announced "their intention to carry a firearm in violation of the challenged laws sufficient to confer Article III standing," (Pls.' Br. at 6), but they fail to provide any arguments countering the State Defendant's point that those statutes will not apply to the Plaintiffs as firearms license holders.  Nor do Plaintiffs satisfy their burden of establishing standing as to these three statutory provisions in their reply brief.  In their reply brief,  Plaintiffs appear to argue that they only have standing to assert the constitutionality of all of the statutes, including §§ 265.01, 265.01-b, and 265.03(3), with respect to the purported right to open carry, (Pls.' Reply at 17), and state that "[t]he ambiguity in the law, and risk of arrest, calls for a judicial declaration before finding that Plaintiffs do not have standing to challenge Penal Law 265.00, et seq."  (*Id.*) Plaintiffs fail to cite to any legal authorities for their statement.  The Court therefore finds that Plaintiffs fail to satisfy their burden to establish standing to challenge §§ 265.01, 265.01-b, and 265.03(3).

**B.  Standing to raise a challenge against N.Y. Penal Law §§ 265.01-d and 265.01-e**

---

[4]      To the extent that Plaintiffs point to these statutes as possibly being enforced against them in the event that they open carry their firearms, Plaintiffs' concerns are misplaced.  As discussed in the Court's previous Order and Opinion, "if Plaintiffs were to carry their weapons openly, they would at best be committing a violation of their handgun license restrictions, and subject to potential penalties under N.Y. Penal Law Section 400.00(15)." *Frey*, 2022 WL 522478, at *7.

14

State Defendant concedes that the N.Y. Penal Law § 265.20(a)(3) exception does not apply to newly added a N.Y. Penal Law §§ 265.01-d and N.Y. Penal Law §§ 265.01-e, both of which did not apply at the time of the Court's prior ruling.  (*See* ECF No. 66 ("State Def.'s Opp.") at 12 n.5).  Therefore, the Court will assess whether Plaintiffs have standing to raise a challenge against N.Y. Penal Law § 265.01-d and N.Y. Penal Law § 265.01-e.

### 1.   Standing to challenge N.Y. Penal Law § 265.01-d

The City Defendants argue that Plaintiffs do not have standing to assert a claim challenging N.Y. Penal Law § 265.01-d, which states that one shall not carry firearms onto private property without permission of the owner or lessee of that property.  N.Y. Penal Law § 265.01-d.  The City Defendants mainly argue that "[i]f Plaintiffs ask and obtain permission from private property owners and/or lessees, they would not be aggrieved by the statute."  (City Defs.' Opp. at 13.)

However, recently, district courts have found standing to challenge N.Y. Penal Law § 265.01-d where plaintiffs, like Plaintiffs do here, state that they intend to carry arms into private property without obtaining permission.  *See Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 WL 17100631, at *4 (W.D.N.Y. Nov. 22, 2022) (finding that individual with concealed carry license established standing where (i) he swore that he would typically bring his firearm on private property open to the public and to establishments that neither prohibit the carrying of firearms nor post signage consenting to the carry of firearms; and where  (ii) New York Governor Kathy Hochul and Police Superintendent Nigrelli publicly announced enforcement action against gun law violations.).  *Antonyuk v. Hochul*, No. 122CV0986GTSCFH, 2022 WL 16744700, at *39 (N.D.N.Y. Nov. 7, 2022) ("Based on the fact that Plaintiffs Johnson and Leman have sworn that they have frequently carried concealed in privately owned, open-to-the-public locations and will

do so again soon (regardless of the absence of CCIA signage), the Court finds they have asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA.").

The Court finds that Plaintiffs Jason and Brianna Frey meet the injury-in-fact element of standing to challenge this particular statute.  When challenging a law prior to its enforcement, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'"  *Susan B. Anthony List*, 573 U.S. at 158–59, 134 S.Ct. 2334. (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 297, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)).  Jason Frey states he will not "seek permission" or refrain from carrying because there is no "conspicuous signage" granting permission to carry.  (Jason Frey Decl. ¶ 16.)  Likewise, Brianna Frey declares that "I am not going to ask permission from the above locations, or from every property owner or lessee or refrain from going about in public to all of the places that members of the general public go – on public and private property, residential and commercial – just because there is no 'conspicuous sign' granting me permission to exercise my right to be armed for self-defense."  (Brianna Frey Decl. ¶ 16.).  In addition, as Plaintiffs discuss, both N.Y. Governor Hochul and First Deputy State Police Superintendent Steven Nigrelli (now Acting Superintendent and Defendant) announced a "zero tolerance" policy to violations of gun law violations, and indicated that New York State, troopers "are standing ready" to ensure that "all laws are enforced."  (Pl.'s Br. at 10–11 (citing Governor Hochul's August 21, 2022 press conference at 38:00-25).[5]  Therefore, the Court finds that there is a credible threat of prosecution regarding this statute.  In addition, given the recency of the law and lack of any indication that it

---

[5]        "Governor Hochul Delivers a Press Conference on Gun Violence Prevention," (Aug. 31, 2022), available at https://www.youtube.com/watch?v=gC1L2rrztQs.

will be repealed, the Court is and should be "willing to presume that the government will enforce" it.  *See Picard*, 42 F.4th 89 (quoting *Cayuga Nation*, 824 F.3d at 331).

The Court notes that Mr. William Sappe fails to provide any statement like the Freys do indicating that he will not seek permission before carrying in a private property, so the Court finds that he fails to establish injury-in-fact as to his challenge of this statute.  (*See generally*, Sappe Decl.).

With respect to the other two elements to establish standing—traceability to the conduct of the Defendants and redressability—the Court finds that Plaintiffs Jason and Brianna Frey meet these elements, given that the named Defendants are specifically tasked with enforcing the gun laws.  *See Antonyuk*, No. 2022 WL 16744700, at *39 (finding traceability and redressability against officials who "each has the specific duty to enforce [N.Y. Penal Law § 265.01-d].").

### 2.   Standing to challenge N.Y. Penal Law § 265.01-e

Plaintiffs do not allege that they seek to carry their handguns in the vast majority of locations deemed "sensitive" under Penal Law § 265.01-e(2)(a)-(t) – *e.g.*, places of worship, zoos, nursery schools, etc.  (City Defs.' Opp. at 10–11; State Def. Opp. at 23–24.)  Plaintiffs therefore cannot demonstrate an injury-in-fact with a "fairly traceable connection" to the entirety of Penal Law § 265.01-e, *see Lujan*, 504 U.S. at 560; Penal Law § 265.01-e(2)(a)-(t), but only those sensitive locations where they have alleged or sworn "sufficiently concrete intention to carry."    *See Antonyuk v. Hochul,* 2022 WL 16744700, at *11 (denying preliminary injunction motion for lack of standing in challenge of N.Y. Penal Law § 265.01-e (a) [prohibiting firearms "any place ... under the control of federal, state or local government, for the purpose of government administration . . . "] because plaintiffs failed to allege or assert a concrete intention to carry concealed on government property or in a government building in the immediate future.); *see id*. at 8

("'someday' intentions—without any description of concrete plans, or indeed even any specification of when the 'someday' will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

Per their declarations, Plaintiffs have only indicated that they currently have or plan on violating the current gun laws in parks, theaters, restaurants with on-premise alcohol consumption, the MTA subway and train cars, and Times Square. (Jason Frey Decl. ¶¶ 14–15, 18–19; Brianna Frey Decl. ¶¶ 12–14, 17–18; William Sappe Decl. ¶¶ 7, 13.). Therefore, they only have standing to challenge those specific sensitive locations. *See* §§ 265.01-e(2)(d) [public parks], e(2)(p) [theaters]; e(2)(n) [subway and Metro North train cars); e(2)(o) [restaurants with on-premises alcohol consumption; e(2)(t) [Times Square].

## C. Standing to Raise a Challenge Under N.Y. Penal Law §§400.00(6) and 400.00(15)

### 1. Standing to Invalidate Restrictions Placed on the Concealed Carry Licenses Issued to Jason Frey and Brianna Frey

The City Defendants argue that Plaintiffs Jason and Brianna Frey do not have standing to challenge restrictions placed on their concealed licenses. (City Defs.' Opp. at 11–12.). A violation of the restrictions on the firearm licenses would derogate N.Y. Penal Law § 400.00(15). Defendants mainly argue that the City and State Defendants cannot redress the alleged violations— in other words, the City and State Defendants cannot remove the restrictions given that they were put in place by Westchester County licensing officials, and Plaintiffs Jason and Brianna Frey should instead undergo the appropriate administrative process to seek to remove restrictions on their licenses (*i.e.* applying to upgrade their licenses and/or commencing an Article 78 proceeding in New York State Court to appeal a denial of a license upgrade. For the reasons stated below, the Court agrees and DENIES preliminary and permanent injunction to the extent that Plaintiffs Jason and Brianna Frey seek to challenge restrictions placed on their concealed licenses.

18

Mr. Jason Frey, who was issued a New York State pistol license by a judicial licensing officer in Westchester County, fails to allege that he applied to the Westchester County licensing official to remove the restrictions on his license.  (SAC ¶¶ 23, 25.)  Brianna Frey, who holds a firearms license limited to sportsman activities that was issued by an officer in Westchester County, applied to remove restriction on her carry license to allow for full carry, but her application was denied in September 2022.  (SAC ¶ 54.)  The City Defendants argue that to the extent that these Plaintiffs challenge restrictions placed on their licenses under *Bruen*, they should apply to the applicable judicial licensing officers in Westchester County to upgrade their licenses.  (City Defs.' Opp. at 12.)  In addition, the City Defendants argue that Plaintiff Brianna Frey should challenge the Westchester County judicial licensing officer's determination denying her application in September 2022 in New York State Supreme Court, pursuant to N.Y. C.P.L.R. 78. (*Id.*)

The "case or controversy" limitation of Art. III of the Constitution requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court. *See Antonyuk*, 2022 WL 16744700, at *9.  Because the named Defendants cannot remove the licensing restrictions that were imposed pre-*Bruen*, and the Westchester County officials who are responsible for licensing are not named as defendants, Plaintiffs Brianna and Jason Frey therefore do not have standing with respect to this challenge.

### 2. Standing to Challenge N.Y. Penal Law § 400.00(6) and 400.00(15) with respect to carrying in New York City

The Court finds, and Defendants do not contest, that Plaintiffs William Sappe and Jason Frey have standing to challenge N.Y. Penal Law §§ 400.00(6) (requiring a special permit in New York City) and 400.00(15) (criminalizing carrying of firearms outside of licensing restrictions)

19

with respect to carrying in New York City.[6]   The Court finds that Plaintiffs William Sappe and

Jason Frey have sufficiently alleged their concrete and imminent intention to carry their firearms

in New York City based on their following statements:

> "Now that the *Bruen* case established a clear test for analyzing Second Amendment
> challenges, I intend to carry my handgun concealed in New York City for self-
> defense on a daily basis. I also intend to carry my handgun to work every day
> because the number of random incidents of violent criminal attacks in New York
> City have risen sharply. Based on my work, including its location in the Diamond
> District where I am coming in and out of high-end jewelry stores, and the
> merchandise and cash that I carry."

Sappe Decl. ¶ 10.

> "I am going to carry my handgun in the Times Square area for self-protection even
> though such constitutionally-protected activity had been made unlawful by New
> York State and New York City."

Sappe Decl. ¶ 13.

> I carry my handgun concealed when I travel to New York City. Whether alone or
> with my family, I take the Metro North Train into Grand Central and the number 4
> train to Times Square to get goodies at Junior's, and sometimes to Murray's Bagels
> on 8th Avenue. I also visit friends in Williamsburg, taking the shuttle to the L train,
> then to the 14th Street stop. I intend to continue being armed when I travel to New
> York City for my own protection and my family's.

Jason Frey Decl. ¶ 27.

Because both Plaintiffs Jason Frey and William Sappe indicate that they have or plan to

carry a handgun when in New York City, even though they do not have a permit allowing them to

lawfully do so, the Court finds that they have alleged a sufficiently concrete and imminent intention

of violating N.Y. Penal Law §§ 400.00(6).  *See Knife Rights, Inc. v. Vance*, 802 F.3d 377, 386-87

(2d Cir. 2015) (finding standing for pre-enforcement challenge to statute banning certain types of

---

[6]      In her declaration, Brianna Frey provides no indication that she has a concrete or imminent intention to
carry her firearms in New York City.  (*See generally*, Brianna Frey Decl.).

knives where the plaintiffs alleged that "they have in the past carried, and wish again to carry, common folding knives")

For the reasons discussed above with respect to public announcements by relevant government officials that gun laws will be enforced, the Court finds that the Plaintiffs have established that there is a credible threat of prosecution.  *See supra*.  In addition, traceability and redressability are established here, given that the named Defendants are tasked with enforcing the gun laws.  *See Antonyuk*, No. 2022 WL 16744700, at *39.

### 3. Standing to Challenge N.Y. Penal Law § 400.00(15) With Respect to Open Carry

Regarding Plaintiffs' challenge to N.Y. Penal Law 400.00(15) with respect to open carry, the Court finds that Plaintiffs do not have standing.  Brianna Frey provides no allegations that she has a concrete and imminent intention of carrying her firearm in an open manner.  *See generally,* Brianna Frey Decl.  While Jason Frey and William Sappe allege an intention to open carry, they fail to allege that such intention is concrete and imminent, as required in pre-enforcement suits. *Lujan*, 504 U.S. at 564.

Jason Frey alleges as follows: "I intend to start carrying my handgun open and holstered at the above locations at times when I am not carrying the same handgun concealed."  Jason Frey ¶ 21.  William Sappe similarly alleges as follows: "("I intend to begin carrying my handgun open and exposed on those days that I am not carrying a handgun concealed on my person, both inside New York City and throughout the state."  William Sappe Decl. ¶ 19

Their allegations are also slightly contradictory or at least they are unclear about their actual intentions to carry open.  William Sappe, for example, states that he "intend[s] to carry [his] handgun *concealed* in New York City for self-defense on a daily basis." (Sappe Decl. ¶ 10) (emphasis added).  Sappe also states he regularly carries his handgun concealed while not in New

York City, but he gives no concrete indication of when he plans to carry open.  (Sappe Decl. ¶ 3).

Jason Frey states he intends to carry open, but also states that "[t]he only reason I do not exercise

the right to open carry in New York City is the fear of arrest, jail and the other criminal and civil

penalties that will follow," (Jason Frey Decl. ¶ 31), and he otherwise gives no specific allegations

regarding when he intends to carry open.

In any event, regarding Jason Frey's and William Sappe's statements that they "intend to"

violate the open carry ban, such "'some day' intentions—without any description of concrete

plans, or indeed even any specification of when the some day will be—do not support a finding of

the 'actual or imminent' injury" that is required."  *Lujan*, 504 U.S. at 564; *see also San Diego Cty.*

*Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1127 (9th Cir. 1996) (holding the plaintiffs' assertions

that they "wish and intend to engage in activities prohibited" by the Crime Control Act, which

prohibited the manufacture, transfer or possession of semiautomatic assault weapons, was

insufficient to establish a genuine threat of imminent prosecution); *see, c.f. Susan B. Anthony List*

*v. Driehaus*, 573 U.S. 149, 161 (2014) (petitioners sufficiently alleged intention to violate law by

pleading specific statements they intend to make in future election cycles).

Therefore, the Court DENIES Plaintiff's preliminary injunction motion challenging N.Y.

Penal Law 400.00(15) with respect to open carry.

### D.  Standing to raise a challenge under NYC Admin. Code § 10-315 and the NYPD Rules promulgated thereunder

The City Defendants argue that Plaintiffs have no basis of challenging NYC Admin. Code

§ 10-315 and rules promulgated thereunder because that law was repealed by operation of law

when Local Law 91 became effective, and there are not any current rules implementing or

expounding upon Administrative Code § 10-315.  (*See* City Defs.' Opp. at 25 n.20.)  In addition,

as the City Defendant persuasively state, Administrative Code § 10-315, however, simply

determined the boundaries of the area commonly known as Times Square, and Plaintiffs do not allege that the City improperly defined Times Square." (*Id.*)  Plaintiff presents no arguments to the contrary and does not mention challenging NYC Admin. Code 10-315 anywhere in their reply papers.  Therefore, the Court determines that Plaintiff concedes to the City Defendant's argument. *Vann v. Persico*, No. 20-CV-628 (KMK), 2022 WL 4368110, at *9 (S.D.N.Y. Sept. 20, 2022) ("'[b]y failing to respond to that argument in its Reply Memorandum, [Riggs] concedes the point for purposes of [its Motion].'") (citing *Cornelius v. Macy's Retail Holdings, Inc*., No. 18-CV-678, 2019 WL 11816537, at *2 (W.D.N.Y. Aug. 5, 2019) (collecting cases).

Accordingly, the Court DENIES Plaintiff's motion for preliminary injunction challenging NYC Admin. Code § 10-315.

## II.  PRELIMINARY AND PERMANENT INJUNCTION

### A.  Likelihood of Success on the Merits

#### 1.   Challenge to N.Y. Penal Law § 400.00(6)

Plaintiffs contest the constitutionality of N.Y. Penal Law § 400.00(6) under *Bruen*, arguing that the law is not consistent with the Nation's historical tradition of firearm regulation.  (Pls.' Reply at 10.)  In relevant part, N.Y. Penal Law § 400.00(6) states that "[a] license to carry or possess a pistol or revolver, or to purchase or take possession of a semiautomatic rifle, not otherwise limited as to place or time of possession, shall be effective throughout the state, except that the same shall not be valid within the city of New York unless a special permit granting validity is issued by the police commissioner of that city.  *See* N.Y. Penal Law § 400.00(6).  At its core, Plaintiffs wish to possess a firearm in New York City without the need for a separate license from the NYPD.  For the reasons discussed below, the Court denies Plaintiffs' preliminary injunction motion challenging N.Y. Penal Law § 400.00(6).

First, Plaintiffs do not contest anything about the requirements of obtaining a New York City gun permit, rather, they just complain that they have to get a permit in the first place. Nothing in *Bruen* suggested that the Second Amendment protects the right to carry a firearm without a license, and concurring opinions indicate the opposite. *See, e.g., Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (the holding "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun . . . . Nor have we disturbed anything that we said in [*D.C. v. Heller*, 554 U.S. 570, 595, 128 S. Ct. 2783, 2799 (2008)] or *McDonald v. Chicago*, 561 U.S. 742 (2010), about restrictions that may be imposed on the possession or carrying of guns."); *Bruen*, 142 S. Ct. at 2157 (Kavanaugh, J., concurring) (Justice Kavanaugh wrote separately to "underscore . . . the Court's decision does not prohibit . . . the imposition of licensing requirements for carrying a handgun for self-defense.").

It is clear that governments can impose firearm restrictions so long as they are consistent with individuals' Second Amendment rights. *See Heller*, 554 U.S. at 595 ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms. Of course the right was not unlimited, just as the First Amendment's right of free speech was not . . . . Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for any sort of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for any purpose."); *Bruen*, 142 S. Ct. at 2128 ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.") (quoting *Heller*, 554 U.S. at 626). Plaintiffs' attempt to dismantle that long-standing rule by indicating that the City cannot impose its own permitting requirements goes too far.

24

In any event, the Court will also evaluate this issue under the *Bruen* analysis.  At the first step, the Court finds that N.Y. Penal Law § 400.00(6) does implicate the text of the Second Amendment because it pertains to the right to keep and bears arms.  Here, the law implicates the right to carry arms while in New York City.  *See Bruen*, 142 S.Ct. at 2134 ("As we explained in Heller, the "textual elements" of the Second Amendment's operative clause— "the right of the people to keep and bear Arms, shall not be infringed"—"guarantee the individual right to possess and carry weapons in case of confrontation.") (citing *Heller*, 554 U.S. at 592).

At the second step of the *Bruen* analysis, Defendants are able to establish in their papers that there is a historical tradition of firearm regulations, and in particular, firearm regulations at the municipal and town level.  *See* ECF No. 65, Declaration of Suzanna Publicker Mettham (hereinafter "SPM Decl."), Exh. A at 2 (Brooklyn licensing ordinance, 1880); SPM Decl., Exh. B at 176–77 (Buffalo licensing ordinance, 1891); SPM Decl. Exh. C at 3 (Elmira licensing ordinance, 1892); SPM Decl. Exh. D at 243 (Syracuse licensing ordinance, 1892); SPM Decl. Exh. E at 425 (Troy licensing ordinance 1905); SPM Decl. Exh. F at 337 (Lockport licensing ordinance, 1909); and Albany, SPM Decl. Exh. G at 849–50 (Albany licensing ordinance, 1905); *see also* ECF No. 67, Ciappetta Decl., Exh. 3 (collecting laws from Pennsylvania in 1750, Tennessee in 1821, Virginia in 1847, Arizona in 1867, Texas in 1871, and North Carolina in 1899); *see also* Ciappetta Decl., Exh. 4 (collecting laws that regulated or empowered municipalities to regulate storage, sale, or transport of gunpowder from Pennsylvania in 1782, Connecticut in 1836, New Jersey in 1837, Florida in 1838, Iowa in 1846, and Nebraska in 1867 and 1869); *see also* Ciappetta Decl., Exh. 5 (collecting laws prohibiting public carry in populated areas from Colorado in 1862; Montana in 1864; New Mexico in 1869; Maryland in 1872 addressing only the city of Annapolis; Wyoming in 1875; Kansas in 1881; Idaho in 1889).  In addition, more than two dozen various municipalities

required an individual to obtain written permission from the local mayor, town marshal, or other authority figure to carry a weapon between 1881 and 1910.  *See* Patrick J. Charles, Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry 156 & n.219 (2018) (collecting ordinances from more than two dozen cities, passed between the mid-19th century and early 20th century, requiring a person to carry firearms in cities across the United States subject to the discretionary determination of a local official).

Plaintiffs argue that the examples provided by the Defendants showing city-based licensing regulations should be rejected because they do not reflect "founding-era tradition."  (Pls.' Reply at 10.).  Plaintiffs argue that the scope of Second Amendment protections are "pegged to the public understanding of the right when the Bill of Rights was adopted in 1791, not the mid-late 1800s and beyond."  (*Id.* (citing *Bruen*, at 2137–38)).  However, Plaintiff's argument is overstated.  The Supreme Court in *Bruen* indicated that while the Court "generally assumed" that the reference point should start at laws in 1791, there is also an "ongoing scholarly debate on whether courts should *primarily* rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)."  *Bruen*, 142 S.Ct.  at 2138 (emphasis added).  In other words, as the City Defendants persuasively argue, the Supreme Court's language demonstrates that there is an open question regarding how much importance to attribute to historical evidence from the Fourteenth Amendment's ratification period, and not whether that evidence deserves any weight.  (City Defs.' Opp. at 16.).   Therefore, the Court finds no issue in considering the abundance of examples provided by the Defendants regarding the existence of municipal gun regulations from 1750 to the late 19th century.  *See also D.C. v. Heller*, 554 U.S. 570, 605, 128 S. Ct. 2783, 2805

(2008) (indicating that post-enactment history that sheds light on "the public understanding of a legal text … is a critical tool of constitutional interpretation.").

For the aforementioned reasons, the Court denies the preliminary injunction as to N.Y. Penal Law § 400.00(6).

### 2.   Challenge to N.Y. Penal Law § 400.00(15) Regarding Open Carry

In their preliminary injunction motion (and in their Second Amended Complaint), Plaintiffs want the Court to find that they have a right to open carry, and that the criminalization of open carry is unconstitutional.  (*See* Pls.' Br. at 14–17.) As explained above, New York state prohibits open carry, though individuals may public carry as long as they carry their firearm in a concealed manner and if they have a valid gun permit.

As indicated above, *see*, Discussion I.C.3, *supra,* the Court finds that Plaintiffs do not have standing to challenge N.Y. Penal Law § 400.00(15) with respect to open carry.  Even assuming, arguendo, that Plaintiffs had standing to bring this challenge and request a preliminary injunction, their request would be denied.

Undertaking the first step of the *Bruen* analysis, the Court agrees with Plaintiffs' point that the text of the Second Amendment does plainly cover Plaintiffs' purported right to publicly carry, as indicated by the Court in the *Bruen* decision.  *Bruen*, 142 S.Ct. at 2135 ("The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to "bear" arms in public for self-defense.").  While the text of the Second Amendment itself does not explicitly say anything about open or concealed carry, it is not difficult to find that the term "'bear' arms" means to cover either public concealed or public open carry.  *See id*. (the Second Amendment guarantees a general right to public carry).

Regarding the second step of the *Bruen* analysis – a review of historical traditions, Plaintiffs argue that the manner of public carry was not regulated in 1791, and that "[i]t was not until "the early to mid-19th century, [that] some States began enacting laws that proscribed the concealed carry of pistols and other small weapons." (Pls.' Reply at 7–8.) However, as correctly pointed out by the Defendants, the Supreme Court has already stated that "[t]he historical evidence from antebellum America does demonstrate that the *manner* of public carry was subject to reasonable regulation . . . . State's could lawfully eliminate one kind of public carry – concealed carry – so long as they left open the option to carry openly." *Bruen*, 142 S. Ct. at 2150 (emphasis in original). Because New York does allow concealed carry so long as the individual has a proper license, Plaintiffs cannot properly argue, as they try to do, that New York has no way to allow people to public carry. (*See* Pls. Br. at 18.) The fact that the manner in which New York allows public carry – concealed rather than open – is not to Plaintiffs' liking does not mean that enforcement against open carry is unconstitutional. Therefore, the Court finds that the Plaintiffs are unlikely to succeed on the merits with respect to their challenge to enforcement against open carry.

Accordingly, the Court denies Plaintiff's motion for preliminary injunction as to its challenge N.Y. Penal Law § 400.00(15) regarding open carry.

### 3.   Challenge to N.Y. Penal Law § 265.01-d

Plaintiffs challenge N.Y. Penal Law § 265.01-d [the "Private Property Provision"], which covers the following two locations: (1) all privately owned property that is not open for business to the public (and that is not a "sensitive location" under N.Y. Penal Law § 265.01-e); and (2) all privately owned property that is open for business to the public (and that is not a "sensitive location" under N.Y. Penal Law § 265.01-e). The law criminalizes a license holders' entrance

into, or remaining on, those retail commercial establishments in New York State that "(1) have not been deemed "sensitive locations" by [N.Y. Penal Law § 265.01-e], (2) operate on privately owned property, and (3) are unable for whatever reason (such as time constraints) to give express consent to each license holder on their doorstep other than by posting a sign containing a controversial message that must (by definition) be visible to all persons passing by (including potential "anti-gun" customers)." *Antonyuk*, 2022 WL 16744700, at *78.

It bears noting that two courts in this Circuit have already issued a preliminary injunction enjoining the enforcement of N.Y. Penal Law § 265.01-d. *Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 WL 17100631, at *12 (W.D.N.Y. Nov. 22, 2022) ("Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this preliminary injunction, are enjoined, effective immediately, from enforcing all of N.Y. Penal Law § 265.01-d with respect to private property open to the public, and their regulations, policies, and practices implementing it."); *Antonyuk v. Hochul*, 2022 WL 16744700, at *86  (enjoining prohibition on carrying in "the 'restricted locations' provision contained in Section 5 of the CCIA except for fenced-in farmland owned by another or fenced-in hunting ground owned by another).

Both cases are currently on appeal before the Second Circuit.  *See Antonyuk et al., v. Hochul, et al.*, C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022); *Christian v. Nigrelli*, C.A. No. 22-2987 (2d Cir. filed Nov. 23, 2022).   As of the date of this Opinion, the Second Circuit has stayed the Northern District of New York's injunction pending resolution of the appeal, which was affirmed by the Supreme Court.  *See Antonyuk et al.,* C.A. No. 22-2908 at ECF No. 76 (issued Dec. 7, 2022), *affirmed,* 598 U.S. __ (issued Jan. 11, 2023) (No. 22A557).

Because the same issue regarding the constitutionality of N.Y. Pen. L. § 265.01-d is currently being reviewed by the Second Circuit, the Court will STAY resolution of this portion of Plaintiffs' Motion for Preliminary injunction in the interests of judicial economy, pending resolution of the appeal in *Antonyuk* and *Christian* as to this issue.  *See McCracken v. Verisma Sys., Inc.,* No. 6:14-CV-06248, 2018 WL 4233703, at *2 (W.D.N.Y. Sept. 6, 2018) ("It is within the sound discretion of a district court to enter a stay pending the outcome of independent proceedings that are likely to affect a case on its calendar") (citations omitted); *see also Christian v. Nigrelli*, No. 22-CV-695 (JLS), ECF No. 60 (W.D.N.Y. Dec. 21, 2022) (staying resolution of portions of plaintiffs' motion for preliminary injunction pertaining to public parks and public transportation pending resolution by the Second Circuit in *Antonyuk v. Hochul*).

### 4.   Challenge to specific portions of N.Y. Penal Law § 265.01-e

As indicated above, *see supra*, Plaintiffs have standing to challenge several provisions in N.Y. Penal Law § 265.01-e, which prohibits carrying in certain "sensitive locations," based on their allegations on where they have or intend to frequent.  (*See* Jason Frey Decl. ¶¶ 14–15, 18–19, 27; Brianna Frey Decl. ¶¶ 12–14, 17–18; William Sappe Decl. ¶¶ 7, 13.)   Specifically, the Court will consider their challenge to the following provisions: (i) public parks, § 265.01-e(2)(d); (ii) theaters, § 265.01-e(2)(p); (iii) public transportation (MTA subway and train cars), § 265.01-e(2)(n); (iv) restaurants with on-premises alcohol consumption, § 265.01-e(2)(o); and (v) Times Square, Penal Law § 265.01-e(2)(t).

Currently, in *Antonyuk et al., v. Hochul, et al*., C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022), the Second Circuit is reviewing an appeal by the State Defendant and other officials that overlaps with issues presented in this subsection, namely and among other things, the injunction imposed by the court in *Antonyuk v. Hochul*, No. 122CV0986GTSCFH, 2022 WL 16744700

(N.D.N.Y. Nov. 7, 2022) against the enforcement of § 265.01-e(2)(d) [prohibiting guns in pubic parks]; 265.01-e(2)(o) [prohibiting guns in restaurants with on-premises alcohol consumption]; and § 265.01-e(2)(p) [prohibiting guns in theaters]. The Court will stay resolution of this portion of Plaintiffs' Motion for Preliminary injunction in the interests of judicial economy, pending resolution of the appeal in *Antonyuk* with respect to these three provisions. It is worth noting that the Second Circuit has stayed the Northern District of New York's injunction against enforcement of the gun laws with respect to §§ 265.01-e(2)(d), (o), and (p) pending resolution of the appeal, which was affirmed by the Supreme Court. *See Antonyuk et al.,* C.A. No. 22-2908 at ECF No. 76 (issued Dec. 7, 2022), *affirmed,* 598 U.S. __ (issued Jan. 11, 2023) (No. 22A557).

Therefore, the only subsections that the Court will evaluate are § 265.01-e(2)(n) which bans firearms in public transportation, including MTA subway cars and train cars and § 265.01-e(2)(t) which bans the carrying of firearms in the Times Square area. For the foregoing reasons, the Court DENIES the preliminary and permanent injunction as to § 265.01-e(2)(n) and § 265.01-e(2)(t).

### a. N.Y. Penal Law § 265.01-e(2)(t): Times Square

On the first step of the *Bruen* analysis, the Court finds that Plaintiffs met their burden of showing that the prohibition against carrying arms in the Time Square area implicates the text of the Second Amendment. *See Bruen*, 142 S.Ct. at 2134.

Moving on to the second step of the *Bruen* analysis, the Court finds that Defendants have sufficiently met their burden of establishing that there is a historical tradition of banning firearms in regularly congested commercial areas. For this reason, the Court DENIES Plaintiffs' motion for preliminary and permanent injunction with respect to N.Y. Penal Law § 265.01-e(2)(t).

Known to many as the "Crossroads of the World," the iconic Times Square is a major hub for commercial and cultural activities, known for its plentiful shopping, street vendors, entertainment, and displays of public art, which attracts residents and visitors alike. *See* https://www.timessquarenyc.org/locations/shopping and http://arts.timessquarenyc.org/times-square-arts/index.aspx (last visited November 21, 2022). Times Square is also recognized as an important space for public gatherings and is often highly congested— for example, in September 2022, there were an average of 312,611 daily visitors to Times Square (Ciappetta Decl., Exh. 17) and in 2021, Times Sq-42 St was the busiest of the 472 subway stations in New York City's transit system. *See* https://www.nyc.gov/site/cecm/permitting/times-square.page.[7]

The State and City Defendants present a number of laws between 1328 to 1903 that show a historical tradition of banning firearms in "fairs" or "markets" or areas that large crowds, which appears to address places with characteristics akin to those found in Times Square. First, Defendants point to a 1328 law from Northampton, England barring arms in "fairs, markets…" Statute of Northampton, 2 Edw. 3, ch. 3 (1328), reprinted in 1 THE STATUTES OF THE REALM 258 (*See* SMP, Exh. AA). A 1328 law from England is too remote from the relevant time period to shed light on the public understanding of the Second Amendment in 1791 and/or of the Fourteenth Amendment in 1868, *see Antonyuk*, 2022 WL 16744700, at *37 n.66, but as the City Defendants point out, there are two additional laws—a 1786 law in Virginia and a 1792 law in North Carolina—which also contains a "fairs" and "markets" prohibition and that traces in relevant part the 1328 Northampton, England law with the same or similar language. (City Defs.' Opp. at 25–26; Ciappetta Decl., Exh. 12.); *see also* 1786 Va. Laws 33, ch. 21, An Act Forbidding and

---

[7]     The boundaries of Times Square are set forth in the emergency rules signed by New York City Mayor Eric Adams and NYPD Commissioner on Sewell on August 23, 2022, and published in The City Record on August 31, 2022 (Ciappetta Decl., Exh. 1.).

Punishing Affrays ("[N]o man, great nor small, [shall] go nor ride armed by night nor by day, in fair or markets ... in terror of the Country...."); Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792) ("[N]o man great nor small ... except the King's servants in his presence . . . be so hardy to . . .  ride armed by night nor by day, in fairs [or] markets . . . ."). According to 1790 census data (*i.e.* from the founding era period), Virginia contained about 17.6% of the American population (691,737 people out of 3,929,214 people), and North Carolina contained about 11% (393, 751 out of 3,569,100 people). *See* Richard L. Forstall, Dep't of Commerce, Population of States and counties of the United States: 1790-1990, available at https://www2.census.gov/library/publications/decennial/1990/population-of-states-and-counties-us-1790-1990/population-of-states-and-counties-of-the-united-states-1790-1990.pdf. The fact that around 28.6 % (as estimated by this Court) of total American population in the founding era period "were governed by such laws regulating the carrying of firearms in 'fairs' or "markets' lends support to Defendants' arguments that the tradition of prohibiting arms in places resembling "markets" and "fairs" was sufficiently well-established and representative during the founding era. *See also Antonyuk*, 2022 WL 16744700, *37 n.66 ("The fact that 31.9 percent of Americans in 1791 were governed by such laws regulating the carrying of firearms in "fairs" or "markets" (albeit one of which was limited to terroristic behavior) would appear to shed some light on the public meaning of the words "keep and bear arms" in Second Amendment when it was adopted. ").

The Court also considers other laws from the latter half of the 19th Century that prohibited firearms involving instances where there are public gatherings engaged in recreational, entertainment, or expressive purposes. While not as persuasive as the founding era laws described above (particularly those coming from the late 19th century), these laws support Defendants'

arguments that there was an ongoing trend in American history of banning firearms in locations where people heavily congregate.  For example, the Defendants point to an 1869 Tennessee law that prohibited both open and concealed carry at any "fair, racecourse, or other public assembly of the people…." (Ciappetta Decl., Exh. 13.)  The City Defendants also present a similar 1870 Texas law that encompassed churches, schools, ballrooms, social parties, election sites, and the catchall language "other public assembly" (Ciappetta Decl., Exh. 14), and which also appears to have served as a model for other laws such as follows: Missouri (1883) (prohibiting concealed carry "where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary, or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other assemblage of persons met for any lawful purpose . . ."), Arizona (1889 and 1901), Oklahoma (1890), and Montana (1903).  (*See* Ciappetta Decl., Exh. 15; *see also* SPM Decl. Exhs. V (1870 Texas law), X (1889 Arizona law), Y (1890 Oklahoma law).   Lastly, the City Defendants provide copies of laws in Georgia (1879) and Idaho (1889), which adopted their own sensitive location statutes prohibiting firearms in places of public assembly or public gatherings.  (Ciappetta Decl., Exhs. 5 and 16.)

The Court is therefore persuaded by the Defendants' argument that N.Y. Penal Law § 265.01-e(2)(n) is in line with the historical tradition of banning firearms in locations where large groups of people are congregated for commercial, social, and cultural activities.  These laws appear to recognize that the presence of groups of people, often in confined spaces, renders a location uniquely vulnerable to firearm violence.

During oral argument, Plaintiffs' counsel argued that N.Y. Penal Law § 265.01-e(2)(n) is overly burdensome, and pointed to the fact that William Sappe often needs to drive through Times

Square while employed as an armed guard for businesses in the New York City Diamond District (which falls just outside of Times Square), and that Sappe and similarly situated individuals would be at risk of facing felony charges.  Putting aside the fact that Sappe did not allege in his declaration that he has attempted to secure a New York City gun permit at all since the enactment of the CCIA, the Court would not find it burdensome for similarly situated individuals who do have permission to carry guns in New York City to drive around the congested Times Square area in order to avoid running afoul of § 265.01-e(2)(n).  The Court also notes that N.Y. Penal Law § 265.01-e provides numerous exceptions for individuals who need to have guns on them in sensitive locations, including the following: (i) persons licensed under N.Y. Penal Law § 400.00 2(c) ("have and carry concealed while so employed by a messenger employed by a banking institution or express company") while in the course of his or her official duty; and (ii) security guards as defined by and registered under article seven-A of the general business law, who have been granted a special armed registration card, while at the location of their employment and during heir work hours as such a security guard.  *See* N.Y. Penal Law § 265.01-e(3)(e) and (g).  While neither of the parties argued whether Sappe could fall under any of the exceptions had he carried a valid New York City gun permit, the fact that these exceptions exist belies Plaintiffs' argument that N.Y. Penal Law § 265.01-e is overly burdensome. Therefore, the Court does not find that Plaintiffs have established a substantial likelihood of success on the merits to challenge N.Y. Penal Law § 265.01-e(2)(n).

### b. N.Y. Penal Law § 265.01-e(2)(n): Subway and Rails

The Court finds that the Second Amendment's plain text covers the conduct in question (*i.e.* carrying a concealed handgun for self-defense in public in "subways" and "train cars"). *Bruen*, 142 S.Ct. at 2134.  Therefore, under *Bruen*, Defendants must rebut the presumption of

protection against the regulation by showing that the law is consistent with the Nation's historical tradition of firearm regulation.

As the City Defendants indicate, the New York City subway system consists of 6,455 subway cars, 665 miles of track and 472 stations, the most of any public transit subway system in the world. *See* https://new.mta.info/agency/new-york-city-transit/subway-bus-ridership-2021 (last visited Nov. 28, 2022). The first stage of the New York City subway system opened in October 1904, with nine miles and twenty-eight stations. *See* HISTORY, The Race to Construct the First Subway: The Engineering that Built the World (S1), at 05:22, YOUTUBE, https://www.youtube.com/watch?v=cVBhvKxw4ow.   On an average weekday in 2019, the last year before the Covid-19 pandemic, the system's ridership was nearly 5.5 million, and in the same year, there were almost 1.7 billion total riders. *See id.*

In summary, the Defendants argue that N.Y. Penal Law § 265.01-e(2)(n) should be upheld as to the MTA subway system and train rails because: (i) the government has the right to control whether firearms are allowed on its property; (ii) there is historical support for firearm prohibition on trains; (iii) subways and the rails  are also places where large crowds are gathered; and (iv) the MTA system plays an integral role in the school system and must be afforded the same protections as schools, which are paradigmatic sensitive places because of the presence of children.  (State Def.'s Opp. at 37–43; City Defs.' Opp. at 38–40.)

As discussed during oral argument, the City Defendants are correct that the MTA subway system and rails, which obviously did not exist during the founding era or during the enactment of the Fourteenth Amendment, presents an issue that implicates "unprecedented societal concerns or dramatic technological changes [that] require a more nuanced approach," *Bruen*, 142 S. Ct. at 2132.  As indicated by the City Defendants, however, the Supreme Court did not explain what

such an approach would entail.  The City Defendants argue that the "nuanced approach" should entail "identify[ing] historical laws that have a similarity of purpose to the modern regulation, even if the historical analogue regulated a different subject.  (City Defs.' Opp. at 37.) *See also Antonyuk*, 2022 WL 16744700, at *41 ("nuanced approach" "essentially mean[s] broaden its conception of what constitutes an "analogue" and focus its attention on the justification for, and burden imposed by, it").  As such, the Court will consider historical laws that are analogous in purpose.

### *Government-as-proprietor*

First, the State and City Defendants argue that just as it is well-established that the government has the power to exclude firearms from "government buildings" such as courthouses and legislative buildings, such right should also extend to the MTA's subway cars and rails, all of which are quasi-governmental.  (*See* Ciappetta, Exh. 23)[8] (City Defs.' Opp. at 35.)  *See Heller*, 128 S. Ct. at 2786 ("The Court's opinion should not be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as . . . government buildings . . . ."); *Bruen*, 142 S. Ct. at 2118 ("courts can use analogies to "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" to determine whether modern regulations are constitutionally permissible."). The City Defendants aver that the application of § 265.01-e to relatively modern forms of public transportation, simply continues the longstanding tradition of allowing the government to regulate gun carrying on its own property.[9]

---

[8]     The New York City subway system is owned by the City of New York and leased to the New York City Transit Authority, a public-benefit corporation, to operate. This arrangement is pursuant to a lease that was first executed in 1953.  (Ciappetta Decl., Exh. 23.).

[9]     The State Defendant makes similar arguments with respect to public parks, averring that because federal, state, and local governments have long prohibited deadly weapons in government-owned parks, and several statutes contain language covering public functions, that subways and rails should fall within that purview.  As indicated, this issue is on appeal before the Second Circuit in *Antonyuk et al., v. Hochul, et al.*, C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022).

During oral argument, the State Defendant's counsel argued that "government buildings" should stretch to encompass the MTA's subways and rails.  The State Defendant's counsel highlighted *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015), where the Tenth Circuit found that the government could prohibit guns in a U.S. Postal Service building as a "government building." *Id*. at 1125.  The State Defendant's counsel, moreover, emphasized that the Tenth Circuit had found that the government could also prohibit guns in the parking lot adjacent to the U.S. Postal Service building. *Id*. at 1126 ("the fact that the government is acting in a proprietary capacity, analogous to that of a person managing a private business, is often relevant to constitutional analysis. The government often has more flexibility to regulate when it is acting as a proprietor (such as when it manages a post office) than when it is acting as a sovereign (such as when it regulates private activity unconnected to a government service).").  Notably, however, the Tenth Circuit's finding with respect to the building's adjacent parking lot was made under the pre-*Bruen* standard, *i.e*. an intermediate scrutiny analysis. *Id*. at 1126.  In its opposition papers, the State Defendant also cites to *United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019), where the D.C. Circuit found that a federal statute prohibiting possession of firearms on U.S. Capital grounds, as applied to the facts of that case, did not violate Second Amendment rights, and stated that "as the owner of the Maryland Avenue lot, the government—like private property owners—has the power to regulate conduct on its property."). *Id*. at 464.  The court came to that conclusion after finding, *inter alia*, that "Maryland Avenue lot has been set aside for the use of government employees, is in close proximity to the Capitol building, and is on land owned by the government," and therefore could "consider the lot as a single unit with the Capitol building, and conclude that the lot is a 'sensitive' place where firearms prohibitions are presumptively lawful." *Id*. at 464.

Two interesting questions arise: (i) whether the MTA subway and rail system should be considered a "government building" and therefore a *per se* a sensitive area; and (ii) whether post-*Bruen*, the government, as proprietor, can prohibit guns in any of its property without regard to any historical tradition consideration and regardless of whether such property can be properly deemed a "government building."  The Court, however, finds that neither question needs to be answered, because Defendants have established a sufficient historical tradition, in the specific context of the rail systems, showing that proprietors of rail systems had authority to lay out their own gun-carrying restrictions within their train cars.

As discussed by the State Defendant's historian, there was no public transportation as such during the relevant time period; instead, train travel was provided by private transportation systems until the 20th century, sometimes operating under a government charter.  (Rivas ¶¶ 13–17.).  As indicated by Rivas, "carriage would have been would have been subject to any rules laid out by the private transportation company in question.  Private companies would have had the authority to decide where and how legally transported weapons."  (*Id.* ¶ 13.)

While admitting that the opportunity to conduct thorough historical research was limited due to the time constraints of a preliminary injunction schedule and the fact that certain of the historical research involves in-person review of in paper archives, (State Def. Opp. at 43), the State Defendant and his expert historian, Brennan Rivas, provide examples of gun-carrying restrictions imposed by private rail companies against passengers on their trains.  For example, the State Defendant's expert points to the North Pennsylvania Railroad's June 1875 "rules and regulations" which stated that that conductors must prevent passengers from taking "into the cars guns, dogs, valises, large bundles or baskets." (Rivas. ¶ 13.)  Rivas also describes that rail companies tended to ship sporting firearms for hunters and treat them like baggage, therefore separating them from

39

the passenger. (*Id.* ¶ 14.)  Lastly, Rivas describes that several states, including Georgia, Ohio, and

Pennsylvania, set out parameters in the late 19th century allowing railway personnel to possess and

exercise powers of policemen or to employ their own police forces in order to enforce relevant

laws, including laws regarding firearms, to ensure peace and safety of passengers in transit.  (*Id.*

¶¶ 15–16.)

Taking the "nuanced approach" required in this context of the MTA subway and rails, the

Court finds that an adequately analogy could be made between (i) the fact that historically, the rail

systems were privately owned and that "[p]rivate transportation companies possessed the power

to create their own reasonable customer/passenger rules, which in at least some instances included

prohibitions against the presence of guns in passenger cars" (Rivas ¶ 20) and (ii) the fact the MTA

subway and rails are government owned and operated, and therefore the government as proprietor

can impose its own restrictions on gun-carrying upon its passengers.[10]

Coupled with the indication, as discussed directly below, that there is a tradition of

prohibiting firearms in highly congested settings presenting a high risk of violence (which

undoubtedly describes the MTA subway system), the Court finds that a preliminary injunction is

not warranted here with respect to N.Y. Penal Law § 265.01-e(2)(n).

### ***Prohibition of Firearms in Congested Locations***

The City Defendants argues that the Court should look at laws that regulated the presence

of firearms in populated spaces, stating that doing so is more informative than trying to analogize

---

[10]     State Defendant and Rivas also point to several cases involving laws that prohibited carrying guns on one's
person except for during long-distance travel.  (State Def. Opp. at 41–42; Rivas ¶¶ 6–13.)  The Court points out that
two of the cases cited do not support the State Defendant's arguments that guns were completely prohibited while
traveling short distances in certain jurisdictions.  *See Willis v. State*, 105 Ga. 633 (1898) ("Any person having or
carrying about his person, unless in an open manner and fully exposed to view, any pistol, dirk, sword in a cane, spear,
bowie-knife, or any other kind of knives manufactured and sold for the purpose of offense and defense, shall be guilty
of a misdemeanor."); *Eslava v. State*, 49 Ala. 355 ("If the necessity existed only while he was travelling, then, if after
he reached the city and had a reasonable opportunity of divesting himself of the weapon, or of changing the manner
of carrying it so as not to offend the statute, he continued to bear it concealed about his person, he is guilty as charged).

this law with regulations concerning early forms of transportation such as trolleys, omnibuses, or horse carts.  (City Defs.' Opp. at 37.)  The City Defendants aver that this approach "recognizes the unique nature of modern life and eliminates the need to make comparisons between things that only bear a superficial similarity (trolleys and subway cars)."  (*Id*.)

The State Defendants point to the same laws described above in the N.Y. Penal Law § 265.01-e(2)(t): Times Square (Discussion II.A.4.a, *supra*), arguing that there is a historical tradition of banning firearms in highly crowded locations where the risk of violence is high. While those laws do not relate to public transportation, the Court does find persuasive Defendants' argument that N.Y. Penal Law § 265.01-e(2)(n) is consistent with those laws, considering that a main concern animating the gun restrictions in the MTA subways and rails is the high amount of foot traffic and related safety issues.   (City Defs.' Opp. at 37–38; State Def. Opp. at 31–33.)

### *Subways as part of the school system*

The Court is less persuaded by Defendant's argument that because the MTA public transportation system "plays an integral role in the school system," it "must be afforded the same protections as the school system."  (State Def. Opp. at 39.)   On one hand, schools are a paradigmatic sensitive place because of the presence of children.  *See Class*, 930 F.3d at 465, *Heller*, 554 U.S. at 626; *McDonald,* 561 U.S. at 786.  Indeed, *Bruen* "assume[d] it settled that" schools full of children "were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." 142 S.Ct. at 2133; *see also id*. at 2157 (Alito, J., concurring).

In addition, Defendants present data indicating that New York City has over 1.1 million students at more than 1,800 schools, *see* Explore NYC Schools, N.Y. City Council, https://council.nyc.gov/data/school-explorer/ (last accessed on Nov. 29, 2022), and conjectures that "there could be over 1.1 million students traveling on the MTA system."  (State Def.'s Opp.

at 40.)   The Court also recognizes that the MTA system plays an important indirect role in the school system. The Court is nonetheless not prepared to state the MTA subway and rails should be considered "sensitive places" just by virtue of its connection with the school system, particularly as Defendants do not show that the MTA subways and rails are "densely populated" by children the way schools are.  *See, e.g., Antonyuk*, 2022 WL 16744700, at *25 ("the State Defendants adduce no evidence that those shelters are as densely populated by children as are schools").

## B. Irreparable Harm

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citing *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). "[T]o satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). The "mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991).

In addition, "[i]n the Second Circuit ... [the] presumption of irreparable harm arising from a constitutional deprivation is not automatic." *Joglo Realties, Inc. v. Seggos*, 16-CV-1666 (ARR)(CLP), 2016 WL 4491409, at *16 (E.D.N.Y. Aug. 24, 2016). Instead, "[b]ecause the violation of a constitutional right is the irreparable harm asserted [ ], the two prongs of the preliminary injunction threshold merge into one" and "in order to show irreparable injury, plaintiff must show a likelihood of success on the merits." *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000). As the Second Circuit has held that it is "more appropriate to determine

irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights," *Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917, 924 (2d Cir. 1997), the alleged violations of Plaintiffs' Second Amendment rights, by themselves, are not sufficient to show irreparable harm.

As discussed above, Plaintiff has failed to show a likelihood of success with respect to its challenges against N.Y. Penal Law §§ 400.00(6), 400.00(15), 265.01, 265.01-b, 265.03(3), §§ 265.01-e(2)(n) and 265.01-e(2)(t), and NYC Admin. Code § 10-315, Plaintiff therefore fails to show that they will suffer irreparable harm without an injunction against those statutes.

### C. Balance of Hardships and Public Interest

Putting aside the issues which the Court stays its resolution on pending Second Circuit review in analogous cases, the Court otherwise finds that a preliminary injunction is not in the public interest.

When the Government is the opposing party, irreparable harm and public interest factors merge. *See Nken v. Holder,* 556 U.S. 418, 435, 129 S. Ct. 1749, 1762 (2009). As stated above, because Plaintiffs failed to show a likelihood of success of the merits with respect to the aforementioned statutes, Plaintiffs therefore cannot show that the balance of hardships tips in their interest.

<u>**CONCLUSION**</u>

For the foregoing reason, Plaintiffs' motion for preliminary injunction is DENIED in part, and STAYED in part, as follows:

- The Court DENIES a preliminary injunction with respect to Plaintiffs' challenge of N.Y. Penal Law §§ 400.00(6), 400.00(15), 265.01, 265.01-b, 265.03(3), and NYC Admin. Code § 10-315.

- The Court DENIES a preliminary injunction with respect to Plaintiffs' challenge of N.Y. Penal Law §§ 265.01-e(2)(n) (with regards to the MTA subway and rails) and 265.01-e(2)(t).

- The Court STAYS its decision on the preliminary injunction motion with respect to Plaintiff's challenge of N.Y. Penal Law §§ 265.01-d, 265.01-e(2)(d), 265.01-e(2)(p), and 265.01-e(2)(o) pending resolution by the Second Circuit in *Antonyuk et al., v. Hochul, et al*., C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022).

The parties are DIRECTED to submit a letter to the Court once a resolution is reached in *Antonyuk et al., v. Hochul, et al*., C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022), which may impact the Court's resolution on the preliminary injunction motion with respect to Plaintiff's challenge of N.Y. Penal Law §§ 265.01-d, 265.01-e(2)(d), 265.01-e(2)(p), and 265.01-e(2)(o).

Dated:   March 13, 2023                                         SO ORDERED:
         White Plains, New York

                                                  _____
                                                        NELSON S. ROMÁN
                                                   United States District Judge