USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Oct 10 2025

23-365-cv
*Frey v. City of New York*

# United States Court of Appeals
## for the Second Circuit

———————————————————

August Term 2023

Argued: January 30, 2024   Decided: September 19, 2025

No. 23-365-cv

———————————————————

JASON FREY, BRIANNA FREY, WILLIAM SAPPE,

*Plaintiffs-Appellants*,

JACK CHENG,

*Plaintiff*,

— v. —

CITY OF NEW YORK, NEW YORK, JESSICA S. TISCH, IN HER OFFICIAL
CAPACITY AS COMMISSIONER OF THE NEW YORK POLICE DEPARTMENT, STEVEN G.
JAMES, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF THE NEW YORK STATE
POLICE,*

*Defendants-Appellees.*

———————————————————

———————————————

* The Clerk of the Court is respectfully directed to amend the caption on this Court's
docket to be consistent with the caption on this opinion.

Before:        SACK, RAGGI, AND BIANCO, *Circuit Judges*.

Plaintiffs-Appellants brought pre-enforcement Second Amendment challenges to certain aspects of New York State's ("New York" or the "State") concealed carry license regime. As relevant to this appeal, Plaintiffs challenge the constitutionality of: (1) the prohibition on carrying firearms in "sensitive locations"—namely, Times Square, the New York City (the "City") subway system, and the Metro-North rail system, *see* N.Y. Penal Law §§ 265.01-e(2)(t), (2)(n); (2) New York's ban on open carry, *see id.* § 400.00(15); and (3) the requirement that a State concealed carry license holder apply for and receive a City-specific permit in order to carry a firearm in the City, *see id.* § 400.00(6). Plaintiffs filed a motion to preliminarily enjoin the enforcement of those provisions, which the district court denied in a March 13, 2023 order. On this appeal from that order, we conclude that Plaintiffs are unlikely to succeed on the merits because, based on the preliminary record before us, the government has demonstrated that each of the challenged provisions falls within our Nation's historical tradition of gun regulations and, thus, does not violate the Second Amendment. Accordingly, we **AFFIRM** the order of the district court.

AMY L. BELLANTONI, The Bellantoni Law Firm, Scarsdale, New York, *for Plaintiffs-Appellants*.

ELINA DRUKER, Corporation Counsel (Richard Dearing and Claude S. Platton, Corporation Counsel, *on the brief*), for the Hon. Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, New York, New York, *for Defendants-Appellees the City of New York and Jessica S. Tisch.*

PHILIP J. LEVITZ, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, and Ester Murdukhayeva, Deputy Solicitor General, *on the brief*), for Letitia James, Attorney General for the State of New York, New York, New York, *for Defendant-Appellee Steven G. James.*

Janet Carter and William J. Taylor, Jr., Everytown Law, New York, New York, *for Amicus Curiae Everytown for Gun Safety, in support of Defendants-Appellees.*

Matteo Godi, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, District of Columbia, Allan J. Arffa, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, *for Amicus Curiae Metropolitan Transportation Authority, in support of Defendants-Appellees.*

Alan Schoenfeld and Ryan Chabot, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York, *for Amicus Curiae The Times Square Alliance, in support of Defendants-Appellees.*

JOSEPH F. BIANCO, *Circuit Judge*:

Plaintiffs-Appellants brought pre-enforcement Second Amendment challenges to certain aspects of New York State's ("New York" or the "State") concealed carry license regime.  As relevant to this appeal, Plaintiffs challenge the constitutionality of: (1) the prohibition on carrying firearms in "sensitive locations"—namely, Times Square, the New York City (the "City") subway system, and the Metro-North rail system, *see* N.Y. Penal Law §§ 265.01-e(2)(t), (2)(n); (2) New York's ban on open carry, *see id.* § 400.00(15); and (3) the requirement that a State concealed carry license holder apply for and receive a

City-specific permit in order to carry a firearm in the City, *see id.* § 400.00(6). Plaintiffs filed a motion to preliminarily enjoin the enforcement of those provisions, which the district court denied in a March 13, 2023 order.  On this appeal from that order, we conclude that Plaintiffs are unlikely to succeed on the merits because, based on the preliminary record before us, the government has demonstrated that each of the challenged provisions falls within our Nation's historical tradition of gun regulations and, thus, does not violate the Second Amendment.  Accordingly, we **AFFIRM** the order of the district court.

## BACKGROUND

New York requires individuals to obtain a license in order to carry firearms from the privacy of their homes into the public realm.  *See generally* N.Y. Penal Law § 400.00; *see also id.* §§ 265.03(3) (criminalizing possession of a loaded firearm outside a person's home or place of business), 265.20(a)(3) (exempting license-holders from liability).  New York grants licenses only for concealed public carry of a pistol or revolver.  *See id.* § 400.00(2)(f).  In other words, New York criminalizes, and thereby effectively bans, the open carrying of firearms in public. *See id.* § 400.00(15) (violation of a licensing restriction is a class A misdemeanor).

3

The licensing processes are administered at the city and county levels.  *See id.* § 400.00(3).  These localities may establish and apply more restrictive licensing requirements than the State.  *See id.* § 400.30.  With some exceptions inapplicable to this appeal, state law requires individuals who want to carry firearms in the City to obtain a license issued by the City, or a special permit if the individual has already obtained a license elsewhere.  *See id.* § 400.00(6).

Prior to July 2022, New York law required license applicants to show, among other things, "proper cause" in order to obtain a concealed carry license.  *Id.* § 400.00(2)(f) (effective Apr. 3, 2021 to July 5, 2022).  However, the Supreme Court held that the requirement violated the Second Amendment and struck it down.  *See generally N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70 (2022).  In response to *Bruen*, the State legislature passed the Concealed Carry Improvement Act ("CCIA"), which removed the proper-cause requirement and amended other portions of the State's concealed carry regulatory regime.  As pertinent here, the CCIA makes it a felony to carry a firearm in certain statutorily defined categories of "sensitive locations," including Times Square, as well as public transportation systems, even by concealed-carry license holders.  N.Y. Penal Law §§ 265.01-e(2)(n), (2)(t); *see also* N.Y.C. Admin. Code § 10-315 (defining

location of Times Square).  There are exemptions for, *inter alia*, law enforcement officers, active-duty military personnel, and security guards.  N.Y. Penal Law § 265.01-e(3).  The CCIA did not alter New York's open carry ban or the City's special permit requirement.

Plaintiffs filed this lawsuit in 2021.  In October 2022, after the CCIA came into effect, Plaintiffs filed the operative second amended complaint against the City, the then-Commissioner of the New York City Police Department, and the then-Acting Superintendent of the New York State Police.  As relevant to this appeal, Plaintiffs brought pre-enforcement Second Amendment challenges to (1) the CCIA's prohibition on carrying firearms in certain "sensitive locations," including Times Square, as well as the New York City subway and Metro-North train systems, *id.* § 265.01-e; (2) various provisions that they alleged together effectively ban the open carrying of firearms in New York, *id.* §§ 400.00(15), 265.01, 265.01-b, 265.03(3), and N.Y.C. Admin. Code § 10-315; and (3) the City's special permit requirement, N.Y. Penal Law § 400.00(6).

Plaintiffs Jason Frey and William Sappe are State residents who hold valid licenses for concealed carry in the State.[1]  Jason Frey has a restricted "sportsman" license issued in Westchester County, New York, allowing him to carry concealed handguns in public to and from target shooting activities and during sporting activities, such as camping, hiking, and hunting.  In 2019, Westchester County denied Frey's application for an unrestricted concealed carry license for failure to show proper cause.  Frey does not have a special permit issued by the City to carry concealed handguns within the City and asserts he "is not going to, and should not have to" apply for a separate City permit.  App'x at 21.  Nevertheless, Frey avers that he regularly carries his handgun concealed outside the scope of his "sportsman" license in Westchester County and in the City, including on the Metro-North train into Grand Central station, on the New York City subway, and in Times Square.  Frey also states that he "intend[s] to start carrying [his] handgun open and holstered" when he is "not carrying the same handgun concealed," and that "[t]he only reason [he] do[es] not exercise the right to open carry in New York

---

[1]  Plaintiff Jack Cheng did not join the preliminary injunction motion that is the subject of this appeal.  In addition, Plaintiff Brianna Frey does not contest the district court's determination that she lacks standing to challenge the statutory provisions relevant to this appeal.  Accordingly, only the challenges brought by William Sappe and Jason Frey are the subject of this appeal.

State is the fear of arrest, jail and the other criminal and civil penalties that will follow." *Id.* at 21.

William Sappe has an "unrestricted" license to carry a concealed weapon issued in Orange County, New York. At some unspecified point in time, he applied for a special permit to carry in the City, but his application was denied. Sappe avers that he is licensed as an armed guard by the State. As part of that job, he regularly transports cash, diamonds, and jewelry in and out of the City's Diamond District, which requires him to travel though Times Square. Sappe states that he "intend[s] to carry [his] handgun concealed in New York City for self-defense on a daily basis," *id.* at 25, and "intend[s] to begin carrying [his] handgun open and exposed on those days that [he is] not carrying a handgun concealed on [his] person, both inside New York City and throughout the state," *id.* at 27. He fears "arrest and incarceration" for carrying in the City as well as for "carrying open and holstered." *Id.* at 28.

On October 20, 2022, Plaintiffs filed a proposed order to show cause for emergency relief, which the district court construed as a motion for a preliminary injunction. *See Frey v. Nigrelli*, 661 F. Supp. 3d 176, 186 (S.D.N.Y. 2023). The district

court denied the motion.[2]  As to the restrictions on carrying concealed handguns in "sensitive locations," the district court determined that the government sufficiently met its burden of establishing a historical tradition of banning firearms in congested commercial areas, such as Times Square and the public transportation systems.  *Id.* at 200–07.  As to the open carry ban, it concluded that Plaintiffs lacked standing to seek a preliminary injunction because they did not sufficiently aver concrete and imminent intentions to carry firearms in an open manner.  *See id.* at 195.  The district court also found that, even assuming Plaintiffs had standing, they were unlikely to prevail on the merits because the open carry ban fits within the historical tradition of regulating the manner of public carry, which allowed a state to lawfully eliminate one kind of public carry (concealed or open), so long as it left the alternative option open.  *See id.* at 198–99.  Finally, the district court concluded that Plaintiffs were unlikely to succeed on the merits of

---

[2] The district court stayed resolution of Plaintiffs' challenge to the CCIA's prohibition on carrying firearms onto private property without permission from the owner or lessee, N.Y. Penal Law § 265.01-d, pending our review of the same provision in two other cases. *See Frey*, 661 F. Supp. at 199.  The district court similarly stayed the resolution of Plaintiffs' challenges to firearm prohibitions in other sensitive locations, including public parks, theaters, and restaurants with on-premises alcohol consumption, pending our review of the identical issues in *Antonyuk v. James*, No. 22-2908 (2d Cir. Filed Nov. 9, 2022).  *See id.* at 200.  Those provisions are therefore not before us on this appeal.

their challenge to the City's special permit requirement because the government

established a historical tradition of firearm regulations at the municipal and town

level. *See id.* at 196–98.

This appeal followed.

## DISCUSSION

"We review the denial of a motion for a preliminary injunction for abuse of

discretion, which we will identify only if the decision rests on an error of law or a

clearly erroneous finding of fact, or cannot be located within the range of

permissible decisions." *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 180 (2d

Cir. 2020). "We may, of course, affirm on any basis for which there is a record

sufficient to permit conclusions of law, including grounds upon which the district

court did not rely." *Name.Space, Inc. v. Network Sols., Inc.*, 202 F.3d 573, 584 (2d Cir.

2000) (internal quotation marks and citation omitted).

"A preliminary injunction is an extraordinary remedy never awarded as of

right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Ordinarily, "[a]

plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to

succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the

absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and

[(4)] that an injunction is in the public interest." *Id.* at 20. However, "when, as here, the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party" can "establish a clear or substantial likelihood of success on the merits." *Cnty. of Nassau. v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008) (alteration, internal quotation marks, and citations omitted).

## I.    Second Amendment Principles

The Second Amendment, made applicable to the states through the Fourteenth Amendment, guarantees that "the right of the people to keep and bear [a]rms [] shall not be infringed." U.S. Const. amend. II.

After *Bruen*, we follow a two-step framework to evaluate Second Amendment challenges. First, the plaintiff must establish that "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If the plaintiff surmounts this initial textual hurdle, the burden shifts to the government to prove that the challenged law is "consistent with the Nation's historical tradition of firearm regulation." *Id*. We focus on history and tradition because the Second Amendment "codified a *pre-existing* right"—with a history

that makes clear that this right is "not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 592, 595 (2008) (emphasis in original). The right's enshrinement in the Bill of Rights "br[ought] the old soil with it," *Sekhar v. United States*, 570 U.S. 729, 733 (2013) (internal quotation marks and citation omitted)—that is, we understand the Second Amendment to "incorporate traditional limitations that existed at or around ratification, unless historical context suggests otherwise," *Antonyuk v. James*, 120 F.4th 941, 968 (2d Cir. 2024) (internal quotation marks and citation omitted), *cert. denied*, 145 S. Ct. 1900 (2025). Historically established firearm regulations therefore inform us of the limits of the right and thereby "give content to the indeterminate and underdetermined text of the Second Amendment." *Id.*

Under this history and tradition analysis at step two, we "must ascertain whether the [challenged] new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (alteration adopted) (internal quotation marks and citation omitted). "Why and how the regulation burdens the right are central to this inquiry." *Id.* The Supreme Court has stressed that the *Bruen* framework was "not meant to suggest a law trapped in amber." *Id.* at 691. Thus, this analogical reasoning "requires only

11

that the government identify a well-established and historical *analogue*, not a historical *twin*" or a "dead ringer." *Bruen*, 597 U.S. at 30 (emphases in original).

Because *Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," *id.* at 29, we attempted to undertake that endeavor at some length in *Antonyuk*. There, we explained that "courts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction." *Antonyuk*, 120 F.4th at 970; *see Bruen*, 597 U.S. at 27 ("[C]ases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."). Thus, a lack of distinctly similar historical regulations during one or more of those time periods "may not be reliably dispositive in Second Amendment challenges to laws addressing modern concerns." *Antonyuk*, 120 F.4th at 970. "Reasoning from historical silence is [also] risky," we said, because "[l]egislatures past and present have not generally legislated to their constitutional limits," and it is thus "not necessarily the case that, if no positive legislation from a particular time or place is in the record, it must be because the legislators then or there deemed such regulation inconsistent with the right to bear arms." *Id.* at 969.

12

We also underscored that it is "not dispositive whether comparable historical regulations exist in significant numbers." *Id.* at 971 (emphasis omitted). Indeed, the Supreme Court had no trouble confirming that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" were "longstanding" and "settled," notwithstanding that "the historical record yields relatively few 18th- and 19th- century 'sensitive places' where weapons were altogether prohibited." *Bruen*, 597 U.S. at 30 (internal quotation marks and citation omitted). That was because the Court was "aware of no disputes regarding the lawfulness of such prohibitions." *Id.* Therefore, especially where there is a lack of constitutional dispute regarding a type of gun regulation, or "if courts during that period upheld similar governmental practices against similar constitutional challenges," "comparable historical laws need not proliferate to justify a modern prohibition." *Antonyuk*, 120 F.4th at 969, 972.

Importantly, in *Antonyuk*, we further held that "[b]ecause the CCIA is a state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis," and that "[t]he time periods in close proximity to 1791 and 1868 are also relevant to our analysis." *Id.* at 972–73. We reasoned that "the understanding that prevailed when the States adopted the Fourteenth

13

Amendment" is, "along with the understanding of that right held by the founders in 1791, a relevant consideration." *Id.* at 973–74 (internal quotation marks and citation omitted). Thus, we suggested that the incorporation of the Second Amendment against the states through the Fourteenth Amendment may have, as commentators observe, "invested those original 1791 texts with new 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022); *see also* Akhil Reed Amar, Heller, *HLR, and Holistic Legal Reasoning*, 122 Harv. L. Rev. 145, 178 (2008) ("In the process of 'incorporating' these rights against states, the Fourteenth [Amendment] also reglossed the earlier amendments and gave America a more liberal, more individualistic Bill of Rights than did the Founders."). However, we did not definitively answer the question that the Supreme Court has so far tabled: "whether courts should *primarily* rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope." *Bruen*, 597 U.S. at 37 (emphasis added); *see Rahimi*, 602 U.S. at 692 n.1 (reserving same question).

Here too, as in *Antonyuk*, we need not choose which era's understanding has primacy. Even if the 1791 understanding primarily controls, the Supreme Court

14

has approved looking to post-Founding history to discern that meaning. We pause here to reiterate why we may comfortably rely on that history, especially from the Reconstruction era, and to explain why we may rely on it where the Second Amendment's plain text and Founding era evidence prove equivocal.

The Supreme Court has explicitly sanctioned looking to post-Founding history in understanding the original public meaning of the Second Amendment in 1791. In *Heller*, the Supreme Court explained that "the examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is "a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis added). *Heller* therefore "address[ed] how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" in its pursuit of understanding the scope of the right to keep and bear arms. *Id*.

In particular, *Heller* underscored the importance of Reconstruction-era evidence. *Heller* explained that, "[i]n the aftermath of the Civil War, there was an outpouring of discussion of the Second Amendment in Congress and in the public discourse," and "those born and educated in the early 19th century faced a widespread effort to limit arms ownership by a large number of citizens." *Id.* at

614; *see McDonald v. City of Chicago*, 561 U.S. 742, 771 (2010) ("After the Civil War, many of the over 180,000 African-Americans who served in the Union Army returned to the States of the old Confederacy, where systematic efforts were made to disarm them and other blacks."). As a result, "their understanding of the origins and continuing significance of the [Second] Amendment is instructive." *Heller*, 550 US. at 614. *Bruen* reaffirmed the appropriateness of relying on post-Founding history as evidence of the public understanding of a Constitutional provision at the time of the Founding. 597 U.S. at 35 ("It is true that in *Heller* we reiterated that evidence of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represented a critical tool of constitutional interpretation." (internal quotation marks and citation omitted)).

Post-Founding historical evidence is also relevant under James Madison's "liquidation" theory. Under that theory—which the Supreme Court has endorsed on several occasions, including in *Bruen*—"'a regular course of practice' can 'liquidate & settle the meaning of' disputed or indeterminate 'terms & phrases'" in the Constitution. *Chiafalo v. Washington*, 591 U.S. 578, 593 (2020) (quoting Letter from J. Madison to S. Roane (Sept. 2, 1819), in 8 Writings of James Madison 450 (G. Hunt ed. 1908)); *Bruen*, 597 U.S. at 35–36 (quoting the passage from *Chiafalo*); *see*

16

*also, e.g.*, *The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions."). In other words, where the meaning of a Constitutional provision is "more or less obscure and equivocal," a deliberate and sustained course of post-enactment action may settle the meaning of that provision. The Federalist No. 37, at 236 (James Madison) (Jacob E. Cooke ed., 1961); *see generally* William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 8–35 (2019); *see also Rahimi*, 602 U.S. at 738 (Barrett, *J.*, concurring) (explaining that post-enactment history can "liquidate ambiguous constitutional provisions" (citation omitted)).

To be sure, *Bruen* cautioned that we should not give "postenactment history more weight that it can rightly bear." 597 U.S. at 35. In particular, we cannot rely on later history if it "contradicts what the text says." *Id.* at 36. Moreover, our reliance on 19th-century evidence should be "secondary" where there is a "wealth of authority" from the Founding era. *Id.* at 37. However, those observations "do[] not require courts to reflexively discount evidence from the latter half of the 19th century absent indications that such evidence is inconsistent with the national tradition." *Antonyuk*, 120 F.4th at 1029.

Where there is no strong historical evidence from the Founding era, it is appropriate to look toward, and rely upon, later historical evidence. As we articulated in *Antonyuk*, the paucity of a similar historical regulation during the Founding era does not evince a lack of a historical tradition in "this Nation's *whole* tradition," *id*. at 972 n.15 (emphasis in original), because "it is not necessarily the case that, if no positive legislation from a particular time or place is in the record, it must be because the legislators then or there deemed such a regulation inconsistent with the right to bear arms," *id*. at 969. Thus, the dearth of similar Founding-era laws does not help us discern with clarity the scope of the Second Amendment right. At that point, rather than shrugging our shoulders, we must instead continue our march through history to ascertain the meaning of that as-yet ambiguous Constitutional provision. Later history may continue to prove equivocal, in which case the government cannot meet its burden of proving a historical tradition of a certain firearm regulation. Later history might instead definitively showcase either the existence or lack of a strong national tradition. However, whatever that later history bears out, the conclusions we derive from it could not be characterized as *contradicting* the understanding of the right in 1791 if the Founding-era history does not point with some certainty in one direction or

another.  *See id.* at 974 (recognizing "that evidence nearest to 1791 can differ from that nearest to 1868," but that 1791, 1868, and "the adjacent and intervening periods" remain "fertile ground" to "seek evidence of our national tradition of firearm regulation").

As discussed above, looking to later history in the face of an indeterminate Founding-era record fits neatly within the originalist and liquidation theories espoused by the Court in *Heller* and *Bruen*.  It comports with an originalism analysis pegged to 1791 because Reconstruction era evidence, though secondary to Founding era evidence, is nevertheless uniquely "instructive" to understanding the original public meaning of the Second Amendment right since "those born and educated in the early 19th century faced a widespread effort to limit arms ownership by a large number of citizens" during that time period.  *Heller*, 554 U.S. at 614; *see also Rahimi*, 602 U.S. at 738 (Barrett, *J.*, concurring) ("[P]ostenactment history can be an important tool" because it can "provide persuasive evidence of the original meaning").  Thus, for example, in explaining that the Second Amendment right "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," and providing the "prohibitions on carrying concealed weapons" as an example of lawful limitations

on the right, *Heller* relied exclusively on the fact that "the majority of the *19th-century* courts to consider the question" found those prohibitions "lawful under the Second Amendment or state analogues." *Id.* at 626 (emphasis added) (collecting 19th century cases). Relying on later history is also appropriate under Madison's liquidation theory because a regular course of practice may settle a constitutional debate at *any* point in our history, so long as the question had previously remained open. *See* Baude, 71 Stan. L. Rev. at 59–60 (arguing that "[p]rivileging early practice through liquidation is tempting but wrong" because "[i]ndeterminate provisions remain open to liquidation for as long as their meanings remain contested"); *cf. Heller*, 554 U.S. at 625 (noting that some "provisions of the Bill of Rights have [] remained unilluminated for lengthy periods"). In short, consistent with the two constitutional interpretive modalities endorsed by *Bruen*, where neither the plain text nor Founding-era evidence makes clear the scope of the Second Amendment right, we may focus on later evidence, especially from the Reconstruction era, to ascertain that scope.[3]

---

[3] We readily recognize that, as Justice Barrett explained in her *Rahimi* concurrence, "for an originalist, the history that matters most is the history surrounding the ratification of the text" because "that backdrop illuminates the meaning of the enacted law." *Rahimi*,

With these principles in mind, we take up the Second Amendment questions

presented in this appeal.

## II.   Sensitive Locations Restrictions

We first address Plaintiffs' challenge to the ban on firearms in certain

sensitive locations.  Section 265.01-e criminalizes the "possession of a firearm, rifle

or shotgun in a sensitive location" when "such person knows or reasonably should

know such location is a sensitive location."  N.Y. Penal Law § 265.01-e(1).  Section

265.01-e then lists and defines those sensitive locations, including, as relevant here,

"the area commonly known as Times Square," *id.* at § 265.01-e(2)(t), and "any

place, conveyance, or vehicle used for public transportation or public transit" or

"any facility used for or in connection with service in the transportation of

passengers," such as subway and train cars and stations, *id.* at § 265.01-e(2)(n).[4]

---

602 U.S. at 737–38 (Barrett, *J.*, concurring).  However, when that evidence fails to yield a
conclusive answer, nothing stops us from considering the next-best evidence.  *See id.* at
738 (explaining that "postenactment history can be an important tool" because it can
"provide persuasive evidence of the original meaning").

[4]  The City's argument that Plaintiffs lack standing to challenge these provisions unless
we conclude that they are likely to succeed on their challenge to the City's special permit
requirement, N.Y. Penal L. § 400.00(6), is unpersuasive.  Although the City offers little by
way of explanation, we construe the City to argue that Plaintiffs cannot satisfy the

The district court found that Plaintiffs satisfied the requirements under step one of the *Bruen* analysis, which Defendants do not challenge on appeal. *Frey*, 661 F. Supp. 3d at 200–01, 203. We assume, without deciding, that finding is correct and turn our attention to the step-two analysis.

Beginning with *Heller*, the Supreme Court has repeatedly confirmed that "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful regulatory measures." 554 U.S. at 626–27 & n.26; *see McDonald*, 561 U.S. at 786 ("repeat[ing] th[e] assurances" in *Heller* that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are presumptively constitutional (internal quotation marks and citation omitted)). Although *Heller* illustrated the sensitive places doctrine by referencing schools and government buildings, it identified them "only as examples" that did "not purport to be exhaustive." *Heller*, 554 U.S. at 627 n.26. *Bruen* then reaffirmed that it is

─────────────

redressability requirement of standing because even if we enjoined Section 265.01-e, Section 400.00(6) bars Plaintiffs from carrying firearms in the City generally, including in Times Square and the City's public transportation systems. However, a violation of Section 265.01-e is a class E felony, whereas a violation of Section 400.00 is a class A misdemeanor. Thus, enjoining the enforcement of Section 265.01-e "satisfies the redressability requirement" because it "will relieve a discrete injury"—the risk of a *felony* conviction. *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982); *see id.* (explaining that a plaintiff "need not show that a favorable decision will relieve his *every* injury" to satisfy redressability (emphasis in original)).

"settled" that certain locations such as legislative assemblies, polling places, and courthouses are "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Bruen*, 597 U.S at 30. *Bruen* further explained that courts can analogize to these "'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings'" "to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis in original).

Bearing those principles in mind in *Antonyuk*, we scoured the history books and concluded that our Nation has a "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond." 120 F.4th at 1019. In so concluding, we first pointed to a British statute from 1328—the Statute of Northampton—which forbade going or riding "armed by night []or by day, in fairs, markets." *Id.* (quoting Statute of Northampton 1328, 2 Edw. 3 c.3 (Eng.)). Two states, Virginia and North Carolina, "passed statutes at the Founding that replicated the medieval English law prohibiting firearms in fairs and markets, *i.e.*, the traditional, crowded public forum." *Id.* at 1019–20 (citing 1786 Va. Acts 35,

Ch. 49 (stating that "no man, great or small, of what condition," except ministers of justice, shall "go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the country"); Collection of Statutes of the Parliament of England in Force in the State of North Carolina, pp. 60–61, ch. 3 (F. Martin Ed. 1792) (stating that "no man great nor small," except ministers of justice, shall "bring no force in an affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets")); *see id.* at 1021 (observing that Virginia's and North Carolina's statutes "applied to over a quarter of the Nation's population"). Looking to the Reconstruction era, we determined that three other states (Texas, Missouri, and Tennessee) and two territories (Oklahoma and Arizona) similarly passed laws prohibiting weapons in public forums and crowded places. *Id.* at 1021–22; *see* 1869–70 Tenn. Pub. Acts 23 (prohibiting carriage of deadly weapons by "any person attending any fair, race course, or other public assembly of the people"); 1870 Tex. Gen. Laws 63 (prohibiting firearms in "place[s] where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering"); 1883 Mo. Laws 76 (barring firearms in "any school room or place where people are assembled for educational, literary or social purposes" and "any other public assemblage of persons met for any lawful

purpose"); 1889 Ariz. Sess. Laws 17 (prohibiting carrying "a pistol or other firearm" to "any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election . . . or to any other public assembly"); 1890 Okla. Sess. Laws 496 (prohibiting carriage of a firearm in places "where persons are assembled for . . . amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering").

These legislative actions were reinforced by judicial imprimatur. We highlighted that "the state courts of all three states that had such laws upheld this type of statute as constitutional." *Antonyuk,* 120 F.4th at 1021; *see Andrews v. State*, 50 Tenn. 165, 182 (1871) (upholding conviction under Tennessee law on grounds that "a man may well be prohibited from carrying his arms" to a "public assemblage, as the carrying [of] them to such places is not an appropriate use of them"); *English v. State*, 35 Tex. 473, 478–79 (1872) (upholding indictment under Texas law and noting that the Second Amendment does not guarantee the "right

25

to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together.")[5]; *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (holding that the Missouri law prohibiting carriage "where people are assembled for educational, literary, or social purposes" was constitutional).  These state supreme court decisions "during that period uph[olding] similar governmental practices against similar constitutional challenges" are "strong evidence of constitutionality."  *Antonyuk*, 120 F.4th at 969.

Accordingly, we held that "[t]his long, unbroken line, beginning from medieval England and extending beyond Reconstruction, indicates that the tradition of regulating firearms in often-crowded public forums is part of the

---

[5]  *English v. State* also upheld a Texas law that forbade anyone from "carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person."  1871 Tex. Gen. Laws § 1.  As to that particular portion of *English*, *Bruen* concluded that it was an "outlier[]" and would therefore "not give disproportionate weight" to it in assessing whether there was a historical tradition of a "proper cause" licensing requirement.  597 U.S. at 64–65.  However, on the issue of carrying a firearm into a public assembly, the Texas statute and *English* decision are, as demonstrated above, supported by a wide swath of other similar state statutes and court decisions.  *Bruen* therefore in no way prevents us from relying on the *English* case here. *See Antonyuk*, 120 F.4th at 1021 n.83.

immemorial custom of this Nation." *Id.* at 1021 (internal quotation marks and citations omitted).

Comparing that robust historical tradition against the prohibition of firearms in urban parks and theaters at issue in *Antonyuk* was "a straightforward inquiry" because "[i]t is obvious that [Section] 265.01-e burdens Second Amendment rights in a distinctly similar way (*i.e.*, by prohibiting carriage) and for a distinctly similar reason (*i.e.*, maintaining order in often-crowded public squares) as do the plethora of regulations provided by the State."[6] *Id.* at 1024. We therefore

---

[6] We are not so certain that the Northampton statute, or the Virginia and North Carolina laws that replicated it, prohibited carriage altogether. As *Antonyuk* acknowledged, the Virginia statute "prohibited conduct and not simply carriage, *i.e.*, bearing arms in 'terror' of the county." 120 F.4th at 1020 n.82 (emphasis omitted). Although *Antonyuk* read the Northampton and North Carolina statutes "to have prohibited firearm carriage in general at fairs and markets regardless of conduct," *id.*, *Bruen* undermines that interpretation. As *Bruen* explained, English courts interpreted the Northampton statute to do nothing more than affirm the common law offense of "going armed to terrify the King's subjects," and therefore, "one's conduct will come within the Act" *only* "where the crime shall appear to be malo animo." 597 U.S. at 43–44 (alteration adopted) (emphasis omitted) (quoting *Sir John Knight's Case*, 3 Mod. 117, 118 (K. B. 1686)). By the 18th century, the Northampton statute "was no obstacle to public carry for self-defense in the decades leading to the founding" because, as one "widely read 1716 treatise[] confirmed," "no wearing of Arms is within the meaning of [the Statute of Northampton], unless it be accompanied with such Circumstances as are apt to terrify the People." *Id.* at 45 (emphasis added) (internal quotation marks and citation omitted). As to the North Carolina law, *Bruen* pointed to *State v. Huntly*, 25. N.C. 418 (1843) (per curiam), where "consistent with the [Northampton] Statute's long-settled interpretation, the North Carolina Supreme Court

27

concluded that the prohibition on firearms in these crowded public spaces was likely constitutional.

Here, the government relies on that same historical evidence to support the constitutionality of laws prohibiting firearms in Times Square and the public transportation system.[7]  Whether these prohibitions are consistent with the

---

acknowledged 'that the carrying of a gun' for a lawful purpose '*per se* constitutes no offence,'" and "[o]nly carrying for a 'wicked purpose' with a 'mischievous result . . . constitute[d a] crime.'"  *Id.* at 51 (quoting *Huntly*, 25 N.C. at 422–23).  It therefore may be that those statutes, just like the Virginia law, did not ban carriage without malintent.  *See Wolford v. Lopez*, 116 F.4th 959, 998 n.12 (9th Cir. 2024) (rejecting the states' reliance on "colonial laws in Virginia and North Carolina that were successors to the Statute of Northampton" because "the Supreme Court has explained that those laws prohibited the carry of firearms only to the 'terror' of the people or for a 'wicked purpose'; lawful carry was permitted.").

Nevertheless, even assuming that *Antonyuk* does not have the better reading of these statutes, we remain confident in *Antonyuk*'s conclusion that we have a well-established tradition of banning firearms in quintessentially crowded places.  The Founding-era Virginia and North Carolina laws evince that lawmakers were sensitive to the potential mayhem gun-wielding may cause in crowded locations, but do not provide clarity into how far they understood they could legislate to mitigate those concerns.  *See Antonyuk*, 120 F.4th at 969 ("Legislatures past and present have not generally legislated to their constitutional limits.").  As we explained *supra*, where, as here, the Founding-era history is inconclusive, we may consider later history.  And, as explained above, there is a host of relevantly similar Reconstruction-era statutes, affirmed by state supreme court decisions during that time period, that more than adequately establish the robustness of the historical tradition.

[7]  In addition to the laws cited in *Antonyuk*, the government has also identified a similar

historical tradition of prohibiting firearms in quintessentially crowded places is similarly "a straightforward inquiry." *Antonyuk*, 120 F.th at 1024.

There is perhaps no public place more quintessentially crowded than Times Square. Extending approximately from 40th to 53rd Street, and from Sixth to Ninth Avenue in Manhattan, *see* N.Y.C. Admin. Code § 10-315, this block at the heart of Manhattan, known as the "Crossroads of the World," teems with "rivers of neon and seas of tourists." Clyde Haberman, *The Crossroads*, N.Y. Times, https://archive.nytimes.com/www.nytimes.com/specials/times-square/ ts-index.html (last visited Aug. 14, 2025). The Nasdaq Exchange and Broadway theaters, as well as hundreds of restaurants and stores are among those that call it home. *See* Times Square Alliance Amicus Br. at 4–5. Over 300,000 people visit Times Square every day. *Id.* at 5. Moreover, Times Square serves as a civic

---

law from Montana, 1903 Mont. Laws 49 (prohibiting firearms in any "other place where persons are assembled for amusement or for education or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering"), as well as two laws from Georgia and Idaho that banned firearms at any "public gathering" without qualification, 1870 Ga. Laws 421 (prohibiting carrying "any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon, to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds"); 1889 Idaho Gen. Laws 23 (prohibiting carrying "any dirk, dirk-knife, sword, sword-cane, pistol, gun or other deadly weapons . . . in any public assembly").

commons where thousands gather to exercise their fundamental democratic and First Amendment rights—to speak, demonstrate, and protest. *Id.* at 10. In short, Times Square is our modern-day, electrified, supersized equivalent of fairs, markets, and town squares of old. We therefore "need not stretch the analogy far," *Antonyuk*, 120 F.4th at 1038, to conclude that Section 265.01-e(2)(t) is entirely consistent with our historical tradition of regulating firearms in quintessentially crowded places in both the "how" and "why."

For similar reasons, we have no trouble holding that Section 265.01-e(2)(n), as it applies to the Subway and Metro-North, is consistent with that tradition. "By any measure, the New York City subway system is America's largest and busiest." *MacWade v. Kelly*, 460 F.3d 260, 264 (2d Cir. 2006). It is "the place where millions of diverse New Yorkers and visitors stand elbow to elbow as they traverse the metropolis." *Id.; see MTA Daily Ridership and Traffic: Beginning 2020*, https://data.ny.gov/Transportation/MTA-Daily-Ridership-and-Traffic-Beginning-2020/sayj-mze2/about_data (last updated August 18, 2025) (showing daily ridership consistently far in excess of 3 million in summer 2025).[8] Similarly, there

---

[8] We take judicial notice of these statistics publicized on the State's website. *See Vill.*

is no dispute that Metro-North trains are often packed with passengers, especially during peak commuting hours. *See MTA Daily Ridership and Traffic: Beginning 2020*, https://data.ny.gov/Transportation/MTA-Daily-Ridership-and-Traffic-Beginning-2020/sayj-mze2/about_data (last updated August 18, 2025) (showing weekday ridership on the Metro-North consistently above 200,000 in summer 2025). What's more, once the familiar command—"stand clear of the closing doors"—sounds and the car doors slam shut, riders are sealed within the slender metal tube until, absent misadventure, they emerge at the next station stop. Firearm prohibitions in subway and train systems are therefore especially akin to those historical laws that specifically singled out *enclosed* crowded spaces, such as ballrooms, as places where prohibiting firearm carriage was appropriate. *See* 1870 Tex. Gen. Laws 63 (enumerating ballrooms in list of places of public assembly where arms are prohibited); 1889 Ariz. Sess. Laws 17 (same); 1890 Okla. Sess. Laws 495 (same); 1903 Mont. Laws 355 (same); 1864–65 N.M. Laws 406 (prohibiting

---

*Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 299 n.7 (2d Cir. 2022) ("A court may take routine judicial notice of documents retrieved from official government websites." (alteration adopted) (internal quotation marks and citation omitted)); *accord Cangemi v. United States*, 13 F.4th 115, 124 n.4 (2d Cir. 2021) (taking judicial notice of statistics on government website).

31

firearms in "balls or fandangos"); New Orleans, L.a., An Ordinance Respecting

Public Balls, art. 1 (Oct. 27, 1817), *reprinted in* General Digest of the Ordinances and

Resolutions of the Corporation of New Orleans 371, 371 (1831) (prohibiting

weapons in ball rooms).

Plaintiffs' focus on a "lack of a distinctly similar historical regulation"

directly addressing firearm carriage on public transportation is misplaced.

Appellant's Reply Br. at 17. There were no mass transit systems at the time of the

Founding, so the lack of historical laws that specifically regulated transit systems

was a natural consequence. Notably, the first railroad in America was not built

until 1827, and the "golden age" of railroads began around the Reconstruction era.

Association of American Railroads, *Chronology of America's Freight Railroads*,

https://www.aar.org/chronology-of-americas-freight-railroads/#! (last visited

Aug. 19, 2025); *see also* Joshua Hochman, Note, *The Second Amendment on Board:*

*Public and Private Historical Traditions of Firearm Regulation*, 133 Yale L.J. 1676, 1685

(2024). Those railroad networks were largely operated by private corporations

throughout the 19th century, and it was not until the 20th century that government

entities began operating their own rail and subway systems.[9]  *See* Hochman, 133 Yale L.J. at 1686, 1708.  Thus, the lack of historical government gun regulations specifically targeting public transport systems is attributable to this "dramatic technological change[] [that] may require a more nuanced approach" under *Bruen*'s analogical method, 597 U.S. at 27, and therefore has little bearing on the constitutionality of our modern-day regulations.  *See Schoenthal v. Raoul*, -- F.4th-- , 2025 WL 2504854, at *1 (7th Cir. Sept. 2, 2025) (concluding that "our nation's historical regulatory traditions" do not foreclose a state from "temporarily disarm[ing] its citizens as they travel in crowded and confined metal tubes unlike anything the Founders envisioned"); *cf. Antonyuk*, 120 F.4th at 1022 (relying on urban public park regulations from 1861 to 1897 because "the rise of public parks as municipal institutions" only began occurring "over the latter half of the 19th century").

---

[9]  These private corporations generally prohibited passengers from carrying guns on their persons.  *See, e.g.*, Rules and Regulations for Running the Trains on the North Pennsylvania Railroad 13 (Philadelphia, 1875).  The district court relied in part on these regulations to conclude that Section 265.01-e(2)(n) was likely constitutional.  *See Frey*, 661 F. Supp. 3d at 205.  Because we find that Section 265.01-e(2)(n) is sufficiently similar to the historical tradition of prohibiting firearms in quintessentially crowded enclosed places, we need not decide whether the district court properly relied on these private yet quasi-public railroad company regulations.

In sum, we conclude that Plaintiffs are unlikely to succeed on their Second Amendment challenges to the CCIA's prohibition on firearm carriage in Times Square, the Subway, or the Metro-North rail system. We therefore affirm the district court's denial of the preliminary injunction with respect to these provisions.

## III.    Open Carry Ban

We turn next to Plaintiffs' challenge to New York's open carry ban, N.Y. Penal Law § 400.00(15).[10] Section 400.00(15) makes "[a]ny violation by any person of any provision of [Section 400.00] a class A misdemeanor." Because Section 400.00(2) only grants licenses for concealed public carry, a license holder that carries openly in public would violate the terms of that license and may thereby be subject to prosecution under Section 400.00(15).

We conclude that, although the district court erred in determining that

---

[10] Plaintiffs alleged that Sections 400.00(15), 265.01, 265.01-b, and 265.03(3), and N.Y.C. Admin. Code § 10-315 together effectively ban the open carry of firearms in New York. The district court found that Plaintiffs lacked standing to seek an injunction against the enforcement of Sections 265.01, 265.01-b, and 265.03(3) because Plaintiffs are valid state concealed carry license holders and therefore cannot face criminal liability under those statutes. *Frey*, 661 F. Supp. 3d at 190. In addition, the district court concluded that Plaintiffs conceded they had no basis to challenge N.Y.C. admin. Code § 10-315. *Id*. at 195–96. Plaintiffs do not challenge those determinations on appeal. Therefore, only Section 400.00(15) is at issue.

Plaintiffs lacked standing to challenge the open carry ban, the denial of the preliminary injunction was proper because Plaintiffs cannot show the requisite likelihood of success on the merits.

### A. Standing

To establish standing, "a plaintiff must show [(1)] that he suffered an injury in fact that is concrete, particularized, and actual or imminent; [(2)] that the injury was likely caused by the defendant; and [(3)] that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). An alleged future injury is sufficiently actual or imminent if it is "certainly impending" or there is "substantial risk" of harm. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013) (original emphasis, internal quotation marks and citation omitted). Thus, a plaintiff bringing a pre-enforcement constitutional challenge must demonstrate "(1) an intention to engage in a course of conduct arguably affected with a constitutional interest; (2) that the intended conduct is proscribed by the challenged law; and (3) that there exists a credible threat of prosecution thereunder." *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023) (internal quotation marks and citation omitted). Here, it is undisputed that the second and third requirements are met: Section 400.00(15) penalizes open

carry, and Plaintiffs face a credible threat of prosecution for open carrying.

The district court determined that Plaintiffs failed to establish standing principally because their statements of their intentions to carry openly were not accompanied by "any description of concrete plans, or indeed even any specification of when" they intended to carry openly and, therefore, did not support a finding of an imminent injury. *Frey*, 661 F. Supp. 3d at 195.

However, as we observed in *Antonyuk*, the Supreme Court has not required plaintiffs bringing pre-enforcement constitutional challenges to aver an intention to violate the law with such particularity. The Supreme Court has recognized, for example, "that plaintiffs who intend to comply with the law solely to avoid prosecution (*i.e.*, who have been deterred) have standing to bring a pre-enforcement challenge." *Antonyuk*, 120 F.4th at 1015 (citing *Holder v. Humanitarian L. Project*, 561 U.S. 1, 15–16 (2010); *Steffel v. Thompson*, 415 U.S. 452, 456 (1974)).

Here, Frey has averred that "[t]he only reason [he] do[es] not exercise the right to open carry in New York City is the fear of arrest, jail and the other criminal and civil penalties that will follow." App'x at 21. Sappe has likewise alleged that he intends to carry his handgun concealed daily for self-defense, that he plans to carry his gun openly on days he is not carrying concealed, and he fears "arrest and

incarceration" for carrying in the City.  *Id.* at 28.  In other words, they "intend to comply with the law solely to avoid prosecution," which is all that they need to aver under *Antonyuk* and the Supreme Court's precedents.  *Antonyuk*, 120 F.4th at 1015; *see, e.g., Holder*, 561 U.S. at 15–16 (finding plaintiffs had standing where they would engage in the proscribed conduct again "if the statute's allegedly unconstitutional bar were lifted").

The City contends that, even if Plaintiffs demonstrated that they suffered an injury in fact, we cannot redress that injury.  We disagree.  The City first argues that even if we enjoin enforcement of Section 400.00(15), which would preclude arresting and prosecuting Plaintiffs for open carry, Section 400.00(2)(f) may still serve as a separate basis for the government to revoke Plaintiffs' licenses.  However, redressability only requires that we can "redress at least some" of the alleged injury.  *Diamond Alt. Energy, LLC v. E.P.A.*, 145 S. Ct. 2121, 2135 (2025) (finding standing where invalidating regulations "would likely redress *at least some* of the [plaintiffs'] monetary injuries" (emphasis added)); *see also Mass. v. E.P.A.*, 549 U.S. 497, 526 (2007) (finding standing where the plaintiff's alleged injury "would be reduced *to some extent* if petitioners received the relief they seek" (emphasis added)); *Elias Bochner, 287 7th Ave. Realty LLC v. City of New York*, 118

F.4th 505, 521 (2d Cir. 2024) ("[T]he law of standing does not require that the relief sought by a plaintiff completely redress the asserted injury.").  Enjoining Section 400.00(15) would at least redress Frey's fear of "arrest, jail and the other criminal [] penalties" and Sappe's fear of "arrest and incarceration" that reasonably deter them from each exercising their alleged constitutional right.  App'x at 21, 28.  The City's additional argument that Frey would nevertheless be unable to carry openly in the City because he does not possess the requisite special permit to carry a firearm in the City at all is unpersuasive for the same reason.  Enjoining Section 400.00(15) would at the very least allow Frey to carry openly outside of the City, which he averred he intended to do.  *See* App'x at 20–21 (listing locations outside of the City and averring that he "intend[ed] to start carrying [his] handgun open and holstered at the above locations").  Plaintiffs therefore "satisf[y] the redressability requirement [because they] show[] that a favorable decision will relieve a discrete injury to [themselves].  [They] need not show that a favorable decision will relieve *every* injury."  *Larson*, 456 U.S. at 243 n.15.

Accordingly, the district court erred in concluding that Plaintiffs lacked standing to challenge the open carry ban.

*B. Merits*

Although Plaintiffs have satisfactorily demonstrated standing, they have not shown a likelihood of success on the merits on their claim that the Second Amendment guarantees them uninhibited choice in their mode of public carry.[11]

*Bruen* alone seriously undermines Plaintiffs' probability of success.  As *Bruen* acknowledged, "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing . . . the manner of carry."  597 U.S. at 38.  The historical evidence demonstrated that "States could lawfully eliminate one kind of public carry—[open carry or] conceal carry—so long as they left open" the other option. *Id.* at 59.  That post-enactment tradition included, *inter alia*, laws from ten states or territories between 1813 and 1859 that prohibited concealed carry of pistols.  *Id.* at 53 n.16 (citing 1813 Ky. Acts § 1, p. 100; 1813 La. Acts p. 172; 1820 Ind. Acts p. 39; 1838 Ark. Rev. Stat. § 13, p. 280; 1838 Va. Acts ch. 101, § 1, p. 76; 1839 Ala. Acts no. 77, § 1; 1837 Ga. Acts §§ 1, 4, p. 90; 1859 Ohio Laws § 1, p. 56; 1821 Tenn. Acts ch. 13, § 1, p. 15; 1835 Terr. of Fla. Laws p. 423).  Furthermore, as *Heller* pointed out,

---

[11] We assume, without deciding, that Plaintiffs have satisfied *Bruen*'s step-one textual requirements.

"the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."  554 U.S. at 626 (collecting cases).  For example, in *State v. Jumel*, the Louisiana Supreme Court held that a statute criminalizing concealed carry "d[id] not infringe the right of the people to keep or bear arms.  It is a measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society."  13 La. Ann. 399, 399–400 (1858) (emphasis omitted).  Those laws and court decisions together evince a strong historical tradition of regulating, and often criminalizing, one manner of public carry, so long as the government does not "altogether prohibit public carry."[12] *Bruen*, 597 U.S. at 54.

---

[12]  That these laws and court cases come after the Founding era does not weaken the established tradition.  As we explained *supra, Antonyuk* and Supreme Court precedents support reliance on 19th-century history in the face of uncertain or silent Founding-era history.  Indeed, *Bruen* itself relied exclusively on these 19th-century sources to conclude there was a "consensus view that States could not altogether prohibit the public carry of 'arms' protected by the Second Amendment or state analogues."  597 U.S. at 55.

To be sure, New York law is the converse of many of these historical laws: it eliminates open carry while permitting concealed carry.[13]  However, the historical analogues need only be "relevantly similar," not a "historical twin," for the challenged regulation to pass constitutional muster.  *Id.* at 29–30 (internal quotation marks and citation omitted).  New York's open carry ban burdens the right to carry to a "similar" degree as these historical laws, *id.*—it "eliminate[s] one kind of public carry" but leaves "open" another option of carry that does not hinder the capacity for self-protection, *id.* at 59.  It does so for the same reasons as those historical analogues—namely, to regulate "a particular mode of bearing arms" that the legislature deems "dangerous to the peace of society."  *Jumel*, 13 La. Ann. at 400 (emphasis omitted); *see also State v. Chandler*, 5 La. Ann. 489, 490 (1850) (holding that a law banning concealed carry was "absolutely necessary to counteract a vicious state of society . . . and to prevent bloodshed and assassinations committed upon unsuspecting persons"); *State v. Reid*, 1 Ala. 612,

---

[13]  We note that there may also have been restrictions on open carry that proliferated during the Reconstruction era and beyond.  *See Baird v. Bonta*, 709 F. Supp. 3d 1091, 1136 (E.D. Cal. 2023) ("From 1860 to 1900, 24 states enacted anti-open carry laws, and 9 states did so in the early 1900s (a few states enacted laws in both centuries)," and "[s]tate courts generally upheld these laws." (internal quotation marks and citation omitted)).  The government did not rely on these laws at this preliminary injunction stage, and we therefore do not consider them in our likelihood of success determination.

617 (1840) (holding that "a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution").  New York's determination that open carry is the more dangerous mode of public carry today is well within its legislative prerogative to address "issues we face today [that] are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction."  *Antonyuk*, 120 F.4th at 970; *see* State Br. at 32 (explaining that New York prohibits open carry "largely to prevent disruption of the peace and fear among citizens, particularly in crowded modern urban settings").

In sum, we conclude that Plaintiffs are unlikely to successfully challenge the constitutionality of the State's open carry ban, and we therefore affirm the district court's denial of the preliminary injunction as to the open carry ban.

## IV.   New York City Special Permit Requirement

Finally, we address Plaintiffs' challenge to the City's special permit requirement.  As noted above, Section 400.00(6) states that "[a] license to carry or

possess a pistol or revolver . . . not otherwise limited as to place or time of possession, shall be effective throughout the state, except that the same shall not be valid within the city of New York unless a special permit granting validity is issued by the police commissioner of that city."  N.Y. Penal Law § 400.00(6).

As a threshold matter, on a preliminary injunction motion, the plaintiff bears the burden of "mak[ing] at least *some* showing to overcome t[he] presumptive constitutionality" of a shall-issue licensing regime.  *Giambalvo v. Suffolk Cnty.*, -- F.4th--, 2025 WL 2627368, at *9 (2d Cir. Sept. 12, 2025) (emphasis in original).  In *Bruen*, the Supreme Court clarified that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes."  597 U.S. at 38 n.9.  Those regimes are constitutionally sound because they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens."  *Id.* (internal quotation marks and citation omitted); *see also id.* at 79–80 (Kavanaugh, J., concurring) ("[T]he Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense.").  We have interpreted those statements, along with the Court's reassurances in *Heller* and *McDonald* that there exists certain "presumptively lawful regulatory measures," *Heller*, 554 U.S.

at 627 n.26; *see McDonald*, 561 U.S. at 786, to mean that shall-issue licensing regimes are "presumptively constitutional," *Giambalvo*, 2025 WL 2627368, at *9; *see also Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222 (4th Cir. 2024) (en banc) ("[N]on-discretionary 'shall-issue' licensing laws are presumptively constitutional."), *cert. denied*, 145 S. Ct. 1049 (2025). Therefore, as part of his burden of establishing "a clear or substantial likelihood of success on the merits," *Leavitt*, 524 F.3d at 414 (internal quotation marks and citations omitted), a plaintiff must initially surmount this presumption by articulating what particular aspects of the challenged licensing regime are unconstitutional and why, *see Giambalvo*, 2025 WL 2627368, at *9; *see, e.g.*, *Bruen*, 597 U.S. at 38 n.9 (suggesting the possibility of constitutional challenges to shall-issue licensing regimes where the plaintiff can allege that the scheme is being "put toward abusive ends," or involves, for example, "lengthy wait times in processing license applications" or "exorbitant fees" that effectively "deny ordinary citizens their right to public carry"); *Rahimi*, 602 U.S. at 692 ("Why and how the regulation burdens the right are central to this inquiry.").

Here, Plaintiffs do not challenge any particular portion of the City's special permit requirement. Indeed, Plaintiffs fail to allege, for instance, that the permit

is not granted on a shall-issue basis once an applicant satisfies the necessary requirements, that the process is administered inappropriately, or that the process is too lengthy or costly.[14]  The only potential constitutional harm Plaintiffs suggest they have suffered is that, having already been issued a license to carry in other parts of the State, they must now endure another application process to carry within the City limits.[15]  We are not persuaded that such a theory can overcome the presumption of constitutionality.  Where, as here, a lawsuit asserts a facial constitutional challenge, the plaintiff must "establish that no set of circumstances exists under which the Act would be valid."  *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) (When a plaintiff pursues a "pre-

_____

[14]  Sappe avers that at some unspecified point in time, he applied for, and was denied, a special permit to carry in New York City.  He does not provide the reason for the denial nor does he challenge the denial on appeal.

[15]  To the extent Plaintiffs separately argue that the City's special permit requirement is unconstitutional merely because it is administered at the municipal, rather than state, level, they have failed to persuasively explain how that distinction has any bearing on the constitutional analysis.  As we observed in *Antonyuk*, "many licensing schemes originated in the cities of the post-Civil War period" as the result of "changes in American society in the nineteenth century, including urbanization and concomitant shifts in norms of governance."  120 F.4th at 992; *see Frey*, 661 F. Supp. 3d at 197 (collecting numerous city licensing ordinances from the 19th century).  Plaintiffs offer no principled reason for us to question the presumptive constitutionality of municipal-level licensing regimes.

enforcement appeal before they have been charged with any violation of law, it constitutes a facial, rather than as-applied challenge." (internal quotation marks omitted)).  Plaintiffs have not articulated *any* burden the additional City permit requirement creates that is not *de minimis*.  *Cf. Heller v. District of Columbia.*, 801 F.3d 264, 274 (D.C. Cir. 2015) ("Because the burden of the basic registration requirement as applied to long guns is de minimis, it does not implicate the [S]econd [A]mendment right.").  We therefore cannot rule out that, at least "in some of its applications," *Rahimi*, 602 U.S. at 693, the additional City permit requirement merely imposes a brief delay on an individual's ability to carry concealed firearms within the City.  That does not amount to constitutional harm. *See Giambalvo*, 2025 WL 2627368, at *12 ("[A] short delay does not violate an individual's Second Amendment rights"); *see also Maryland Shall Issue*, 116 F.4th at 227 (rejecting an argument that "any temporary delay" constitutes an infringement of Second Amendment rights).

In any case, even assuming *arguendo* that Plaintiffs' theory of harm is sufficient to rebut the presumption of constitutionality and satisfy the step-one plain-text requirements, we have a strong historical tradition of allowing localities to implement their own, often stricter, regulatory measures within their

jurisdictions.  "[P]erhaps no characteristic of gun control in the United States is as 'longstanding' as the stricter regulation of guns in cities than in rural areas." Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82, 85 (2013).  For example, beginning in the Antebellum era, states and territories gave newly incorporated towns the power to regulate the carriage of guns or gunpowder within those towns.  *See, e.g.*, 1825 Tenn. Priv. Acts 306–07 (incorporating towns of Winchester and Reynoldsburgh and empowering them to "restrain and punish . . . shooting and carrying guns, and enact penalties and enforce the same"); 1836 Conn. Pub. Acts 104–05 ("[T]he court of common council . . . shall have power . . . to make by-laws  . . . relative to prohibiting and regulating the bringing in, and conveying out, or storing of gun-powder in said cities . . . ."); 1838 Fla. Laws 70 ("Be it further enacted, That the common council of said city shall have power and authority to prevent and remove nuisances  . . . to provide safe storage of gun-powder . . . ."); *see also* Blocher, 123 Yale L.J. at 116 & n.177.  From the Reconstruction era onward, many states and territories have more precisely delineated the gun laws applicable in towns and cities.  Some, like New York, gave municipalities the specific power to issue their own gun permits.  *See, e.g.*, 1891 N.Y. Laws 127, 176 (giving the city of Buffalo the power to "issue to any person a permit in writing to carry a pistol

or pistols in the city"); Ordinances of the Mayor, Aldermen and Commonalty of the City of New York (1881) (requiring residents and non-residents to receive a permit from the superintendent of the police to carry a pistol); Ordinance to Regulate the Carrying of Pistols in Brooklyn (1880) (similar); *see also* 1880 City of Kansas Ordinances 264 ("No person shall, in this city, wear under his clothes or concealed about his person, any pistol or revolver, except by special permission from the Mayor"); 1896 City of Milwaukee Gen. Ordinances 692–93 (requiring a written permit from the city's chief of police in order to carry concealed weapons within the city). Others "flatly prohibited the carrying of nearly any weapon within towns, cities, villages, and settlements." Blocher, 123 Yale L.J. at 117 & n.195; *see* 1853 N.M. Laws 67 ("That each and every person is prohibited from carrying short arms . . . about their persons concealed, within the settlements."); 1871 Tex. Gen. Laws 25 (forbidding, with some exceptions, any person but a law officer from carrying a "pistol" in a city "unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing"); 1876 Wyo. Sess. Laws 352 (prohibiting residents and non-residents from bearing "concealed or openly, any fire arm or other deadly weapon, within the limits of any city, town or village"); 1881 Kansas Sess. Laws 92

("The [city] council shall prohibit and punish the carrying of firearms . . . concealed or otherwise."); 1888 Idaho Sess. Laws 23 ("[I]t is unlawful for any person, except [certain officers], to carry, exhibit, or flourish any . . . pistol, gun or other deadly weapons, within the limits or confines of any city, town or village or in any public assembly of Idaho Territory."); 1901 Ariz. Sess. Laws 1251–52 ("If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in saddlebags, any pistol . . . he shall be punished by a fine . . . and, in addition thereto, shall forfeit to the county in which he is convicted the weapon or weapons so carried.").  These laws establish that "city people have long had a different relationship with guns than their rural neighbors, a relationship generally marked by greater concern about interpersonal violence."  *Antonyuk*, 120 F.4th at 992 (citing Blocher, 123 Yale L. J. at 112–21).  In addition, they demonstrate a history of addressing this uniquely urban concern in an equivalent or even more stringent manner than the City's special permit requirement today.

Plaintiffs' principal quarrel is not over whether these laws are sufficiently analogous to the City's special permit requirement.  Again, it is with the fact that the government "proffer[s] only 'late-nineteenth-century' regulations to justify

§ 400.00(6)'s restriction." Reply Br. at 15. However, as discussed *supra*, Supreme Court precedents and this Court's opinion in *Antonyuk* confirm that we can use 19th century evidence to discern our American tradition—at least where it does not conflict with Founding-era evidence. Plaintiffs have pointed to no such conflicting evidence, and we are aware of none.

Accordingly, we affirm the district court's denial of the preliminary injunction with respect to the City's special permit requirement.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the order of the district court and **REMAND** for further proceedings consistent with this opinion.[16]

---

[16] Just as in *Antonyuk*, we emphasize that our affirmance here of the denial of the preliminary injunction motion "does not determine the ultimate constitutionality of the challenged [] provisions, which await further briefing, discovery, and historical analysis, both in this case as it proceeds and perhaps in other cases." 120 F.4th at 1048 n.126.

50